January 9, 2025

**VIA ECF**

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United Courthouse
40 Foley Square
New York, New York 10007

Re: *United States v. Oren Alexander*, No. 24-cr-00676 (VEC)

Dear Judge Caproni:

We represent Oren Alexander ("Oren") in the above matter. Oren submits this letter in opposition to the government's letter request for pretrial detention, DE 4, and in response to the government's oral motion for detention at his initial appearance.

This is an unprecedented and legally insufficient prosecution for federal criminal sex trafficking that seeks to convert years-old, and only recently alleged, claims of social context sexual misconduct into a "commercial sex act" for which a defendant "benefitted financially" or received "anything of value." *See* 18 U.S.C. § 1591.[1] The conduct as alleged by the government amounts to state-level social-

---

[1] "Whoever knowingly—
   (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
   (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the persons to engage in a commercial sex act."

KLUGH WILSON LLC
40 NW Third Street, Penthouse One
Miami, Florida 33128

context or date rape accusations, not to federal sex trafficking—and the defense investigation has identified witnesses and evidence that refute the government's characterization of the facts relevant to the Superseding Indictment. But even if taken at face value, there are severe statutory problems, federalism problems, interstate nexus problems, and even identity problems[2] with this case. Such issues with the Superseding Indictment and prosecution theories are directly relevant to this Court's consideration of the detention hearing factors.

The Supreme Court has made clear that there is a constitutional due process interest in pretrial liberty. *See, e.g., Schall v. Martin*, 467 U.S. 253, 297 n.25 (1984) (recognizing that any "tenable concept of due process" must give "weight to the accused's interest in pretrial liberty") (citation omitted); *United States v. Salerno,* 481 U.S. 739 (1987) (recognizing liberty interests and only upholding facial constitutionality of the Bail Reform Act based on its extensive procedural safeguards). The bond statute, 18 U.S.C. § 3142, imposes a least restrictive means test resembling strict scrutiny for infringing on pretrial liberty; defendants "shall" be released pretrial "subject to the least restrictive" "condition or combination of conditions" that will "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).[3] In

---

[2] FBI Special Agent Audra Hampsch, who testified at Alon Alexander's hearing, when provided a photograph of one of the twins, could not identify which brother it was. Moreover, the United States Marshals already mistakenly transported Oren, prior to a court order authorizing removal, causing him to not appear for a scheduled hearing in the Southern District of Florida. As the record stands now, there is a greater risk of non-appearance when he is in custody than when he is not.

[3] "Section 3142 speaks of conditions that will 'reasonably' assure appearance, not guarantee it." *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996). *See also United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) (finding district court erred in interpreting the "reasonably assure" standard as a requirement that release conditions "guarantee" community safety and the defendant's appearance).

determining whether sufficient conditions exist, courts are instructed to consider "the nature and the circumstances of the offense charged"; "the weight of the evidence against the person"; "the history and characteristics of the person"; and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." § 3142(g). The presumption of innocence remains firmly intact. § 3142(j).

These factors apply also to presumption cases; indeed, presumption cases like this one, based on statute charged, are perhaps best viewed as affecting the analysis on the "nature of the offense" factor, which still must be weighed against the other factors. The defense bears only a "light burden of production" to rebut the presumption, *United States v. Wilks*, 15 F.4th 842, 846 (7th Cir. 2021); the defendant must produce only "some credible evidence" in rebuttal, *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985), and "evidence of economic and social stability, coupled with absence of any relevant criminal record," has been found sufficient to rebut the presumption. *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

**I. The Nature of the Offense**

The government's Superseding Indictment charges a single substantive sex trafficking count (Count 3) against Oren, and a § 1594 conspiracy count (Count 1). Both counts are legally deficient.

The substantive sex trafficking count, as described by the government, does not adequately allege a commercial sex act nor does it adequately allege "anything of value" that Oren received in exchange for this commercial sex act as required by statute. Nowhere in the government's lengthy detention letter does it identify any

proceeds from sex trafficking. Notably, though the Superseding Indictment includes a forfeiture count, that count deals with only instrumentalities. The forfeiture section of the Superseding Indictment does not seek *any* proceeds of any commercial sex act, and it does not seek any substitute property equivalent to non-financial proceeds. The government's theory of the case as disclosed in its detention letter and in open court is that if someone schedules a date; pays for that date's Uber ride from New Jersey to New York; and any non-consensual sex subsequently occurs, that is sufficient to seek an indictment on charges of federal sex trafficking. The government cannot transform a date where one party purchased transportation or drinks for another party into federal sex trafficking violation simply by alleging that non-consensual sex occurred.

The "sex trafficking" alleged here is materially different from that in other sex trafficking cases. In *United States v. Jeffries*, No. 24-cr-423 (E.D.N.Y. 2024), for example, the defendants are accused of "operating a prostitution enterprise," which involved "employ[ing] a referral system and interview process that did not inform men of the details of the sex events"; "caus[ing] men to believe that attending the Sex Events could yield modeling opportunities with Abercrombie or otherwise benefit their careers"; "caus[ing] men to believe that not complying with requests for certain acts during the Sex Events could harm their careers"; and recruiting victims who "had previously worked at Abercrombie stores or had modeled for Abercrombie."[4] In *United States v. Raniere*, 55 F.4th 354, 358 (S.D.N.Y. 2022), the victims, referred to as "'slaves[,]' were expected to provide their 'masters' with services called 'acts of

---

[4] *See* Former CEO of Abercrombie & Fitch and Two Other Individuals Charged with Sex Trafficking and Interstate Prostitution, https://www.justice.gov/usao-edny/pr/former-ceo-abercrombie-fitch-and-two-other-individuals-charged-sex-trafficking-and

care' which included buying them groceries, editing videos, cleaning, and organizing." *Id*. "Each 'slave' was expected to provide about an hour of work per week for her 'master' as her 'normal contribution.' In some cases, 'masters' assigned their 'slaves' to engage in sexual conduct with Raniere and implied that collateral might be released if the slave refused." *Id*. To join, the victims were required to provide collateral, which "took many forms, including sexually explicit photographs and videos of themselves, rights to financial assets, and letters containing damaging accusations–whether true or untrue–about family and friends." *Id*. "'Slaves' were also required to be branded with a symbol that, unbeknownst to them, consisted of Rainiere's initials." *Id*.

The conspiracy count suffers similar deficiencies. 18 U.S.C. § 1594 punishes anyone who "conspires"—that is, purposefully enters into an agreement to do something unlawful—"to violate section 1591." At the detention hearing for Alon Alexander in the Southern District of Florida, the government claimed the brothers had an "explicit agreement . . . to orgy." Transcript of Alon Alexander Detention Hearing, December 30, 2024, at 88. That is not an agreement to do something unlawful.

The Superseding Indictment's conspiracy section is bare-bones and scattershot. It does not allege a manner and means; it does not identify specific roles by members of the conspiracy; and it does not identify any overt acts. Moreover, and further contributing to the identity problems in this case, the Superseding Indictment frequently refers not to individuals but to "the Alexander Brothers" as a collective unit and says they "sometimes" engaged in certain acts without specifying who allegedly did what. Just as social interaction is not a commercial act, kinship does not render conduct a conspiracy.

The nature of the offense, as alleged here and as detailed by the government in open court, is plainly not what Congress envisioned when it enacted § 1591, or when it included in the bond statute a presumption for such cases. The nature of the offense as alleged here favors Oren, because there is substantial doubt as to the legal sufficiency of the government's case. Congress has not enacted a federal date rape statute, and the federal sex trafficking statute does not reach the state conduct alleged here. The government is overreaching, and attempting to twist the sex trafficking statute into something it is not. Facilitating a woman's travel to a social event is not federal sex trafficking.

Finally, the nature of the offense is such that it will involve voluminous discovery, including communications that date back years, and communications that the defense might have to subpoena because the government has not conducted a sufficiently thorough investigation. If the defendants are incarcerated, that will pose substantial roadblocks to preparing the defense and to reviewing that voluminous discovery. That, too, is a factor that must be considered in conducting the constitutional balancing test imposed by the Bail Reform Act, as it implicates another constitutional right: the defendant's Sixth Amendment right to counsel. Rape cases are often described as "he said, she said" cases—and in an adversarial system, the "he said" aspect of that adage cannot be overlooked. In order to prepare to defend against such allegations, communication is essential. And incarceration poses severe hurdles to the client-attorney relationship—hurdles that the Bail Reform Act makes clear must only be imposed in the most limited of circumstances. This case is going to involve massive discovery and a substantial defense investigation. If Oren is detained as a man who is innocent and who is presumed innocent by law, he will be waiting a long time for his day in court.

Sex trafficking allegations do not preclude this Court from granting bail; indeed, courts in this Circuit have previously granted bail to sex trafficking defendants. In *Jeffries*, No. 24-cr-423 (EDNY 2024), all three of the defendants–including Matthew Smith, a citizen of the United Kingdom—were released pending trial. In *United States v. Fox*, 602 F. Supp. 3d 434 (W.D.N.Y. 2022), the defendant was charged with sex trafficking and other drug and firearms charges, including an 18 U.S.C. § 924(c) count. The government proffered that its evidence would include testimony from two victims that the defendant "would leverage the victims' addiction to get them to engage in extreme sexual acts, to include binding the women to his bed and other furniture so that he could engage in sex with them, anally raping them, shocking the women in their vaginas using a dildo capable of delivering an electric shock, and restraining the women to a large 'X' type structure." *Id*. at 440. The court found that pretrial release was appropriate, given the strict conditions of bond proposed. *Id*. at 443-44. The Second Circuit affirmed. *United States v. Fox*, 2022 WL 2564600 (2d Cir. July 8, 2022).

**II. The Weight of the Evidence**

The government, throughout its letter to the Court, repeatedly proffers what the "evidence demonstrates." But at two detention hearings in this case, the government has failed to put on any evidence; indeed, the government has gone out of its way to make sure there is no evidence in what is supposed to be a "full-blown adversary hearing" as contemplated by the Bail Reform Act. *Salerno*, 481 U.S. at 750. A full-blown adversary hearing is only possible if the defense is provided with meaningful exculpatory and *Jencks* evidence, and if the testifying agent at the detention hearing is sufficiently involved in the case. *See, e.g. United States v. Kelly*, No. 09-6047-Rosenbaum, 2009 WL 10698204, at *1 (S.D. Fla. Feb. 9, 2009) (now-Eleventh

Circuit Judge Rosenbaum ordering government to provide exculpatory evidence and *Jencks* material for pretrial detention hearing). The government to this day has failed to provide the *Jencks* material for Agent Atwood, who testified at Tal Alexander's hearing and whose testimony Oren has adopted for his hearing. And for Alon Alexander's hearing, the government chose to bring a witness who was not even familiar with the Superseding Indictment. Transcript of Dec. 30th Hearing at 26–27. Further, the government has refused to provide to the defense with ROIs of witness statements whose testimony it has supposedly relied upon in its proffers. *See, e.g., United States v. Cooper*, 2008 WL 2331051, at *3–*4 (D. Md. June 8, 2008) (where government's sole live witness was not present when the defendant's confession allegedly occurred and had no involvement in the investigation until three months after the relevant confrontation, the court was "unable to assess the credibility of the police officers who claim that they heard the defendant make a surprising, detailed confession" and thus failed to present "weighty evidence in support of a motion to detain").

The government's case, as described in its letter and in open court, rests at this point on hearsay testimony of accusers. The government's case is based on years-old recollections of events that often occurred when the accusers were consuming substances. The government's case is thus weakened by: (1) the problems with memory and recollection (particularly important here due to the identity issues; the government *cannot* substitute one Alexander brother for another consistent with due process); (2) the power of suggestion by plaintiffs' lawsuits and media reports thereof; and (3) the lack of corroborating evidence. Record evidence also suggests a failure to adequately investigate on the part of the government. The government's witness at Tal Alexander's hearing, Agent Atwood, admitted that they had not imaged

the victims' phones but had instead relied only upon the messages that they were shown by the accusers.[5] This is certainly relevant to victim credibility under *Brady* and *Giglio* insofar as it relates to weight of the evidence.

The government asserts that there are "many more victims." But this is federal court; it is insufficient for the government simply to assert that it has "many more victims." The Superseding Indictment does not make reference to "many more victims," even in the conspiracy count.

The government in its letter also inappropriately relies on defamatory juvenile allegations of "gang rape in high school" that have no place in this Superseding Indictment and are ultimately inadmissible under Fed. R. Evid. 404(b). Uncharged juvenile allegations are not an appropriate basis for detention, and this case is no exception to that; a police report of the event the government refers to shows no crime was committed, and in fact that is why there was a fake blog about it that resulted in an injunction. Police determined that no offense was committed; no one was charged; and no one sought to pursue any charges. A decades-old nolle prossed charge in a pretrial services report would not be given much, if any, weight at a detention hearing, and the juvenile allegations here are far outside the scope of the Superseding Indictment and not appropriately raised by the government.

Meanwhile, the government's statement that Oren "boasted at school" about gang rape supplies the worst form of rampant speculation about juvenile talk. The government's assertion that a reference to riding a "choo-choo train" in a yearbook is somehow indicative of gang rape reveals the weakness of its case. That obviously

---

[5] At Tal Alexander's hearing, FBI Special Agent Justine Atwood, testified that she had not imaged accusers' phones even where these purported victims were known to have text messages with one or more of the brothers after an alleged rape. (Tal, 12/19) Tr. 24:7-13.

was not a comment about illegal activity; even accepting the sexual connotation given by the government, what results would be a characteristic teenage boy reference to consensual sex, a fixation in the minds of many teenage boys. The government's reliance on this teenage innuendo here displays the weaknesses of its case and the absence of corroborating evidence.

The government also has described at the other brothers' detention hearings a "fairly consistent MO and pattern," but the only *consistent* pattern alleged is social behavior, not unlawful in the least. The variable and vague nature of the allegations, particularly as to the conspiracy count where the government made little if any effort to distinguish between the three brothers. Further, the government's proffer reveals internal inconsistencies that make the conspiracy count unreliable.

As for the commercial sex act element, the government proffers allegations of the defendants "lur[ing] the victims" and "buy[ing] flights," referencing facially non-criminal activity. To the extent that the government argues the defendants in some way portrayed themselves as appealing dates who would throw appealing parties, that certainly would not establish a federal sex trafficking conspiracy. From the government's proffer the government alleges women chose to attend on the understanding that they were going to party with the Alexander brothers—whom they met on dating apps or social media. There is no allegation that such social meetings would be equivalent to the uncharged situation of women lured under false promises of employment. The government also misuses the term "procuring" to describe conduct that would be consistent with scheduling a date and entirely inconsistent with federal sex trafficking. The allegation itself is social—not commercial—activity.

The government also has accused the defendants of providing alcohol laced with drugs to paralyze or incapacitate the women, but it does not have evidence to

support those accusations. In the only text messages the government relies upon where GHB was mentioned, it was not any of the defendants but rather a third party that referenced GHB in planning a trip to Tulum. More significantly, the agent who testified at Alon's detention hearing could not identify any evidence of anybody using drugs or being sexually assaulted in Tulum.

### III. The History and Characteristics of the Defendant

Oren Alexander has strong ties to the Miami community and no criminal record. He is not a serious risk of flight and there are ample conditions that exist to assure his appearance. The Supreme Court has distinguished between an opportunity and an inclination to flee, and Oren has absolutely no inclination to flee; nor can the government point to any. He is committed to fighting these charges and his sole focus is on clearing his name. He knows that fleeing would be the most damning course of action he could take, and he has no intention of shying from these charges as he maintains his innocence. Despite learning of the federal investigation long ago, Oren chose to stay here rather than to flee. Indeed, he traveled to Brazil with his then-pregnant wife last fall for a "baby moon" and did not, as the government suggests he might do, choose to start a new life there.

Oren has strong ties to his community. He attended high school in Miami and college in Colorado. He graduated in three years from college, and arrived in New York in 2008, where he got his start in real estate with rentals on Craigslist. He built a successful business from the ground up, and as he has become successful he has given back to his community through philanthropic events.

Oren also has strong family ties in the United States that weigh against a finding that he is a serious risk of flight, as well as against a finding that there are no

KLUGH WILSON LLC
40 NW Third Street, Penthouse One
Miami, Florida 33128

11

conditions to assure his appearance in Court. His wife just gave birth to their first baby on Christmas Day—a milestone in his life that he could not attend due to his incarceration. He missed out on his son's birth and that can never be returned to him. He has suffered immensely from this loss, and continues to suffer daily for all the moments he is missing with his family. He certainly does not want to miss out on any other life events, and he understands that fleeing would cause precisely that. The baby does not have a passport, and he and his wife will agree as a condition of his bond to not obtain one for the baby during the pendency of this case, as well as agree to any other conditions this Court sets to assure his appearance. Oren understands the gravity of the charges and that makes him want to maximize every minute with his young family.

The government has focused on Oren's wife's ties to Brazil, but the reality is that his wife left Brazil 15 years ago and, in her words, has no significant connections there or reason to ever return. She became a legal permanent resident of the United States *before* she was married to Oren, and independently from him. She has made great sacrifice to have the privilege of living in this country and she has no intention of throwing that away. Moreover, it is not feasible for the government to suggest Oren could—or would want to—just start over in Brazil. He does not speak Portuguese, and there are strict residency requirements in Brazil. Moreover, extradition from Brazil is a well-established and straightforward process. *See United States v. Utsick*, 44 F.4th 1325 (11th Cir. 2022). Prior to these charges, as the pretrial services report reveals, Oren did travel, but virtually all of the travel mentioned in the pretrial services report was trips with his wife. This is not indicative of a serious risk of flight but rather helps to illustrate his strong family ties.

In addition to his family ties, Oren is involved in philanthropic and religious events in the Miami community. To the extent that the government suggests his faith makes him a flight risk, the government is mistaken. Oren is a United States Citizen, not an Israeli citizen. And as of January 1, 2025, the Israeli government has imposed additional strict requirements for any non-citizen, like Oren, to enter Israel. *See* https://il.usembassy.gov/message-for-u-s-citizens-mandatory-israeli-electronic-travel-authorization-program/; https://etaisrael.com/. The government has suggested that extradition is a concern, but Oren is willing to agree to waive extradition from anywhere as a condition in his bond.

The government suggests that Oren is a risk of flight based on his real estate portfolio, but the reality is that Oren's status in the real estate market reduces the risk of flight. Oren is widely recognizable, especially given the publicity this case has received. It will be virtually impossible to start over anywhere else; indeed, the allegations in this case have destroyed his business. He has nowhere to go and he has no intention of going anywhere.

Oren has been married for nearly two years and there are no allegations of sexual misconduct against any of the brothers in the last several years, much less any evidence of it. If he flees, life would be permanently ruined; his family's life would be permanently ruined; his children's life would be permanently ruined; and everyone near and dear to him would be prosecuted. He is willing to surrender to any conditions that this Court deems reasonable and he asks this Court to fashion a reasonable bond.

Respectfully submitted,

**KLUGH WILSON LLC**

BY: /s/ Richard C. Klugh
Richard C. Klugh
Jenny Wilson
40 NW Third St. PH 1
Miami, Florida 33128
Tel: 305-536-1191
Email: jw.klughlaw@gmail.com