UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.                                                  24-00676-VEC

ALON ALEXANDER,
OREN ALEXANDER, and
TAL ALEXANDER,

     Defendants.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR BILL OF PARTICULARS

     Oren Alexander, Alon Alexander, and Tal Alexander, through counsel and pursuant to Fed. R. Crim. P. 7(f), move for a bill of particulars. Defendants state the following in support of this motion:

     The bill of particulars has been described as "the one method open to a defendant in a criminal case to secure the details of the charge against him." 1 Wright, Federal Practice and Procedure, Criminal 2d, § 129. The use of a bill of particulars to inform a defendant of just what facts, assertions, and occasions he must be prepared to meet is "entirely consonant with the growing realization [even 60 years ago] that disclosure, rather than suppression of relevant materials, ordinarily promotes the proper administration of criminal justice." *Dennis v. United States*, 384 U.S. 855, 970 (1966). The bill of particulars is not part of the indictment, but "merely amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial." *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996).

     The Supreme Court has "identified two constitutional requirements for an indictment:

'first, [it must] contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which me must defend, and, second [it must] enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). From a practical standpoint, the two requirements are closely related in the sense that any indictment failing to meaningfully inform the defendant (the first requirement) would likely fail to satisfy the second (permitting a double jeopardy bar or claim of estoppel). Perhaps for that reason, inquiries into the sufficiency of an indictment almost inevitably focus on the first requirement, *i.e.*, on whether the indictment (a) sets forth the elements of the offense, and (b) fairly informs the defendant of the charge against which he must defend. *Russell v. United States*, 369 U.S. 765-72 (1962). *See also Bousley v. United States*, 523 U.S. 614, 618 (1998) ("[T]he first and most universally recognized requirement of due process" is "real notice of the true nature of the charge against [the defendant].") (citation and internal quotation marks omitted). Lack of notice and specificity in an indictment allows the government to freely shift its theory of prosecution on any whim, forcing defendants "to go to trial with the chief issue undefined" and thus making them vulnerable to unfair and unconstitutional surprise. *Russell*, 369 U.S. at 766.

These constitutional requirements have been codified in Rule 7(c)(1) of the Federal Rules of Criminal Procedure, which states that an "indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Where critical facts are missing, Rule 7(f) authorizes the use of bills of particulars to fill the gaps. Rule 7(f) affords the district court broad discretion to order the government to file a bill of particulars when an indictment fails to adequately inform and notify the defendant of the full universe of charges

against him.

The rule was amended in 1966 "to encourage a more liberal attitude by the courts toward bills of particulars[.]" Fed. R. Crim. P. 7. Advisory Committee's Note. The Committee directed judges and lawyers to a 1954 decision from the Western District of Missouri, describing that judge's analysis as a "wise use of the discretion" judges have in ordering a bill of particulars. *Id.* (citing *United States v. Smith*, 16 F.R.D. 372 (W.D. Mo. 1954)). In that case, the court emphasized that "there is no discovery means in a criminal cases, such as provided by the civil rules for civil cases, and . . . the only means to open to a defendant . . . for the securing of the details of the charge against him is that afforded by Rule 7(f)[.]" *Smith*, 16 F.R.D. at 375. The court went on to hold that although bills of particulars "are not intended to advise a party of his adversary's evidence or theory, they will be required, *even if that is the effect*, in cases where justice necessitates it." *Id.* (quotation marks omitted, emphasis added).

In the instant case "justice necessitates" a bill of particulars given the impossibility of reliably mounting a defense to the vague charges outlined in the indictment, especially as to the conspiracy count. The Indictment fails to adequately put the defendants on notice of what they are accused of doing and to whom; notably, the government has declined to identify *any* of the subjects of the charges in the Indictment or to say how many the conspiracy count comprises. Nor does the Indictment allege any specific overt acts in furtherance of the conspiracy except to identify the subjects of the substantive counts as part of the charged conspiracy (though the government suggests in Count 1 that it views the conspiracy as including other allegations, further necessitating a bill of particulars). *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2nd Cir. 1987) (finding district court erred in failing to compel the government to reveal crucial information: the dates of the fake burglaries and the identities of three fraudulent documents);

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) (district court abused its discretion by denying a bill of particulars identifying at least the victims; noting that bill of particulars principles must be applied "with some care" when the prosecution has "wide latitude" to "frame a charge that a defendant has conspired to promote the affairs of an "enterprise" through a "pattern of racketeering activity" comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope").  With respect to the conspiracy count, the indictment fails to identify when the unlawful agreement was made; where it was made; who was part of the conspiracy (though the indictment makes vague reference to "others"); and what specifically the *agreement* entailed.[1]

A bill of particulars "is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge."  *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998).  *See also United States v. Mobile Materials, Inc.*, 871 F.2d 902, 908 (10th Cir. 1989), *cert. denied*, 493 U.S. 1043 (1990) (*quoting Glasser v. United States*, 315 U.S. 60, 66 (1942)) (when an indictment alleging conspiracy merely states a common intent without identifying "the particulars of time, place, circumstances, causes, etc., in stating the manner and means of effecting the object of the conspiracy . . . a bill of particulars may be sought.").

And this is no ordinary conspiracy count.  A thorough review of the case law indicates that there has never before been a sex trafficking conspiracy prosecution of this nature—a non-prostitution, nonprofit sex trafficking conspiracy involving disparate and largely unspecified incidents and circumstances.  Nor has there ever been a date rape conspiracy charged under

---

[1] Illustrating the indispensable need for a bill of particulars is the random kitchen-sink of conspiracy allegations—ranging from psychedelic mushrooms to musical performances and including references to events over which the government has no apparent basis for jurisdiction.

federal sex trafficking theories, nor an allegation that inviting someone on a date constitutes enticement.  The crux of the government's allegations is that brothers engaged in social activity together; those allegations do not say when or how any unlawful agreement was allegedly formed but rather suggest through inflammatory and vague accusations untethered to the statutory text that there was some kind of genetic proclivity to take advantage of women in social environments.  It is the most unusual and strange application of 18 U.S.C. § 1591, et seq., ever charged—as evidenced by the extent to which it has captured the imagination of the media due to the incredible oddity of the claims. These claims amount to allegations that single men who like to socialize and date women—and who have in some isolated and disconnected instances been accused of sexual misconduct—are somehow engaged in a sex trafficking conspiracy simply because they are related and run in the same social circles.  There is no ongoing relationship with any sexual partner alleged; no exchange, whether financial or otherwise, for sex; nor any other comparator to the paradigm sex trafficking concept that the statute was intended to address. This makes it essential that the government state with greater specificity the components of its allegations of conspiracy and sex trafficking.

Therefore, the defendants request a bill of the following particulars:

**A.    General allegations as to background and conspiracy (Count 1).**

1.    Who did the defendants allegedly conspire or intend to sex traffic? Who did they allegedly sex traffic or attempt to sex traffic?

2.    Who are the subjects of paragraph (6) of the Indictment—that is, who did the defendants allegedly "sexually assault or rape" but not sex traffic?

3.    Who was allegedly drugged by the defendants? What drugs were they allegedly given? Who allegedly procured the drugs?  When did the agreement to involuntarily drug women come into existence and when did any such drugging first occur and to whom?

4.    Who was promised luxury "experiences"?  Who was promised luxury "travel"? Who was promised luxury "accommodations" by the defendants? What were they promised?

When was an agreement to provide each of these first entered into? Who paid for them?

5.      Who was offered "concert tickets" and when was the agreement to offer concert tickets first entered into? Who entered into the concert-ticket agreement and on when were concert tickets allegedly first offered? Who paid for them?

6.      What "luxury items" did the defendants allegedly provide, and when? Who was received such luxury items and when was the agreement to offer luxury items first entered into? Who provided these luxury items? Who paid for them?

7.      When did the defendants allegedly make an agreement to provide luxury items to any person who was allegedly raped? Where was this agreement allegedly made? Who, other than the defendants, was part of this agreement?

8.      Who at the events referenced in the Indictment was participating in the conspiracy?

9.      What occurrences at any alleged social event converted the social event into sex trafficking?

10.     In advance of what events did the Alexander brothers and others procure (a) "cocaine"; (b) mushrooms; or (c) GHB? Who was allegedly sex trafficked at such an event? Who was allegedly raped but not sex trafficked at such an event?

11.     Of the alleged subjects of the charges who experienced symptoms of "impaired physical and mental capacity," who had not voluntarily consumed alcohol and/or drugs?

12.     Who "screamed" or "explicit[ly] request[ed] the defendants to stop" having sex with them? Who, among such individuals, are subjects of the sex trafficking allegations?

13.     Who are the party promoters referenced in the Indictment? When did such individuals join the conspiracy alleged in Count 1 and when, if ever, did each such unindicted co-conspirator withdraw from, or cease participation in, the alleged conspiracy?

14.     When and how did the defendants make an agreement to "cho[o]se their victims by chance"? When was such agreement first entered into and who joined in such agreement?

15.     Who was "prevent[ed] from fighting back or escaping"?

16.     Who was "lur[ed] and entic[ed]" to a location under the "promise of luxury experiences, travel and accommodations"?

17.     Who were the "others" the defendants worked with to "carry out and facilitate their sex trafficking scheme"?

18.     For whom did the defendants arrange domestic travel and accommodations? For whom

did the defendants arrange international travel and accommodations?

19.    Who "jointly financed" which overt acts as part of the conspiracy?

20.    When did the defendants form an agreement to "operate[ ] a long-running sex trafficking scheme"?  Where and how was this agreement formed, and who was present for the forming of this agreement?

21.    Who was provided "material benefits"?  What material benefits were provided to each such person and when?

22.    What is the definition or other specification of the "luxury accommodations" as used in the Indictment?

23.    Who was provided "luxury accommodations at high-end hotels"? Who was provided "luxury vacation properties"? When were they provided this?

24.    What are the "other luxury experiences" referenced in the Indictment? What are the "events" to which the subjects of the charges were allegedly "provided . . . access"?

25.    Who met the defendants in a private location as a result of "deception, fraud or coercion"? What was the nature of this "deception, fraud or coercion?"

26.    Who traveled with the defendants as a result of "deception, fraud, or coercion"? What was the nature of this travel or the "deception, fraud, or coercion"?

27.    How did the defendants "use[ ] their wealth and positions to create and facilitate opportunities to rape and sexually assault female victims?"  Who was allegedly raped or sexually assaulted as a result of the defendants' "wealth and positions"?

28.    Who attended an event or party as a result of Oren and Tal's "prominent positions in the real estate industry"?

29.    Who are the "other men" the defendants worked with to "arrange events and domestic and international trips"?  What events were arranged as part of the conspiracy? What domestic trips were arranged as part of the conspiracy? What international trips were arranged as part of the conspiracy?

30.    Who was "enticed" to attend such trips rather than attending them willingly and voluntarily?  Who was "recruited" to attend such trips? Who was "transport[ed]"?

31.    Who was allegedly "harbored" by the defendants?

32.    Who was "lur[ed] and entice[d]" via "social connections"? Who lured and enticed them?

33.    Who was "lur[ed] and entice[d]" under "the guise of starting a relationship"? Who lured

and enticed them?

34.    Who was offered "material items" "immediately following" a sexual assault? What were they offered?

35.    Who was offered "travel" "immediately following" a sexual assault? What were they offered and by whom?

36.    Who was offered "concert tickets" "immediately following" a sexual assault"? What were they offered and by whom?

37.    Who was offered "other luxury experiences" immediately following a sexual assault? What were they offered and by whom?

38.    Which trips were "organized by the Alexander Brothers well in advance"?  What was the agreement with respect to these trips?

39.    Who are the "others" the defendants allegedly worked with "to recruit women and girls to attend these events and trips"?

40.    Who are "the others" with whom the defendants "shared photographs of women and girls to select those they found sufficiently attractive to invite"?  Was there an alleged agreement to sex traffic only "sufficiently attractive" women?  When was this agreement made? Where was this agreement made? Who was part of this agreement?

41.    Who are the women in the photographs that were shared? Are the women in the photographs subjects of the charges?

42.    Who are the "other men organizing the trip"?

43.    Who was "induced to attend" an event or trip based on defendants' or other co-conspirators "offering to purchase their flights"?  Who offered to purchase these flights? Who was part of an agreement to purchase flights?

44.    Who was "induced . . . to attend" an event or trip based on defendants' or other alleged co-conspirators "making other travel arrangements?" Who made these travel arrangements? What were they? Who was part of the agreement to make these travel arrangements?

45.    Who was "induced . . . to attend" an event or trip based on the defendants or other alleged co-conspirators "providing accommodations without charge"?  Who provided these accommodations?  When was there an agreement made to provide accommodations without charge?  Who was part of this agreement?

46.    Who were the party promoters with whom the defendants "and others" worked to "arrange for women and girls to attend events or travel with them?"  Who were the

"others" who worked with the party promoters? When did they join the alleged conspiracy? When, if ever, did they withdraw from the alleged conspiracy? Were the party promoters part of the alleged conspiracy? When did they join the alleged conspiracy? When, if ever, did they withdraw from the alleged conspiracy?

47.    When was there an agreement made to have a "sufficient number of women and girls present?"  Does the conspiracy only extend to events at which a "sufficient number" of women were present?

48.    Who would have not attended a trip but for these travel arrangements?

49.    Who were the "other men attending the trips" who "pooled financial resources" with the defendants in order to "pay for flights and other travel expenses"?  What did they pay for? Are these "other men attending the trips" alleged co-conspirators?  When did they join the conspiracy? Where did they join the conspiracy? When, if ever, did they withdraw from the conspiracy?

50.    Who were "the others" with whom the defendants "procured drugs"?  When did they join the conspiracy?  When, if ever, did they withdraw from the conspiracy?  On what occasions did the defendants "and others" procure drugs?

51.    Who were "the others" who "surreptitiously drugged" people's drinks?  When did they join the conspiracy?  When, if ever, did they withdraw from the conspiracy?

52.    Which subjects of the charges "experienced symptoms of impaired physical and mental capacity"?

53.    Who were the "other men" with whom the defendants allegedly raped or sexually assaulted people?  When did they join the alleged conspiracy?  When, if ever, did they withdraw from the alleged conspiracy?

54.    When did the defendants enter into an agreement to commit "numerous other acts of sexual violence in addition to sexual assaults during planned trips and events"?  What were these "other acts of sexual violence"?  When did they occur? Who are the alleged subjects of these "numerous other acts"?

55.    When did the defendants agree to "drug[ ] and rape[ ] or sexually assault[ ]" people they "encountered by chance"?

56.    Who was taken to an isolated location?

57.    Who was physically restrained during an alleged assault?

58.    Who made "explicit demands to stop"?

59.    When did the defendants allegedly enter into this conspiracy?

60.     Where did the defendants allegedly form this conspiracy?

61.     What is the alleged unlawful agreement that forms the basis for the conspiracy count?

62.     On what occasions was there a joint effort to provide some material value in exchange for sex?

63.     Over the course of this 12-year period, how many overt acts were there in furtherance of this alleged conspiracy?  What were the overt acts of the conspiracy?

64.     Who else is part of the alleged conspiracy?  When did they join the conspiracy?  For what period of time were they in the conspiracy, and when, if ever, did they withdraw from the conspiracy?

65.     What are the international acts over which the government intends to assert jurisdiction?

**B.      Allegations as to Count 2.**

66.     In Count 2, is the government's allegation that Tal Alexander (a) recruited; (b) enticed; (c) harbored; (d) transported; (e) provided; (f) obtained; or (g) maintained the subject of the charge?    What constituted the alleged recruitment? Enticement? Harboring? Transporting? Providing? Obtaining? Maintaining?

67.     In Count 2, what is the force alleged? What is the fraud alleged? What is the coercion alleged?

68.     Who is the principal that Tal is alleged to have aided and abetted in Count 2?

69.     What is the "commercial sex act" alleged in Count 2? Who received something of value in exchange for the commercial sex act alleged in Count 2? What is the thing of value received?

**C.      Allegations as to Count 3.**

70.     What is the "commercial sex act" alleged in Count 3?  Who received something of value in exchange for the "commercial sex act" alleged in Count 3? What was the thing of value received? Who provided the thing of value?

71.     What form of force is alleged in Count 3? What form of coercion is alleged? What form of fraud is alleged?

72.     In what manner was the subject of Count 3 recruited? Enticed? Harbored? Transported? Provided? Obtained? Advertised? Maintained? Patronized? Solicited? Which of these statutory alternatives forms the basis for the allegation?

73.     Who is the principal of the offense charged in Count 3?

**D.      Allegations as to Count 4.**

74.     What is the form of inducement, enticement, or coercion alleged in Count 4?

75.     What is the sexual activity in violation of New York Penal Law Sections 130.35 (setting out three different statutory alternatives to prove first-degree rape, each which have four sub-alternatives), 130.30 (six different statutory alternatives for proving second-degree rape), 130.25 (nine different statutory alternatives for proving third-degree rape), and 130.52 (two statutory alternatives for proving forcible touching misdemeanor) that is the predicate alleged in Count 4, i.e., that the individual was enticed to engage in?

**E.      Allegations as to Count 5.**

76.     How did Alon Alexander and Tal Alexander "benefit financially" from the conduct charged in Count 5?  What was the "thing of value" they allegedly received?

77.     What is the form of force alleged in Count 5? What is the form of fraud alleged?  What is the form of coercion alleged?

78.     In what manner was the subject of Count 5 recruited? Enticed? Harbored? Transported? Provided? Obtained? Maintained?

79.     Who is alleged to be the principal of the offense charged in Count 5?

**F.      Allegations as to Count 6.**

80.     In what manner was the subject of Count 6 recruited? Enticed? Harbored? Transported? Provided? Obtained? Maintained?

81.     What is the form of force alleged in Count 6? What is the form of fraud alleged?  What is the form of coercion alleged?

82.     What is the "commercial sex act" alleged in Count 6?  Who received anything of value in exchange for this commercial sex act? What was the thing of value they received? Who provided this thing of value?

83.     Who is alleged to be the principal of the offense charged in Count 6?

**G.      Allegations as to Count 7.**

84.     In what manner was the subject of Count 7 recruited? Enticed? Harbored? Transported? Provided? Obtained? Maintained?  Alternatively, in what manner did the attempt to do so occur?

85.     What manner was force was used against the subject of Count 7? What manner of fraud?

11

What manner of coercion?

86.     Who is alleged to be the principal of the offense charged in Count 7?

87.     What is the commercial sex act alleged in Count 7? Who received something of value in exchange for the commercial sex act? What was the thing of value they received? Who provided this thing of value?

**H.     Allegations as to Count 8.**

88.     How was the subject of Count 8 recruited? Enticed? Harbored? Transported? Provided? Obtained? Maintained?

89.     In Count 8, what means of force were used? What type of fraud is alleged? What type of coercion is alleged?

90.      What was the commercial sex act charged in Count 8? Who received anything of value from the commercial sex act charged in Count 8? What did they receive? Who provided the thing of value?

91.     Who was the principal of the conduct charged in Count 8?

**I.     Allegations as to Count 9.**

92.     What is the sexual activity in violation of New York Penal Law Sections 130.35 (setting out three different statutory alternatives to prove first-degree rape, each which have four sub-alternatives), 130.25 (nine different statutory alternatives for proving third-degree rape), 130.52 (forcible touching misdemeanor which has two statutory alternatives), and 130.20 (sexual misconduct misdemeanor which provides four statutory alternatives) that is the predicate alleged in Count 4, i.e., that the individual was enticed to engage in?

93.      Who is the alleged principal of the offense charged in Count 9?

94.     In what manner did Tal Alexander allegedly "persuade, induce, or entice" the subject of Count 9 to travel in interstate commerce?

**J.     Venue.**

95.     What is the government's basis for venue as to each of the counts charged?

The indictment fails to identify the alleged subjects of the charges, (and uses "including but not limited to" language to reserve the right to include other individuals as the subjects of the conspiracy); fails to identify the overt acts of the conspiracy; and fails to identify the co-

conspirators.  Given these broad and generalized allegations, which span a 12-year period, a bill of particulars is essential to enable the defendants to prepare for trial, to avoid unfair and unconstitutional surprise, and to permit a double jeopardy bar.  A bill of particulars is necessary here to enable the defendants to prepare an adequate and vigorous defense without "wast[ing] precious pre-trial preparation time guessing [what] [t]he[y] ha[ve] to defend against."  *United States v. Trie*, 21 F. Supp. 2d 7, 21-22 (D.D.C. 1998).

Counsel for Alon and Tal Alexander have authorized undersigned to represent that they join in this motion.

Oren Alexander, Alon Alexander and Tal Alexander therefore ask this Court to grant the motion for a bill of particulars.

## CERTIFICATION PURSUANT TO LOCAL RULE 16.1

Undersigned counsel has attempted to confer with government counsel regarding the request for the above-listed particulars, via email on June 1, 2025.  At the time of this filing a week later, the government still had not responded to the emailed request for particulars.  However, the government had previously indicated that it opposes disclosing to the defense the identities of the accusers forming the basis for the counts charged in the indictment.

Respectfully submitted,

KLUGH WILSON LLC
40 NW Third St., PH 1
Miami, Florida 33128
Tel: 305-536-1191

BY:  /s/ Richard C. Klugh
Richard C. Klugh
Fla. Bar No. 305294
E-mail: rklugh@klughlaw.com
*Counsel for Oren Alexander*