UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    v.                                   24-cr-00676-VEC

ALON ALEXANDER,
OREN ALEXANDER, and
TAL ALEXANDER,

    Defendants.

_____/


## OMNIBUS REPLY IN SUPPORT OF PRETRIAL MOTIONS

BLACK SREBNICK
201 South Biscayne Blvd, Suite 1300
Miami, Florida 33131
(305) 371-6421

HOWARD SREBNICK
Fla. Bar No. 919063
HSrebnick@RoyBlack.com
*Counsel for Alon Alexander*

KLUGH WILSON LLC
40 NW Third St., PH 1
Miami, Florida 33128
(305) 536-1191

RICHARD C. KLUGH
Fla. Bar No. 305294
rklugh@klughlaw.com
*Counsel for Oren Alexander*

## TABLE OF CONTENTS

**PART I:**       **ABUSE OF THE GRAND JURY PROCESS TO IMPROPERLY**
          **ASSERT VENUE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**PART II:**      **ISSUES WARRANTING A HEARING** . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**1.**    ***The search warrants must be suppressed and a Franks hearing is essential in this
      case, see DE:110; DE:108*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    The original affidavit was filled with false statements and material
          omissions—which the government, in its non-responsive filing, fails
          to grapple with—and subsequent affidavits included a false
          representation ███████████████████████ . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    The warrant failed to establish probable cause as to the subject
          offenses—the government's response only makes a conclusory
          assertion to the contrary, and fails to explain how isolated instances
          of alleged sexual assault (or agent-characterized sexual assault)
          establishes probable cause of sex trafficking . . . . . . . . . . . . . . . . . . . . . . . . 16

    C.    The iCloud warrant was unconstitutionally overbroad; the general
          rummaging that occurred in this case is at odds with the Fourth
          Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    D.    The good-faith exception does not apply here for several reasons;
          exclusion is warranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**3.**    ***Identifications must be suppressed due to the unduly suggestive photobooks, see
      DE:108*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

**4.**    ***The government's seizure and subsequent continued use of privileged material
      warrants a hearing, see DE:103*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**5.**    ***Defendants have made the requisite adequate showing of selective prosecution
      entitling them to discovery and a hearing, see DE:95, Part II*** . . . . . . . . . . . . . . . . . 39

**PART III:**     **DISMISSAL ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

**1.**    ***The federalization of date or party rape violates the Tenth Amendment under
      binding Supreme Court precedent to which the government offers no
      response—only apparent concession, see DE:95, Part I*** . . . . . . . . . . . . . . . . . . . . 46

**2.**    ***The indictment is legally invalid and must be dismissed, see DE:97*** . . . . . . . . . . . . . 49

i

A. The indictment's conspiracy allegations are defective  . . . . . . . . . . . . . . . . . . . 51

B. The indictment fails to allege a commercial sex act  . . . . . . . . . . . . . . . . . . . . . 54

C. The failure to allege interstate nexus warrants dismissal . . . . . . . . . . . . . . . . . . 59

D. The government's conflation of essential elements and failure to independently allege separate elements warrants dismissal . . . . . . . . . . . . . . . 59

E. The indictment must be dismissed because it fails to provide constitutionally adequate notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

F. The government has charged time-barred offenses, warranting  . . . . . . . . . . . . 64

**3. *The Mann Act counts must be dismissed, see DE:72*** . . . . . . . . . . . . . . . . . . . . . . . . 66

A. Persuading another person to engage in activity is not the same as persuading the person to travel "so" the defendant can engage in activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*i. The government's focus on victims' intent is in this case a red herring where the defect is the failure to allege the requisite persuasion element*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*ii. The government's reworking of 18 U.S.C. § 2422 stands in contradiction of the different language used by Congress*  . . . . . . . . . . . . . . . . 73

*iii. The rule of lenity compels resolving any statutory ambiguities in the defendant's favor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*iv. Congress's decision to limit the persuasion prohibition of 18 U.S.C. § 2422 to persuasion to engage in sexual activity is warranted by additional constitutional and practical reasons*  . . . . . . . . . . . . . . . . . . . . . 76

B. The government fails to offer any justification for the lack of notice as to the state predicates charged in the Mann Act counts . . . . . . . . . . . . . . . . . . 78

**4. *Count five of the indictment must be dismissed due to duplicity and lack of notice, see DE:106*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

**PART IV: OTHER RELIEF REQUESTED ON DUE PROCESS AND RELATED GROUNDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

**1. *The government must be compelled to produce Brady evidence***  . . . . . . . . . . . . . . . 81

ii

*2.*       *This Court should grant the request for a bill of particulars* . . . . . . . . . . . . . . . . . . . . 85

*3.*       *The trials should be severed* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    A.       Oren is not charged with sex trafficking of a minor  . . . . . . . . . . . . . . . . . . . . . 88

    B.       The government's sprawling "conspiracy" charge only heightens the
        need for severance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    C.       The inevitable misidentification of the twins, and surrounding
        confusion, makes a reliable verdict impossible . . . . . . . . . . . . . . . . . . . . . . . . . 90

    D.       Judicial economy cannot trump the right to a fair trial . . . . . . . . . . . . . . . . . . . . 92

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     v.                                24-cr-00676-VEC

ALON ALEXANDER,
OREN ALEXANDER, and
TAL ALEXANDER,

     Defendants.
_____/

## OMNIBUS REPLY IN SUPPORT OF PRETRIAL MOTIONS

Oren and Alon Alexander, through undersigned counsel, hereby file this reply in support of their pretrial motions.

Not unlike other young men, Alon, Oren and Tal Alexander spent time and energy trying to win the attention of single women. They went about this in eminently typical ways: they rented share houses in the Hamptons, they threw parties, they met women on internet sites. Because they were three brothers, they were able to readily create a party atmosphere, which made them popular among other young people looking for exactly this. In addition to their active social lives, there was a perception they were each professionally successful.

As a result of this combination, years after their social lives as single men were long behind them, the brothers became subjects of civil lawsuits, not because any of them did anything wrong but because certain people came to believe they had sufficient resources they would pay them. Although these lawsuits lack merit (a fact seemingly known by the authorities), the federal criminal authorities used them to build one of the more sweeping sex trafficking cases in recent memory. Seeing no difference between vans full of girls coming across the border and young people wilfully lining up for the Hampton Jitney, the government has again resorted to the sex trafficking statute

to address conduct to which it does not apply. To try to get these errant, overblown charges to a jury, the government has committed several legal errors, which are the subject of these motions and the instant reply.

This reply brief is divided into four parts. Part I addresses the abuse of the grand jury process to manufacture venue as to Count 10 and the resulting structural error. Part II addresses other issues warranting evidentiary hearings in this matter—the defective search warrants; the unduly suggestive photo books; the privilege violations; and the selective prosecution of these defendants. Part III addresses dismissal arguments. Part IV addresses various due process arguments including *Brady* violations; the need for a bill of particulars; and the need for severance.

## PART I: ABUSE OF THE GRAND JURY PROCESS TO IMPROPERLY ASSERT VENUE, *see* DE:99

The abuse of the grand jury process warrants dismissal. Discovery and a hearing are necessary to determine appropriate further relief. The government is unapologetic about its clear misconduct and abuse of grand jury and judicial processes and institutions. The government lied to the defense, intentionally telling defense counsel that the long-awaited superseding indictment had been filed on May 8, conveying to the defense counsel that the nine-count indictment was the charging instrument they would need to defend against—when in fact it was little more than a stalking-horse indictment, because even the grand jury knew that no proceedings of any kind were ever going to be pursued by the government on that indictment and that the defense was going to be misled to believe it was the operative indictment. The government convinced the defense to believe that was in fact the indictment on which it would proceed—that motion practice on the indictment could now proceed and be finalized (with the parties agreeing to an extension of the motion deadlines tied to the return of the indictment) such that Oren Alexander filed motions for a

bill of particulars and *Brady* materials, and all defendants conducted their intensive motion practice under the false premise of the stalking-horse indictment. This ruse caused defense counsel to believe for more than a month that the faux grand jury document sent to counsel was the actual superseding indictment, which the defense had been waiting for in order to prepare its motions, including to determine whether any additional motions needed to be filed regarding discovery, dismissal and other matters.

A hearing is essential. The exact dates and timing of what occurred and how it occurred are entirely unclear, and cannot be authoritatively established without a full record and examination of what steps the government took to convert the grand jury into an arm of the prosecution rather than a constitutional protection for the defense.[1]

For more than a month, the government intentionally diverted the defense from fully effective case preparation by means of this bait-and-switch. The government engaged the grand jury in that process and used court proceedings and procedures meant for other purposes in order to assist in the deception and the government's effort to manipulate evidence of venue. The government's response makes clear that the government never had any intention of going forward with arraignment on the indictment that it sent to the defense on May 8—a diversion in which the grand jury was used for the improper purpose of delaying and confusing the defense, which lasted for a (statutorily-relevant) period of 33 days in May and June. As the defense was spending weeks working on the motion practice as to the *faux* indictment, the government, with less than a week

_____

[1]For example, the government is unwilling in its response to pin itself down to a specific date of return of these indictments—arguing that the "S3" indictment was returned "on or about May 8" and thus raising the possibility that the purportedly operative indictment ("S3") *preceded* the return of the *second* superseding indictment—which would make the government's nine-count stalking-horse indictment the operative one here. This is among the many reasons that a hearing is essential.

remaining until the motion deadline, decided to delay arresting the defendants on its secret "S3" indictment. By no means did the government seek arrest of the defendants at the earliest time. Instead, the government chose a time that caused prejudice to the defense, who lacked the ability to viably check issues of conflict-of-interest with respect to the newly identified alleged statutory victim prior to proceeding to litigate the pretrial motions.

The pretense of an arraignment (at which the government *insisted* on defendants' presence and opposed their motion seeking to excuse personal appearance) was rendered even more obvious when there was no mention of the faux indictment at all during the arraignment. The defendants commented solely that they had not had sufficient opportunity to review the so-called S3 indictment before having a plea entered for them. The manipulation of the arraignment process by the government and the government's unjustifiable abuse of judicial process to assist in this unprecedented deception was stark; the defendants were taken from the Eastern District in a charade to make it look as if they were not arrested there.

The government does not contest that it impermissibly deprived more than a month of defense preparation time on a new set of allegations regarding events alleged to have occurred 13 years ago on a swingers' cruise, delaying the revelation of the indictment for none other than a tactical, deliberate reason. And if the government's conduct was really proper, as the government says, there would have been no reason not to notify the defendants of this third indictment on May 8 when it was filed with the Court. The defendants were in custody, and knew they were facing an additional indictment. The government's hiding the ten-count indictment from defense counsel until it could effectuate an arrest demonstrates consciousness of guilt; the government cannot reasonably say that it was comfortable unsealing the nine-count indictment for a month until the arraignment,

but that there were legitimate countervailing interests that justified sealing only the ten-count indictment.

Seemingly satisfied with its course of conduct, the government somehow imagines that it is the defendant's burden to prove the extent of anticipated trial prejudice in the context of this gross misconduct in which the government involved the grand jury and used court processes. But there is no such burden on the defendant. When the government arranged the pick-up of the defendants in the Eastern District, that became the place of the arrest (if not Miami). For that reason alone this count should be dismissed. Similarly, even if there were no other misconduct than involving the grand jury in the delay trickery, convincing the grand jury to have the expectation that the arrest would occur outside the place and district where the defendants were being held by the government and taken to court other than through this deceptive process is improper standing alone. And the indictment should be dismissed if for no other reason than its sealing was obtained for a wholly improper, and apparently concealed basis, simply to manipulate venue—although the defense has not yet received, and demands as part of its hearing request, production of the government's motion to seal. It is apparent that the government was not honest in stating its grounds for that sealing relief. There was no need or occasion for the government to fear the defendants' flight from the Brooklyn MDC so as to necessitate sealing of the indictment. In fact, there has never ever been such a fear of escape from Brooklyn, much less one linked to disclosure of a superseding charging document in a case where defendants have already been arrested in the Southern District of Florida. Evidence of prosecutorial misconduct is *Brady* evidence, and the defense demands all such evidence here, including grand jury minutes and any and all internal prosecutorial communications relating to the decision to conduct this ruse.

The preposterous claim of a need for sealing—when the diversionary (nominally, "second") superseding indictment went unsealed despite adding even more (six) charges on the same day as the return of the sealed indictment—unduly involved the Court's offices in the government's plan to deceive and prejudice the defense. Even if there were no other reason for dismissal, the mere fact that the sealing was delayed to effectuate the deception of defense counsel establishes a false premise for depriving the defense of time to prepare. Deception of the Court to achieve a tactical advantage and deception of the Court in order to fulfill an evidentiary objective are equally pernicious.

Contrary to what the government claims, venue is not proper in the Southern District of New York as to Count 10. Venue is proper in Miami, where the defendants' were first arrested, or in the Eastern District of New York. To the extent that the government asserts otherwise, the government also must produce discovery and establish at a hearing when it learned of these allegations that underlie Count 10 and when it made the decision to create this ruse indictment. If the government delayed indicting on this charge *until* it could manufacture venue, the pre-indictment delay and resulting prejudice represents another fact warranting dismissal and highlighting the need for a hearing.

The government, apparently recognizing that venue is in the Southern District of Florida or in the Eastern District of New York, argues that the question of venue must be taken to a jury. But there is no set of facts that would enable a jury to find venue in the Southern District of New York—precisely due to the government's manipulating the process to assert venue here. Jurors cannot be asked to make a factual finding as to a future prediction of government behavior, just as grand jurors should not have been asked to do. The indictment's charging of future conduct by the

government is defective and cannot be submitted to a jury.

The Supreme Court has long held that the interest in maintaining an appearance of impartial justice may well warrant dismissal. *See United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment). Certainly, corruption of the independent function of the grand jury is a fundamental government violation here. Either the government lied to the grand jury with regard to how it would establish the jurisdictional element on which the grand jury ostensibly found probable cause (albeit as to a future prediction) or the government misled the grand jury as to how it would procure such a result. Most likely, the government told the grand jury that it would invoke sealing of the indictment (based on false allegations of need for secrecy), and then would mislead the defendants to believe they faced an indictment the grand jury knew would never be pursued.

This abuse of the grand jury to issue faux indictments in order to aid in prejudicial deception is fundamentally at odds with the purpose of a grand jury. If the government is permitted to use the grand jury as part of a venue sting, the government in the future could use the grand jury to induce additional criminal conduct by making faux charges that might send a defense target down a path of obstruction to which the government seeks to engage other individuals. Any use of the grand jury to induce underlying conduct for purpose of causing charges to be filed makes the grand jury an active participant in, rather than an independent judge of, criminal enforcement actions left to the Executive Branch. If the government can use the grand jury to trick the defense in a manner that will enable the government to produce evidence that will satisfy the filing of a sealed secret indictment, the grand jury simply becomes an undercover agent of the government—not merely a rubber stamp, ready to indict a ham sandwich, but a sous chef in the making of the sandwich. That

is what happened here.  A hearing and discovery are essential, and the indictment must be dismissed.

## PART II: ISSUES WARRANTING A HEARING

Evidentiary hearings are necessary on four other issues: (1) the misleading and reckless nature of the search warrant applications, which make a *Franks* hearing essential, *see* DE:108; DE:110; (2) the unduly suggestive photo books, *see* DE:108; (3) the government's admitted privilege violation involving its access to files containing case-related material prepared and shared with counsel in anticipation of litigation, *see* DE:103; and (4) the selective prosecution of the defendants.

### *1. THE SEARCH WARRANTS MUST BE SUPPRESSED AND A FRANKS HEARING IS ESSENTIAL IN THIS CASE (REPLY IN SUPPORT OF DE:110; DE:108)*

The government's response highlights material disputes of fact, including as to material omissions and misstatements in the warrant affidavits, that show the need for an evidentiary hearing on the motion to suppress, including to consider the government's reliance on the good-faith exception to the exclusionary rule.  The warrant affidavits—and particularly the crucial iCloud warrant affidavit from which other warrant applications derived—were recklessly premised on citation to materially misleading allegations, which were not presented in a neutral manner but rather cherry-picked to avoid disclosure of important contextual information.   These material misrepresentations and omissions permeate the warrant application submissions and cannot be excised without undermining the probable-cause theory on which the expansive warrants were sought and executed.

The government seeks to divert the analysis to one of whether, despite problems with each allegation, nevertheless there were multiple claims by women of sexual assault—potential offenses over which there is no federal jurisdiction, including ███████████████████████.  But

the question that must be answered with respect to the warrants is not merely whether there was probable cause that even one improper sexual contact occurred. Instead, a core additional issue is whether, upon excision of the multiple misstatements and after correction of essential omissions, there remained sufficient probable cause of a conspiracy of any kind, much less sex trafficking conspiracy consistent with the allegations in the warrant, within the jurisdiction of the agency seeking to obtain a warrant, and extending to the virtually unlimited breadth of the search. And the fact that not one of the alleged assaulted women ever claimed to have been sex trafficked is just the starting point for evaluating how the misstatements tainted the warrant applications.

Notably, the government's response leads off by citing the number of warrants issued in this case after the initial, highly-problematic set of warrant applications for electronically-stored data had yielded results. The government thus disregards the obvious implications of the fruit-of-the-poisonous tree doctrine: *none of the warrants issued can be cured of the material omissions and misrepresentations in the original (i.e., iCloud) warrant.* And rather than correcting the record of that warrant application, the problem grew worse: subsequent warrants included false accusations ███████████████████████████████████████████████████████ and included the false representation that the ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████. Finally, as noted in Tal's reply (which Oren and Alon adopt to the extent applicable to them), the warrants failed to disclose the origin of certain videos it relied upon—stating those videos were derived from Oren's "work computer" when it still to this day is unclear how or when police accessed that computer, and now clear that the agents relied heavily on an anonymously delivered USB drive. *See* Reply of Tal Alexander, DE:136 at 5. And,

as disclosures made by the government on August 7 reveal, ██████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████. This conduct, which mirrors that revealed in Florida state court proceedings, *see*

Klugh Decl. (referring to a sworn statement given by an alleged victim, during which the alleged

victim's civil attorney coached her to change a statement identifying one of the twins), is in itself

a conclusive showing of the need for an evidentiary hearing, just as a hearing is needed to determine

to what degree Agent Atwood relied on the anonymous drive (without talking to relevant witnesses)

in applying for searches.

Frequently throughout its suppression response, the government chooses only to engage with

arguments raised in Tal Alexander's Motion to Suppress—dismissing without engaging those raised

in Oren and Alon's motions, DE:110, DE:108, and apparently conceding the factual assertions raised

in Oren and Alon's original motions.   The fact that the government has conceded some

misrepresentations and omissions, and only generically disputed others, highlights the need for an

evidentiary hearing in this matter.   The government cannot brush aside defective warrants by

asserting lack of materiality when the misrepresentations and omissions permeate the entire warrant.

**A. The original affidavit was filled with false statements and material omissions—which the government, in its non-responsive filing, fails to grapple with—and subsequent affidavits included a false representation ██████████████████████**

Under the government's reading of applicable law, even false allegations ████████████ in a

search warrant do not justify a *Franks* hearing.   This is wrong.   And there are several other

materially misleading aspects of the warrants that make a *Franks* hearing essential, with more

10

having been revealed this week.

The government on August 7, 2025—one day before the defense replies were due—produced discovery related to the photo books; the defense had first inquired as to these photo books on April 11, 2025. The production revealed tha ██████████████████████████████

███████████████████████████████████████████████ ██

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ This warrants a hearing regarding the *Franks* omissions and as to the photobook, the suggestiveness of which is discussed *infra*.

Worse yet, one of the individuals referenced in the iCloud and other warrants ████████████

██████████████████████████████ This fact is particularly material here because the assault was alleged to have occurred ██████████████████. The most recent event identified in the iCloud warrant prior ██████ allegedly occurred ██████—if that incident were the last event cited in the warrant as evidence of a *conspiracy*, the conspiracy would have been time-barred. The government has made ████████ a focus of its response, and indeed used it to obtain the iCloud warrant because without it, it could not have claimed conspiracy to support the sweeping search for nearly 15 years of data.

████████████ is a wholly state-regulated alleged sex assault, which is not charged in the indictment to be sex trafficking; the government insists that even state rapes that it does not consider sex trafficking are part of the conspiracy and attempts to defeat the time bar on that basis, as discussed *infra* in Part II. The *only event in the search warrant alleged to avoid the conspiracy time*

11

*bar*, ███████████ is by the government's admission not sex trafficking; did not involve all three brothers; occurred after two of the three brothers were married (a material fact undisclosed in the warrant as none of the defendants has been accused of anything since getting married); and *was based on the account of* ████████████████████████████████████████████ ████████████████████████ These are among the substantial material omissions and misrepresentations that render the search warrant application's claims as to a sex trafficking conspiracy lasting through present day wholly deficient and failing the probable cause test. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber-stamp for police").

A *Franks* hearing is compelled because the government's response implicitly confesses error in several respects. The response:

- Mistakenly characterizes Oren and Alon's motions as raising material omissions when they also identified material misrepresentations, including misleading insinuation █████████ ███; false allegations ███████████; false assertion that defendants would endanger the life or physical safety of others; false representation that the FBI for months was "working to obtain copies of a police report" when the defense obtained the report in a matter of days.

- Perpetuates the material omissions in the warrant application where lead case agent Justine Atwood turned a blind eye to any exculpatory contemporaneous evidence—████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ This is plainly exculpatory and is material.

- Advances contradictory–and non-responsive–arguments that (a) ████████████████ ███████"; and (b) ████████████████████████████████████████████████████. That means (1) not only is the purported victim (and it is unclear if she describes herself as such, given

Atwood's admission to revising narratives) ███████████████–but also (2) ██
████████████ likewise exculpated the defendants. And that is information that needed to be included in the warrant application. Agent Atwood's failure to do so highlights the need for a hearing.

- Fails to respond to arguments raised by the defense motion, which make clear that the defense is asserting there is a substantial possibility Agent Atwood *did* know about the police report at the time of applying for at least some of the warrants (which were spread out over months when the defense obtained the report in a matter of days); that if she did not, then her representation that the FBI was "working to obtain copies" was materially false or misleading, DE:108 at 16, and that a hearing is needed on that basis. *Cf.* DE:121 at 65 (government's brief stating that it is "uncontested that the affiant did not have this report at the time of the iCloud and Meta Affidavits" but failing to acknowledge the same statement was included in a warrant months later—the government's conclusory assertions to the contrary do not make clear what steps were taken, what Atwood knew and when, and mandate a hearing.

- The representation that the FBI needed months to obtain a simple police report (or, apparently, even a discussion with the police officer who had read it) is not plausible on its face. It is independently material and it is relevant to the totality of the materiality of the omissions and misrepresentations, which render the warrant application (and subsequent applications) defective.

- Illustrates that a hearing is warranted because the government fails to address or reconcile allegations in the warrant regarding ██████████████████████████████
██████████ the government cannot simply state that the omission is not material without providing more facts as to what the omission entailed; only the government is in possession of such information.

- By so asserting, the government creates a material dispute of fact. A hearing is warranted to determine : (1) what steps Agent Atwood took to ████████████████████████████
██████ (2) whether she did, in fact, learn █████████ undermined the accuser's narrative; and (3) whether ████████████████████████████████ were materially false and misleading in light of what she learned about ████████████████
██████—relatedly, whether the warrant application omitted material facts ████████████
█████████

- Misconstrues the significance of the fact that (1) ███████████████████████████
████████████████████████████████████████████████████ and (2)
████████████████████████████████████████████████████████████████████
████████████████████████████████████

- Fails to acknowledge that some individuals ████████████████████████████

13

██████████████████████████████████████████████████████
████████████████

- Wrongly characterizes a false insinuation █████████ as irrelevant—and, in so doing, reveals the government's mistaken position that the warrant application only needed to prove probable cause of non-consensual sex. This highlights the absence of probable cause as to the specific crimes identified in the warrant application, and demonstrates the need for a hearing.

- Concedes the falsity of the government's allegations ██████████████████ ████████████████ and in so conceding, argues that the government is entitled to make false allegations █████████ without "fully investigat[ing]" them, when really the government did not investigate them at all before relying on them in a warrant application. The government's assertion that these false allegations were "properly included" demonstrates the need for a hearing to examine the basis for this assertion. Such false allegations go well beyond negligence or innocent mistake. A false statement that ██ ████████████████████ is material; at the time of making the statement the FBI had no such knowledge of that occurring and had not even bothered to speak to the individual, it was thus reckless and improper to include such information in a warrant application.

- Fails to address or acknowledge the materiality of Atwood's omission that an unduly suggestive photobook show-up was used to ask accusers to identify the defendants—this is made more material by the fact that discovery produced August 7, 2025, revealed ███████████████████████████████████████████████ warrant a *Franks* hearing);

- Falsely denies that the alleged sexual assaults and rapes occurred in the course of dating or otherwise consensual social interactions; a hearing is warranted because this assertion, made in the government's response filing, materially contradicts the statements in the warrant application regarding dating interactions.

- Fails to defend the warrant's selective explanation of ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████

- Fails to identify facts establishing probable cause of any federal conspiracy conduct within the statutory time frame or within any time frame.

- Fails to recognize that the only allegation that potentially could bring the matter within the

statute of limitations (that is, only if it had been a sex trafficking or conspiracy allegation, which the government concedes it was not) was ███████████████████████████████████ ███████████████████████████████

- Creates a material dispute of fact warranting a hearing by failing to disclose which accuser accounts Atwood revised to describe as rape when the accusers did not describe their conduct as such; and fails to disclose when Agent Atwood revised the facts to suit her own narrative.

- Fails to grasp the significance, in the totality analysis, of Agent Atwood's materially false claims with respect to non-disclosure of the warrant—her claims that the ongoing investigation was not publicly known and that the targets of the investigation may "physically endanger the life and physical safety of others" when (1) the investigation *was* in fact publicly known, and known to the defendants; and (2) no one's life or physical safety has been endangered, nor was there *any indicia of evidence whatsoever* that any accuser's life or physical safety is in danger.  This demonstrates the overall recklessness of the warrant and the extent to which allegations were not based in fact or reality but rather designed to forward Agent Atwood's own narrative.

- Fails to understand the materiality of the omission that all defendants had since left the dating scene and gotten married when the last event alleged in the warrant application predated the marriage of the sole defendant involved; this material omission would have at least resulted in a narrowing of the time frame as there are no allegations against any of the defendants since they married.

- Fails to recognize the significance of subsequent warrant applications' reliance on privileged material seized and accessed by the government in execution of the overbroad iCloud warrant.

The government's response creates several material disputes of facts and fails to respond to arguments raised in the opening brief, or to consider the totality of the omissions and representations—suggesting instead that they must be examined in a vacuum.  The totality of the misrepresentations and omissions renders the warrant defective and satisfies the materiality standard. The government's failure to respond to many of the arguments, or to rebut the factual assertions, raised in the defense motion illustrates the need for a hearing.

**B. The warrant failed to establish probable cause as to the subject offenses—the government's response only makes a conclusory assertion to the contrary, and fails to explain how isolated instances of alleged sexual assault (or in some cases, agent-characterized sexual assault)**

**establishes probable cause of sex trafficking.**

As to the lack of probable cause supporting the warrant application, the defendants' motion to suppress argued that there are two theoretically plausible readings of the warrant application, neither which is sufficient to establish probable cause. The government's response reinforces, and indeed highlights, the lack of probable cause as to the subject offenses in the warrant application. *See United States v. Brouillette*, 478 F.2d 1171, 1178 (5th Cir. 1973) (search warrant was deficient "for the affidavit upon which probable cause had to be based did not sufficiently allege facts to establish the probable cause that a federal crime was being committed").

The first theoretically plausible reading is that there is no probable cause that the sexual assaults or rapes in fact occurred (or certainly not probable cause they occurred in a manner such to justify a sweeping and unlimited privacy intrusion). The second theoretically plausible reading is that there was probable cause some sexual assaults and rapes *did* occur—but in such circumstances, there is still no probable cause of the federal offenses actually identified in the warrant.

The government's response reinforces the first reading because it:

- Fails to address the fact that the vast majority of these incidents occurred ████████████ ████████ is unreliable (as even the government concedes in its response);

- Fails to reconcile with the fact that ████████████████████████ ████████████████████████ (further demonstrating the need for a hearing);

- Relies on rumors and hearsay that cannot establish probable cause;

- Repeatedly—and recklessly—relies on second- or third-hand (or worse) accounts of events *without ever speaking to the individuals purportedly described in these events*;

- Fails to defend the facially implausible allegations that an individual, ████████████

16

████████████████████████████████████████████████████████████

- Fails to acknowledge the search warrant's reliance on entirely contradictory allegations, undermining probable cause and making a *Franks* hearing essential;

- Fails to reconcile the fact that ████████████████████████████████████████████
████████████████ (under the government's bizarre theory, this offer to extend material benefits suggests that she, in fact, was the "sex trafficker"); ████████████████████████
████████████ further illustrating the need for a hearing; and

- Fail to grasp the significance of overlapping plaintiff counsel—which inevitably leads to coordination of stories, which is relevant to the extent that government argues similarity of stories helps to establish probable cause.

Even if, notwithstanding the above deficiencies, one deems the warrant as establishing probable cause that some number of sexual assaults or rapes did occur, the government fails to grapple with—and thus concedes—the fact that such occurrences are not *res ipsa* evidence of sex trafficking, instead dismissing in passing defense arguments to that effect. The absence of probable cause as to the *federal* offenses identified in the warrant is demonstrated by:

- The government's response, which simply relies on the fact that it has sold this "sex trafficking" theory to multiple grand juries, in an entirely one-sided proceeding that the government has abused in this case, *see* DE:99 (defense motion to dismiss based on grand jury abuse and forum and venue manipulation);

- The conclusory assertions in the response that date rape is sex trafficking because the government says it is;

- The erroneous suggestion in the government's response that because Atwood is not a lawyer, the warrant need not connect probable cause to the subject offenses, *cf. Brouillette*, 478 F.2d at 1177 (5th Cir. 1973) ("It is not onerous to require federal officers to state their reasons for believing that a federal crime has been committed in obtaining a warrant"—and Agent Atwood did not do so here); *Thomas v. United States*, 376 F.2d 564, 567 (5th Cir. 1967) ("Conceding that the affidavit for the warrant may have been written by a layman, the only crime it charges, if any, is that an individual had been shot in Lowndes County, Alabama. This does not begin to describe a federal crime.");

- The government's simultaneous defense of Atwood's supposed expertise in sex trafficking

17

(even though the question whether she actually has such expertise is never answered by the government, further illustrating the necessity for a hearing to determine questions relevant to the *Franks* inquiry);

●     Remarkably, in the next sentence, after asserting that Atwood is unqualified to make legal conclusions, the government defends her revision of accusers' narratives on the theory that the conduct "meets legal definitions of the terms." DE:121 at 66. Atwood's total revision (and thus misrepresentation) of accuser narratives cannot be excused because "in her view" the conduct meets legal definitions that go undefined in the warrant application (when the government itself admits she is unqualified to make legal conclusions)—and simultaneously be excused for her failure to offer any probable cause of *sex trafficking* or related *federal* crimes;

●     Reliance on time-barred allegations in the total absence of any conspiracy conduct within the relevant time frame; the government's response fails to acknowledge that the only conduct alleged within the statutory time frame involved ██████████████ ██████████████ undermining the conspiracy allegations which led to the issuance of an overbroad warrant for a time-barred investigation;

●     Reliance on an allegation that occurred overseas, over which the United States has no jurisdiction whatsoever; and

●     The government's repetition of particularly salacious ██████████████ which it knows it has no jurisdiction to prosecute—and do not *in any way amount to sex trafficking*—illustrate the legal deficiencies with its case. The government knows that it cannot prosecute such allegations; ██████████████████████████████████████████████████ ████████████ aking these allegations deficient even under the government's rape-by-wealthy-men-is-sex-trafficking view of the case); the government highlights these allegations for this Court nonetheless. This illustrates the government's leaning on the prejudicial over the probative. But no amount of prejudice can cure the total lack of probative allegations *as to federal crimes* in this warrant. *See Brouillette*, 478 F.2d at 1173-77. This further illustrates the need for a hearing, where the government is welcome to demonstrate why, under any plausible view of applicable law, ██████████████ are evidence of *conspiracy or racketeering* as to the federal crimes outlined in the warrant. The government's assertion ██████████████ is in any way relevant *undermines* its arguments regarding probable cause of federal crimes.

The warrant lacks probable cause on its face.

The government, *see* DE:121 at 77, fundamentally misapprehends arguments regarding probable cause raised in the defense motion. By asserting the warrant application was unsupported

by probable cause, defendants are of course arguing that there is an error in a magistrate's conclusion to the contrary. Defendants did not recognize that they had to spell this out for the government. The government holds itself to the wrong standard: it suggests that the warrant can identify probable cause as to *any crime*, even state crimes which it has no jurisdiction to prosecute. And even under that view, the government misapprehends the defense motion.

Oren and Alon's motion clearly argued (1) there is no probable cause as to even the alleged state crimes of sexual assault and rape; and (2) even if there were, there is *no probable cause as to any federal offense identified in the warrant*. *See, e.g.,* DE:110 at 2-5 (identifying two possible inferences and explaining why both inferences must fail). "Federal agents are not to go around looking for state violations and then try to turn them into federal violations." *United States v. Brouillette*, 478 F.2d at 1177. Rather, the warrant must explain why the conduct alleged offers probable cause of a violation of federal law. *See id.* at 1175 (finding warrant deficient because "[a]t the most, the affidavit established probable cause to support a finding that appellants were operating a prostitution ring in violation of Louisiana state law."). It is not enough "merely to state the section [of the U.S. Code] which allegedly has been violated." *Id*. at 1176.

The government is wrong to assert that lodging and transportation provided to people in social contexts supplies probable cause of sex trafficking. *Cf. id*. at 1178 (stating, with respect to racketeering statute: "we are convinced that Congress, by passing 18 U.S.C. § 1952, did not intend to make every conceivable crime that occurs at a motel or a hotel into a federal offense punishable in the federal courts"). "Such a construction of the statute would be extremely unreasonable. It would open up whole new realms for federal prosecution. ***It could lead to searches where the agents of the federal government know only that a state crime is being committed but have the***

19

***hope that a search would turn up sufficient evidence to find that a federal crime is also being committed, thus, leading to grounds for federal prosecution.***" *Id*. (emphasis added). "This is, of course, an absurd and unnecessary result." *Id*. And that is precisely what occurred here.

Furthermore, in arguing that the iCloud warrant application allowed for a general rummaging based on the alleged provision of lodging or transportation, the government fundamentally mischaracterizes the allegations in the warrant. In the vast majority of allegations in the iCloud warrant, *there was no allegation that any lodging or transportation was provided*. There was no evidence of interstate nexus. The government's sex trafficking theory is deficient on independent grounds, but the government's suppression argument attempts to transform the allegations in the warrant into something they are not. The government cites ███████████████ as fitting this "lodging-transportation" model. This is the allegation where, ████████████████
██████████████████████████████████████████████████████

████  Notably, the government has not even charged this allegation in the indictment, sharply undermining its claims that it established probable cause of sex trafficking. ██████████████ standing alone certainly does not establish probable cause for the sweeping search that occurred here, especially when there are no others like it and the accuser's account is implausible on its face ██████████████████████████████████

The second allegation that the government relies upon as establishing *probable cause of RICO and conspiracy to commit sex trafficking* ██████████████████ Nobody was transported. Nobody was persuaded to travel interstate to engage in illegal sexual activity. ██ ██████████████ as the warrant application falsely insinuated. The allegations are as follows: ████████████████████████████████

20

██████████████████████████████████████████

███████████████████    ████████████████████████████████

████████████████████ This alleges dating that was ███████████████████ ; to the extent that any sexual assault allegedly occurred, that is for authorities ████████████ and not the federal government to determine. These allegations are not "instructive" that there was probable cause of a sex trafficking conspiracy. Notably, this incident also was not the subject of any charges in the indictment—again undermining the government's arguments that this incident establishes probable cause of any federal offense to support the general rummaging.

What *is* in fact instructive is the government's arguing that *just two incidents*, of the *twelve alleged in the warrant application,* are sufficient to search and seize nearly 15 years of the defendants' most personal private records. The government asserts that ████████████████████ provide an "additional understanding of the duration and scope of the defendants' conspiratorial agreement." Gov. Resp., DE:121:80. For the first time, the government asserts that the conspiracy ███████████████████—undermining and rendering fatally defective its sex trafficking and RICO allegations. This also makes the warrant application's omissions as to the exculpatory police report *that much more material*. A hearing to evaluate why federal authorities wilfully disregarded this police report and whether and when they learned of its contents is needed.

The government concedes that the vast majority of the allegations in the warrant were alleged state law violations, which even it does not view as sufficient to charge federally (and some of which state authorities *declined* to prosecute). This illustrates the federal government's unprecedented intrusion into a state-regulated sphere of conduct in this case. The government's position is that if it can stack together several allegations of date rape, and find one that it can stretch

to call sex trafficking—no matter how incredible, and no matter how different in kind from the other allegations—then it can engage in a general rummaging of nearly 15 years of data.

The government's own brief illustrates its awareness that the state allegations were only included to create the impression that it had conducted a thorough investigation, when at least 10 of those allegations *the government itself admits* do not establish probable cause of any federal offense. There was no probable cause to support the conspiracy claims, the sex trafficking claims, the Mann Act claims, and the RICO claims. And there was certainly not probable cause to support such a broad search.

**C. The iCloud warrant was unconstitutionally overbroad; the general rummaging that occurred in this case is at odds with the Fourth Amendment.** *See* **DE:110 at 19.**

The government's response reveals that it apparently has not read the warrant application the prosecution so vehemently defends. The government mischaracterizes the warrant by suggesting it did not give broad authority to search and seize everything. The government misreads its own warrant and creates a material dispute of fact that must be examined at an evidentiary hearing. In fact, in so arguing, the government highlights the deceptive nature of the warrant—it was written to give off the impression that it was in someway limited, but every section that purported to prevent general rummaging was overridden by sections giving broad authority to law enforcement to search and seize anything they wanted.

In arguing that the warrant was limited, the government cites to the warrant and discusses the "evidentiary items" that were "tied directly" to the purported probable cause on which the warrant was based, DE:121 at 73 (91 in PDF). It draws this Court's attention to a section of the warrant that argues the types of evidence for which Agent Atwood claimed probable cause. That is a *different* section from the section that authorized police to search and seize everything. And that

is precisely the problem.  The government does not identify *anything in the iCloud accounts that the warrant did not  authorize police to search and seize* .  And the  government in fact seized everything.  The government cannot have it both ways: if the government is right, and the warrant was limited, then the execution exceeded the scope of the warrant.  But the warrant application was not limited in any way, much less in any meaningful way.  It sought large swaths of data and allowed the government to rummage through that data at will—which it did, seizing even privileged material and later using it against defendants.  That is unconstitutional.  The government's contesting this predicate issue highlights the need for a hearing.

The government is wrong to suggest that the warrant need not have been temporally limited. There was no probable cause of any coordination or planning.  The warrant could have sought temporally limited data as to each of the events alleged in the application, but it did not do so.  It relied on defective conspiracy claims, unsupported by the allegations in the warrant, to support a wholesale search.  The last date of any allegation ████████ and predated the involved defendants' marriage.  Other defendants had married earlier and nothing was alleged to have occurred after any of the defendants' marriages.  The government's assertion that it could not temporally limit the application in a manner that complied with the Fourth Amendment is wrong.  The search also should have been content-limited as to specific events or individuals.

There is a "heightened sensitivity to the particularity requirement in the context of digital searches," and a "serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013).  The fact that the Second Circuit has distinguished *Galpin* in other cases does not, as the government suggests, overrule it entirely.  *Galpin* is still controlling law.

The government relies on the Second Circuit's distinguishing *Galpin* in *United States v. Tompkins*, 118 F.4th 280 (2d Cir. 2024), but the discussion in *Tompkins* does not absolve this warrant of its defective nature. Indeed, the Court in *Tompkins* pointed out that the warrant in *Galpin* "failed to 'describe with particularity the items to be seized by their relation to designated crimes.'" *Id*. (citing *Galpin*, 720 F.3d at 450). That is the problem with this warrant: it failed to make clear how the vast and unrestricted categories of data it sought were related to the specific federal crimes identified in the application. In *Tompkins*, the particularity requirement was met because officers were looking for evidence for failure to register as a sex offender and seized child pornography evidence. The function of the warrant in this case was to allow the government to rummage through defendants' *entire social, personal, and sexual lives* for a period of nearly 15 years, including years in which there were no allegations whatsoever of any impropriety. The warrant failed to describe with particularity the items to be seized, especially given the government's position that any social relationship was subject to scrutiny. This case falls into the *Galpin* category and not into the *Tompkins* category.

The government then suggests that the defendants should instruct the government as to how to draft a constitutionally permissible warrant. *See* Gov. Br. DE:121 at 75 (92 in PDF) (arguing that the data need not be content-restricted because the "defendants do not suggest what a proper restriction would have entailed in this case"). The constitution requires the search to be limited. It does not require the defense to help the government understand the Fourth Amendment or its application to search warrants. The government attempts to defeat defense arguments about content-restriction by asserting that defense should have explained "how Apple should have been asked" to content-restrict. But the defense in its opening motion, DE:110 at 21-22, made clear that it is well-

established that technology companies are willing to content-restrict.  The government apparently concedes that content-restrictions would have been appropriate, but asserts—without any supporting affidavit or declaration—that such restrictions would have been impossible here.  This illustrates the need for a hearing.  The government could have easily limited its search to particular allegations (time) or to specific topics (content).  It failed to do so here, and its justifications for why it did not are insufficient and warrant further consideration at a hearing.  The government also fails to respond to or address the wealth of case law, cited in Oren and Alon's motion, discussing the dangers of overbroad digital warrants.  *See* DE:110 at 21-24.  The government's response treats prosecutorial entitlement to wholesale privacy intrusion as the rule and the Fourth Amendment as the exception. The government has it backwards.

**D. The good-faith exception does not apply here for several reasons; exclusion is warranted.**

The government argues good faith, and "[t]he burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on a subsequently invalidated warrant.  *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992).  The government fails to even request a hearing to meet such a burden here.  The relevant inquiry is whether a "reasonably well-trained officer" would have known that the search was illegal despite being authorized by a neutral magistrate.  *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).  Three of the four circumstances in which the good-faith exception does not apply are present here:

> (1) The magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for her reckless disregard for the truth;

> (2) The affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

> (3) the warrant was so facially deficient that executing officers could not presume it to be

valid.

First, the magistrate was misled by information in the warrant.  The exclusionary rule deters "deliberate, reckless, or grossly negligent conduct." *Herring v. United States*, 555 U.S. 135 (2009). The shield of good-faith immunity is lost when an officer "knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause." *United States v. Raymonda*, 780 F.3d 105, 121 (2d Cir. 2015) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 871 (2d Cir. 1991).  The good-faith exception will not shield an officer's relying on a duly issued warrant where "the issuing magistrate has been knowingly misled." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (internal quotation marks omitted).  "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis v. United States*, 564 U.S. 229, 238 (2011). As discussed above, in Section I, *supra*, and in the defendant's original motions, DE:110; DE:108, the warrant application was materially misleading and recklessly disregarded the truth.  The magistrate was recklessly and knowingly misled; and Agent Atwood's conduct amounted to at least gross negligence.  The good-faith exception does not apply.

The warrant was also wholly lacking in any indicia of probable cause to support the sweeping privacy violation and general rummaging that occurred here—and the warrant was so facially deficient that reliance on it was unreasonable.  As discussed above, in Sections II and III, *supra*, and in the opening brief, DE:110, there was no probable cause, especially as to the subject offenses.  The overbreadth of the warrant is directly relevant to this analysis.  "Courts commonly refuse to find good faith reliance when the warrant is too broadly worded or its terms so vague or unspecific that it fails to distinguish adequately between items that are evidence of a crime and

innocent possessions." *United States v. One Parcel of Prop. Located at 18 Perkins Road, Woodbridge, Conn.*, 774 F. Supp. 699, 707 (D. Conn. 1991). *See also United States v. Travers,* 233 F.3d 1327, 1330 (11th Cir. 2000) (the officers do not act in objective good faith "if the warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid").

The government argues that evidence should not be suppressed because "there is no evidence that any law enforcement officer had knowledge that the warrants were not supported by probable cause, lacked particularity, or were overbroad." Gov. Resp., DE:121 at 87 (105 in PDF). First, the government applies the wrong standard. The case law is clear that the standard is whether an officer "knows, or has reason to know" that the warrant application as a whole was recklessly false or misleading. *Raymonda*, 780 F.3d at 121 (quoting *Golino*, 950 F.2d at 871 (2d Cir. 1991)). On the "reason to know" prong, the government offers no arguments—apparently conceding that law enforcement had reason to know of the deficiencies with the warrant application. Second, the government cannot simultaneously assert Atwood's expertise in sex trafficking and argue that she did not know the warrant lacked probable cause; there were no indicia of a 20-year sex trafficking conspiracy (as she argued in the warrant) here.

The good-faith exception does not apply here. Evidence obtained as a result of the illegal searches must be suppressed.

## 2. IDENTIFICATIONS MUST BE SUPPRESSED DUE TO THE UNDULY SUGGESTIVE PHOTOBOOKS ( REPLY IN SUPPORT OF DE:108)

The government's response makes the contradictory assertions that some victims do not well recall the details of their assaults, but also that they should be allowed to identify their alleged attackers. That alone is dubious under the Federal Rules of Evidence. But it gets worse. The show-

up procedure used here rendered the already unreliable (but perhaps subject to cross-examination) identifications *fatally* unreliable.  And it gets worse still.  Two of the defendants are twins—whom the government, its agents, and its witnesses, cannot tell apart. ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████, making identification as to any allegedly illegal sex that much more important.  This is one of those circumstances where due process mandates the exclusion of in-trial identification.

The government's response at the very least demonstrates that, under the circumstances of this case, an evidentiary hearing is necessary to determine the extent of the suggestiveness and its impact on the present memory and testimony of the particular witness.  The government asserts that the photo book procedure was not suggestive, but a hearing is necessary to determine how suggestive it was; who expressed confusion; how many misidentifications were made and subsequently corrected; and how many identified *additional* brothers as a result of this show-up.

The government argues that giving a witness photo books with two twins and asking them to choose one "lessen[s] the risk" that such a procedure would be unduly suggestive.  DE:121 at 110 in PDF).  But this is a nonsensical argument.  By putting both together in one book, it leads people to believe that is "the look" of the person—and then they pick one.  This is exacerbated by the fact that Oren and Alon ran in the same social circles and were present at the same events.  It is also exacerbated by the fact that the photo books often contained a photo of all three brothers standing together, signaling to any witness that they were the ones involved, and pushing a conspiracy notion.  The government never should have included both twins, or even all three brothers, in a single lineup.  If the government has two people who look identical *who are also both suspects* in a single lineup,

it is unduly suggestive.  And it is even more unduly suggestive if individual photos of the twins are combined in a lineup with one or more group photographs of all three brothers.

The government defends the photo books on the basis that they "consisted mostly of young, white men with short to medium-length brown hair."  DE:121 at 93 (111 in PDF).  But this is not true.  The photo books include men with grey hair. A man with shoulder-length, curly blonde ringlets.  A man who appears to be very young, perhaps a child.  Men with long hair.  And the three Alexander brothers—individually and posed together. The government's own representations about its own photo books contradict what was actually depicted in the books, further requiring a hearing. *See* Klugh Decl.

Nothing could be more suggestive than putting all three Alexander brothers in a lineup and asking witnesses if they think these three are involved.  This is made worse when all three brothers are together in the same photo—it is akin to having them link arms in a physical line-up.  The government's response demonstrates the need for a hearing and warrants suppression of in-court identifications that resulted from this procedure.  The government asserts that the identifications are "independently reliable," but provides no basis for this assertion and does not support this factual assertion with a declaration or affidavit.  If the government's argument is that the photobooks are independently reliable, then it must demonstrate that at a hearing.  The photobooks standing alone are suggestive enough to warrant suppression, especially in cases where there was uncertainty expressed or a misidentification followed by a correction.

### 3. THE GOVERNMENT'S SEIZURE AND SUBSEQUENT CONTINUED USE OF PRIVILEGED MATERIAL WARRANTS A HEARING (REPLY IN SUPPORT OF DE:103)

The government does not contest that they invaded a large file containing privileged material. Instead they make certain representations—unsupported by affidavits—about their use of

the material.  But this makes a hearing essential.  They agree with the qualitative analysis; their dispute is quantitative.  Discovery and a hearing are warranted to determine the scope of the privilege violation and the appropriate remedy, including disqualification of government attorneys tainted by their exposure to privileged material—a remedy routinely applied in civil cases.

The government admits, but seeks to defend its knowing violation of the attorney-client privilege and work product doctrine, by claiming that apart from extensive use in bond proceedings, and in guiding the government in seeking search warrants following issuance of the iCloud warrant and in focusing and shaping the stories told by its potential witnesses, the government has not yet made any significant additional use of the privileged material such as at a suppression hearing or at trial.  The government's hoped for conclusion of the privilege matter merely illustrates the unquestionable need for an evidentiary hearing on the privilege violation under the Second Circuit's well-established authority of *United States v. Schwimmer*, 892 F.2d 237, 244-45 (2d Cir. 1989).  *See* DE:103 at 4-5.

The government asserts that the privilege violation was accidental, but in arguing as much, it only demonstrates the ineffectiveness of its filter team procedure in walling off from the investigative team privileged material; privilege violations cannot be deemed "accidental" when the government is aware that the material may include privileged material, has a duty to screen for privilege material, and fails to comply with that duty.  A hearing is needed to determine what the filter team did to identify privileged information and whether it was consistent with its duty.  The government's numerous factual assertions—about the filter team process; and about the extent of the government's subsequent reliance on this material—are unsupported by any kind of factual declaration or affidavit and demonstrate the need for a hearing.

The defendants have made the showing that the material was used against them to their prejudice, by identifying *multiple* proceedings (both in applying for search warrants and in seeking detention) where the privileged material was used. A hearing, and discovery, is needed to determine how else the government used the material—such as in charging decisions and before the grand jury. And the material seized is quintessentially privileged material: it relates to confidential case strategy matters. Material specifically selected and shared with an attorney for purposes of developing a case strategy is wholly protected.

The government is wrong to suggest that the privilege material only includes screenshots and case photos. There was substantially more information accessed by the government. The government's reducing this to only "screenshots and photographs" is misleading, suggests a more substantial privilege violation has occurred, and creates a material dispute of fact warranting a hearing.

"The essence of the Sixth Amendment right is, indeed, privacy of communication with counsel." *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973). "The interests of society and the accused in obtaining fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case. *United States v. Nobles*, 422 U.S. 225, 238 (1975). "[I]f the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer." *Fisher v. United States*, 425 U.S. 391, 403 (1976).

The government has previously conceded that if it "places an informant in the defense camp during a criminal trial and receives from that informant privileged information pertaining to the

defense of the criminal charges," it violates the Sixth Amendment because the constitution's "assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the proceeding." *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977). *See also id*. at 547, 554-56 (finding retrial not mandated because "nothing at all" had been communicated to prosecution; distinguishing prior precedents on the ground that "in each case, some but not all of the conversations overheard were between the criminal defendant and his counsel during trial preparation," as here, and noting that had the prosecution learned the details of the conversations about trial preparation, the defendant would have a much stronger case for retrial).

In 2020, Justice Sotomayor wrote respecting the denial of certiorari in *Kaur v. Maryland*, 141 S. Ct. 5 (2020) (Sotomayor, J., respecting the denial of certiorari). She observed: "many federal and state courts have struggled to define what burden, if any, a defendant must meet to demonstrate prejudice from a prosecutor's wrongful or negligent acquisition of privilege." *Id*. at 6.

The defense does not concede that the seizure of privilege material was merely "wrongful" or "negligent" here but rather asserts that it was reckless and intentional, and respectfully requests a hearing at which to establish this. Government counsel accessed joint defense privileged material and referenced it in live court at detention hearings; the government also relied on it in search warrants. The government knew its own investigation was publicly known and thus known to the defendants since the prior June; and knew that there were civil lawsuits pending against the defendants. Government counsel are attorneys; and the title "The Case" (the name of one of the privileged folders) is not ambiguous. The defense has shown actual knowledge and intent. A

hearing will establish this knowledge and intent.

In writing on the denial of certiorari in *Kaur*, Justice Sotomayor further commented on "the many insidious ways that potential Sixth Amendment violations can affect the course of a trial" and noted "the many ways in which the prosecutors' possession of [a defendant's] privileged information could have subtly but indelibly affected the course of her trial." *Id*. at 7. There, prosecutors might have: selected of a different mix of jurors, "either intentionally or subconsciously"; "changed their pretrial preparation, perhaps by emphasizing different parts of the State's case or focusing on different weaknesses in the defense"; "considered different lines of questioning, brainstormed different objections; or anticipated different arguments." *Id*. "The trouble with all of these scenarios is that . . . it is exceedingly difficult to prove a negative." *Id*. And all of these scenarios are possible—indeed, likely—here. Defendants respectfully request a hearing at which to establish "the many insidious ways" that the Sixth Amendment violations here prejudiced and stand to prejudice this trial and prosecution—including those identified by Justice Sotomayor; as well as those relating to decisions regarding who to charge; decisions regarding who to interview; and how the government's investigation was affected in any way by its months of access to privileged defense files.

In *United States Schwimmer*, the Second Circuit found the district court "should have conducted an evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege in regard to confidential communications passing from Schwimmer to Glickman." 892 F.2d at 245. It further remanded, in the event of an affirmative finding at such a hearing, for "a determination as to what use was made of the derivative information and whether a substantial right of the appellant was affected." *Id*. An evidentiary

hearing resembling that required in *Schwimmer* is required here.

The prejudice from the privilege violation here is monumental; the government used the information in obtaining search warrants and in seeking to detain the defendants, and possibly in other pre- and post-indictment investigation and case preparation. Some courts presume prejudice "regardless of whether the invasion into the attorney-client privilege was intentional." *State v. Lenarz*, 22 A.3d 536, 549 (Conn. 2011). *See also State v. Bain*, 872 N.W.2d 777, 791 (Neb. 2016) (presuming prejudice even "when the State did not deliberately intrude into the attorney-client relationship"). Whether presumed or not, prejudice is clearly established here and defendants respectfully request a hearing regarding the scope of that prejudice.

Grand jury minutes are essential to review in determining the extent of the privilege violation. Just as courts can review privileged materials when privilege issues arise, courts may also review grand jury materials to determine how that privilege affected grand jury proceedings. Such review is warranted here, at least by the Court if not also by the defense. Such review must be conducted by the defense here as well; such review is essential because the defense has access to internal privileged information and case strategy that will help it identify and demonstrate the privilege violation in grand jury minutes. The defense is in a unique position to recognize the extent of the privilege violation insofar as it relates to what occurred before the grand jury.

"The Case" folder contains privilege materials that the government should never have accessed in the first place, and nor would it have, if it had a reliable filter process in place. The defense has not been able to assert privilege to a walled-off filter team because the government has failed to provide an untainted filter team that is walled off from the prosecution team, even upon multiple defense requests. The filter team attorney has instructed the defense to contact the

prosecution team regarding filter issues; this of course defeats the purpose of a filter team. This makes a walled-off filter team and a privilege protocol going forward essential. *See United States v. Korf,* 11 F.4th 1235 (11th Cir. 2022) ("the Modified Filter-Team Protocol allows the Intervenors to conduct the initial privilege review. It also requires the Intervenors' permission or court order for any purportedly privileged documents to be released to the investigation team. This means that the filter team cannot inadvertently provide the investigation team with any privileged material. For three reasons, we conclude that this Protocol suffices under the law.).

In situations where the government knows in advance that privileged materials are likely to be found during the execution of a search warrant, courts have virtually unanimously recommended or required the inclusion of a meaningful screening procedure in the search warrant application and in the warrant itself—*i.e.*, to include the protections before, not after, the search takes place.[2] Law enforcement here did not take sufficient preemptive action. Multiple prosecutors and investigators reviewed privilege material and used it in subsequent searches and in open court.

The procedures used here were inherently defective because they did not give the defendants, who were in a joint defense agreement, any opportunity to lodge any meaningful objections to the government's attempts to review privileged material. *See In re: Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006) (where holders of privilege would have had no opportunity to dispute taint

---

[2] *See, e.g., United States v. Derman*, 211 F.3d 175, 181 (1st Cir. 2000); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 961 (3d Cir. 1984); *United States v. Crim. Triumph Capital Group*, 211 F.R.D. 31, 42-43 (D. Conn. 2002); *United States v. Hunter*, 13 F. Supp. 2d 574, 585 (D. Vt. 1998); *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 57 (S.D.N.Y. 1994). *See generally Preventive Med. Assocs. v. Commonwealth*, 465 Mass. 810, 992 N.E.2d 257 (2013) (listing four "essential component[s] – a *sine qua non* – of a valid taint team procedure"); *Kala v. Aluminum Smelting & Ref. Co.*, 688 N.E.2d 258, 266 (Ohio 1998) (listing elements of an effective screen); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 124 cmt. d (2000) (discussing screening).

team's privilege determination, court "[did] not see any check in the proposed taint team review procedure against the possibility that the government's team might make some false negative conclusions, finding validly privileged documents to be otherwise"); *United States v. Pedersen*, No. 3:12-cr-00431-HA, 2014 WL 3871197, at *29 (D. Ore. Aug. 6, 2014) ("it is obvious that no government entity should intentionally review privileged material without the express approval of the court"); *In re Search of 5444 Westheimer Rd. Suite 1570*, Misc. Action No. H-060238, 2006 WL 1881370, at *3 (S.D. Tex. July 6, 2006) (nothing that courts have upheld "taint team" review in circumstances in which "the defendants would have the opportunity to object to any privilege determinations made by the taint team" with such objections resolved by the court before materials were turned over to the Prosecution Team). *Accord* United States Department of Justice, *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*, 111 (3d ed. 2009) (recommending that defense counsel have the opportunity to review taint team's results before turning over documents to the prosecution in order to enhance legitimacy).

The use of even one privileged document can result in disqualification. *E.g., Lewis v. Capital One Services, Inc.*, 2004 U.S. Dist. LEXIS 26978 (E.D. Va. 2004) (plaintiff's counsel disqualified for viewing privileged document). The full extent of the Prosecution Team's use of privileged information cannot be fully determined without additional discovery, a review of the agents' notes of their interviews, a review of grand jury minutes, and a full evidentiary hearing.

In determining whether disqualification of the Prosecution Team is required for privilege violations, courts consider the following factors: (1) whether the attorney knew or should have known that the material was privileged; (2) the adequacy and timeliness of any screening safeguards employed to shield against intrusions into the privilege; (3) the promptness with which the attorney

notifies the opposing side that he or she has received its privileged information; (4) the extent to which the attorney reviews the privileged information; (5) the potential prejudice from the violation; (6) the extent to which the privilege holder may be at fault for the unauthorized disclosure; and (7) the extent to which the violator will suffer prejudice from the disqualification. *Richards v. Jain*, 168 F. Supp. 2d 1195 (W.D. Wash. 2001), adopting *In re Meador*, 968 S.W.2d 346 (Tex. 1998). *Accord Maldonado v. New Jersey*, 225 F.R.D. 120, 138 (D. N.J. 2004).

Although the *appearance* of impropriety, standing alone, is usually not enough to require disqualification, many courts still consider it to be a relevant factor.[3] This is especially so when the conduct of government attorneys is under scrutiny.[4] Indeed, pursuant to 5 C.F.R. § 2635.501, government employees, including prosecutors, are directed to "take [ ] appropriate steps to avoid an appearance of loss of impartiality in the performance of his [/her] official duties." *See also* 5 C.F.R. § 2635.502; 28 C.F.R. § 45.2(b)(2).

Some of the reasons for invoking disqualification as a remedy include:

(1) to deprive the offending party and counsel of the benefits obtained from improper access;

(2) to prevent even the risk of future use of privileged information, especially by an

---

[3] *See, e.g., Optyl Eyewear Fashion Int'l Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1049 (9ᵗʰ Cir. 1985); *Arnold*, 2004 U.S. Dist. LEXIS 19381, at *16); *Lewis v. Capital One Servs.*, No. 3:04CV186, 2004 U.S. Dist. LEXIS 26978, at *13-14 (E.D. Va. June 10, 2004); *MMR/Wallace Power & Indus., Inc. v. Thames Assoc.*, 764 F. Supp. 712, 718 (D. Conn. 1991). Some states, including Florida, have amended their conflict rules to eliminate references to the "appearance of impropriety." However, Florida courts have continued to rely on it as a basis for disqualification. *See State Farm Mut. Auto. Ins. Co. v. K.A.W.*, 575 So. 2d 630, 633-34 (Fla. 1991); *Baybrook Homes, Inc. v. Banyan Const. & Dev., Inc.*, 991 F. Supp. 1440, 1444 (M.D. Fla. 1997).

[4] *See, e.g., Gomez v. Superior Court*, 717 P.2d 902, 904 (Ariz. 1986); *Villalpando v. Reagan*, 121 P.3d 172, 177 (Ariz. App. 2005); *Speckels v. Baldwin*, 512 N.W.2d 171, 176 (S.D. 1994); *People v. Davenport*, 760 N.W.2d 743, 748-50 (Mich. App. 2008); *People v. Doyle*, 406 N.W.2d 893, 899 (Mich. App. 1987); *Pisa v. Commonwealth*, 393 N.E. 2d 386, 389 (Mass. 1979).

adversary with a selective memory. "The rules governing disqualification are designed to protect against the potential breach of such confidences, even without any predicate showing actual breach . . . The threat or potential threat that confidences may be disclosed is enough." *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 591 (D. Minn. 1986); *see Martinez v. Cty. of Antelope*, 2016 WL 4094864, *2 (D. Neb. August 1, 2016) ("Courts also take into account a party's interest in a trial free from even the risk that confidential information has been unfairly used against it") (quoting *Gifford v. Target Corp.*, 723 F. Supp. 2d 1110, 1117 (D. Minn. 2010) (quoting *Arnold v. Cargill*, 2004 WL 223410, *5, 13 (D. Minn. Sept. 24, 2004) (holding that "the 'risk' that improperly obtained confidential and privileged information might be used against Cargill justifies disqualification here"));

(3) To "avoid the appearance of impropriety and to protect against the disclosure of confidences." *Baybrook Homes, Inc. v. Banyan Constr. & Development, Inc*, 991 F. Supp. 1440, 1444 (M.D. Fla. 1997) (citation omitted).

The defendants cannot be faulted for anything the government unlawfully learned via their seizure, review, and subsequent use of privileged materials. The government has only itself to blame for its conduct. The foregoing factors strongly support disqualification. *See Richards*, 168 F. Supp. 2d at 1209 (even if the Plaintiff's counsel returned the privileged materials, it would not remove the taint on the proceedings because "disclosure of privileged information cannot be undone."); *Cnty. of Los Angeles v. Superior Ct*, 222 Cal. App. 3d 647, 657-58, 271 Cal. Rptr. 698, 705 (Ct. App. 1990) ("Having become privy to an opposing attorney's work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case."). In both *Richards* and *Maldonado v. New Jersey*, 225 F.R.D. 120, 138 (D. N.J. 2004), cases with similar

but less egregious factual scenarios, counsel were disqualified. The fact that this case involves prosecutors and federal agents does not call for a different result. *See In re Grand Jury Proceedings John Doe #462 (Under Seal)* 757 F.2d 600, 602 (4th Cir. 1985) (ordering the disqualification of the prosecutor and two agents but later finding issue moot); *United States v. Horn*, 811 F. Supp. 739, 748 (D. N.H. 1992) (where prosecutor and agent secretly kept track of discovery documents copied by defense counsel, work product privilege, ordering disqualification of both the prosecutor and the agent), *aff'd in part and rev'd in part* 29 F.3d 754, 758 (1st Cir. 1994) (affirming disqualification order).

A hearing to determine the appropriate remedy—whether disqualification or dismissal—is warranted.

### 4. DEFENDANTS HAVE MADE THE REQUISITE ADEQUATE SHOWING OF SELECTIVE PROSECUTION ENTITLING THEM TO DISCOVERY AND A HEARING (REPLY IN SUPPORT OF DE:95, PART II)

Even accepting the government's allegations as true, a group of guys occasionally having parties in the Hamptons where sometimes non-consensual sex has allegedly occurred does not make a sex trafficking conspiracy. It makes a selective prosecution.

Finding at least a prima facie case of selective prosecution is demonstrated by the government's conduct thus far. This has included:

- Statements to the press describing defendants as "predators" and "heinous," *see* DE:95 at 13, and conducting a loud press conference which led a reporter to remark that the office had multiple times in the past been at the podium talking about wealthy men;

- Violating privilege by illegally accessing materials prepared and shared with counsel to defend against claims, and then using such materials to build its case against the defendants and to detain them;

- Refusing to turn over *Brady* evidence to which the defendants are entitled;

●      Abusing the grand jury process to charge an alleged swingers cruise rape on the high seas that occurred over a decade ago;

●      Keeping a third superseding indictment hidden from defendants from over a month;

●      Manufacturing venue to add a purely swingers-cruise-rape charge, thus betraying the true non-federal nature of its allegations;

●      Improperly obtaining a search warrant when it had no evidence of probable cause of any federal crime;

●      Refusing to dismiss an 18 U.S.C. § 1594 attempt charge as time-barred when it has previously dismissed such attempt charges against other defendants falling outside of the statute of limitations.

The government has sought to substantially expand the federal criminal statutes to bring novel federal charges amounting to date rape. There is no reason the allegations in the case should not have been left to the states—as is mandated by constitutional constraints, reasonable statutory construction, and criminal procedure. This record evidence, combined with statistics cited in the opening brief, *see* DE:95 at 11, demonstrates the discriminatory intent and impact of this selective prosecution. The defendants have made the required adequate showing that the motive of this case was to prosecute these specific high profile and wealthy defendants precisely so that exact fame and wealth would bring attention and accolades.

A defendant is entitled to discovery supporting a constitutional claim for selective prosecution upon providing evidence that "the government's discriminatory selection of him for prosecution has been invidious or in bad faith," *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974), along with "a credible showing of different treatment of similarly situated persons." *United States v. Armstrong*, 517 U.S. 456, 470 (1996). Once a defendant makes this "adequate preliminary showing of relevancy," he is entitled to "a hearing upon a motion raising defenses or objections," and for the district court to "issue a subpoena directing the government to produce

books, papers or records for introduction at the hearing." *Berrios*, 501 F.2d at 1211.

Even if this Court were to find the litany of abuses listed above irrelevant to this analysis, the government's lengthy and strident response fails to explain how defendants have not met both of these requirements based on the government's comments and conduct and the prevailing statistical evidence. First, defendants are in the rare position of having direct evidence of discriminatory intent in the public record. The government has held press conferences at which reporters have remarked on the tendency to prosecute people of wealth and status. This necessarily raises whether or not the defendants were impermissibly selected for prosecution based on "an unjustifiable standard or arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). A defendant's net worth is an entirely arbitrary selection criteria for pursuing a sex crime prosecution.

Second, defendants are in the equally rare position of having staggeringly one-sided statistical evidence supporting a finding of discriminatory effect. The government's response does not attempt to identify any similarly situated people who *were* prosecuted. As the government apparently concedes, defendants are the first of their kind. Never before have similarly situated people been charged under the federal sex trafficking and Mann Act laws for the conduct alleged in the indictment. Indeed, as defendants make clear in their motion, DE:95 at 12, their alleged conduct is identical to that committed by more than 139,000 other people a year. Yet defendants alone have been charged with a federal crime.

The government relies on *United States v. Bass*, 536 U.S. 862, 864 (2002) for the principle that statistics are only relevant if they contain data as to similarly situated individuals. The government's reliance on *Bass* is misplaced. There, the Court rejected allowing nationwide statistics as to the racial demographics of death penalty charges and pleas to be probative of whether the

41

defendants were selectively prosecuted for their specific crimes.  *Id*.

Here, the defendants did exactly what the Court requested in *Bass*—they brought national statistics, not about the relative prosecution rates of the wealthy, but specifically as to the relative federal prosecution rates of those who committed the crimes of which they have been accused.  In that group of "similarly situated" people, individuals charged with federal date rape, the defendants stand alone.  The government has not identified a single case where someone has been federally prosecuted for alleged date rape under 18 U.S.C. § 1591.  The government asks the Court to ignore this fact, asserting there is nothing to see in these numbers; somehow, under the government's view, the defendants are uniquely deserving of the unique status as *the only people charged with date or party rape* by the federal government.  As the Supreme Court has made clear, "presumptions at war with presumably reliable statistics have no proper place in the analysis of this issue."  *United States v. Armstrong*, 517 U.S. at 470 (1996).

The government provides three defenses for its conduct.  The first is to hide behind the supposedly high bar set by *Armstrong*.  That bar is necessarily high—not every prosecution can be derailed by *unprompted* accusations of selective prosecution.  But the government, as with its Tenth Amendment response, *see infra*, treats the standard as so high it is practically impossible to meet, essentially foreclosing discovery for *any* selective prosecution theories without perfectly analogous facts to existing cases.  This plainly misstates the law—selective prosecution claims provide a constitutionally mandated protection against prosecutorial abuse that cannot be ignored simply because the protection rarely applies.

As the defendants' opening brief makes clear, the standard for selective prosecution is high but not insurmountable.  The bar is cleared in those rare cases where there is adequate relevant

evidence of arbitrary classification by the government.  The government fails to grapple with or explain how their public focus on the defendants' wealth has not, standing alone, already entitled defendants to discovery as to the motives behind the prosecution.  All the government says is that the defendants' wealth is relevant to the case because it was the "means and method" of their crime.  DE:121 at 39.  This defies credulity.  Every crime committed by a wealthy person is presumably enabled by their wealth.  And in this case, the "means" in question is not, in fact, paying women to travel or paying women for sex.  It is simply hosting social events that are more characteristic of a wealthy individual than of a less wealthy individual.  The defendants' vacationing in the Hamptons is not enough to make their wealth a foundation of the prosecution.  The government's focus from the beginning has been on defendants' status and wealth, and it has made that clear to the national media.

The government's second defense is that evidence of discriminatory effect is irrelevant since this is a complex sex-trafficking case so unique that no one else could be "similarly situated" to the Alexanders.  This ignores how any "complexity" to the case has been manufactured by the government's grossly expansive view of the federal sex trafficking laws.  In reality, this is a series of unrelated alleged party- or date-rape cases, shoe-horned into a federal "conspiracy" to assert jurisdiction and to draw headlines.  The government's strategy is simple: create an unprecedented expansion to the relevant federal statutes to permit the federal prosecution of the defendants and then use this manufactured novelty to defend their prosecution against the constitutional challenge of selective prosecution.  By the government's reasoning, only the defendants could ever fit the government's theory; therefore, there can be no discrimination in the selection of only them for prosecution.

The government cannot use its own unprecedented charging theory as a shield.  It is the government that chose to label the provision of dating and social benefits by wealthy men as a federal "scheme."  It cannot now claim its own aggressive characterization makes the case unique. If the government's theory were applied evenly, any person who paid for a date's travel or who hosted or contributed to a social event and was later accused of sexual assault would be a federal trafficker.  And yet no such people have been previously charged.  The government's reliance on this tautology only  highlights precisely why there is strong evidence of arbitrary classification.

When evaluating a claim for discriminatory effect, the question is whether others who engaged in the same type of conduct were not prosecuted under the same federal laws.  *See United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992).  The conduct here is not a federal trafficking enterprise holding women in sexual slavery; it is alleged sexual assault in a social or dating context. National statistics show over 139,000 such assaults are reported annually.  *See* DE:95 at 12.  None of those cases—not one—has resulted in a federal sex trafficking prosecution.  The alleged conduct at the heart of this case is handled by state authorities thousands of times a year.  Yet only the defendants, men of wealth and status, now face a federal sex trafficking prosecution for the same alleged conduct.  That is discriminatory intent and effect.

The government's third defense is to waive away the defendant's serious constitutional and procedural concerns, identified above and in defendants' other motions, as "mere assertions that the government intends to prove are false."  Gov. Br. DE:121 at 40.  This illustrates the need for an evidentiary hearing at which the government may attempt to disprove the adequate showing that has been made by the defense.  The government has responded to factual assertions relevant to the selective prosecution inquiry by declaring them to be false.  This necessitates a hearing.

The government's pattern of conduct in this case has included misleading warrant applications to a neutral magistrate; abuse of the grand jury; and substantial breaches of attorney-client privilege. The government has stretched the federal statutes past their breaking point to attempt to find laws that cover the defendants' alleged conduct, and then gone so far as to concoct a scheme to create venue where it otherwise would not exist. The government's own conduct with respect to the press illustrates that the prosecution is driven by an improper aim to vastly expand federal jurisdiction to prosecute wealthy people who commit state offenses and to thus generate headlines and attention.

Because defendants have presented clear evidence of both discriminatory effect and purpose, they are entitled to discovery, a hearing—and ultimately dismissal.

## PART III: DISMISSAL ARGUMENTS

This section discusses the myriad bases for dismissal in this matter. It is divided as followed:

(1) **The prosecution violates the Tenth Amendment**, *see* DE:95;

(2) **The indictment is legally invalid and must be dismissed**, *see* DE:97:

> (a) The indictment fails to allege a legally sufficient conspiracy, *see* DE:97;
>
> (b) The indictment fails to allege a commercial sex act, *see* DE:97;
>
> (c) The failure to allege interstate nexus warrants dismissal; *see* DE:97;
>
> (d) The indictment's conflation of essential elements of 18 U.S.C. § 1591 fails to state an offense, *see* DE:97;
>
> (e) The indictment fails to provide constitutionally adequate notice; fails to allege essential elements with the requisite degree of specificity; and is unconstitutionally vague, failing to state an offense;
>
> (f) Count 1 and Count 7 (charging 18 U.S.C. § 1594 violations) are time-barred; and the substantive § 1591 counts are time-barred to the extent they rely on *Pinkerton*;

45

(4) **Count Five must be dismissed**, *see* DE:106

(5) **The Mann Act counts must be dismissed**, *see* DE:72.

## *1. THE FEDERALIZATION OF DATE OR PARTY RAPE VIOLATES THE T ENTH AMENDMENT U NDER BIN DING SU PREME CO URT PRECED ENT TO WHICH THE GOVERNMENT OFFERS NO RESPONSE—ONLY APPARENT CONCESSION. (REPLY IN SUPPORT OF DE:95, PART I)*

Defendant's Tenth Argument is straightforward. Reading the federal sex trafficking laws to criminalize any rape that occurs at a social event where someone paid to have the social occasion be an attractive event worthy of a guest's attendance violates the Tenth Amendment, absent a strong showing that this expansive meaning was intended by Congress. This is not a fringe theory. It instead follows explicit Supreme Court guidance that discourages broad readings of federal criminal law that infringe on state jurisdiction. The infringement here is obvious. The government's theory transforms every rape that happens at or after a party, a concert, a boat ride, a dinner, or a football game into sex trafficking. After all, at each of these events, something was exchanged for value to induce attendance at an event, and rape occurred subsequent to that exchange. That cannot be the state of the law. Social rape occurs every day, and is a local matter traditionally left up to the states. As Defendants' initial motion, DE:95, lays out, the legislative history establishes that Congress never indicated it was federally criminalizing date rape, social rape, or any other rape that happens to occur subsequent to any social purchase; it instead sought to reach materially different conduct. And the Supreme Court made clear in *Bond v. United States*, 572 U.S. 844 (2014), that the relevant test is whether Congress has clearly indicated that the law should have such a reach. There is no such clear indication here.

The prosecution addresses defendant's Tenth Amendment argument with an inadequately supported syllogism: If a federal statute prohibits conduct, and the federal courts have said to define

46

such conduct broadly, it cannot violate the Tenth Amendment to charge an individual for conduct that falls under a broad reading of the statute. This syllogism misstates controlling law. Per a well-established line of on-point Supreme Court precedent, the rule is in fact the opposite: "Because our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Bond v. United States*, 572 U.S. 844, 848, 134 S. Ct. 2077, 2083, 189 L. Ed. 2d 1 (2014). Under *Bond* and like cases, the presumption is precisely against reading federal criminal statutes broadly when doing so would infringe on the traditional police powers of the states.

The sole controlling authority the government relies on to argue that the relevant statutes should be read so broadly as to defeat any Tenth Amendment claim is *United States v. Raniere*, 55 F.4th 354 (2d Cir. 2022), which affirmed a sex trafficking conspiracy conviction in a case that involved a secret society with masters and sex slaves. The prosecution insists *Raniere* instructs courts to read these laws broadly. DE:121 at 31. But the case is not properly applied here in the manner the government seeks to use it. *Raniere* explains that the laws in question allow a capacious understanding of what things, whether monetary or otherwise, can be a predicate for sex trafficking when exchanged for sex. It is otherwise entirely in agreement with defendants as to what *conduct can be considered sufficient to constitute an exchange* of sex for something of value, such that sex or rape was directly antecedent to trafficking in sex. There must have been an exchange, whereby there was a "sex act of which anything of value is given to or received by any person because of such sex act." *Raniere*, 55 F.4th at 363. This is an essential distinction. Without it, all sex or rape that occurs in a social context where socializing at the event was meant to be attractive, such as due

to being hosted a fancy location or the expected presence of reputable, attractive, or powerful people, is now considered sex trafficking, despite no evidence that there was ever any intentional exchange of anything as to sex.  If inducement of attendance of a victim, standing alone, without any evidence of inducement for sex, or the commercial facilitation of the rape itself, can constitute sex trafficking, then the federal sex trafficking laws essentially criminalize all rapes that occur when the victim's attendance was itself not coerced but in any way influenced by the nature of the experience she decided to attend.

There must be a limit as to when ordinary social conduct—such as having a party that includes food, alcohol, a fancy DJ, or a nice pool; inviting someone on a boat ride; or hosting a paid dinner at a venue—prior to sex, whether consensual or non-consensual, can reasonably be interpreted as constituting an exchange for sex.  There must be a limit as to whether ordinary rape that occurs after things of value have existed in connection with a date or a party can ever, under any plausible reading of the relevant statutes or their legislative history, legally constitute sex trafficking. As to this question—whether or not courts should allow an expansive reading of what can be sex that occurred in exchange for anything of value—the Supreme Court could not be more clear in its guidance.  Statutes are "not soundly read to make virtually every [crime] in the country a federal offense." *Jones v. United States*, 529 U.S. 848, 859 (2000).  Here, the Government's reading of the sex trafficking and Mann Act laws "would alter sensitive federal-state relationships, convert an astonishing amount of traditionally local criminal conduct into a matter for federal enforcement, and involve a substantial extension of federal police resources." *Bond v. United States*, 572 U.S. 844, 863 (2014).  To paraphrase the Chief Justice, it would "transform the statute from one whose core concerns" are the international sexual slave trade into a massive federal anti-date-rape regime "that

reaches the simplest of assaults." *Id*.

## 2. THE INDICTMENT IS LEGALLY INVALID AND MUST BE DISMISSED (REPLY IN SUPPORT OF DE:97)

The government begins its responsive filing by highlighting first five pages of the Indictment's conspiracy count, which include sordid tales of sexual assault but never once allege anything of value being provided *in exchange* for any sex. Indeed, the first line of the government's response, and of the indictment, illustrates the noncommercial nature of the allegations: "For well over a decade, Alon Alexander, Oren Alexander, and Tal Alexander, the defendants, worked together and with others to repeatedly and violently drug, sexually assault, and rape dozens of female victims." DE121:1 (citing Indictment).

Later in the brief, the government shifts gears, and as with its Tenth Amendment response advances yet another inadequately supported—and wrongly premised—syllogism: If an indictment contains factual detail that exceeds the requirements of the Rule 7(b) pleading standard, then the facts as alleged cannot be scrutinized for whether they are legally sufficient to state an offense. This is wrong. The government chose to issue, via factual allegations in Count 1 of its indictment, what amounted to a press release cluttered with generic and unspecific allegations, unrelated to sex trafficking, in the conspiracy count—yet to tell the defendants nothing else about what they are accused of doing, when, and to whom. The lack of detail as to these essential facts is problematic on notice grounds. The facts as alleged in the conspiracy count can of course be scrutinized for legal sufficiency—and that is precisely the role of a 12(b)(3) motion to dismiss. These are two separate arguments raised by the motion to dismiss—one related to notice, and the other to legal sufficiency of the facts as alleged. The government conflates the two in its response which enables it to avoid engaging with either. To argue, as the government appears to do, that "we didn't have to include

this detail ergo we are immune from review" is fundamentally inconsistent with Fed. R. 12(b)(3).

Consider the following example: An indictment charges an individual with possessing a firearm as a convicted felon. The indictment alleges, in painstaking factual detail, that the defendant was seen running around with a toy gun and had previously been convicted of a crime (which under state law happens to be a misdemeanor). Under the government's view, this is sufficient to survive a motion to dismiss, because the deficiencies relate to facts the government was not required to allege. *United States v. Dawkins*, 999 F.3d 767, 779 (2d Cir. 2021), the case cited by the government, does not stand for the principle that this is permitted. In *Dawkins*, the Second Circuit instructed that motions to dismiss should not be transformed into requests that the district court "engage in summary judgment proceedings"—that is, proceedings where competing versions of additional factual showings outside of the indictment are considered. That is not what defendants seek here. The defendants here do not argue that *additional* facts must be alleged; they argue that those alleged are *legally* insufficient.

To be clear: while defendants fully contest the facts outlined in Count 1 of the Indictment, their motion to dismiss does not seek dismissal based on a factual dispute about what actually happened. Rather, they seek dismissal because *even if accepted as true*, the allegations in the indictment are legally insufficient to support the sex trafficking charges. The government's attempting in its brief to shy from its own allegations, and hinting that it might constructively amend or vary from the indictment, does not justify allowing it to proceed on a defective indictment. Where the indictment is not "valid on its face," it cannot form the basis for "trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

## A. The indictment's conspiracy allegations are defective

The government insists that a conspiracy, i.e., an agreement to forward and commit a crime, may be backward-looking only and need not have any forward-looking or anticipatory aspect. This would turn conspiracy law on its head. One cannot agree to commit a crime that has already been committed. Nor is it a conspiracy to agree that if circumstances are ever favorable to commit a crime, a crime might be committed; this is because of the conditional nature of such agreement is such that the lack of commitment necessary to inchoate liability does not rise to the level of a prosecutable offense.

Ultimately, the government asserts something in the nature of intermittent sexual aggression in the context of high-end living. This is unlike a situation in which there is an ongoing agreement between a group of people to commit a specific crime, such as a series of boiler room operations that are connected sufficiently in time, with consistency of membership and methodology to warrant a finding of ongoing conspiratorial action. In such cases, as the Second Circuit has found, there must be a connectedness between one event and the next going beyond mere methodology. The government must allege and prove a "single *continuing* conspiracy," not the opposite, i.e., multiple non-continuous joint actions each distinct in completion. *United States v. Aracri*, 968 F.2d 1512, 1522 (2d Cir. 1992) (emphasis added). Here, the government alleges intermittent use of a modus operandi to make women available for sexual aggression. That does not satisfy the Second Circuit standard, particularly in a trafficking matter. It is not merely the case that there is no ongoing contemplation of another *trafficking* event, but that the individuals themselves alleged to be victims are not thereafter trafficked, according to the government. In other words, one-off sexual events for individuals in the government's chronically misplaced commerciality theory lacks the relevant connection beyond idiosyncratic repeated methodology. The theory the government is employing

has no precedent and would render any related lives in which events of a criminal nature have occurred into a criminal conspiracy, thereby eliminating the difference between joint action and conspiracy.

The Indictment's conspiracy count charges as follows, by reference to the substantive counts: Alon, Oren and Tal Alexander are jointly accused of rape in 2009 and in 2016. This is insufficient to allege a conspiracy. As discussed above, the government seeks to rely on notice principles to defeat the defense claims of legal insufficiency. The allegations in Count 1 however do not sufficiently state an offense of conspiracy. The government also stated in its response that the conspiracy began ███████████████████████ The indictment only alleges conduct starting in 2009. This demonstrates that what is alleged is not a trafficking conspiracy, and the government must allege a sex trafficking conspiracy. The government asserts dozens of victims, but this improperly inflates its allegations *as to sex trafficking specifically.* The government wants to introduce at trial all kinds of prejudicial allegations—but the conspiracy is alleged only as to a few specific instances. The government's non-sex trafficking allegations reveal that there is no linear connection as required.

<u>The Lack of an Ongoing Basis Alleged Warrants Dismissal</u>

Disparate behavior without a necessary connection of shared criminal purpose is insufficient to state an offense of conspiracy.

The government misapprehends the basis for which the defense cited *United States v. LeCompte*, 599 F.2d 81, 82 (5th Cir. 1979) and *United States v. Raniere*, 55 F.4th 354 (2d Cir. 2022). The facts in those cases demonstrate the extent to which sex trafficking conspiracy case law is well understood to refer to a "single-purpose and continuously ongoing undertaking," *Lecompte*,

599 at 82 (citing *United States v. Clemons*, 577 F.2d at 1253) or a continued conspiratorial effort to enslave people for sex. *United States v. Raniere*, 55 F.4th 354 (2d Cir. 2022).

There is no forward-looking or ongoing nature of the conspiracy alleged; no pattern; and no allegations as to any sort of agreement. The government's response does not identify a single case where a conspiracy has been established on the basis of disparate and unconnected events, without any sort of pattern or consistency or any forward-looking and continuous nature. The government cannot identify a single case where a purported conspiracy of this sort was alleged.

Multiple Conspiracies

The government alleges no shared continuing single criminal purpose; there are no factual allegations that allow for the inference of a single *ongoing* purpose. The nature of the conspiracy alleged is such that any shared criminal purpose would have been completed at the extinguishment of each independent event.

The government argues that "the defendants' multiple substantive sex trafficking offenses are evidence of their ongoing and unbroken agreement to engage in these crimes." Gov. Br., DE:121 at 29 (PDF). But this argument demonstrates the invalidity of the conspiracy alleged, which is revealed by the substantive counts. The substantive counts, incorporated into the conspiracy count, charge the three brothers with jointly participating in sex trafficking only in 2009 and 2016; those are the only two years in which substantive counts are alleged against all three brothers. Oren and Alon are charged with participating in sex trafficking only in 2009 and 2016. These years-long gaps, and the disparate unconnected nature of the conspiracy allegations, demonstrate that the government has alleged multiple conspiracies.

No Agreement

The government cites "knowingly agreed" language in the indictment in its response, but that language appears only in the restating of the statute. With respect to its five pages of factual allegations, the government fails to allege any agreement of shared criminal purpose.

The government says in response that the defendants "worked together to accomplish their criminal objectives." But the indictment's language that the defendants worked together "to repeatedly and violently drug, sexually assault, and rape dozens of female victims" does not adequately allege an illegal agreement to commit a federal crime of sex trafficking. The government's reference to the language that the defendants "worked together and with others to carry out and facilitate their sex trafficking scheme, including on some occasions by committing forcible rapes and sexual assaults together and with others, jointly arranging domestic and international travel and accommodations, and jointly financing the scheme," suffers from the same deficiencies. It alleges that on some occasions the defendants did things, but it does not allege a continuous agreement to do such things, much less to sex traffic. Allegations of joint rape and allegations of jointly funding accommodations do not state an offense of sex trafficking conspiracy.

**B. The indictment fails to allege a commercial sex act.**

The government responds to defense arguments regarding the lack of a commercial sex act, as it did in oral argument before the Second Circuit, with non-responsive citations to *Rainiere* and its progeny, which establish that a thing of value need not be monetary. The primary problem with these citations is that they do not actually respond to arguments raised by the defense. The disagreement can be boiled down as follows:

THE DEFENSE: There must be a thing of value exchanged *on account of* the sex.

THE GOVERNMENT: A peppercorn is enough for consideration.

54

> THE DEFENSE:  There is no exchange "on account of" alleged.  And a peppercorn is not enough to make something commercial.

Indeed, the indictment alleges that material benefits were provided, *but never once alleges that such material benefits were provided in exchange for or on account of* the sex.  Even in its response, the government cannot identify a single sentence of the indictment that alleges anything was *exchanged* for sex.  Not a single reference to any material benefit in the indictment alleges that it was given because of sex or on account of sex.  That is a fundamental flaw in this indictment; it is not, as the government says, an argument based on what the defense expects the government to prove at trial.  It is an argument based on what the government has specifically alleged, and the government seeks to use trial to cure its defective allegations.

Consider the following examples:

- An indictment alleges that a defendant took a woman on an expensive date he planned over the phone (enticement); lied about his height to get her to come on the date (fraud); and had consensual sex after the date (commercial sex due to the expensive date).  If the indictment in this case sufficiently alleges sex trafficking, so too would that one.

- An indictment charges that a defendant hosted a party with a famous DJ and invited 50 attractive women from all over the country.  Many women show up based on this representation. (Enticement.)  No famous DJ—just a local guy with an old mixer, stereo headphones, and a limited playlist. The venue isn't what it was advertised to be either.  (Fraud.)  Both consensual and non-consensual sex happens at the party.  (Commercial sex.)  Everyone was sex trafficked, according to the indictment in this case.

- An indictment alleges that group of single male friends rent a beach house out-of-town for the weekend.  They agree to all to chip into the house, and all agree to each bring two single female friends.  They share pictures of the friends they are thinking of inviting on a group text, asking each other which ones they prefer, and whether they are sufficiently attractive to invite.  Some women are vetoed because they are deemed not sufficiently attractive.  The women accept the invitations for a free beach weekend with a bunch of single guys in beautiful house with a hot tub overlooking the ocean.  One woman is raped on the trip.  The person who raped her subsequently invites her to a concert with him in his hometown the following week.  Sex

trafficking, according to the indictment in this case.

- A college sports team hosts high school recruits for a weekend. They lure them there with potential offers of athletic scholarships. They show them a good time. They take them to a football game. They throw a big party that night. There is a lot of alcohol at the party. They give the high school recruits drinks. One of the recruits, a minor, gets very drunk and sleeps with a fifth-year senior who had taken an active role in planning the recruiting weekend. She doesn't remember what happened the next morning. Sex trafficking of a minor, according to the indictment in this case.

- A 17-year-old flies to New York to visit her 22-year-old boyfriend. Her boyfriend pays for the flight. He lies and tells her his roommates won't be in town, but when she arrives, they are there. She has consensual sex with her boyfriend upon arrival. Sex trafficking of a minor, according to the indictment in this case.

This is not an issue for trial. It an issue created by the specific factual allegations in Count 1 of the Indictment (and incorporated into the substantive counts, which are charged as overt acts of the conspiracy). If these factual allegations are sufficient to state an offense, then so too are the above examples. None of the cases cited by the government suggests that this is the state of the law. The government can cite language saying that a thing of value need not be monetary as much as it wants. But the theory that an attractive event followed by non-consensual sex constitutes sex trafficking is not at all endorsed by the cases the government cites. This is the theory the government took to the grand jury. This is the theory the government indicted on. It is the theory as alleged in Count 1 of the indictment and incorporated into the substantive counts by reference. And when pressed by a panel of the Second Circuit, the government said that luring someone to a secluded area was enough for a commercial sex act under its theory of the case. *See* 2d Cir., No. 25-1296 (audio recording of oral argument of 6/10/25) at 28:18 (government agreeing with court that its theory necessarily means that if someone induces another person to go with them to a secluded place and then rapes them, that is a commercial sex act).

The government in its response says its indictment "demonstrates the causal connection

56

between the sex act and the items of value provided," DE:121 at 20 (p. 38 in PDF) because it alleges that the material benefits were provided to "lure and entice" the accusers to attend the various social events. But that is precisely the problem. An event made more appealing by its material value does not render any sex that occurs at that event commercial. If it did, then *all* sex that occurred at the social events referenced in the indictment, both consensual and non-consensual, would be commercial sex according to the statute. This is where the government's allegations fall apart. The material value of a social event where sex occurs does not establish an exchange of value for sex. Not a single case has held that it does. The government's brief cites no cases to support its unconstitutional and expansive reading of the statutory text. It asks this Court to let it take its deficient indictment to the jury—but that is precisely what the motion to dismiss is designed to prevent against.

Faced with the legal deficiencies of its allegations, the government then drops a footnote suggesting that it intends to deviate substantially from these allegations at trial. *See* DE:121 at fn. 13. The government cannot respond to arguments about legal deficiencies by saying it will switch gears and prove something else at trial. That creates *more* problems with the government's case, leading to at best material variance and at worst constructive amendment. This is not allowed at trial—but more importantly, it is not an adequate response to the legal deficiencies with the case as charged.

The government points out that the sexual slavery in *United States v. Raniere*, 55 F.4th at 365, was sufficient to satisfy a thing of value; indeed, there, sex slaves provided their "masters" various "acts of service" including apparently housework. But *Raniere* involved at least sexual slavery and servitude. *Raniere* emphasized that sexual slaves would perform acts of service for

their masters.  *Rainiere* does not stand for the proposition that if a defendant invites someone to an expensive date or expensive party, subsequently rapes them, and then they go home, there has been commercial sex.

The government cannot plausibly suggest that hosting a party or inviting someone on a date is akin to the sexual slavery in *Rainiere* or the conditional employment tied to sex in *Eckhart v. Fox News Network, LLC*, 2021 4124616 (SDNY Sept. 9, 2021); *Nobel v. Weinstein*, 335 F. Supp. 3d 504, 515 (SDNY 2019); and *Geiss v. Weinstein*, 383 F. Supp. 3d 156, 168 (SDNY 2019).  Sexual slavery is enough.  Sex in exchange for an offer of employment may be enough, as other courts in this district have found in the civil context.  Deriving company profits from a corporate culture that silences sexual assault has been deemed by one out-of-Circuit district court to be enough, *see Acevedo v. exP Realty LLC*, 713 F. Supp. 3d 740, 774 (C.D. Cal. 2024) (cited by the government). But what is not enough is non-consensual sex following an entirely consensual date or party simply because the event itself was improved or enabled by the expenditure of funds.  The government's reliance only on district court civil cases does not bolster its arguments: it demonstrates that this prosecution is completely unprecedented.

The government's response argues that the indictment alleges that defendants provided lodging or traveling to lure victims to locations where the defendants would then sexually assault them.  But this is precisely the problem: the on-account-of is linked in such circumstances to the event, and not to the subsequent sex.  Under the government's reading of the statute, luring someone to an event and subsequently engaging in *consensual* sex would thus also be a commercial sex act. The government would still need to prove force, fraud, or coercion; or that a minor was involved—but that need not be proved via non-consensual sex; it could include fraudulently

58

advertising the event.  The line could not be reasonably drawn between this scenario and that charged here under the government's reading of the applicable text.  The internal contradiction of the government's enticement and commercial sex act theories, and the implications if these theories are deemed a permissible reading of the statutory text, justify dismissal.

**C. The failure to allege interstate nexus warrants dismissal.**

The sex trafficking counts in the indictment do not contain factual allegations that allege interstate commercial nexus, and this is made worse by the absence of any commercial sex act.  The enticement must affect interstate commerce *and* the sex act must be independently commercial.  The vague reference to "Southern District of New York and elsewhere" does not adequately allege interstate nexus; the Hamptons are out of the Southern District but intrastate.  The government does not identify any factual allegations that sufficiently allege interstate commercial nexus.

**D. The government's conflation of essential elements and failure to independently allege separate elements warrants dismissal.**

The government does not contest that its allegations are unlike any sex trafficking conspiracy previously charged. The government's novel theory of sex trafficking is only made possible, as the indictment's allegations reveal, by the conflation of essential elements.

The statute makes clear that there is a (1) requirement that enticement affect interstate commerce; and (2) a requirement that the sex be commercial.  The government's position is that it is enough to just meet the first requirement as to enticement, and that commercial sex can be found on the basis of enticement that affects commerce.  This reading is contrary to the statutory text, which requires two separate elements.

**E. The indictment must be dismissed because it fails to provide constitutionally adequate notice.**

Notice problems render the indictment deficient, and warrant dismissal for reasons discussed in DE:106, DE:97, and DE:72.

The government's citation to *United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013), is instructive here. That case compared *United States v. Russell* the case relied upon by the defendants in their opening motions (*see* DE:106; DE:97 [incorporating DE:106 by reference]; DE:72) with *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007)—an illegal reentry case where the Supreme Court distinguished *Russell* because the illegal reentry statute charged in *Resendiz-Ponce* did not depend so crucially on such a specific identification of fact.

Reconciling these two cases, the Second Circuit in *Stringer* reasoned that "for certain statutes specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element"—or, as here, alternative elements—"is of such importance to the fairness of the proceeding that it must be spelled out in the indictment, but there is no universal requirement." *Stringer*, 730 F.3d at 126. In cases where guilt depends so crucially upon a specific identification of fact, the Supreme Court has "uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *Hamling*, 418 U.S. at 118.

In *Russell*, the defendants were charged under a federal statute that made it a crime for a witness before a congressional committee to refuse to answer questions pertinent to the committee's inquiry, and the Supreme Court found the indictments to be insufficient because they failed to specify the subject matter of the inquiry. As the Second Circuit in *Stringer* observed, other cases falling into the *Russell* category have required indictments to specify "what statements are alleged to be false, and in what respect they are false, in charges of criminal falsity," 730 F.3d at 126 (citing *United States v. Tonelli*, 577 F.2d 194, 200 (3d Cir. 1978) (vacating conviction because indictment

did not set forth precise falsehoods with sufficient clarity to permit a jury to determine their verity and to allow for meaningful judicial review of materiality) and *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (same as to false tax returns)), and, in drug cases, "the type of controlled substance alleged to have been manufactured, distributed, dispensed, or processed, when charging under the controlled substances statute, 21 U.S.C. § 841." *Stringer*, 730 F.3d at 127 (citing *United States v. Thomas*, 274 F.3d 655, 660 (2d Cir. 2000)).

The discussion in *Stringer* makes clear that the complexity of the statute charged is relevant to whether *Russell* or *Resendiz-Ponce* controls. In a case involving, say, possession of a firearm as a convicted felon, it may be enough to track the statutory language and state the dates, as it was in *Resendiz-Ponce*. But this case charges far more complex sex trafficking, Mann Act, and rape counts; the core of criminality is directly related to the identity of the individual and the interactions with that individual. It is unlike a scenario involving conduct where the illegality is obvious from the restatement of the offense in the indictment; here, the indictment provides no notice as to which sexual activity specifically the government alleges was criminal. It seeks to meet the force, fraud, or coercion element of sex trafficking by alleging rape or sexual assault; but it is entirely unclear from the indictment who was raped or sexually assaulted and when.

Criminality here is also related to *how* certain individuals were allegedly sex trafficked or otherwise, as 18 U.S.C. § 1591; 18 U.S.C. § 2422(a); and 18 U.S.C. § 2241 all provide various statutory alternatives for essential elements. Sex trafficking especially is among the more complex of those offenses identified in the federal criminal code. And here, defendants are left guessing as to what they are accused of doing.

Notably, the indictment in *Stringer* "included far more limiting specificity" than the

61

indictment in this case. 730 F.3d at 124. "In addition to tracking the language of the pertinent criminal statute and specifying the time frame of the commission of the offense, Count Two, by cross referencing Count One, provided substantial additional detail as to the means by which Stringer committed the offense. It specified that he committed the fraud by "creat[ing] counterfeit checks drawn on an account at JP Morgan Chase in Manhattan, which he deposited into fraudulently created accounts at SunTrust Bank in Florida." *Id.* "Notwithstanding its failure to specify the names of persons whose identifying documents were used, this charge, compared to many commonplace indictments, contained substantially more limiting detail." *Stringer* was thus a case where the defendant could easily ascertain what the charge involved, because the defendant would have known which identification he used as to each transaction. In a case where defendants understood all sex they had to be entirely consensual, and interacted with hundreds of people socially over the years, the identification of people who say they were injured at a social event where defendants were present and allegedly involved is essential. And this indictment does not give specific dates, specific locations, or specific things of value exchanged for specific sexual relations with specific individuals. "[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Pirro*, 212 F.3d at 93. This indictment fails to do so and therefore must be dismissed.

Discovery cannot save a defective indictment, *see United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999), but even if it could, it would not do so here. And the defendants are plainly prejudiced by this: they do not know who they are accused of sex trafficking, when it occurred, or

how they are alleged to have sex trafficked people with whom they supposedly socialized—they do not even know if they have ever met the alleged victims. To the extent that the government's theory is the mere hosting of a party or date invitation renders sex commercial, then *anyone who ever attended a party or went on a date could be a victim*. Defendants socialized with hundreds of women when they were single. This is not illegal. Due to the two-party and often complex nature of sexual interactions—and the unescapable reality that sometimes one party will view an interaction as entirely consensual while another party will not—this is precisely the sort of case that falls under *Russell* and requires more specificity. As the indictment stands now, the defendants do not even know if they *ever had sex with* the people identified as "victims" because they do not know who they are. This does not satisfy the constitutional notice requirements nor the Indictment Clause. For all we know, the government could have identified several alternative victims to the grand jury, and be waiting to decide whom they want to identify as a "victim" at trial. This disregards constitutional safeguards underlying indictments, and the constitutional concerns requiring specificity are present here.

Defendants have tried to identify, to the best of their ability, certain accusers in the indictment. There are several counts for which the defendants have been entirely unable to identify who the alleged victim is among the many people with whom they socialized over a decade ago. This is not how criminal trials work in this country. This is substantial prejudice, as the defense in this matter will of course in some aspects relate to defendants' own understanding of and memory of what occurred, if anything, with respect to each individual. It also severely hampers defense investigation into the charges, further prejudicing the defense. The Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*,

547 U.S. 319, 319 (2006).  The lack of specificity and constitutional notice in the indictment denies

them that opportunity, and warrants dismissal.

## F.  The government has charged time-barred offenses, warranting dismissal.

*The conspiracy count is time-barred*

The government concedes that the applicable statute of limitations for sex trafficking

conspiracy is five years.  The government's response indicates its intent at trial to rope in conduct

that even falls outside of its own expansive reading of the sex trafficking statute.  The government

responds to defense arguments regarding the time bar by arguing that the sex trafficking conspiracy

also included state-regulated rape and sexual assault.  The government cannot escape the statutory

time-bar for conspiracy to commit *sex trafficking* by alleging other-acts evidence that does not

satisfy even the government's expansive and unprecedented definition of sex trafficking.

The government again seeks to make this an issue of pleading requirements, but the specific

facts alleged demonstrate the time bar. The government has not alleged that anyone was sex

trafficked after 2016. They have alleged that a "sex trafficking conspiracy" occurred between 2009

and 2021—but they have also alleged that the conspiracy related to state-defined sex crimes that

were not sex trafficking.  Statutory time bars cannot be evaded in this manner.

*The attempt charged in Count 7 is also time-barred*

Attempt under 18 U.S.C. § 1594 has a five-year statute of limitations.  *See* 18 U.S.C. § 3282.

In an effort to distract from the fact that the *government has previously acknowledged this time bar,*

*see United States v. Gibbs*, 2024 WL 1998055 (D. Del. March 20, 2024), the government focuses

its response on aiding-and-abetting law which is not relevant here.   Count 7 charges a violation of

18 U.S.C. § 1594(a)—attempted sex trafficking.  In *Gibbs*, the *pro se* defendant moved to dismiss

charges of attempted sex trafficking under 18 U.S.C. § 1594(a) as time-barred. The government

responded with a "motion to dismiss the charges of violating 18 U.S.C. § 1594(a)." *Id*. at *2. Now,

the same government disputes the time bar that its own conduct previously recognized. The

government does not respond to the defendants' *Gibbs* citation, and nor does it attempt to justify its

differential treatment of these defendants, which cannot be justified here.

     *Gibbs* is not the only case where a district court has dismissed a § 1594(a) count as time-

barred without objection from the government. In *United States v. Pittman*, 2015 WL 4772731, *5

(S.D. Cal. Aug. 12, 2015), the court held:

> As to Martin's contention that Count Eleven is barred by the five-
> year limitations period set forth in [18 U.S.C.] § 3282, this Court
> finds defendant's argument persuasive. Count Eleven charges
> defendant Martin with recruiting an adult female (AF1) through the
> use of force, threats of force, fraud or coercion to engage in
> commercial sex acts in violation of 18 U.S.C. § 1591(a),(b), and
> 1594(a). This charge alleges unlawful conduct between July 2009
> and October 19, 2009. The original indictment was filed on
> December 19, 2013, but it did not contain Count Eleven. Defendant
> Martin was charged as to Count Eleven in the superseding indictment
> filed on November 20, 2014, approximately one month after the five
> year statute of limitations for this offense expired. As such, this
> Court finds that the charge alleged in Count Eleven is untimely and,
> as such, must be dismissed.

*Id*. at *5. And in *Pittman*, the government "neither addressed the issue in its response to Martin's

motion nor during oral argument." *Id*. at *5 n.3. The government's contesting the issue here—with

distracting and non-responsive discussion of aiding-and-abetting law—when it has previously

conceded it in other cases also illustrates its selective prosecution of these defendants.

     <u>*Any counts that rely on Pinnkerton are time-barred*</u>

     The government claims to not understand the defense arguments regarding Pinkerton

liability. These arguments are straightforward. Pinkerton liability is a theory of substantive guilt

that relies on the existence of a conspiracy; in other words, it allows conviction based on substantive counts if such acts were reasonably foreseeable to the members of the conspiracy. If the basis for conviction on the substantive counts is the existence of the conspiracy, then the substantive counts must fall within the *conspiracy time bar*—not within the time bar for substantive counts. This is because, where the government seeks to establish substantive guilt via *Pinkerton* it creates a scenario in which, but for the conspiracy, there would be no conviction on the substantive counts. The government cannot have it both ways. If it wants to establish substantive guilt via a Pinkerton theory, it must contend with the conspiracy statute of limitations. If it wants to instead prove substantive guilt as to each defendant, then it may do so without contending with the five-year time bar.

### 3. THE MANN ACT COUNTS MUST BE DISMISSED (REPLY IN SUPPORT OF DE:72)

The government seeks to rewrite the statute by eliminating the offense's fundamental actus reus: persuasion of another person to engage in sexual activity. Focusing on an irrelevancy—i.e., whether the target of the persuasion (as opposed to the defendant) must have criminal intent or any knowledge that a crime would occur if the target engages in sexual conduct, DE:121 at 26 (43 in PDF) (citing *United States v. Kelly,* 128 F.4th 387, 414 (2d Cir. 2025))—the government has crafted the Indictment's allegations on these counts to replace the statutory requirement of persuasion of another person "to engage" in sexual conduct with the government's extra-textual reading of the law in which the defendant need not persuade anyone to engage in sexual conduct, relegating persuasion (the core of the criminality) to merely a component of the interstate jurisdictional element, which would render the interstate travel statute, 18 U.S.C. § 2421, superfluous, as discussed below.

The government's distortion of the statute to reach new levels of federal intrusion into

interpersonal relations is unjustified by any precedent or textual analysis, violates the Tenth Amendment and the Due Process Clause, and should be rejected as exceeding the crime defined by Congress.

**A. Persuading another person to engage in activity is not the same as persuading the person to travel "so" the defendant can engage in activity.**

The government's response identifies no prior statement of the charge and no prior use of the statute in this manner, and concedes that no prior court has approved the use of the statute in this manner. The government's reading of the statute—which is not an anticipated trial theory as they erroneously claim, but rather directly compelled by the language they chose to use in the indictment—would eliminate half of the persuasion element of the offense. The government in their response filing rest their entire argument on a single case where the issue presented here was not even raised. As for the issue that *was* raised in the original motion to dismiss Mann Act counts, DE:72, the government offers no response.

The government replaces the statutory language requiring persuasion "to travel *to* engage" in unlawful sexual activity, *see* 18 U.S.C. § 2422(a) (emphasis added), with an allegation that persuasion to travel occurred *so* a defendant could engage in illicit sexual activity. *See* DE:86:8, ¶ 10 (charging that defendants "persuaded, induced, and enticed Victim-2 to travel from Illinois to New York, *so* [they] could engage and attempt to engage in unlawful sexual activity with Victim-2") (emphasis added). This deficiency has nothing to do with victim intent—it has to do instead with the persuasion/inducement/enticement element written into the statute.

The Second Circuit has never considered this question, and the government in its response seeks to recast the question presented to avoid confronting the statutory interpretation arguments raised by the defendants' motion. The government does not respond to these statutory interpretation

arguments in its brief. Nor do they identify a single case where these arguments have been rejected—or any case where mere persuasion to travel, followed by non-consensual sex, has been prosecuted under 18 U.S.C. § 2422(a). The government must allege persuasion as to travel and persuasion as to sexual activity.

The government failed to do so here, opting instead to charge defendants with persuading an individual to travel "so" they could later commit a crime otherwise left to the states to prosecute. This is an entirely different offense than the one enumerated in § 2422(a). Defendants here were charged for efforts to encourage travel for any reason, as long as they had plans to commit a sexual crime after the travel. Despite the government's efforts to elide the statutory text, these allegations only meet the less onerous "with intent" element present in 18 U.S.C. § 2421(a) and § 2423(a), and do not meet the higher bar set by § 2422(a), the only section of the Mann Act charged here.

    i. *The government's focus on victims' intent is in this case a red herring where the defect is the failure to allege the requisite persuasion element.*

The government now mischaracterizes Defendants' motion to dismiss the Mann Act counts as an attempt to graft a "victim's intent" element onto the statute. Govt. Resp., DE:121 at 25. But the only grafting here has been done by the government, who invented a new criminal statute that allows charging someone for inducing or persuading travel "so" (i.e., with intent that) the defendant could engage in unlawful sexual activity. In reality, no such hybrid version of § 2421(a) and § 2422(a) exists. The government's urgent insistence otherwise—and attempt to recast the question presented into one that has already been answered, when in fact it has not been considered—suggests that without this attempt at a statutory sleight of hand, the facts available to them would not have allowed indictment under any section of the Mann Act. But federal prosecutors cannot patchwork statutes together to create a new offense that Congress has never

enacted.

The government's sole defense against the plain language and widely understood meaning of the statute charged is an inaccurate assertion that the Second Circuit has already ruled otherwise in *United States v. Kelly*, 128 F.4th 387, 414 (2d Cir. 2025).  But neither *Kelly* nor the case it relied upon, *United States v. Waqar*, 2021 WL 2005928 (2d Cir. May 20, 2021), addressed the statutory construction arguments now before the Court.  Instead, each of these opinions rejected defense arguments about the mindset of the victims that were related to the sufficiency of the evidence and to jury instructions, respectively.  Neither *Kelly* or *Waqar* engaged in any reading of 18 U.S.C. § 2422(a) against 18 U.S.C. § 2421 or 18 U.S.C. § 2423, or dealt with any arguments as to the statutory meaning of the "with intent" language being absent from 18 U.S.C. § 2422(a).

The outer limit of the precedential effect of *Kelly* is the rejection of arguments actually raised by the defense in that case—arguments about how Kelly's victims already wanted to travel to see him, which relates more to whether there was sufficient evidence of persuasion than it does to the statutory interpretation issue raised here.  *Kelly*, 128 F.4th at 414.  That the Second Circuit rejected these arguments as to whether they undermined the sufficiency of evidence at trial does not foreclose defendants now raising entirely novel statutory interpretation issues concerning the enumerated statutory requirements of charges under 18 U.S.C. § 2422(a).  Despite the government's bullish insistence otherwise, the existence of appellate opinions addressing whether there is an unwritten victim intent element or a requirement that the defendant "overcome the will of his intended victim," *Waqar*, 997 F.3d at 483, does not foreclose this Court's consideration of entirely different questions of statutory interpretation.  And it certainly does not allow the government to edit statutes to fit the conduct for which it wishes to indict.

The government is not permitted to rewrite the criminal statutes, and nor can it evade response to the novel arguments raised by defendants motion by citing case law that did not consider the issue raised here.  Congress used the "with intent" language in various subsections of the Mann Act but opted not to in § 2422(a).  That was never discussed or considered in *Kelly*, and the dicta the government relies upon there does not preclude this Court from addressing the question raised here, which was neither briefed, argued, nor decided in *Kelly*.  The "with-intent" vs. "to" distinction cannot be swept away as already decided, as the government seeks to do here.  Under the only reasonable reading of § 2422(a), and based on the plain text of that statute, the Mann Act counts charged here do not state an offense and therefore must be dismissed.

As the Second Circuit said in *Kelly*, encapsulating the difference between the question presented there and that raised here:

> To determine whether the defendant had the requisite intent under § 2422(a), which "imposes no requirement that an individual endeavor to 'transform or overcome' the will of his intended victim," the jury need only consider **whether the defendant  "intended to induce,** persuade, and/or entice" **the victim to travel to engage   in illegal sexual conduct with him**, "regardless of whether she expressed (or felt) reluctance, indifference, or, for that matter, enthusiasm at the prospect of doing."

*Kelly*, 128 F.4th at 413 (2d Cir. 2025) (emphasis added) (citing *United States v. Waqar*, 997 F.3d 481, 487-88 (2d Cir. 2021).  The question whether the alleged victim went enthusiastically or indifferently, or instead needed much persuading, was not raised by Defendants' motion, DE:72—which focuses instead on what the defendant intended to persuade the victim to do and did persuade the victim to do.  And the question presented here was not addressed in *Kelly* or *Waqar*.

The defendant in *Kelly* had argued that "it was Jane and her mother who tricked *him* into spending time with Jane, without disclosing that she was underage." 128 F.4th at 414.  As to the of-

age victim, the defendant in *Kelly* argued that because she was of-age, she could not have been coerced or enticed to have sex. These are entirely different arguments than those raised by the defense motion to dismiss; the defense does not argue that it is a legal impossibility to persuade an adult to engage in sexual activity; rather, it argues such persuasion must be alleged in the indictment.

*Waqar*, the Second Circuit case relied upon in *Kelly*, is instructive here. *Waqar* involved a violation of 18 U.S.C. § 2422(b), which punishes "Whoever . . . **knowingly persuades**, induces, entices, or coerces **any individual** who has not attained the age of 18 years, **to engage in**" prostitution or illicit sexual activity. *Waqar* confirmed that the prohibited conduct is the persuasion to engage. *Waqar* involved a defense-requested jury instruction that "the evidence must show that the defendant is seeking to transform or overcome the will of a minor and not merely agreeing or even arranging to have sex." *Id*. at 484. The Second Circuit held that this was not an accurate reflection of the statute's prohibited conduct. Rather, the prohibited conduct is the defendants' *intent to persuade*, regardless of how much persuading is needed, and that the ordinary meaning of persuade and the other verbs used in the statute "do not include, as a necessary element, the overbearing or transformation of another's will." *Id*. at 483. The court in *Waqar* noted that "[a]lthough there may be some certainty as to the precise demarcation between persuading, which is criminalized, and asking, which is not, the statute's terms are sufficiently definite that ordinary people using common sense can grasp the nature of the prohibited conduct," *id*. at 485 (citing *United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007), and held "we need not delineate that precise line of demarcation" to decide the jury instruction question presented in that case. *Id.*

*Waqar* confirmed that § 2422 prohibits persuasion to engage in certain sexual conduct. And *Kelly* instructs that § 2422(a) must be interpreted consistently with § 2422(b). Both subsections of

§ 2422 therefore require persuasion to engage in illicit sexual conduct. The government's sole citation to *Kelly* bolsters defendants' statutory interpretation argument—it does not defeat it. With its novel and unprecedented reading of this statute, the government seeks to transform the wholly state-regulated act of non-consensual sex *into the entire crime*, simply because an alleged invitation to travel preceded it. The cases both in this Circuit and elsewhere are clear that the core of criminality punished in 18 U.S.C. § 2422 is the persuasion related to sex. *See, e.g., United States v. Rutgerson*, 822 F.3d 1223 (11th Cir. 2016) (noting, in 18 U.S.C. § 2422(b) that the underlying criminal act "is the persuasion, inducement, enticement or coercion"—there, of a minor—"rather than the sex act itself,"' finding there was "more than enough evidence to support the jury's finding that Rutgerson was guilty of attempting to persuade, induce, or entice" a minor "to engage in prostitution with him."); *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000) ("While it may be rare for there to be separation between the intent to persuade and the follow-up intent to perform the act after persuasion, they are two clearly separate and different intents and the Congress has made a clear choice to criminalize persuasion and attempt to persuade, not the performance of sexual acts themselves"). The only difference between 18 U.S.C. § 2422(a) and 18 U.S.C. § 2422(b) is that subsection (a) relates to travel, and subsection (b) relates to minors. Both punish persuasion to engage in sexual activity. The persuasion element in 18 U.S.C. § 2422(a) is thus not *only* related to travel, but also to sexual activity.

ii.    *The government's reworking of § 2422 stands in contradiction of the different language used by Congress.*

Words are defined by the company they keep. It is instructive to examine the various sections of the Mann Act side-by-side:

**§ 2421**: ***Transport*** of an individual ***with intent*** that such individual engage in illicit sexual activity

or prostitution;

**§ 2422(a)**: **_Persuasion_** to travel **_to engage in_** illicit sexual activity or prostitution;

**§ 2422(b)**: **_Persuasion_** of a minor **_to engage in_** illicit sexual activity or prostitution**;**

**§ 2423:** **_Transport_** of a minor **_with intent_** that the minor engage in prostitution or illicit sexual activity.

Section 2422(a) and 2422(b) are nearly identical, as two subsections of the same statutory section. They both address persuasion to engage in illicit sexual activity or prostitution. The *only* difference between the two subsections is that in subsection(a), the persuasion to engage in illicit sexual activity must also be persuasion to travel; and in subsection (b), the persuasion to engage in illicit sexual activity must be related to a minor. The reason these subsections are grouped in a single section is because they both relate to persuasion to engage in illicit sexual activity. That is the core of the persuasion prohibited. And the government's sole citation to *Kelly* does not say otherwise; rather, it is consistent with this reading.

The interpretation the government has previously adhered to—and compelled by the statutory text and decisional authority—is further informed by common usage. Consider the following examples:

- I persuade someone to go to the store to buy a soda. I have persuaded them *both* to go to the store *and* to buy a soda.

- I persuade someone to go to the movies to see *Formula 1* starring Brad Pitt. Same as above: There is persuasion to actually see a movie, not just to go to the theater and eat popcorn.

- I persuade someone to pay for a class to learn CPR. Same as above: Persuasion to pay for a class; and persuasion that the class is CPR.

The common-usage analysis has the same force when applied to more closely analogous

73

hypotheticals.  Consider, for example:

- A statute prohibits persuading someone to travel to engage in the illegal drug trade. That statute would not be fairly read to cover persuasion to travel *with the intent* that after travel has occurred, one will hold a gun to their head and force them to make a drug sale.  If that were what was to be prohibited, the statute would need to prohibit "persuading an individual to travel with the intent that such individual will engage in the illegal drug trade."  These two different statutes would prohibit different types of persuasion.

- A statute prohibits persuading someone to travel to commit a murder.  That statute would not be fairly read to cover persuading someone to travel, *with the intent* that the person later help commit a murder.  If that was what Congress wanted to prohibit, it would write the statute as "persuading an individual to travel with intent that the individual engage in the commission of a murder."

These statutory interpretations are particularly compelled by the fact that neighboring provisions of the Mann Act use the "with intent" language, whereas § 2422 does not. *See, e.g., King v. Burwell*, 575 U.S. 473, 486 (2015) (plain language of a statute must be enforced according to its terms, and, in deciding whether statutory language is plain, "we must read the words in their context and with a view to their place in the overall statutory scheme.") (citations and internal quotation marks omitted).  The government does not once attempt to defend against these plain language arguments that render its Mann Act charges deficient. The plain language makes clear that the underlying criminal conduct prohibited is dual persuasion.

As an example, if an individual asks all women in Mississippi to come to New York, or to Las Vegas, hoping they will engage in prostitution after they travel to those other states, that does not satisfy the statute's plain requirements.  Hoping, i.e., harboring unspoken thoughts, is not persuasion and cannot satisfy the requirements of the statute.

There are reasons why Congress did not mean what it did not say—including the fundamental Congressional concern of prohibiting the misuse and poisoning of the channels of

interstate commerce without intruding on First Amendment protected speech.

      iii.    *The rule of lenity compels resolving any statutory ambiguities in the defendant's favor.*

To the extent there remain any ambiguities in the statute, the rule of lenity requires resolving them in the defendant's favor. *See Lurie v. Wittner*, 228 F.3d 113, 126 (2d Cir. 2000) (recognizing the rule is a maxim of statutory construction that is invoked to protect the accused's constitutional rights); *see also United States v. Litchfield*, 986 F.2d 21, 22 (2d Cir. 1993). "'When all legitimate tools of interpretation fail to decisively dispel the statute's ambiguity, the rule of lenity is to be applied where 'reasonable doubt persists.'" *Alli–Balougun v. United States*, 114 F.Supp.3d 4, 35 (E.D.N.Y. 2015) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). And, "'[w]here 'text, structure, and history fail to establish that the Government's position is unambiguously correct—we apply the rule of lenity and resolve the ambiguity in [the defendant]'s favor.'" *Alli-Balougun*, 114 F. Supp.3d at 35 (quoting *United States v. Granderson*, 511 U.S. 39, 54 (1994)). This rule must be applied to interpret ambiguities so as to avoid constitutional problems, including due process violations. *See, e.g., Skilling v. United States*, 561 U.S. 358, 405-09 (2010) (adopting narrow construction to avoid finding criminal statute unconstitutionally vague); *McDonnell v. United States*, 579 U.S. 550, 574-77 (2016) (narrowly construing statute to avoid vagueness, First Amendment, and federalism concerns); *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (if one "of two plausible statutory constructions…would raise a multitude of constitutional problems, the other should prevail").

"To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Skilling*, 561 U.S. at 402-03

(quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)) (alterations in *Skilling*). "[T]he failure of 'persistent efforts ... to establish a standard' can provide evidence of vagueness." *Johnson v. United States*, 576 U.S. 591, 598 (2015) (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921)). This underscores the serious fair notice and arbitrary enforcement concerns here dictating a narrow construction.

> iv. *Congress's decision to limit the persuasion prohibition of § 2422 to persuasion to engage in sexual activity is warranted by additional constitutional and practical reasons.*

There are further constitutional and practical considerations explaining why the plain language—which, even if it were ambiguous, would require the more limited reading under due process and separation-of-powers principles—must control here.

First, if the statute is expanded to include the "with intent" or "so" situations as charged in the indictment, it creates severe Tenth Amendment problems. The reading advanced by the government in its indictment (which the government notably shies from in its response) gives the federal government unlimited leeway to prosecute any state-regulated social context rape that occurs following an invitation to travel, without any time limit or nexus requirement. The government's reading of this statute—which has always been aimed at persuasion to engage in harlotry and the like—would drastically expand the offense to federalize any social context rape that was preceded by an invitation to travel across state lines. In the tri-state area particularly, this would have significant implications that contradict congressional intent and the plain language of the statute. And these implications include the unconstitutional intrusion of the federal government into a state sphere of conduct, in violation of the Tenth Amendment.

Second, the cases interpreting 18 U.S.C. § 2422 have made clear that *the sex need not actually occur. See supra*. But the criminality of the government's proposed offense, as rewritten

and charged in the indictment, *depends* on the sex occurring, or at least an attempt that it occur, because otherwise there is nothing illegal about the conduct. But sex or attempted sex is not the actus reus: persuasion is. The government's interpretation as charged in the indictment renders § 2422(a) a mere thought crime with no actus reus that makes the conduct illegal. It is the charging of a state offense, posing as a Mann Act count.

What the government has done in this case is charged two inapplicable federal felonies (sex trafficking and Mann Act) for a single instance of conduct that as alleged by the government is party rape. The Supreme Court has repeatedly invoked federalism concerns to narrow the scope of federal criminal statutes to avoid "'plac[ing] under federal superintendence a vast array of conduct traditionally policed by the States.'" *Ciminelli v. United States*, 598 U.S. 306, 316 (2023) (quoting *Cleveland v. United States*, 531 U.S. 12, 27 (2000)); *see also, e.g., Snyder v. United States*, 603 U.S. 1, 14-15 (2024); *McDonnell v. United States*, 579 U.S. 550, 576-77 (2016). Those concerns are particularly salient here, because the government has reached into wholly intrastate conduct to concoct its overarching "sex trafficking" theory of the case, while the only conduct alleged—as demonstrated in the Mann Act counts—is social context sexual assault which is left to the states to regulate. The decision of whether any rapes did or did not occur is to be made by state authorities and by state juries. The federal statutes cannot be rewritten simply because the federal government wants to extend its jurisdiction into traditionally local spheres of conduct.

## B.    The government fails to offer any justification for the lack of notice as to the state predicates charged in the Mann Act counts.

The government's opposition fails to address the second independent ground for dismissing Counts 4 and 9 of the Indictment—the complete failure to provide constitutionally adequate notice. The Mann Act counts must independently be dismissed because they are fatally vague, fail to state

an offense, and lack specificity.

The Indictment alleges an offense based on a laundry list of New York penal statutes—ranging from first-degree rape to misdemeanor forcible touching—without providing defendants notice of which, if any of them, are in fact the predicate counts. Each of these statutes includes numerous subsections defining different ways the crimes can be committed. This strategic vagueness violates the Fifth and Sixth Amendments by failing to provide notice of the specific statute and subsection violated. Defendants cannot be left to surmise which of a number of statutes they will defend against. "[W]here an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (citing 2 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 19.2, at 452 and 1 Charles Alan Wright, *Federal Practice and Procedure: Criminal 3d* § 124 at 549) (1999). This Indictment fails to do so.

An Indictment must do more than gesture toward a state's entire criminal code. The government's declining to defend this vague charging practice highlights the grounds for dismissal. Failing to uphold the notice requirements of the Fifth and Sixth Amendments provides a separate and sufficient basis for dismissal. The Mann Act counts as charged do not alert defendants to the core of criminality of those offenses nor do they sufficiently allege what conduct is said to have occurred. They do not give a "customary citation of the . . . law that the defendant is alleged to have violated" as Fed. R. Crim. P. 7(c)(1) requires; instead, they throw in a grab-bag of laws that they may seek to prove at trial. This is insufficient and causes substantial prejudice to defendants in preparing to defend the case at trial. The Mann Act counts should be dismissed.

***4. COUNT FIVE OF THE INDICTMENT MUST BE DISMISSED DUE TO DUPLICITY AND LACK OF NOTICE (REPLY IN SUPPORT OF DE:106)***

Count Five of the indictment charges "at least one" commercial sex act against an unidentified minor and alternatively by force fraud or coercion "in or about" May 2009—a period covering over a month "in the Southern District of New York and elsewhere." This results in a guessing game—which of these sex acts related to the minor only? Which sex acts were by force, fraud, and coercion? When did these sex acts occur? Did they occur on different days? Different weeks? Different months? Is there one sex act that only relates to the minor, but others that involve force, fraud, or coercion? How many sex acts are alleged in Count 5, which charges a substantive violation and not a conspiracy? Did some commercial sex acts occur in the Southern District of New York and others elsewhere?

The problem with the government's charging 18 U.S.C. § 1591(a) and (b) in a single count is that the count *also* charges an infinite number of "commercial sex acts," asserting that "at least one" comprises the charge. This is an elements issue rather than a means issue. The "at least one" language functions to charge multiple offenses in a single count, rather than the commission of a single crime by several means.

The government's brief does not offer any response at all to defense arguments that the count is duplicitous because it charges "at least one" commercial sex act. The government never acknowledges these arguments in its response, and thus concedes that such language is impermissibly duplicitous. The government's response focuses only on the dual charging of § 1591(b)(1) and (b)(2), without addressing the main problem with this Count, as raised in the defense motion to dismiss: the duplicitous charging of multiple commercial sex acts, some apparently involving a minor and others also involving force, fraud and coercion. Fed.R.Crim.P. 8(a) requires that there be "a separate count for each offense," and by charging multiple commercial sex acts in

a single offense, the government has violated the rule against duplicity.

Binding precedent instructs that the rule against duplicity must be invoked when an indictment affects the policy considerations underlying the rule—that is, adequate notice, lack of unanimity, and a bar against double jeopardy. *See United States v. Margiotta*, 646 F.2d 729, 732-33 (2d Cir. 1981). All three policy considerations are invoked here, warranting dismissal of Count Five.

First, the lack of adequate notice in Count Five counsels in favor of invoking the rule against duplicity and dismissing the count. The defense is prejudiced by the lack of notice in Count Five because they do not know when this event occurred. The count does not allege who engaged in which of the "at least one" commercial sex acts that occurred; does not allege which commercial sex acts involved only Alon nor which allegedly involved only Tal; and does not allege which commercial sex acts involved both of the defendants charged in the Count. The indictment does not allege when each respective commercial sex act of the "at least one" charged is said to have occurred; which involved force, fraud, or coercion; whether some involved force, fraud, and coercion while others involved just the presence of a minor; and whether some allegedly involved both. The charge as alleged does not identify a single commercial sex act forming the basis for the charge—and its expansive "in or about May 2009" language functions to charge multiple commercial sex acts in up to a six-week period. Defendants are clearly prejudiced by this.

Second, there is a double jeopardy problem, which the government fails to address in its response. The government could seek at trial to prove up an event that occurred in or around May 2009, and then return to charge a specific act that occurred within that time frame, by simply asserting that the duplicitous language here referred to a different commercial sex act. The charging

80

of multiple commercial sex acts in a single count fails to provide double jeopardy protection in a future prosecution.

Finally, Count Five as charged creates substantial unanimity problems by its charging of multiple commercial sex acts. This raises the possibility that the grand jury indicted without agreeing on a specific sex act. This is impermissible; commercial sex act is an element. Nor is the government at trial permitted to attempt to prove to the jury multiple commercial sex acts, charged in a single count that spans a six-week period. Nor is it permitted to tell the jury that it need not agree on which commercial sex act occurred. The unanimity concerns associated with charging more than one commercial sex act over a six-week period counsel in favor of dismissal.

The government failed to defend its charging of "at least one" commercial sex act in a single count. Charging as such renders the count duplicitous, and Alon was prejudiced by this. The counts therefore must be dismissed.

## PART IV: OTHER RELIEF REQUESTED ON DUE PROCESS AND RELATED GROUNDS

Part IV of this brief addresses other relief requested on due process and related grounds: the production of *Brady* evidence, *see* DE:70; the need for a bill of particulars, *see* DE:74; and the need to sever the trials. *See* DE:102.

### 1. THE GOVERNMENT MUST BE COMPELLED TO PRODUCE BRADY EVIDENCE

The evidence sought regards the defendants' presence or absence at charged events and other exculpatory information that far exceeds impeachment evidence or 18 U.S.C. § 3500 evidence. The constitutional right to *Brady* evidence, which the FBI 302s and other reports necessarily contain, overrides certain rules governing disclosure. This is not about impeachment—this is about evidence in the government's possession that undermines its own claims. Evidence that witness statements

contradict the "on account of" element, or any other elements of commercial sex trafficking is not mere impeachment; it is *Brady*. The government does not contest that the categories of information contain exculpatory evidence; it instead tries to categorize such evidence as impeachment or 18 U.S.C. § 3500 evidence to avoid producing it in a timely manner as *Brady v. Maryland*, 373 U.S. 83 (1963) requires. "Complying with the *Jencks* Act, of course, does not shield the government from its independent obligation to produce exculpatory material under *Brady*, a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500." *United States v. Rittweger*, 524 F.3d 1171, 181 n.4 (2d Cir. 2008).

The government must produce evidence that anyone denied being trafficked. It must produce evidence that anyone denied being paid for sex. It must produce evidence that someone only decided to characterize an experience as trafficking, if they did, after consulting with a civil lawyer. It must produce any evidence that undermines its allegations as to subsequent guilt, even if that evidence is *also* impeachment. The importance of the witness's statements regarding any commercial sex, and its linkage to a story being marketed to certain plaintiffs' lawyers, is not merely to impeach the stories but to demonstrate that rather than financial rewards on account of sex, what the case is about is financial rewards on account of testimony, packaged to fit a narrative that still does not fit the statute. Just as witnesses will surely deny giving testimony on account of financial reward, *if they denied having sex on account of financial reward, that is Brady.* The government has disputed dismissal claims on the theory that the evidence at trial might not support the dismissal arguments. But if the government is in possession of material that *does* support the party-rape-not-sex-trafficking theory of the case, then such evidence is of course *Brady*. And the government does not contest that its witness statements contain such evidence.

Evidence is *Brady*, and not impeachment, if every single woman the government has ever spoken to declined to say that they had sex on account of any financial or monetary benefit. That is not impeachment. The categories listed in the defense motion identify several categories of exculpatory evidence, and the government abuses prosecutorial authority to deny us such evidence. It is not a question of whether alleged victims are being truthful. It is a question of: Even if everything the witnesses say is truthful, does it undermine their theory? That cannot be swept away as mere impeachment or *Jencks* evidence.

The government asserts that its representation that it has provided *Brady* in a timely manner is sufficient, but the record indicates that it has not done so. The government for months withheld *Brady* evidence related to the misidentification of the defendants by several witnesses. This new Aug. 7 disclosure is just another example that there are important leads that have not been produced pursuant to *Brady*. *Cf. United States v. Mitchell*, 372 F. Supp. 1239, 1257 (SDNY 1973) ("due process implications of *Brady*" mandate that government "disclose exculpatory information as soon as the character of such information is recognized"). If a witness has identified someone else, or has identified a different brother than that charged or initially accused, as a culpable party, that is important and exculpatory evidence that must be investigated and to which the defense is entitled.

The government's response also suggests that investigative failure need not be produced as *Brady* evidence. But investigative failure—including failure to corroborate an accusers' account; including statements by witnesses that undermine the government's version of the facts; including the absence of evidence as to the government's drugging theory, revealed by any such statements that do not mention drugging; including reports related to investigative failure as to this drugging theory—is indeed deemed *Brady*. *See Kyles v. Whitley*, 514 U.S. 419 (1995).

83

The government's response indicates why the *Brady* parameters are broad, and are not based on the government's own subjective view of the helpfulness of the evidence. The prosecutor's assessment of the reliability of the evidence is irrelevant to the *Brady* determination, and any doubts as to the usefulness of the exculpatory evidence should be resolved in favor of disclosure. The government's seeking to characterize the entire world of *Brady* evidence in this case as "impeachment" is an inaccurate characterization; the categories of *Brady* requested, including the statements, relate to substantive exculpatory evidence, which is potentially of use in proving the allegations are not true. The categories requested by the defense thus must be produced pursuant to *Brady*.

The requested *Brady* materials are particularly warranted given the government's recent expert disclosure and the upcoming deadline for defense expert disclosures. The government is still withholding from the defense the specific defects in the accusations—defects that it of course will try to remedy with its own experts. It is fundamentally unfair, and it violates due process, to allow the government to pick experts whose testimony play to the facts while requiring the defense to guess the facts to pick experts. The defense is entitled to know the same details that the government knows about the specifics of the allegations—and, particularly, their defects (such as alleged victims returning for more social interactions; absence of drugs; conflicting stories; failure to seek medical treatment; failure to contemporaneously report; and other categories identified in the opening motion) in selecting experts. The defense cannot select experts, and cannot conduct any meaningful pretrial preparation or investigation, without knowing details about

## 2. THIS COURT SHOULD GRANT THE REQUEST FOR A BILL OF PARTICULARS

"The test for the court in passing on a motion for a bill of particulars should be whether the

information requested is necessary to allow the defense to prepare its case or to avoid unfair surprise." Wright & Miller, 1 Fed. Prac. & Proc. Crim § 130 (5th ed.) Here, the government does not—as it cannot—claim that the information is unnecessary to defense preparation. Instead, the government believes that a bill of particulars necessary to preparation can be vitiated by the government's desire to compress the time given to the defense for such preparation.

The defense requested identification of the alleged victims at the Feb. 7 arraignment. The Court asked the government: "When does the government anticipate being able to identify for the defense who you anticipate to be the victims that are sort of subjects of particular criminal charges?" Arraignment Tr. at 19. The government responded that it would need "at least another month or two" to supersede. The government still has not told the defense, long after superseding, who are the alleged victims in the indictment; who they are accused of sex trafficking; and who they are accused of sexually assaulting but not raping. This is essential to trial preparation and to defense investigation. The defense is unable to prepare for trial without this information. The defense is unable to interview potential witnesses; unable to determine whether defendants knew these people or to what extent they may have socialized with them; and unable to isolate particular events or conversations for preparation. The government's providing them several phone dumps in discovery of their entire social history, but failing to identify which alleged victims and which alleged events are relevant to the indictment is inconsistent with the Due Process Clause and with Fed.R.Crim.P. 16. Photos and videos of people attending parties or having sex does not put the defense on notice of who, among the hundreds of people with whom they socialized, they are alleged to have sex trafficked and who, among the hundreds of people with whom they socialized, they are alleged to have sexually assaulted. It is impossible to prepare for trial without this information.

The government highlights ███████████████████████████ but any such concerns—to the extent they exist—can be dealt with pursuant to a protective order. Notably, the government does not allege that *the protective order in this case has been violated in any way.* Also, the government's concerns about privacy are overblown where ████████████████ ████ ███████████ ██████████████████████ ███████████████ ████████████████████ The defense has endeavored to identify as many people as it can, made possible in part by civil lawsuits, but there are several alleged victims in the indictment whom the defense has been unable to identify. And the defense investigation should not focus on identifying the charges; it should focus on defending them. This added task of trying to determine what they are accused of doing is not contemplated by the constitution's fair trial requirements. The government cannot avoid its production obligations, and avoid identifying for the defense the subjects of the charges, and how any or all of them were in any way trafficked.

The defense is entitled to particulars that are necessary to enable them to "mount an independent pretrial investigation." *United States v. Ray,* No. 2021 WL 3168250, at * 11 (S.D.N.Y. July 27, 2021). It is impossible for defendants to mount an independent pretrial investigation when they still do not know the identity of their accusers. They do not know who the government alleges was sex trafficked; they do not know who was not sex trafficked but allegedly sexually assaulted or raped; and they do not know who they allegedly attempted to sex traffic or conspired to sex traffic. A bill of particulars is necessary on these issues as well as others raised in the opening motion.

### 3. THE TRIALS SHOULD BE SEVERED

A severance is warranted here. Jointly trying Alon and Oren as twins would deprive them

of a fair trial, result in a substantial miscarriage of justice, and would confuse the jury in a manner inconsistent with due process. In addition to the record confusion identified in the original motion, DE:102, it has since been revealed that several of the alleged victims misidentified or confused Oren and Alon in interviews with the FBI. The government cannot lodge allegations against both twins, and ask the jury to convict them both. Guilt must be proved individually as to *each defendant*.

With respect to the minor count, the government suggests any prejudice as to Oren could be proved with a limiting instruction but there is no conceivable instruction that will overcome all of the issues presented by the sprawling indictment, particularly as it relates to sex trafficking of a minor in which Oren is not alleged to be involved.

A joint trial would require Oren and Alon Alexander, twins whom neither the governments' agents, nor the prosecutors, nor the alleged victims can tell apart, to choose between misidentification defenses and harming the defense of their own twin brother. And it would ask the jury to sort between years of disconnected events involving different combinations of defendants all in service of determining each brother's guilt under an improperly fashioned single conspiracy count. When there is such a "serious risk" a jury will be unable to render a reliable verdict, severance is constitutionally required. *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

Severance is also warranted because, once the government has disclosed more information about the identity of the accusers and the specific allegations (as it is required to do), one brother may need to testify to exculpate another, but would decline to testify at a joint trial. *See, e.g., Byrd v. Wainwright*, 428 F.2d 1017, 1018 (5th Cir. 1970).[5]

---

[5]A defendant in a criminal case has a fundamental, constitutional right to present a defense and, specifically, to call witnesses to present exculpatory testimony on his behalf. Courts must scrupulously protect this right. Failure to do so renders the trial fundamentally unfair and violates due process. *See, e.g., Abbott v. Wainwright*, 616 F.2d 889 (5th Cir. 1980); *Tifford v. Wainwright*,

**A. Oren's trial should be severed as he is not charged with sex trafficking of a minor.**

Oren is not charged with any conduct related to a minor, rendering it unduly prejudicial to join him in the prosecution of sex crimes against a minor.

The government claims any "spillover prejudice" from the minor-related count against Alon and Tal is relatively insignificant in the context of the other charges, and curable with a limiting instruction. Yet the case they cite for this principle plainly agrees with defendants, noting that when the difference is merely "fewer or less culpable acts" or "more evidence," concerns are minimal, as opposed to when "the evidence against others in the case will be more shocking or prejudicial." *United States v. Robles*, 2005 WL 957338, at *2 (SDNY Apr. 22, 2005). This is plainly an example of shocking prejudice—social-context rapes of otherwise consenting adults, including alleged rape on a swingers cruise, are an entirely different category of offense than the alleged sexual exploitation and rape of a minor.

---

588 F.2d 954, 957 (5th Cir. 1979); *Byrd v. Wainwright*, 428 F.2d 1017, 1018 (5th Cir. 1970). Once the government has disclosed information that should have already been provided regarding the specific details of the accusations and the identity of the alleged victims, there is a strong likelihood (given the overlapping social lives of the individual defendants) that one brother will need to testify on another brother's behalf. In such circumstances, severance is the only remedy that would vindicate one brother's Fifth and Sixth Amendment rights to due process and compulsory process without intruding on another brother's Fifth Amendment right to remain silent at his own trial.

The Second Circuit's test for severance in such circumstances instructs courts to consider "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." *United States v. Wilson*, 11 F.3d 346, 354 (2d Cir. 1993) (quoting *United States v. Finkelstein*, 526 F.2d 517, 523-24 (2d Cir. 1976). Consideration of the *Finkelstein* factors here requires additional information about the nature of the accusations—information that the defense has requested and that the government has declined to provide so far. However, neither Oren nor Alon Alexander should be "foreclosed of the possibility that [the other] would testify in his behalf merely because that eventuality [is] not a certainty." *United States v. Echeles*, 352 F.2d 892, 898 (7th Cir. 1965). "[A] single joint trial, however desirable from the point of view of efficient and expeditious criminal adjudication, may not be had at the expense of a defendant's right to a fundamentally fair trial." *Id.*

This is not an instance of merely "differing levels of culpability." It is a case of two fundamentally different categories of crime: one involving adults, one involving a minor. It is implausible to believe a jury can hear inflammatory evidence of sexual violence against a minor and then surgically apply it to Alon and Tal. Forcing Oren to defend himself in a trial concerned with a minor victim will cause "substantial prejudice" that no instruction can fix.

## B. The government's sprawling "conspiracy" charge only heightens the need for severance

The government argues the conspiracy cures all risk of confusion or prejudice, as all related evidence is inevitably admissible against Oren as part of the broader conspiracy charge. Just the opposite is true. The prejudice from the minor-related count is compounded by a structurally flawed conspiracy charge that will be impossible for a jury to fairly parse between the defendants, especially when two of the defendants—one charged with sex trafficking of a minor and one who is not—are twins that nobody seems to be able to distinguish from one another. By relying on a single, broad, catch-all conspiracy charge, the government will render Oren's trial unconstitutionally imprecise, as the jury will be tasked to sort through multiple different conspiracies to commit discrete crimes, as the government presents a series of unrelated episodes but seeks to tell the jury that it is a single ongoing scheme.

The conspiracy count is a legal fiction designed to join unrelated acts and defendants. The indictment alleges a single agreement spanning 12 years, yet the substantive counts describe discrete events separated by years, regularly involving a different one or two of the defendants and rarely involving all three (only in 2009 and 2016). The link between these events is not a "single-purpose and continuously ongoing undertaking," but rather a shared last name.

A jury hearing evidence of an assault allegedly committed by one brother in 2011 will

inevitably be prejudiced when it considers a separate allegation against another brother in 2016. The government has charged the "spokes of a wheel" but has failed to allege the "rim" that connects them into a single conspiracy. *Id.* at 755. In a joint trial, this will inevitably yield variance; "the appearance of coordinated criminal activity appears more culpable . . . implicating the Supreme Court's long-standing admonition that 'charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes." *United States v. Swafford*, 512 F.3d 833, 843 (6th Cir. 2008) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943). "Conspiracy prosecutions call for use of every safeguard to individualize each defendant in relation to the mass." *United States v. Gordon*, 990 F. Supp. 171, 176 (EDNY 1998).

## C. The inevitable misidentification of the twins, and surrounding confusion, makes a reliable verdict impossible

A joint trial of Oren and Alon will force each of them to choose between asserting a valid misidentification defense and harming the defense of their own twin. Despite the government's hand-waving, the problems posed by the conspiracy are made exponentially worse by a simple, undisputed fact: both the government and several of its witnesses have not been able to tell Oren and Alon Alexander apart. One agent testified that a photo appeared to resemble one of the twins. Counsel for the government referred to them interchangeably in describing a video. *See* DE:102. The government disclosed on Aug. 7, 2025. ███████████████████████████████ ███████████████████████████ The jury will of course likewise struggle to tell them apart.

The government argues that severance will be unduly burdensome because "requiring victims to testify at multiple trials would be unnecessarily traumatizing." But the risks of misidentifications, and the resulting heightened prejudice, create a substantial due process violation that cannot be overlooked. If even the government's trained professionals who are investigating and

prosecuting the case—and the witnesses—are confused, it is unrealistic to expect a jury to keep the facts and faces straight and to consider the evidence separately against each defendant, as they must to ensure a fair trial.

Each twin has a right to fervently advocate on their own behalf without having to harm the defense of their own twin. This is not, as the government characterizes it, merely an issue of "antagonistic defenses"; it is about the practical impossibility of mounting any misidentification defense in a joint trial without causing substantial harm to the person in your life that has been there since birth. How can Alon's lawyer cross-examine a witness on her inability to distinguish the twins without the jury seeing it as an attempt to point the finger at Oren? Every defensive step one brother takes to protect himself would necessary harm the other, because it will give rise to the suggestion—eagerly embraced by the government—that the other twin is responsible. This creates an "irreconcilable" conflict that guarantees an unfair trial, as the court found in *United States v. Monge*, 2011 WL 1317607, at *2 (D. Ariz. July 14, 2011).

The government attempts to distinguish *Monge* on the basis that the twins will be charged "as active participants in specific criminal activity together, undercutting any argument that a misidentification defense provides a basis for severance." DE:121 at 98. But this reduces the government's burden to prove guilt independently as to each twin. And it presumes the conspiracy allegations will cure any outstanding risks of confusion or prejudice when it will in fact exacerbate them. Given the record confusion as to Oren and Alon, the government cannot simultaneously claim to be sure as to where it views culpability to lie when it cannot even tell them apart and nor can several of its witnesses. But the jury must be sure. And if the cases are tried together, the jury will be tasked not only with unraveling a myriad of unrelated crimes over the span of several years, but

91

a body of evidence wherein both investigators and alleged victims are incapable of telling two of the defendants apart. When even the government's agents and witnesses are confused, the risk of a wrongful conviction based on misidentification is too high to tolerate.

**D. Judicial economy cannot trump the right to a fair trial**.

The government's final response is that judicial economy warrants joinder. It argues that separate trials would be inefficient and burdensome for witnesses. Economy can only trump minor risks of confusion. The paramount concern in a criminal trial is the defendant's fundamental right to due process, to the presumption of innocence, and to a finding by a jury of proof beyond a reasonable doubt. Forcing a defendant to endure a trial where the jury is hopelessly confused and inflamed by prejudicial evidence unrelated to that defendant does not protect these rights. And forcing a defendant to sit through a trial with his twin, when there has been so much confusion by the government and its witnesses as to who is who, does not protect fair trial rights. This is a case where fairness must override efficiency. Oren and Alon thus respectfully request that this Court grant the motion to sever.

## CONCLUSION

Defendants respectfully request  dismissal of the indictment due to structural error in the grand jury, and request a hearing on the abuse of the grand jury process that occurred here, to manufacture venue as to Count 10. Defendants also respectfully request hearings and, where applicable, discovery related to (2) *Franks* violations; (3) unduly suggestive photobook procedures; (4) privilege violations; and (5) selective prosecution. The indictment also must be dismissed due to the Tenth Amendment violation; the legally defective conspiracy charge; the failure to allege a commercial sex act and thus sex trafficking; the failure to allege interstate nexus; the conflation of

essential elements and resulting failure to allege an offense; the failure to allege constitutionally adequate notice. The time-barred offenses must be dismissed; the Mann Act counts must be dismissed for failure to allege an offense; and the count charging sex trafficking of a minor must be dismissed. Finally, constitutional considerations compel the production of *Brady* evidence to which defendants are entitled; a bill of particulars; and the severance of Oren's trial from his co-defendants.

Respectfully submitted,

BLACK SREBNICK
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
(305) 371-6421

HOWARD SREBNICK
Fla. Bar No. 919063
HSrebnick@RoyBlack.com
*Counsel for Alon Alexander*

KLUGH WILSON LLC
40 NW Third St., PH 1
Miami, Florida 33128
(305) 536-1191

/s/ Richard C. Klugh
RICHARD C. KLUGH
Fla. Bar No. 305294
E-mail: rklugh@klughlaw.com
*Counsel for Oren Alexander*