UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ALON ALEXANDER,
OREN ALEXANDER, and
TAL ALEXANDER,

Defendants.

S3 24 Cr. 676 (VEC)

THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Kaiya Arroyo
Elizabeth A. Espinosa
Andrew Jones
Madison Reddick Smyser
Assistant United States Attorneys
      *Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

    I. The Charges Against the Defendants ............................................................................ 2

    II. The Evidence Against the Defendants ......................................................................... 2

        A. The Defendants' Scheme to Entice, Rape and Sexually Assault Women ........................ 3

        B. The Defendants' Enticement and Rape or Sexual Assault of the Substantive Victims ..... 4

        C. The Defendants' Enticement and Rape or Sexual Assault of the Conspiracy Victims.... 11

DISCUSSION ..................................................................................................................... 25

    I. Evidence of the Defendants' Sexual Assaults and Abuse of the Conspiracy Victims Is Admissible as Direct Evidence or Under Rules 413 and 404(b) ............................................ 25

        A. Applicable Law ................................................................................................ 26

            1. Direct Evidence of a Charged Conspiracy .................................................... 26

            2. Federal Rule of Evidence 413 .................................................................... 27

            3. Federal Rule of Evidence 404(b) ................................................................ 29

            4. Federal Rule of Evidence 403 .................................................................... 31

        B. Discussion ....................................................................................................... 32

            1. The Defendants' Rapes and Sexual Assaults Not Charged in Substantive Counts Are Direct Evidence of the Charged Conspiracy .............................................................. 32

                a. The Rapes and Sexual Assaults Charged in the Conspiracy and Substantive Counts Are Part of the Same Course of Criminal Conduct ....................................... 33

                b. The Conspiracy Rapes and Sexual Assaults Are Necessary Evidence of the Background of the Conspiracy ................................................................... 40

            2. The Defendants' Other Rapes and Sexual Assaults Are Admissible Under Rules 413 and 404(b) .............................................................................................................. 41

                a. Evidence of the Defendants' Other Rapes and Sexual Assaults Is Admissible Under Rule 413 .................................................................................................. 41

                b. Evidence of the Defendants' Other Rapes and Sexual Assaults Is Admissible Under Rule 404(b) ............................................................................................. 43

                c. The Probative Value of the Defendants' Other Rape and Sexual Assault Evidence Outweighs Any Potential Prejudice ....................................................... 46

    II. Evidence of Statements by the Defendants and Other Co-Conspirators Is Admissible Under Rule 801(d)(2)(E) ............................................................................................................ 47

        A. Applicable Law ................................................................................................ 47

        B. Discussion ....................................................................................................... 49

            1. Each Defendant's Statements Are Admissible as Co-Conspirator Statements ........... 49

    2. Drug Discussions Are Admissible as Co-Conspirator Statements ............................... 53

        a. Statements Regarding GHB Are Admissible ........................................................... 54

        b. Statements Regarding Ambien Are Admissible ..................................................... 55

        c. Statements Regarding Quaaludes Are Admissible .................................................. 57

        d. Statements Regarding MDMA Are Admissible ...................................................... 58

III. Evidence of the Defendants' Lack of Response to Statements Regarding Violent Assaults Is Admissible .............................................................................................................................. 60

   A. Relevant Facts ................................................................................................................ 61

   B. Applicable Law .............................................................................................................. 63

   C. Discussion ....................................................................................................................... 64

IV. Evidence of the Victims' Prior Consistent Statements Is Admissible................................ 66

   A. Applicable Law .............................................................................................................. 66

   B. Discussion ....................................................................................................................... 69

V. Evidence or Argument Concerning Irrelevant and Unfairly Prejudicial Topics Should Be Precluded ................................................................................................................................... 71

   A. Evidence or Argument Concerning Minor Victim-3's Alleged Consent to Sexual Abuse Should Be Precluded......................................................................................................... 72

   B. Evidence or Argument Concerning Defendants' Failure to Commit Other Bad Acts, Including Other Alleged Consensual Sex Acts, Should Be Precluded.................................. 74

   C. Evidence or Argument Concerning the Government's Motives for the Investigation or Prosecution Should Be Precluded ...................................................................................... 77

   D. Evidence or Argument Concerning that the Charges Brought Against the Defendant Are Novel Should Be Precluded ................................................................................................ 80

   E. Evidence or Argument Concerning the "#MeToo" Movement Should Be Precluded..... 82

   F. Evidence or Argument Concerning the Defendants' Personal Circumstances Should Be Precluded............................................................................................................................ 83

   G. Evidence or Argument Concerning the Defendants' Possible Punishment or Their Desire for to be Released from Prison Should Be Precluded ........................................................... 84

   H. Evidence or Argument Concerning the Government's Motivations for Arresting Alon and Oren Alexander on Count Ten Should Be Precluded .......................................................... 85

VI. Evidence or Argument Concerning Victims' Counsel or Privileged Topics Should Be Precluded ................................................................................................................................... 87

VII. Cross-Examination of Witnesses with Respect to Issues Irrelevant to Credibility Should Be Precluded ................................................................................................................................... 91

   A. Applicable Law .............................................................................................................. 92

   B. Discussion ....................................................................................................................... 94

1. Cross-Examination of Minor Victim-3 Regarding Her Citation for Trespassing and Arrest for Criminal Impersonation Should Be Precluded................................................. 94

2. Cross-Examination of Victim-1, Friend-1, and Friend-2 Regarding Their Criminal Convictions Should Be Precluded .................................................................................. 96

VIII. The Defendants' Proffered Expert Testimony Should Be Precluded ............................ 98

A. Legal Standard ................................................................................................................ 98

B. The Proffered Expert Testimony of Dr. Strange Should Be Precluded ........................ 102

1. Expert Disclosure.................................................................................................... 102

2. Discussion ............................................................................................................... 106

a. Opinions as to False Memory Formation Should Be Precluded ............................ 106

b. Opinions as to Potential Sources of Suggestive Influence Should Be Precluded... 111

c. Opinions Within the Ken of the Jury Should Be Precluded.................................... 115

d. Opinions Bearing on Witness Credibility Should Be Precluded ........................... 117

C. The Proffered Expert Testimony of Dr. Aoun Should Be Precluded............................ 119

IX. Victims Who Have Not Filed Suit Under Their True Names Should Be Permitted to Testify Under a Pseudonym to Protect Them from Undue Harassment, Embarrassment, or Other Adverse Consequences .................................................................................................... 125

A. Applicable Law ............................................................................................................. 125

B. Discussion ..................................................................................................................... 130

1. The Court Should Permit the Anonymous Victims to Testify Under Pseudonym to Avoid Unnecessary Harassment, Humiliation, Social Stigma, and Professional Consequences ................................................................................................................................. 131

2. The Use of Pseudonym of Narrowly Tailored to the Particular Privacy Interests of the Anonymous Victims ................................................................................................... 134

**CONCLUSION** ....................................................................................................................... 137

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings on the following issues prior to the trial of defendants Alon Alexander, Oren Alexander, and Tal Alexander, which is scheduled to begin on January 5, 2026.

*First*, the Government seeks pretrial rulings that the following categories of evidence are admissible:

- statements made by the defendants and other co-conspirators under Federal Rule of Evidence 801(d)(2)(E);

- the defendants' lack of response to statements regarding violent assaults that occurred at their homes, as adoptive admissions under Rule 801(d)(2)(B);

- the defendants' sexual assaults and abuse of victims whose assaults have not been charged in substantive counts in the indictment, as direct evidence of the charged conspiracy or under Rules 413 and 404(b); and

- prior consistent statements of victims, under Rule 801(d)(1)(B).

*Second*, the Government seeks to preclude the defendant from introducing evidence and argument and from pursuing lines of cross-examination concerning the following:

- certain irrelevant and unduly prejudicial topics, including (1) Minor Victim-3's alleged consent to sexual abuse; (2) the defendants' failure to commit other bad acts, including other alleged consensual sex acts; (3) the Government's motives for the investigation and prosecution; (4) the alleged novelty of the charges brought against the defendants; (5) the "#MeToo" movement; (6) the defendants' personal circumstances; (7) possible punishment or the defendants' desire to be released from prison; and (8) the Government's motivations for arresting Alon and Oren on Count Ten;

- counsel representing certain victims and any privileged communications between the victims and their counsel; and

- issues irrelevant to the credibility of witnesses, including prior citations, arrests, and convictions of certain witnesses.

*Third*, the Government moves to preclude the defendant from offering certain testimony from two proffered experts, Dr. Deryn Strange and Dr. Elie Aoun, under Rule 702.

1

*Fourth*, the Government respectfully requests that the Court protect the dignity and privacy of victims by permitting certain witnesses to testify under pseudonyms or using only their first names, and permitting the filing of related trial exhibits under seal.

For the reasons set forth below, the Court should grant the Government's motions.

## FACTUAL BACKGROUND

### I. The Charges Against the Defendants

For well over a decade, Alon, Oren, and Tal Alexander, the defendants, worked together and with others to repeatedly and violently drug, sexually assault, and rape dozens of female victims. As a result of their participation in this criminal scheme, the defendants are charged in Superseding Indictment S3 24 Cr. 676 (VEC) (Dkt. 86 (the "S3 Indictment")), with engaging in a conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c) (Count One). In addition, one or more of the defendants are charged with five counts of committing sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a) and (b)(1) (Counts Two, Three, Six, Seven, and Eight); one count of committing sex trafficking by force, fraud, or coercion or of a minor, in violation of 18 U.S.C. § 1591(a), (b)(1), and (b)(2) (Count Five);[1] two counts of inducement to travel to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2 (Counts Four and Nine); and one count of aggravated sexual abuse by force or threat or intoxicant, in violation to 18 U.S.C. §§ 2241(a)(1), (b)(2), 3238, 7, and 2 (Count Ten).

### II. The Evidence Against the Defendants

The Government expects that its evidence at trial will include, among other things, victim and witness testimony, law enforcement testimony, expert testimony, travel records, and

---

[1] For Count Five, the Government intends to proceed at trial solely on sex trafficking of a minor under 18 U.S.C. § 1591(b)(2), not sex trafficking by force, fraud, or coercion under 18 U.S.C. § 1591(b)(1).

electronically-stored communications from the devices of the defendants and others. The Government further expects that the evidence at trial will prove the following, in substance and in part and as relevant to the motions made herein.

### A. The Defendants' Scheme to Entice, Rape and Sexually Assault Women

From at least in or about 2009, up to and including in or about 2021, the defendants engaged in a persistent pattern of sex trafficking and sexual assault. As part of their long-running sex trafficking scheme, the defendants raped and sexually assaulted female victims to whom they had provided material benefits, including travel to vacation destinations and accommodations there, as well as access to events and parties. (S3 Indictment ¶¶ 4-5). The defendants worked together and with others to recruit women to these events and trips. (*Id.* ¶¶ 3, 5(a)-(b)). The defendants and those working with them contacted the women, often through dating applications or social media, and induced them to attend by, among other things, offering to purchase their flights, making other travel arrangements, or promising accommodations at hotels or vacation properties without charge. (*Id.* ¶ 5(d)-(f)). Once the women were there, the defendants or their friends often offered them alcohol, which for some victims caused symptoms consistent with being drugged, including impaired physical and mental capacity, limitations of movement and speech, and incomplete memories of events. (*Id.* ¶ 5(g)). The defendants then—sometimes alone, sometimes with each other, and sometimes with other men—forcibly raped or sexually assaulted their victims. (*Id.* ¶ 5(h)). At times, the defendants physically restrained and held down their victims during rapes and sexual assaults and ignored screams and explicit requests to stop. (*Id.*).

Aside from planned trips and events, the defendants used the same playbook to commit rapes and sexual assaults after chance encounters with women they met at bars, nightclubs, social and professional events, and on dating applications or social media. (*See id.* ¶ 6). In these instances, the defendants often similarly drugged or otherwise incapacitated the victims, took the

victims to isolated locations, and raped or sexually assaulted them, sometimes within hours of meeting them. (*See id.* ¶ 6). Again, the defendants engaged in these rapes and sexual assaults alone, with each other, and with other men, at times physically restraining the victim or ignoring the victim's explicit pleas to stop. (*Id.*).

**B. The Defendants' Enticement and Rape or Sexual Assault of the Substantive Victims**

In addition to Count One, which charges a sex trafficking conspiracy, the S3 Indictment contains nine substantive counts. These substantive counts pertain to the defendants' assaults of seven victims (the "Substantive Victims"). Count Two relates to the sex trafficking of Victim-1, Counts Three and Four to the sex trafficking and enticement of Victim-2, Count Five to the sex trafficking of Minor Victim-3, Count Six to the sex trafficking of Victim-4, Count Seven to the sex trafficking of Victim-5, and Counts Eight and Nine to the sex trafficking and enticement of Victim-6. Count Ten pertains to Alon and Oren's aggravated sexual abuse of Victim-7 on an international cruise. The details of the defendants' abuse of the Substantive Victims are set forth, in substance and in part, in greater detail below.

<u>Victim-1</u> was invited by a friend to a rental home in the Hamptons in or about Memorial Day Weekend 2011 (the "2011 Hamptons House").[2] Victim-1 traveled from Manhattan to the Hamptons on the Long Island Rail Road with her friend. When Victim-1 arrived in the Hamptons, she was picked up at the station by Tal, who drove her and her friend to the 2011 Hamptons House. Before she arrived in the Hamptons, Victim-1 was unaware that it was the defendants who had rented the 2011 Hamptons House or that she would be spending the weekend with them. █████

---

[2] Count Two alleges Victim-1 was assaulted "in or about July 2011." As the Government has continued investigating the offense, it expects the evidence at trial will show the offense was committed on or around Memorial Day Weekend 2011. The Government informed the defense of this information on October 30, 2025.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████ After arriving at the house, which was large and had amenities that included a sauna and hot tub, Victim-1 was given a room to stay in.

Shortly after arriving, Victim-1 went into a hot tub with Tal and others.  In the hot tub, Victim-1 was given a glass of wine, of which she drank about half.  The half glass of wine caused Victim-1 to feel strange and to lose some of her memory.  Victim-1 remembers coming to while in the sauna with Tal and another man.  Victim-1 has some memories of what was done to her in the sauna, including that Tal and the other man raped her, were aggressive with her, were laughing about it, and used a camera to record it.  The next morning, Tal told Victim-1 to leave the 2011 Hamptons House.

Victim-2 and her friend were living in Chicago during the summer of 2016 when they began interacting with Oren and Alon on the dating application Raya.  Oren and Alon messaged Victim-2's friend and invited the friend and Victim-2 to the Hamptons for Labor Day weekend.  Around the same time Oren and Alon were arranging for Victim-2 and her friend to come to the Hamptons, all three defendants texted with one another and agreed to fly girls to the Hamptons and to "try to orgy the[m] out."  The defendants provided Victim-2 and her friend with travel and accommodations to come to the Hamptons for the weekend.  Specifically, they provided flights, gave them a place to stay in a waterfront mansion, and sent a car to pick them up at the airport and drive them to Sag Harbor.

During the second night that Victim-2 was in the Hamptons, the defendants hosted a large Labor Day weekend party.  During the party, Oren gave Victim-2 a drink.  Victim-2 drank only

part of this drink and soon after began to feel very strange and struggled to walk. Victim-2 tried to go to her bedroom in the basement of the home, but she was cut off by Alon. Alon took Victim-2 not to her bedroom, but instead to a different bedroom. Alon left Victim-2 in the bedroom where she passed out. Victim-2 woke up later when Oren entered the bedroom. Victim-2 was on the bed and unable to move or say anything. Oren climbed onto the bed and on top of Victim-2. Oren put a condom on, held Victim-2 down, ignored her when she asked him to stop, and raped Victim-2. When Oren was finished, he left Victim-2 lying on the bed, where she passed out again and woke up the next morning. Victim-2 spent the following day arranging travel to leave the home and then left with her friend the following afternoon before eventually returning to Chicago.

Minor Victim-3, who was sixteen years old at the time, was invited by a party promoter ("CC-1") to a large home the defendants were renting, together with CC-1, in or about Memorial Day Weekend 2009 (the "2009 Hamptons House"). ████████████████████████

███████████████████████████████████████████████████████████

████████  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████  █

███████████████████████████████████████████████████████████

████████████████████████████████ These drinks made Minor Victim-3 feel wobbly, overwhelmed, and as if she had heightened senses. Minor Victim-3 went inside, ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



Victim-4 and Victim-5 ████████████████ were invited by party promoters to the Hamptons to celebrate Alon and Oren's birthday in or about late June 2009. Victim-4 and Victim-5 were told that a party bus would take them from Manhattan to a club in the Hamptons. When they arrived at the club, Victim-4 and Victim-5 met the defendants and saw CC-1, among others. At the club, Victim-4 and Victim-5 had some drinks and learned that the party bus was not taking them back to Manhattan. Alon talked to Victim-4 and told her that he had a nice house, *i.e.*, the 2009 Hamptons House, where there would be a fun afterparty, and invited Victim-4 to stay there.

Victim-4 and Victim-5 went to the 2009 Hamptons House that night for the afterparty. The defendants, ████████████████████████ ████████ were also at the house. After arriving, Victim-4 saw what appeared to be cocaine in the house. Victim-4 was offered a drink, which she drank, and then Alon later brought her a drink in the hot tub, which made her feel tired when she consumed it. In the hot tub, Alon physically held her down and raped her, while she told him to stop. ████████████████████

████████████████████████████████████████

████████████ While in the house, Victim-4 saw Tal having sex with a woman who was

crying.  Victim-4 blacked out and has no more memories ████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Like Victim-4, one of the twins also gave Victim-5 drinks at the house on the same night of Victim-4's assault.  Victim-5 has only flashes of memory from that night.  Victim-5 remembers that Alon and Oren had sex with her, and when she tried to get up, they would pin her back down.  Tal ████████ walked in at different points when the twins were raping her.  Victim-5 also remembers seeing Alon and Oren pinning down Victim-4 and having sex with her, and Victim-4 asking Victim-5 to help her.  █████████████████████████████████████████

█████████████  Victim-4 and Victim-5 left the house and took the Long Island Railroad back to Manhattan.

Victim-6 met Tal on Instagram in or around the summer of 2013, and they exchanged contact information.  █████████████████████████████████████████████

██████████████  In or around August 2014, Tal invited Victim-6 and a friend ("Friend-1") to the Hamptons for a weekend.  Tal told Victim-6 that he would reimburse her and Friend-1 for their flights but never actually did so.  Tal also told Victim-6 that he had booked a hotel room for Victim-6 and Friend-1 in Manhattan for the night they arrived.  Victim-6 and Friend-1 flew from ████████████████████████t, where Tal ███████████████████ arranged for a car to pick them up and bring them to Manhattan.  After they landed in New York, Tal told Victim-6 to instead come to his apartment, where she and Friend-1 spent that night.  The next day, Tal arranged for a

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ a waterfront mansion where Oren and two of his friends were also staying.  Victim-

6 and Friend-1 stayed in a room on the first floor ████████████ which had a revolving door that did not lock and an attached bathroom. Tal and Oren arranged for a private chef to cook for the group for the weekend. The first night the chef prepared dinner for the group, and Victim-6 and Friend-1 went to bed early.

The next night, the group drank heavily, and Tal, ████ and others passed out shots. Tal and others gave Victim-6 shots but she either put them down or surreptitiously poured them out, as she did not want to drink. Friend-1 had half a glass of wine and began acting erratically, which was out of character for Friend-1 in Victim-6's experience. Victim-6 took Friend-1 into their room and put her to bed before putting on her own nightgown. Because the door to their room did not lock, Victim-6 placed their luggage in front of the door in an attempt to keep it closed. A short while later, Tal opened the door—causing the luggage to slide across the floor—and jumped onto the bed between Victim-6 and Friend-1, who was asleep. Tal asked Victim-6 why they were going to bed and whether she had been drinking. Victim-6 told Tal that she had been drinking (even though she had not). Tal left the room. After Tal left, Victim-6 was too nervous to sleep, as she was worried someone else would enter the room. She put the luggage back in front of the door and sat awake while Friend-1 slept. A couple of hours later, the door slid open again, and Victim-6 saw two men silhouetted in the doorway, backlit by the light in the living room. Victim-6 recognized one of the men as Tal and believed that the other man was Oren. Victim-6 asked the men "can I help you" and heard one say "oh shit" before they left.

The next morning, Victim-6 told Friend-1 that they needed to leave early, so Victim-6 and Friend-1 began to pack and get ready to leave. While Friend-1 was drying her hair in the bathroom and Victim-6 was finishing her makeup in the bedroom, Tal came into the room again. Seeing that Victim-6 had been packing, Tal asked where they were going. Victim-6 said that she and

Friend-1 were going back to the city. Tal seemed upset that Victim-6 was leaving, saying that he thought he had invited "fun girls" for the weekend. Tal tackled Victim-6 onto the bed, and she pushed him off. After Victim-6 pushed him off, Tal's demeanor shifted, and he seemed angry. Frightened, Victim-6 ran into the connected bathroom, past Friend-1 drying her hair by the sink, and through a door to the shower area. Once she entered the shower, Victim-6 realized that Tal was right behind her and that he closed the wooden door behind him, shutting Victim-6 in the shower area with him and standing between her and the door. Tal took off his swim trunks, turned on the shower, and entered the shower with Victim-6. Tal turned Victim-6 around, bent her over, and held her there with one hand on the back of her neck and head. With the other hand, Tal pulled down Victim-6's underwear and vaginally raped her. Friend-1 heard the sound of Tal and Victim-6 having sex and left the bathroom. Victim-6 tried to scream but could not raise her voice, instead whispering "no, no, no." When Tal finished raping Victim-6, he got out of the shower, cleaned himself off, and turned back to Victim-6. Victim-6 was crying and Tal said to her, "you wanted that," "I care about you," and "you wanted that."

Victim-6 cleaned herself up in the bathroom and went back into the bedroom, where Friend-1 saw that Victim-6 was upset. Victim-6 and Friend-1 left ██████████ shortly thereafter and saw Tal on their way out of the house. Tal was angry that they were leaving and asked Victim-6 if that was how she thanked him.

Victim-7. In January 2012, Victim-7, ████████████████████████████ attended ██████████████████████████████████████ ████████████████████. In 2012, ██████████ embarked from Miami, Florida and traveled to multiple locations in the Bahamas.



10



While on the cruise, Victim-7 went to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That
evening, Victim-7 met Oren and Alon ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Victim-7 accompanied Oren and Alon to a cabin where she was immediately
offered a drink, which she drank. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ She does not know how much time passed while she was blacked out. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

After the rape ended, Victim-7 dressed and left the cabin. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## C.  The Defendants' Enticement and Rape or Sexual Assault of the Conspiracy Victims

In their decades of abusing women, the defendants have raped or sexually assaulted many more women than the Substantive Victims.[3]  Examples of these women, whose assaults and rapes have not been charged in a substantive count (the "Conspiracy Victims"), are outlined below:

Minor Victim-8, Victim-9, and Minor Victim-25 ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] On or about October 17, 2025, the Government provided the defense notice pursuant to Rules 413 and 404(b) for approximately 17 additional victims.  References to the victims in this section are consistent with that notice.  On or about November 4, 2025, the Government provided a supplemental notice of Minor Victim-25, who was referenced in the original notice as "Friend-1."

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

<u>Victim-10 and Victim-11</u> ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

<u>Victim-12</u> ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███

Victim-13 ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Victim-14

<u>Victim-15</u>

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Victim-16 ████████████████████████████████████

████████████████████████████████████████████████████

████████    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

Victim-17 ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Victim-18

Victim-19 ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

Victim-20 ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Victim-21

23

Victim-23 ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Victim-24 ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████

Video evidence of sexual assaults was discovered on at least one hard drive seized in the course of the search of Tal's apartment in Manhattan. One such video, recorded in or about April 2009, depicts Oren sexually assaulting, with another person, a victim who appears to be severely intoxicated and incapacitated. During the assault, Oren physically manipulated the body of the incapacitated victim and had vaginal intercourse with her. The victim did not actively participate in the sexual activity, largely lying on the bed while Oren moved her body and had sex with her. When the victim spoke, her words were so badly slurred that it is difficult to understand what she is saying, making clear that she was too incapacitated to consent to any sexual activity. Other videos found on the hard drive that appear to have been recorded shortly before the assault described above depict Oren saying the following to the incapacitated victim: "I fucked you twice"; "It's not my fault your pussy wasn't wet because you took too much cocaine"; and "Did you take that pill? You should have took that pill."

## DISCUSSION

### I.  Evidence of the Defendants' Sexual Assaults and Abuse of the Conspiracy Victims Is Admissible as Direct Evidence or Under Rules 413 and 404(b)

The defendants' rapes and sexual assaults of the Conspiracy Victims, *i.e.*, victims whose assaults are not charged as separate substantive offenses, are acts in furtherance of the sex trafficking conspiracy and thus, evidence of those rapes and sexual assaults are admissible as direct evidence of the offense charged in Count One.

Even if the Court were to determine that evidence of certain other sexual assaults of the Conspiracy Victims is not admissible as direct evidence, it is plainly admissible under Rule 413. In addition, evidence of the defendants' rapes and sexual assaults of these Conspiracy Victims is

25

admissible under Rule 404(b). Such evidence is highly probative of the defendants' guilt and—consistent with the Federal Rules of Evidence—relevant to their character and propensity to commit the charged crimes pursuant to Rules 413, and to their motive, opportunity, intent, preparation, plan, knowledge identity, absence of mistake, or lack of accident under Rule 404(b). At trial, the Government expects that the defense will claim that the defendants lacked the intent to commit the charged crimes while also attacking the credibility of Substantive Victims.[4] These attacks will likely come in several forms and include claims of mistake, faulty memory, and fabrication, as discussed in greater detail below. Evidence of the defendants' other sexual assaults and abuse will be critical in corroborating each of these victims' testimony and establishing the defendants' intent and plan to commit the charged crimes. The Government thus moves to admit evidence of the defendants' sexual assaults and abuse of Minor Victim-8, Minor Victim-25, and Victim-9, -10, -11, -12, -13, -14, -15, -16, -17, -18, -19, -20, -21, -23, and -24 as referenced *supra* Background Section II.C.[5]

### A. Applicable Law

#### 1. Direct Evidence of a Charged Conspiracy

It is well established in the Second Circuit that where, as here, an indictment alleges a conspiracy, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged."[6] *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999);

---

[4] While the Substantive Victims and the Conspiracy Victims are grouped separately for purposes of this motion, evidence pertaining to the rapes and sexual assaults of the Substantive Victims also is probative evidence of the sex trafficking conspiracy charged in Count One.

[5] The Government will likely not call all of the Conspiracy Victims described herein at trial, but because the testimony of each of the Conspiracy Victims is plainly admissible and noncumulative, the Government seeks to reserve the ability to call any number or combination of them.

[6] Unless otherwise noted, case and record text quotations omit all internal quotation marks, citations, and previous alterations.

*see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994 (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"); *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (when "a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself"). An act in furtherance of the conspiracy is not uncharged criminal conduct subject to Rule 404(b)—it is part and parcel of the charged conduct. Evidence of uncharged criminal conduct or other bad acts is relevant and not considered "other crimes" evidence under Rule 404(b) if the uncharged conduct (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (explaining that some kinds of evidence offered "to show the background of a conspiracy" is not "other crimes" evidence subject to Rule 404(b), but rather "direct proof of the charged conspiracy"); *accord United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

### 2.  Federal Rule of Evidence 413

Federal Rule of Evidence 413 provides that "in a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. Such evidence may be considered on any matter to which it is relevant." Sexual assault, in turn, is defined as "a crime under federal law or under state law . . . involving contact, without consent, between any part of the defendant's body—or an object—and another person's

27

genitals or anus" or "contact, without consent, between the defendant's genitals or anus and any part of another person's body." Fed. R. Evid. 413(a), (d)(2), (d)(3).

Simply put, cases concerning sexual abuse are unique. *United States v. Vickers*, 708 F. App'x 732, 736 (2d Cir. 2017) ("Sexual assault . . . cases are different."). In recognition of that fact, the Federal Rules of Evidence permit a court to "admit evidence that the defendant committed any other sexual assault" and such "evidence may be considered on any matter to which it is relevant." *Id.* (quoting Fed. R. Evid. 413(a) (assault)). Indeed, Rule 413 departs from Rule 404(b) inasmuch as it permits evidence of prior acts of sexual assault to prove a defendant's propensity to commit such acts. *See United States v. Schaffer*, 851 F.3d 166, 177-178 (2d Cir. 2017) ("In other words, a prosecutor may use evidence of prior sexual assaults precisely to show that a defendant has a pattern or propensity for committing sexual assault."); *United States v. Davis*, 624 F.3d 508, 511-12 (2d Cir. 2010) (district court did not abuse its discretion in admitting at trial a nineteen-year old conviction for child molestation); *United States v. Hadden*, No. 20 Cr. 468 (RMB) (S.D.N.Y.) (Dec. 29, 2022 Order) (granting Government's motion to admit evidence of defendant's other sexual assault and abuse crimes); *United States v. Paduch*, No. 23 Cr. 181 (RA) (S.D.N.Y.) April 24, 2024, Tr. at 2-18; *United States v. Rosado*, No. 21 Cr. 516 (RMB) (S.D.N.Y.) Sept. 19, 2023 Tr. at 5-6, 19 (admitting evidence of sexual assault of non-statutory victim under Rules 413 and 404(b)). "In passing Rule 413, Congress believed it necessary to lower the obstacles to admission of propensity evidence in a defined class of cases. Its rationale for sexual assault cases includes the assistance it provides in assessing credibility." *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998). Indeed, the Congressional Record reflects the following:

> [S]exual assault cases, where adults are the victims, often turn on
> difficult credibility determinations. Alleged consent by the victim
> is rarely an issue in prosecutions for other violent crimes—the
> accused mugger does not claim that the victim freely handed over

> his wallet as a gift—but the defendant in a rape case often contends
> that the victim engaged in consensual sex and then falsely accused
> him. Knowledge that the defendant has committed rapes on other
> occasions is frequently critical in assessing the relative plausibility
> of these claims and accurately deciding cases that would otherwise
> become unresolvable swearing matches.

*Id.* (quoting 140 Cong. Rec. S129901-01, S12990 (R. Dole, Sept. 20, 1994)); *see also Schaffer*, 851 F.3d at 178 (quoting *Enjady*, 134 F.3d at 1431).

### 3.  Federal Rule of Evidence 404(b)

Under Rule 404(b), evidence of a defendants' prior crimes, wrongs, or acts are admissible to prove "motive, opportunity, intent, preparation, plan, knowledge identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has "adopted an inclusionary approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. Memoli*, 648 F. App'x 91, 93 (2d Cir. 2016) (quoting *United States v. Scott*, 677 F.3d 72, 79 (2d Cir. 2012)). The Supreme Court has recognized that other act evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Trial courts, therefore, have broad latitude in determining whether to admit evidence pursuant to Rule 404(b), and their rulings will be reviewed only for abuse of discretion. *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).

In particular, where a defendant claims that his conduct has an innocent explanation, evidence of prior acts is admissible to prove that the defendant acted with the state of mind necessary to commit the offense. *See, e.g.*, *United States v. Martino,* 759 F.2d 998, 1005 (2d Cir. 1985); *United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008); *United States v. Bruno*,

873 F.2d 555, 561-62 (2d Cir. 1989); *United States* v. *Casimiro*, No. 09 Cr. 497 (NRB), 2011 WL 2714217, at *2 (S.D.N.Y. July 8, 2011).

To be admissible, Rule 404(b) evidence "must relate to an issue in dispute." *United States v. Robinson*, No. 17 Cr. 249 (PAE), 2017 WL 4466616, at *2 (S.D.N.Y. Oct. 5, 2017). A defendant's knowledge and intent are at issue unless the defendant has expressed with sufficient clarity a decision not to dispute that element of the offense. *See United States v. Colon*, 880 F.2d 650, 659 (2d Cir. 1989).[7] Moreover, the Government may introduce such evidence in its direct case. *See United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993); *see also Inserra*, 34 F.3d at 90.

In addition to its admissibility as direct evidence of conspiracy, evidence of uncharged acts also is admissible as background evidence where it is used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual criminal trust that existed between co-conspirators; and/or (iii) complete the story of the crime charged. *See United States v. Mercado*, 573 F.3d 138, 141–42 (2d Cir. 2009); *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (affirming admission of prior act evidence involving co-conspirators "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed" (internal quotation marks omitted)); *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (other act evidence admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Pipola*, 83 F.3d

---

[7] "[T]o take intent out of a case, 'a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed.'" *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992) (quoting *Colon*, 880 F.2d at 659). "A defendant may do so either 'by putting forward a particular theory of defense or by specifically offering to stipulate.'" *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 168 (S.D.N.Y. 2006) (quoting *Colon*, 880 F.2d at 657).

556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.").

### 4. Federal Rule of Evidence 403

Whether admitted as direct evidence of the conspiracy, under Federal Rule of Evidence 413, or Rule 404, prior act evidence is subject to Rule 403, which authorizes the exclusion of relevant evidence only if its "probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that does not mean it is "unfairly" prejudicial. *Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair."). The Supreme Court has defined "unfair prejudice" as "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof of the specific offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). The Second Circuit has long made clear that "other act" evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also Schaffer*, 851 F.3d at 183 (finding no error in district court's admission of videos depicting minors trying on swimsuits and being fondled by the defendant where conduct portrayed was "not more inflammatory" than the sexual conduct for which the defendant was tried); *Williams*, 205 F.3d at 34; *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted).

31

The fact that evidence may be damning does not render it inadmissible. *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972); *see also Schaffer*, 851 F.3d at 182 (evidence may be "highly prejudicial" without being "unfairly prejudicial") (quoting *Davis*, 624 F.3d at 512).

To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions.").

### B. Discussion

#### 1. The Defendants' Rapes and Sexual Assaults Not Charged in Substantive Counts Are Direct Evidence of the Charged Conspiracy

As laid out above, the defendants—with each other and other co-conspirators—sexually assaulted and raped dozens of women and girls over the course of the conspiracy. While not all of these rapes and sexual assaults are charged as stand-alone substantive sex trafficking incidents, the defendants' sexual assaults of Conspiracy Victims were committed in furtherance of the charged conspiracy and are admissible as direct evidence. *See United States v. Caille*, No. 23-7651, 2025 WL 1450806, at *4 (2d Cir. May 21, 2025) (holding in case charging both conspiracy to commit carjacking and substantive carjacking that evidence of a carjacking not charged in a substantive count was properly admitted as "direct evidence of the conspiracy itself") (quoting *Diaz*, 176 F.3d at79.

### a. The Rapes and Sexual Assaults Charged in the Conspiracy and Substantive Counts Are Part of the Same Course of Criminal Conduct

Each of the rapes and sexual assaults that the Government will present at trial used a similar pattern of behavior: the defendants lured or persuaded a victim to come to a particular location—*e.g.*, a vacation house, a hotel room or suite, or their apartment—with the promise or inducement of a weekend in the Hamptons, an afterparty, or a date. After the victims arrived, the defendants typically gave them a drink that caused the victim to experience symptoms of being drugged. Then, one or more of the defendants raped or sexually assaulted their victims, often using physical force regardless of whether the victim was incapacitated by the drugged drink. The Conspiracy Victims' testimony is equally important evidence as the testimony of Substantive Victims, *i.e.*, the victims charged in substantive sex trafficking counts. Their testimony proves the existence of that conspiracy, the relationship and mutual trust between the co-conspirators, the aims of the conspiracy, and the ways in which the defendants carried out those aims. *See Gonzalez*, 110 F.3d at 942. The following sections describe how the defendants collaborated to rape and sexually assault, to drug and incapacitate, and to use physical force to restrain their victims—the Substantive Victims and the Conspiracy Victims alike.

### (1)  The Defendants Worked Together to Rape and Sexually Assault Victims

As part of the conspiracy, the defendants often worked together to rape and sexually assault their Conspiracy Victims. On some occasions, one defendant would restrain a victim while another raped or sexually assaulted her. On other occasions, two of the defendants would take turns raping or sexually assaulting the same victim. And on still other occasions, one defendant would watch while another raped or sexually assaulted a victim. Each of these assaults involving more than one of the defendants is evidence of the relationship between the co-conspirators and the way they coordinated and worked together to carry out the aims of the conspiracy. The assaults

33

are also evidence that "inform[s] the jury of the background of the conspiracy charged, in order to explain how the illegal relationship between the participants in the crime developed" and "the mutual trust that existed between coconspirators." *Caille*, 2025 WL 1450806, at *4 (citing *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997)); *see United States v. Phillips*, No. 22 Cr. 138 (LJL), 2023 WL 6620146, at *9 (S.D.N.Y. Oct. 10, 2023) (evidence of "the close relationship and mutual trust the Defendant had with [CC-2]" . . . goes directly to the charged conspiracy and is not subject to Rule 404(b).").

For example, with regard to the Substantive Victims, on Memorial Day Weekend 2009, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ Just a few weeks later, Alon and Oren both raped Victim-4. That same night, Alon and Oren also both raped Victim-5 while Tal ████████ walked in and out of the room. And in January 2012, Oren and Alon took turns raping Victim-7 on ████████████.

The defendants worked together in the same way to assault the Conspiracy Victims. In January 2017, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ In another similar example, ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████ This was not

the only time the twins—Alon and Oren—took turns raping women together.  For example, █

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████

Tal also worked with one or both of the twins to facilitate rapes and sexual assaults. █

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████

Although these individual rapes and sexual assaults are not charged as substantive sex trafficking incidents, each is powerful direct evidence of the defendants' mutual trust, their coordination and cooperation in the course of the conspiracy, and demonstrates the existence of their agreement and how they worked together to carry out their criminal aims.

### (2)  The Defendants Drugged and Incapacitated Victims

Many of these rapes and sexual assaults took place after the defendants incapacitated their victims by drugging them.  Victim after victim reported drinking alcohol given to them by one of the defendants and feeling far more intoxicated than was consistent with the amount they had consumed, losing control of their bodies and blacking out for periods of time. [8]

This is true for the Substantive Victims.  Victim-1 drank half a glass of wine and then blacked out, recalling only flashes of the rest of the night.  Victim-1 recalled that Tal and the other man raped her.  She also recalls being in a sauna with Tal holding her down from behind while another man was in the room.  She also remembered being in the gym with Tal and the other man. Victim-2 drank only part of a drink that Oren gave her and then felt as if she could not walk.  Alon took Victim-2 to a room to lie down and she passed out for several hours.  Victim-2 woke up when Oren entered the room; Oren held Victim-2 down and raped her.  During the rape, Victim-2 tried to move her arms to push him off but lacked the strength to do that.  Minor Victim-3 and Victim-4, both consumed drinks provided by the defendants and became far more intoxicated than usual before multiple defendants raped them.  Victim-7 similarly blacked out after drinking a drink provided by the twins, ██████████████████████████

---

[8] As discussed below, the drugging of victims was an integral part of the sex trafficking conspiracy. As such, evidence of drugs and the defendants' access to and distribution of drugs is direct evidence of the charged sex trafficking conspiracy, or in the alternative, is admissible under Rule 404(b) to demonstrate the defendants' access to drugs, as well as their common scheme or plan, intent, motive, and opportunity to drug the victims and a lack of mistake or accident.

It is also true for the Conspiracy Victims.  The experiences of some of the Conspiracy Victims are described below:

- Victim-12 

- Victim-14

- Victim-16

- Victim-17

- Minor Victim-8, Victim-9, and Minor Victim-25

- Oren gave Victim-19

- Victim-20

- Victim-23 

- Victim-24

Beyond the Conspiracy Victims, the video of Oren and another man raping a visibly incapacitated victim in April 2009 is further visual evidence of the drugged sexual assaults that were the hallmark of the defendants' conspiracy. The video shows the victim lying limply on the bed with another man who digitally penetrated and fondled her while Oren set up a camera to film the encounter. When the victim attempted to speak, she slurred her words so badly that it is difficult to understand what she said. Oren then climbed onto the bed and manipulated the victim's legs so that he could lie between them and begin to have sex with her. During the assault, the victim did not appear to actively participate, instead lying there while Oren raped her and the other man lay next to them. This video was filmed at the beginning of the charged conspiracy and shows Oren working with another man to rape and sexually assault a victim who is visibly too impaired to consent—which is consistent with what the Substantive Count and Conspiracy Victims alike describe the defendants doing to them.

### (3) The Defendants Used Physical Force to Restrain and Rape Victims

The defendants' victims frequently describe one or more of the defendants using physical force to restrain them while raping or sexually assaulting them. As to the Substantive Victims: Tal held Victim-1 down from behind while raping her in a sauna; Oren climbed on top of Victim-2 and raped her, even though she was too incapacitated to move; ██████████████████ ████████████████████████; Alon physically held Victim-4 as he raped her in a hot tub, and later that night, Alon and Oren pinned Victim-4 down while he raped her; Alon

and Oren pinned down Victim-5 while they raped her; Tal bent Victim-6 over in the shower and held her down by the back of her neck and head while she sobbed and whispered "no, no, stop."

The same is true for the Conspiracy Victims. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

Taken together, the testimony of the Conspiracy Victims and the video described above are powerful evidence of the means and methods of the conspiracy and the way the defendants worked with each other and other co-conspirators to carry out rapes and sexual assaults throughout the period of the charged conspiracy. The Court should admit them as direct evidence of the conspiracy.

**b. The Conspiracy Rapes and Sexual Assaults Are Necessary Evidence of the Background of the Conspiracy**

Evidence of the defendants' rapes and sexual assaults of the Conspiracy Victims are also necessary to provide background to the events alleged in the indictment, to demonstrate the circumstances surrounding those events, and to demonstrate the understanding and intent with which the defendants carried out rapes and sexual assaults. *See Daly*, 842 F.2d at 1388. As the examples laid out above make clear, the defendants habitually engaged in rapes and sexual assaults. They were not one-off or sporadic attacks. Rather, the defendants regularly followed a playbook to lure their victims to a location where they could rape them, often after drugging them to prevent resistance or escape. The repeated, habitual nature of the defendants' rapes and sexual assaults are clear evidence of their understanding of the nature of the conspiracy and their intent in carrying out these attacks. That they worked together to rape and sexually assault the victims (Conspiracy Victims as well as the Substantive Victims) makes clear that each defendant understood and supported the criminal aims of the conspiracy.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████ That the defendants regularly walked in on each other engaged in rapes and sexual assaults without any surprise or alarm evinces their unspoken agreement to work together to carry out these crimes. Each defendant was willing and prepared to help his brothers rape and sexually assault victims regularly, illustrating the agreement between the co-conspirators.

40

### 2. The Defendants' Other Rapes and Sexual Assaults Are Admissible Under Rules 413 and 404(b)

If the Court were to determine that the Conspiracy Victims' testimony is not admissible as direct evidence of the charged conspiracy, such testimony is admissible under Federal Rules of Evidence 413 and 404(b).

#### a. Evidence of the Defendants' Other Rapes and Sexual Assaults Is Admissible Under Rule 413

The defendants are charged with "sexual assault" offenses as defined in Rule 413. Rule 413 defines "sexual assault" as, among other things, "contact, without consent, between any part of the defendant's body—or an object—and another person's genitals or anus" and "contact, without consent, between the defendant's genitals or anus and any part of another person's body". Fed. R. Evid. 413(d)(2), (d)(3). Each of the victims charged in substantive counts (for sex trafficking, enticement, or aggravated sexual abuse) were vaginally raped and/or digitally penetrated without consent by at least one of the defendants. The defendants also vaginally raped, digitally penetrated, and/or performed oral sex without consent on each of the Conspiracy Victims, as described in detail above. *See supra* Background Section II.A-C.

The defendants' other sexual assaults and abuse are highly probative of the charged conduct under Rule 413. To begin, the Conspiracy Victims describe markedly similar accounts of sexual abuse to those described by the victims underlying the substantive counts. As laid out in detail above, the defendants used the same methods to carry out their rapes and sexual assaults of their victims: they induced victims with desirable locations and events where they could overcome the victims' will to rape or sexually assault them; they gave victims drinks that incapacitated them; they worked together to carry out these assaults and rapes, often restraining victims for each other or taking turns raping the same victim. Collectively, these accounts establish a yearslong "pattern or propensity for committing sexual assault." *Schaffer*, 851 F.3d at 177-178. *See also, Vickers*,

41

708 F. App'x at 737 (concluding that evidence of the defendant's grooming, including the "techniques he employed to gain his victims' trust . . . was plainly admissible under Rules 413 and 414 because it was probative of Vickers' propensity for sexually abusing adolescent boys").

The video described in Background Section II.C, *supra*, is similarly admissible under Rule 413. *See Schaffer*, 851 F.3d at 181-184 (affirming admission of sexually explicit videos of minors as "prior sexual assaults" under Rule 413 where defendant was charged with enticing a minor to engage in unlawful sexual activity). The video corroborates the testimony of the Substantive Victims who were incapacitated at the time of the sexual assaults (Victim-1, -2, -3, -4, -5, and -7), corroborates the testimony of Substantive Victims who were raped and sexually assaulted by more than one co-conspirator (Victim-1, -3, -4, -5, -7), and corroborates Victim-1 and -4's testimony that they saw cameras that appeared to be filming them while the defendants raped them.

Consistent with Federal Rule of Evidence 413, the defendants' other sexual assaults are probative for another reason: the testifying Conspiracy Victims and the video make more plausible the testimony of the Substantive Victims. Indeed, this was exactly why Congress passed Rule 413: because sexual assault cases often rest on the credibility of the victims and "[k]nowledge that the defendant has committed [sexual assaults] on other occasions is frequently critical in assessing the relative plausibility of these claims." *Enjady*, 134 F.3d at 1431; s*ee also Schaffer*, 851 F.3d at 178. Here, as in many sexual assault cases, the defendants took steps to isolate their victims and get them away from anyone who was able or inclined to try to prevent the assault. As is typical in cases such as this, the evidence that each rape and sexual assault was non-consensual depends on the testimony of each victim. Victim testimony is at the heart of this trial, and for that reason the Government expects that the defendants will attack the credibility of the testifying victims, including through claims of fabrication, motive to lie, mistake, and faulty memory. Indeed,

defense counsel have already made public statements claiming that each of the victims is lying to get money through civil lawsuits.[9]  And defense counsel have noticed an expert in false memory, making clear that their strategy is to discredit the victims.  Admitting evidence of similar sexual assaults by the defendants fulfills the precise purposes Congress envisioned in enacting Rule 413 in that it allows the Government to answer those attacks by corroborating its victims with accounts from other similarly situated victims.  *See Schaffer*, 851 F.3d at 178; *Enjady*, 134 F.3d at 1431.

### b. Evidence of the Defendants' Other Rapes and Sexual Assaults Is Admissible Under Rule 404(b)

Evidence of the defendants' sexual assaults of the Conspiracy Victims is also admissible under Federal Rule of Evidence 404(b).  Such evidence is probative of:  (i) the defendants' opportunity to commit the charged crimes by creating occasions to isolate and incapacitate victims in order to sexually assault and rape them; (ii) the defendants' intent and motive for sexually assaulting and raping victims, including their own sexual gratification and desire and to enhance their own status and reputation in the conspiracy by bragging about their sexual activities; (iii) the absence of mistake or lack of accident; and (iv) the defendants' idiosyncratic means and methods of sexual assault, constituting a common scheme or plan.

To establish a conspiracy to commit sex trafficking and substantive sex trafficking as alleged in Counts One, Two, Three, Six, Seven, and Eight, the Government bears the burden of

---

[9] *See*, *e.g.*, Debra Kamin, "Alexander Brothers Face More Lawsuits Accusing Them of Sexual Assault," N.Y. Times (Feb. 18, 2025), https://www.nytimes.com/2025/02/18/realestate/tal-oren-alexander-brothers-lawsuits-sexual-assault.html (counsel for Oren describing the victims' lawsuits as "a last-ditch money grab barred by state law"); *id*. (counsel for Tal stating that his accusers are "mak[ing] up stories for financial gain. *See also* Tynisa Senior & Alex Browning, "Judge denied bond for Alon Alexander in federal sex trafficking cases; decision pending for twin brother," Miami 7 News (Jan. 3, 2025) at 02:20-02:25, https://wsvn.com/news/local/miami-dade/judge-denies-bond-for-alon-alexander-in-federal-sex-trafficking-case-decision-pending-for-twin-brother (counsel for Alon stating that "every one of [the victims]" are lying in an interview in a news conference).

43

proving that the defendants knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion would be used to cause Victim-1, -2, -4, -5, and -6 to engage in a commercial sex act.  *See* 18 U.S.C. § 1591; *United States v. Purcell*, 967 F.3d 159, 193 (2d Cir. 2020).  To succeed on Count Ten, the Government also must prove that Oren and Alon either knowingly used force to cause a victim to engage in a sexual act or knowingly administered a drug or intoxicant, or similar substance to a victim without the knowledge or permission of the victim.  18 U.S.C. § 2241(a)(1) and (b)(2); *United States v. Martinez*, 110 F.4th 160, 171 (2d Cir. 2024).  The defendants' history of utterly disregarding verbal and physical resistance from both Substantive Victims and Conspiracy Victims and pattern of drugging victims until they were incapable of consent or meaningful resistance supports the inference that the defendants knew or recklessly disregarded the fact that they were causing the Substantive Victims to engage in sex acts against their will.  Accordingly, it provides probative evidence of the defendants' opportunity, intent, motive and lack of mistake or accident.

Specifically, the testimony of certain Conspiracy Victims helps prove that the defendants were aware that victims were not consenting to these sexual encounters or that they felt too impaired to consent or resist.  For example, ███████████████████████████ in 2009, ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████  In 2010, ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  In 2012, ███ ████████████████████████████████████████████████████████████████

44



. In 2016,

In 2017,

. In 2021,                              .

Should the defendants argue that they were unaware that the victims were too impaired to consent or that the victims did not want to have sex with them, the testimony of these Conspiracy Victims is powerful evidence to the contrary.  The number of victims who confronted the defendants, particularly those like Victim-20 and Victim-21 who did so very early in the charged conspiracy, refute any notion that the defendants somehow committed dozens of rapes and sexual assaults inadvertently.

In addition, evidence of the defendants' other rapes and sexual assaults tends to show a specific scheme employed by the defendants in committing the charged crimes against the Substantive Victims.  *See, e.g.*, *Carroll v. Trump*, 124 F.4th 140, 168 (2d Cir. 2024) ("Courts have routinely admitted evidence of a pattern or *modus operandi* in sexual assault cases where, as here, the defendant is alleged to have engaged in a distinctive pattern of conduct related to non-consensual sexual contact"); *United States v. Sliker*, 751 F.2d 477, 486-87 (2d Cir. 1984) ("The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence.").  In other words, the assaults recounted by the Conspiracy Victims reveal idiosyncratic details of abuse constituting a *modus operandi*.  *Compare* Background Section II.B *with* Background Section II.C, *supra*.  For example, the defendants provided material benefits to entice women to locations where they could sexually assault and rape them—in the case of the Substantive Victims, a trip to the Hamptons (Victim-1, -2, -3, -4, -5, -6);

45

in the case of the Conspiracy Victims, an afterparty at a high-end hotel, a day of skiing, dinner, a date (Victim-8, -9, -10, -11, -12, -13, -14, -18, -19, -20, -21, -23, -24, -25).  Once both Substantive Victims and Conspiracy Victims were at that location, the defendants' used similar strategies to isolate and incapacitate them before raping or sexually assaulting them:  often, the defendants would give the victims a drink that caused them to lose control of their bodies, impacted their memories, and rendered them incapable of consent or resistance (Victim-1, -2, -3, -4, -5, -7, -8, -9, -12, -14, -16, -17, -19, -20, -21, -23, -25).  Then, one or more of the defendants would rape or sexually assault the victims, sometimes using force (Victim-6, -8, -13, -15, -24).  The defendants regularly participated in these assaults together or with other men—one defendant watching while the other raped a victim (Victim-1, -12, -16), one defendant restraining the victim while the other raped her (Victim-3, -4, -5), or the defendants taking turns raping the same victim (Victim-3, -4, -5, -7, -10, -11, 14).

### c. The Probative Value of the Defendants' Other Rape and Sexual Assault Evidence Outweighs Any Potential Prejudice

Under Rule 403, the probative nature of the defendants' other rape and sexual assault evidence outweighs any potential prejudice.  Fed. R. Evid. 403.  Powerful evidence is not the same as unfairly prejudicial evidence.  Likewise, evidence is not unfairly prejudicial solely because it relates to sexual assault or intimate body parts.  *See Davis*, 624 F.3d at 512; *Schaffer*, 851 F.3d at 178; *Vickers*, 708 F. App'x at 736.  This is particularly the case where, as here, the similar-act evidence is no more egregious than the charged acts.  *See, e.g.*, *Schaffer*, 851 F.3d at 183 (no error in admission of videos depicting minors trying on swimsuits and being fondled by the defendant where conduct portrayed was "not more inflammatory" than the sexual conduct for which the defendant was tried); *United States v. Abu-Jihaad*, 630 F.3d 102, 132-33 (2d Cir. 2010) (affirming admission under Rule 403 of uncharged conduct that is "no more inflammatory than the charges

alleged in the indictment"). Given the defense's likely arguments and attacks on victim credibility in this case and the highly probative nature of the evidence of the defendants' other rapes and sexual assaults, any potential prejudice under Rule 403 is outweighed.[10]    Evidence of the defendants' other rapes and sexual assaults should thus be admitted at trial.

## II.    Evidence of Statements by the Defendants and Other Co-Conspirators Is Admissible Under Rule 801(d)(2)(E)

As described above, the defendants engaged in a conspiracy to traffic women by enticing or transporting the victims to their location, often providing them drinks that were drugged, and then sexually assaulting or raping them, often using force. All three of the defendants worked together to carry out the conspiracy, and consequently, the Court should admit each defendants' statements in furtherance of the conspiracy against their co-defendants under Rule 801(d)(2)(E). In addition, in order to facilitate the sexual assaults at the heart of the conspiracy, the defendants obtained drugs that they could slip in victims' drinks to leave the victims incapacitated. The defendants' conversations with others concerning drugs are at minimum statements in furtherance of a drug conspiracy and should be admitted as such.

### A.    Applicable Law

Rule 801(d)(2)(E) provides that a statement is not hearsay if "the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that "the statement was made during the course of, and in furtherance of, that

---

[10] Rule 403 also does not preclude evidence of drugs and the defendants' access to and distribution of drugs described in footnote 8, *supra*. Evidence that the defendants had and distributed drugs is highly probative given that drugging was a method by which they carried out the assaults at the heart of the charged conspiracy. In addition, such evidence is no more inflammatory than the sex acts, including the coercive drugging, with which they are charged.

conspiracy. *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged co-conspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).

When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000). The conspiracy in furtherance of which the statement was made does not have to be the conspiracy charged in the indictment. *See Gigante*, 166 F.3d at 82 ("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) (explaining that "it is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)"); *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *United States v. Riley*, 90 F. Supp. 3d 176, 193 (S.D.N.Y. 2015) (admitting co-conspirator statements from conspiracy that differed from conspiracy charged in indictment), *aff'd*, 638 F. App'x 56 (2d Cir. 2016). Instead, the Government only needs to show that the defendant and the declarant are members of some conspiracy that is somehow "factually intertwined" with the charged offenses. *Stratton*, 779 F.2d at 829.

To be "in furtherance" of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy. Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-

48

conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, for example: (1) inform or provide an update as to the "progress or status of the conspiracy," *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158; (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *Diaz*, 176 F.3d at 87; or (7) inform a co-conspirator of "the identity and activities of his coconspirators." *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *Thai*, 29 F.3d at 813; *see also Desena*, 260 F.3d at 158; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002). Further, "so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator." *Gupta*, 747 F.3d at 124.

### B. Discussion

#### 1. Each Defendant's Statements Are Admissible as Co-Conspirator Statements

At trial, the Government intends to offer numerous statements made by the defendants that are related the charged conspiracy. Although such statements are admissible as to the particular speaker under Rule 801(d)(2)(A), the Court should admit the statements as co-conspirator

statements admissible against all the defendants pursuant to Rule 801(d)(2)(E).  Non-exhaustive examples of these statements are discussed below.

*First*, the Government intends to offer statements by the defendants, made to each other and to others, concerning their plans for transporting victims and having sex with them.  For example, in advance of Labor Day Weekend 2016, on or about August 28, 2016, Alon messaged Victim-2's friend on Raya, a dating application and asked her if she wanted to come to the Hamptons.  Victim-2's friend confirmed that she did, and they discussed flights from Chicago to New York.  Alon told her, "you can stay with me" and that he had a car that would take her from the city to the Hamptons, and she asked if she could bring a friend, *i.e.*, Victim-2.  Some of these statements are not hearsay (such as Alon's question as to whether the friend wanted to come to the Hamptons), but other assertions should be admissible against all of the defendants as co-conspirator statements (such as the Alon's statements that the friend could stay with him and that he had a car).  Statements such as this are squarely in furtherance of the sex trafficking conspiracy to entice victims to a particular location with promises of material benefits, where they then raped or sexually assaulted the victims.

The defendants' statements to each other concerning the victims are also admissible as co-conspirator statements.  One example, also in advance of Labor Day Weekend 2016, is a group chat among the brothers.  On or about September 1, 2016, at approximately 11:04 p.m. ET, Alon messaged Oren and Tal, "Are we booking flights?  First 3 on the left[.]" / "We split and try to orgy then out?"  Tal responded, "For sure" / "Last weekend" / "Throw it up[.]"  And Alon said, "I agree. Oren?"  Oren too agreed: "All 4?  Why not[.]"  Again, although Alon's initial question is not offered for its truth, each defendant's agreement to book flights for women and then "split" and

"orgy the[m] out" the same weekend that Oren raped Victim-2 is evidence in furtherance of their conspiracy and should be admitted as such.

*Second*, the Government expects to offer statements by the defendants that detail the means and methods of the conspiracy, namely the use of drugs and/or force to ensure compliance from the victims.  Examples of the defendants' statements as to drugs are discussed in detail below and should be admitted as to all defendants.  The defendants also made similar statements about their use of force and non-consent.  For example:

- On or about November 14, 2011, a colleague emailed Oren a congratulatory email, which included that Oren "won't take no for an answer" from women:  "Congrats oren[.] nonstop networking, (can bang more than one girl at a time) ability to adjust quickly (if doing a 2 on 1, and brothers cock is in his face, he quickly adjusts his position) and persistence (won't take no for an answer from any ho), that you can achieve great milestones.(You have great climaxes)"  Oren responded, "Amen!" and forwarded the email to Alon.

- On or about January 31, 2012, following ███████████—on which the sexual assault charged in Count Ten took place—Alon messaged his friend to tell the friend about the cruise.  The friend asked whether another friend ("CC-6") had "fuck[ed] alot" on the cruise.  Alon responded, "hes not as aggressive as oren and i."  The friend said, "not many people are man," and Alon agreed: "this is true[.]"

- On or about May 24, 2012, Oren messaged a male friend ("CC-7") to tell him that "me n alon were walking the streets of soho in the rain and met a cute canadian and took her back to the crib and trained her[.]"  CC-7 asked if "she was just down like that," to which Oren responded, "all day" / "too crazy," / "not a lot of mind tricks" / "but me n alon together are a force[.]"  CC-7 responded, "ya i know what you mena" / "no is not an option[.]"  Oren agreed: "nope[.]"

These statements, which detail the brothers' aggressive tactics ("hes not as aggressive as oren and i" and "me n alon together are a force") and intent to have non-consensual sex ("won't take no for an answer from any ho" and "no is not an option") are powerful evidence of the force the defendants use to carry out the sexual assaults and the knowledge among the defendants that force will be used that form the basis of the conspiracy.

*Third*, the Government intends to offer statements by the defendants recounting their assaults as statements in furtherance of the conspiracy.  Descriptions of past events are admissible

51

as co-conspirator statements where, as here, they serve some purpose in the conspiracy. *Thai*, 29 F.3d at 813. Their statements regarding past assaults serve as updates to each other as to the progress of the conspiracy, *see Desena*, 260 F.3d at 158, as well as bragging rights to increase their status among one another and their male friends, perpetrating the conspiracy, *cf. United States v. Velez*, 170 F. App'x 146, 147 (2d Cir. 2006) (bragging about crimes evidence intent to maintain or increase position in enterprise). For instance, on or about ██████████ the day after Alon and Oren's assaults on ███████████████████████ Alon texted Oren and others, stating, "I took down a 17yr old"—███████████████████████████, both of whom he assaulted. Alon similarly bragged to others about his assaults. For example, on or about October 5, 2011, Alon messaged a male friend and stated, "so this girl last night" / "took down the boys and then bounced" / "she sends a txt to her girl who spent the night" / "Never going out with you again, got gangbanged last night[.]" The friend responded, "ha, yes she did," to which Alon responded, "one down." These kinds of statements, which provide updates as to the success of the conspiracy and seek the approval of others, further the ultimate object of the conspiracy: to sexually assault more women.

*Fourth*, the defendants' statements regarding covering up and managing their assaults also further the conspiracy. As one example, on or about January 14, 2021, Oren texted Tal, "Start to think about the reputation you want out there. We are on top of of the game and only thing can bring us down is some Hoe complaining. Don't want reputation amongst the wives[.]" Tal responded that he "[u]nderstood" and asked if someone had complained, to which Oren said, "People talk[.]" This conversation demonstrates the defendants' consciousness of guilt and desire to ensure that there are no "Hoe[s] complaining" and their desire to ensure that evidence of their assaults stays under wraps.

All of the statements described above concern some aspect of the conspiracy, whether it is the planning, the methods used, the assaults themselves, or the coverup. Each defendant's statements in furtherance of these aspects of the conspiracy should be admitted not only as to themselves under Rule 801(d)(2)(A) but as to all the defendants under Rule 801(d)(2)(E).

### 2.    Drug Discussions Are Admissible as Co-Conspirator Statements

The Government intends to offer evidence concerning the defendants' access to and attempts to obtain drugs. These drugs include, but are not limited to, GHB, Ambien, quaaludes, benzodiazepines, and MDMA (also known as ecstasy or molly), all of which can be used to commit drug-facilitated sexual assaults.[11] The defendants' conversations with each other and with others concerning these drugs, regardless of whether those individuals are aware of the defendants' scheme to drug and rape women, are admissible as co-conspirator statements in furtherance of a conspiracy to traffic drugs. That a drug trafficking conspiracy is not charged in the indictment is of no moment, as it is "not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)." *Stratton*, 779 F.2d at 829; *see also Gigante*, 166 F.3d at 82; *Lyles*, 593 F.2d at 194. Indeed, the Second Circuit has approved of admitting statements in furtherance of a drug conspiracy, even when that conspiracy was not charged. *See Stratton*, 779 F.2d at 829 (rejecting defendant's argument that statements in furtherance of conspiracy to distribute drugs could not be used against him because he was not charged with being a member of that conspiracy). These statements are "factually intertwined" with the offenses for which the defendants are

---

[11] The Government has noticed Dr. Stacey Hail as an expert witness who is qualified to discuss the effects of these drugs and their use in drug-facilitated sexual assaults. The effects of the drugs described in this section are consistent with the Government's expectations for Dr. Hail's testimony.

charged, given that the defendants used these kinds of drugs to incapacitate women to further their sex trafficking scheme.[12]  *Id.*

### a. Statements Regarding GHB Are Admissible

GHB commonly presents as a clear liquid that can easily be slipped into drinks and cause memory loss, sedation, and a temporary inability to move.  The Government intends to offer evidence of the defendants' access to GHB as co-conspirator statements under Rule 801(d)(2)(E).

For instance, in a group chat called "Lions in Tulum,"[13] made up of the defendants and other male friends who were planning a trip to Tulum in or about November 2016, the members discussed flying in women and obtaining drugs.  The lead planner of the trip ("CC-8") texted the group on October 4, 2016—during the time frame of the charged conspiracy—that he "[g]ot everything covered.  Cars , restaurants , parties, activities . . . I just need to handle drugs[,]" to which Tal responded, "Yes."  CC-8 then said, "I don't want X"—or ecstasy, a reference to MDMA—"around too much." / "Nothing gets done with that." / "Coke , shrooms and G" / "X makes the girls wanna chase the fucking party."  Ecstasy, described in more detail below, can increase people's sexual drive, unlike "G," or GHB, which can cause memory loss and sedation. These texts clearly demonstrate that the defendants and their co-conspirators wanted to obtain drugs and had access to GHB.

---

[12] Even if the Court does not admit the statements described below as co-conspirator statements in furtherance of a drug trafficking conspiracy, the defendants' statements at minimum are statements in furtherance of their sex trafficking conspiracy, of which the drugs are a crucial part.  In that case, the statements of the individuals to whom the defendants are speaking should be admitted for context.

[13] As discussed further below, the defendants were part of multiple chat groups relating to a group who called themselves "Lions."  In these chats, the defendants and their friends discussed the women they were seeking out in order to have sex (which they called "hunting") and the women whom they had sex with (which they referred to as "kills").

This discussion is "factually intertwined" with the sex trafficking conspiracy. *See Stratton*, 779 F.2d at 829. GHB is a well-known date-rape drug that can lead to bodily reactions, such as the inability to move and memory loss, that some of the victims describe experiencing after being given a drink by the defendants. *See supra* Background Section II.B-C (describing experiences of Victim-1, -2, -3, -4, -5, -7, -8, -9, -12, -14, -16, -17, -19, -20, -21, -23, and -25). The connection between the drugs and sex is apparent in the Lions of Tulum chat itself. Later in the chat, Tal followed up to ensure that CC-8 had "Photographers? Drugs?" CC-8 confirmed, "[a]ll getting worked on." Oren then responded, "Are all girls getting shipped out on Sunday?" and CC-8 confirmed, "Yes." CC-8 then joked, "I feel like I'm getting audited here." / "You want my tax returns also ? Lol." Alon responded, "Nut returns end of trip," and Oren said, "Just trying to make sure I max returns. Was going to come for that Sunday night tax and make sure all girls make quota." The continued conversation demonstrates that the defendants were working to ensure there were both women and drugs in Tulum—the women to ensure they could have as much sex as they desired ("max returns"), and the drugs to enable that sex and take away from women the choice of whether to consent or not. These conversations should therefore be admitted under Rule 801(d)(2)(E).

### b. Statements Regarding Ambien Are Admissible

Ambien is a prescription medication that is most commonly provided in pill form to help with sleep but can also be crushed up and mixed into a drink, which can cause memory loss, sedation, and a temporary inability to move, similar to GHB. The Government intends to offer evidence demonstrating that the defendants had access to Ambien and sought it out from one another frequently.

For example, on May 2, 2019, Tal asked Oren, "You have ambien?" Oren responded, "Yes," and Tal said, "Ok pls leave it with me." A few hours later, Tal followed up, "Did you leave

me ambien[?]"  Oren did not respond, so Tal later said, "Ambien," to which Oren responded, "Left on your bed."  These kind of exchanges were common among the brothers over the years.  (*See, e.g.*, July 4, 2016 text from Tal to Oren: "Anyone have ambien"; July 26, 2018 text from Oren to Tal: "Plz bring me ambien"; Jan. 1, 2021 text from Tal to Oren: "Do you have ambien at the house?").  Even if one or all of the defendants had prescriptions for Ambien, sharing those prescriptions in this way is evidence of engaging in a drug conspiracy.

In addition, obtaining Ambien via a prescription and even using Ambien at times as directed by that prescription does not mean that the defendants were not also using Ambien in other prohibited ways in furtherance of the sex trafficking conspiracy.  Ambien can be crushed and slipped in drinks, resulting in memory loss, sedation, and temporary ability to move, all of which are effects that victims experienced.  In particular, Ambien that has been crushed and consumed can cause users to suddenly come to while already awake—███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

The defendants' texts to one another suggest that they were not using Ambien for sleep alone but rather to facilitate their scheme.  For example, on or about August 23, 2018, Oren texted Tal, asking him, "Can you clear the room for a bit," in reference to a hotel room they appear to have been sharing, to which Tal responded, "No." / "Grab another one no biggie."  Oren texted Tal back, frustrated: "Bro it's killing my vibe.  You should come handle it[.]" / "So I can be smooth and just go in the room."  Tal said, "You still hungry after last night.  I'm getting on a flight in 4 hours.  Bargain with the guy behind the desk tell him you want an hourly rate[.]"  Oren responded, "He's not playing" / "Spending 550.  Charging you for it."  Tal responded with a thumbs up emoji.

Oren then said, "Need to get ambien and condom" / "What room is it[?]"  Approximately five hours later, Tal responded, "303."  The context of this conversation demonstrates that Oren was with a woman whom he planned to have sex with (asking Tal to clear the room and stating that he needed a condom, and Tal asking if Oren was "still hungry" after the previous night), and that he needed the Ambien to give to the woman to facilitate that sex ("Need to get ambien and condom").  It is unlikely that Oren was getting the Ambien to help himself sleep, given that he and Tal discussed getting a room for an "hourly rate" and that Oren asked only for Ambien and a condom but not any of his other belongings, which he would have done had he been moving hotel rooms permanently for the night.  Given the ability to use Ambien as a drug to facilitate sexual assault, any evidence of access to Ambien is relevant to both a drug and sex trafficking conspiracy and should be admitted pursuant to Rule 801(d)(2)(E).

### c. Statements Regarding Quaaludes Are Admissible

Quaaludes are the brand name for a substance that is currently banned in the United States but was historically used to commit drug-facilitated sexual assaults because it causes a sedative-hypnotic effect similar to the effects of GHB, Ambien, and other similar drugs, such as benzodiazepines (a type of which is flunitrazepam, commonly known as "roofies").  These drugs can all cause memory loss, sedation, and a temporary inability to move, without affecting the ability of the user to breathe.  The Government will seek to admit discussions of "ludes," a shorthand for quaaludes, under Rule 801(d)(2)(E).

One of these discussions is a group chat between Oren, CC-6—a member of a Lion's Den group chat—and another friend ("CC-9"), in which Oren and his co-conspirators mentioned obtaining "ludes" multiple times.  For example, on or about October 25, 2017, Oren asked, "Can you guys get ludes?"  CC-9 responded, "the city is dry," meaning he was not able to obtain quaaludes.  Oren responded, "Next time we want a order[,]" to which CC-9 said, "We'll buy a

thousand next time." Oren was not the only one in the chat who requested quaaludes. On or about November 10, 2019, CC-9 was on his way to pick up Oren and texted, "Bring ludes." Oren also sought out quaaludes from other people. In a discussion with another individual ("CC-10") on or about November 28, 2019, CC-10 asked, "Did u try those ludes?" Oren answered, "Yes. Can't wait to tel you the story about that night. Wow" / "Bring some plz" / "Need the connect," meaning the drug dealer.

Like GHB and Ambien, quaaludes are also factually intertwined with the charged conspiracy. They are a date-rape drug that has effects similar to that of GHB and Ambien, such as memory loss and inability to move, which multiple victims experienced. The effects of quaaludes are well-known given their appearance in popular culture, including in movies such as the Wolf of Wall Street. That quaaludes are banned in the United States and not commonly seen now does not change the analysis. Whether the defendants are obtaining quaaludes on the black market or are using the term "ludes" to refer to drugs with similar effects, such as GHB, Ambien, or benzodiazepines, their statements are nevertheless relevant to a conspiracy to obtain and distribute drugs that help facilitate sexual assaults and should be admitted.

### d. Statements Regarding MDMA Are Admissible

MDMA, also known as molly or ecstasy, is usually taken in pill or powder form and can be dissolved in other liquids. In contrast to the sedative-hypnotic drugs discussed thus far, MDMA is a stimulant that can cause increased feelings of attachment and sexual drive. It is also used to facilitate sexual assault, as it can induce compliance and cause an individual to engage in sexual activities they would not otherwise engage in without the drugs. As with the other drugs, the Government will seek to introduce discussions of MDMA involving the defendants as co-conspirator statements.

58

The defendants had numerous conversations about MDMA.  For example, in advance of the November 2016 Tulum trip described above, on or about November 9, 2016, CC-8 encouraged everyone to "focus on our cocks for a second" and said "[g]uys I need to know why drugs everyone wants."  Tal responded, "[c]oke and molly for the girls" and "[c]ialis for the boys[.]"  CC-8 confirmed that he had ordered some cocaine and MDMA ("I ordered 15 grams of Coke and 10 of Molly" / "I need to know what you guys want"; "Well I ordered 20 grams of Coke and 10 of MDMA".  Another member of the chat ("CC-11") then told CC-8 to "[g]et more drugs."  CC-7 later asked for a "variety pack" and when CC-8 asked CC-7 to be more specific, CC-7 responded, "Whatever makes her say yes[.]"  The direct ties between the drugs and sex ("[c]oke and molly for the girls" and "cialis for the boys"), as well as CC-7's request for "[w]hatever" drugs "make[] her say yes," demonstrates that the drug conspiracy and the charged sex trafficking conspiracy are factually intertwined, such that all these statements related to MDMA should be admitted as co-conspirator statements.

There is other evidence, aside from the Tulum trip, that the defendants were engaged in a conspiracy to distribute MDMA.  For instance, ████████████████████████████████ ████████████████  And Alon and Oren lured Victim-7 to their room on ████████████████ ████████████████████████  The defendants' communications corroborate their use and distribution of molly, and drugs generally, on ████████████.  On or about January 21, 2012, prior to the ████████████  Oren emailed CC-6, one of his friends with whom he discussed quaaludes, *see supra*, and asked, "Can u take care of the favors," *i.e.*, the drugs.  CC-6 responded, "Yes, how many should I bring?"  The next day, CC-6 confirmed that his flight was booked and asked Oren "is 25 favors enough?"  On or about January 24, 2012, Oren forwarded information from a travel agent to CC-6 about the cruise, which included the following: "Drugs.  Yes, they do search for

drugs. If they find drugs on your or your traveling companions, you will be denied boarding. Period. ███████████████████ have a ZERO tolerance policy for drugs." CC-6 responded, "Been thinkin about risk bs reward and I don't wanna bring let's just get on the boat." Oren asked, "R they capsules[,]" and then sent a follow up: "From [male name] 'Put it in your checked bags. Not carry, when u go carry on you have to walk past 20 dogs, DEA, Customs and Miami Police, however the checked bags bypass all that[.]'" CC-6 responded, "That's cool, I'll take on the plane but I don't feel comfortable going thru the checkpoint on to the boat. I don't stand to make anything by doing it and I don't fuck with walkin past dogs. So if u or someone else will bring it on the boat then cool otherwise I'm not bringin it and yea they're capsules[.]"

It is evident that the drugs did make it on the cruise: ████████████████ ███████████████████ and Alon also messaged CC-7 on Facebook after the cruise, describing the cruise and confirming that they brought drugs. Specifically, on or about January 30, 2012, Alon messaged CC-7, saying, "im sure oren told u already" that ████████ was "biggest fuck fest i every seen" and that he (Alon) "did 10 grls in 3 days," including with "twin DP"—i.e., double penetration—as "the special on the menu[.]" CC-7 asked how CC-6 did, and Alon said, "he did alright, i put him down in a couple trains[.]" CC-7 asked Alon, "did u bring party favors with you," to which Alon confirmed, "yea[.]" All of this evidence of drugs and, in particular molly, undoubtedly is factually intertwined with the charged conspiracy and should be admissible as co-conspirator statements.

## III. Evidence of the Defendants' Lack of Response to Statements Regarding Violent Assaults Is Admissible

As described above, the defendants' conspiracy involved enticing women with material benefits, such as travel, accommodations, and events, to locations where the defendants—often together or with other men—could rape or sexually assault women, sometimes using force. On or

about March 7, 2017, one of the defendants' friends sent them a video of a violent assault of naked woman by multiple men, which he referred to as "Old days at the Alexanders."  All three of the brothers received this message, but none denied the accuracy of the statement.  As a result, the statement and corresponding video should be admitted as adoptive admissions under Rule 801(d)(2)(B).

### A.  Relevant Facts

The defendants were part of a group WhatsApp chat with approximately ten participants called the "Lion's Den," which was made up of members of the Lions group discussed above.  In this chat, the defendants and their male friends discussed both their sexual "hunts" and conquests.  When new members were added to the Lion's Den chat, they were given a formal introduction that outlined the group's rules.  For example, on October 7, 2016, a new member ("CC-12") joined, and CC-2 welcomed him with the following:

> Welcome to the Lion's Den [CC-12]!
> Here is where we'll share our hunted and organize new hunts!
> Rules of the Serengety:
> 1.  All members must be single
> 2.  All members must be top hunters
> 3.  All content in this chat stays in the chat
> 4.  No BS kills
> 5.  All new members must be approved by majority vote
> Long live the Lion's Den!

All three defendants participated in the Lion's Den chat, receiving and sending text messages.  They did not hesitate to voice their opinions when they disagreed with others in the chat.  For instance, on or about October 12, 2016, CC-2 sent a photo and video that appeared to depict two nude women.[14]  Oren responded to these texts, "Where did you download this video

---

[14] This portion of the Lion's Den chat was extracted from a phone belonging to CC-12, one of the members of the chat.  This video is not viewable, but a thumbnail that appears to depict the breast of two women is visible.  CC-2 sent these messages on or about October 13, 2016, at 12:34 a.m.

🙁 " CC-2 responded that a woman had sent it to him, and Oren responded with disapproval, "[woman's name] she's an escort bro. Cmon[,]" and instructed that it was "[c]ivilians only," meaning that CC-2 should only send content of women who do not work as commercial sex workers. CC-2 responded, "I know, so what, great video! Ok fine, won't send it next time, figures u'd like it[.]" Tal next messaged, "Agreed[,]" voicing support for Oren. CC-2 responded, "I figure as long as u don't pay for the sex, they"—the commercial sex workers—"r civilians.." / "No?" CC-12 chimed in in support of CC-2, saying, "Wiggling around not paying is a fun game, promise them heaven give them hell[,]" but Alon disagreed: "Dangerous game [CC-12]. Won't recommend it[.]" / "The pros know how to extort[.]"

On or about March 7, 2017 at 5:54 p.m. ET, CC-2 sent a six-second video that appears to be commercially-produced pornography, depicting four almost entirely unclothed men surrounding a naked woman, with at least one other man slightly offscreen. (*See* Ex. A (the "Assault Video")). One man had the woman by the neck, another grabbed her hair, and all of the men violently pulled her back and forth until the man who had the woman by the hair pulled her off the ground while another man covered her mouth with his hand. After sending the Assault Video, CC-2 sent a second text at 8:56 p.m. ET, which read, "Old days at the Alexanders[.]" None of the defendants responded. The next message in the group chat was sent by CC-2 at 11:36 a.m. ET on or about March 8, 2017, and did not reference the Assault Video.

After the video and CC-2's text, the defendants all continued to participate in the group chat. For instance, two days later, on or about March 9, 2017, CC-2 sent a screenshot of a message from a woman that included nude photographs. Oren responded asking if it was a particular

---

Universal Coordinated Time ("UTC"), which when converted to Eastern Time is October 12, 2016 at 8:34 p.m.

woman and said, "[h]er insta has better photos." Alon and Tal also continued to respond to the chat. On or about March 18, 2017, another participant ("CC-13") sent a screenshot from an Instagram user, which said the following:



CC-13 then said, "Who is this psycho[,]" Tal responded, "Whoa" / Who's that," and Alon said, "Lol[.]"

### B.  Applicable Law

Federal Rule of Evidence 801(d)(2)(B) provides that a statement that an opposing party "adopted or believed to be true" is not hearsay. Fed. R. Evid. 801(d)(2)(B). The Second Circuit has held that a defendant can adopt a statement through silence. *See United States v. Aponte*, 31 F.3d 86, 87 (2d Cir. 1994); *United States v. Shulman*, 624 F.2d 384, 390 (2d Cir. 1980). When

considering whether a defendant has adopted a statement through silence or other ambiguous conduct, courts "consider the statement's incriminatory content and whether it is of the type that a person would respond to with a denial 'or at least with some indication that he objects to the statement as untrue." *United States v. Ho*, 984 F.3d 191, 208 (2d Cir. 2020) (quoting *Shulman*, 624 F.2d at 390); *see also United States v. Tocco*, 135 F.3d 116, 128 (2d Cir. 1998) ("An innocent person accused of being involved in a crime will ordinarily deny such involvement or, at least, assert that the incriminatory statement is untrue."). The Advisory Committee Notes "call[] for generous treatment of this avenue to admissibility." Fed. R. Evid. 801(d)(2) advisory committee's note to 1972 amendment.

## C.  Discussion

The video of a violent assault and CC-2's corresponding text that the video represented "Old days at the Alexanders" are admissible as adoptive admissions under Rule 801(d)(2)(B). The clear import of CC-2's statement is that assaults took place at the defendants' home that were similar to the video, *i.e.*, assaults in which multiple men aggressively ganged up on naked women. (*See* Ex. A). In other words, CC-2's messages implicated the defendants in heinous crimes. The messages were not simply a joke—the Government expects testimony at trial to demonstrate that in or about ██████████████████████████████████████████████

████████████████████.[15]  These messages are precisely the type that would cause an innocent

---

[15] Notably, even if the defendants argue that these messages were in the context of a joke, the defendants' silence would still constitute an adoptive admission under Rule 801(d)(2)(B). *See Neuman v. Rivers*, 125 F.3d 315, 320 (6th Cir. 1997) (admitting adoptive admission against petitioner whose father bragged to him about committing illegal sex acts, holding that the circumstances "were adequate to support the conclusion that [the petitioner] manifested adoption of the statements by his conduct," which included the petitioner and his father "[l]aughing" and "joking" with one another, and "slapping []hands, like high fives"); *Transbay Auto Serv., Inc. v. Chevron USA Inc.*, 807 F.3d 1113, 1119-20 (9th Cir. 2015) ("To constitute an adoptive admission, the action that a party takes in conformity with the document need not be serious.").

person to deny or at minimum assert was in some way untrue. *See Ho*, 984 F.3d 191, 208. The defendants, however, said nothing in response. Their silence constitutes an adoption of the messages. *See Tocco*, 135 F.3d at 129 ("Absent circumstances that render it more probable that a person would not respond to an accusation against him than that he would, such person's silence or other ambiguous conduct is admissible as an adoptive admission under Fed. R. Evid. 801(d)(2)(B)."); *see also, e.g.*, *Aponte*, 31 F.3d at 87 (2d Cir. 1994) (adopting admission through silence).That CC-2's messages were text messages sent to the defendants' phones rather than statements made during in-person conversations does not change the analysis. The Second Circuit has found that "silence in response to [a] text reflected [an individual's] contemporaneous agreement with a statement he would otherwise have been expected to dispute or refuse." *Ho*, 984 F.3d at 209; *see also United States v. Rosado*, No. 21 Cr. 516 (RMB) (S.D.N.Y.), Dkt. 100 (Sept. 22, 2023 Tr.) at 21-23 (granting Government motion *in limine* to admit text messages accusing defendant of kidnapping to which the defendant largely did not respond as adoptive admissions). There can also be no question that the defendants saw and understood the messages, given that they were actively responding in the Lion's Den chat in the following days and weeks. The defendants' lack of a denial—in fact, lack any response at all—to the messages thus demonstrate an adoption of CC-2's sentiment. That is especially true given that the defendants did not hesitate to speak up in the Lion's Den chat when they disagreed with what others were sending. As noted above, all three defendants voiced their disagreement when the topic of commercial sex workers was raised—Oren and Tal to insist that the members of the chat share their hunts and kills of "[c]ivilians only" rather than commercial sex workers, and Alon to warn that it was a "dangerous game" to have sex with escorts without paying them. They notably did not do the same in response to the Assault Video and CC-2's description of it. Given the nature of the video and CC-2's

subsequent statement directly implicating the defendants, their silence constitutes a highly probative admission.

Rule 403 does not preclude the admission of the Assault Video and CC-2's text.  The probative value of this evidence is high, especially given the Government's burden to prove the defendants' intent to commit the charged sex crimes beyond a reasonable doubt.  Moreover, there is minimal unfair prejudice, given that the Assault Video, which clearly does not depict the defendants themselves, is no more "inflammatory" than the charged conduct.  *See United States v. Pitre,* 960 F.2d 1112, 1119 (2d Cir. 1992).

Accordingly, the Court should permit the Government to admit the Assault Video and statement sent by CC-2 on March 7, 2017, and the following unrelated text message to demonstrate the defendants' adoptive admission through their silence.

## IV.  Evidence of the Victims' Prior Consistent Statements Is Admissible

The Government anticipates that the defendants will seek to challenge the credibility of testifying witnesses—in particular, testifying victims—at trial.  Indeed, the defendant has already suggested that the victims are lying because they are allegedly part of "orchestrated efforts encouraging women to profit from past sexual experiences that they had with the brothers."  Jan. 16, 2023 Bail Hearing Tr. at 18.  If the defendant attacks the credibility of a victim (or a non-victim witness) on this ground or any other—whether in opening statements or through cross-examination—including by claiming that the victim's testimony has been recently fabricated or that the victim has a motive to lie, the Court should permit the Government to admit the victim's prior consistent statements about her experiences with the defendants under Rule 801(d)(1)(B).

### A.  Applicable Law

Under Rule 801(d)(1)(B), a testifying witness's prior statement is admissible when the witness's credibility is attacked, either by cross-examination, insinuation, or argument. Fed. R.

Evid. 801(d)(1)(B).  Specifically, where a declarant testifies and is subject to cross-examination, a declarant-witness's prior statement is not considered hearsay when it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground."  Fed. R. Evid. 801(d)(1)(B).

Prior to 2014, a witness's prior consistent statement was only permitted to rebut a charge of recent fabrication that postdated the prior consistent statement.  *See Tome v. United States*, 513 U.S. 150, 156 (1995).  Many courts, however, including the Second Circuit, had developed rules allowing admission of prior consistent statements outside of the context of Rule 801(d)(1)(B) in order to rehabilitate a witness after certain attacks on credibility.  *See, e.g.*, *United States v. Pierre*, 781 F.2d 329, 333 (2d Cir. 1986). In 2014, Rule 801 was amended to allow prior consistent statements that were "otherwise admissible for rehabilitation" to come in "substantively as well." Fed R. Evid. 801 advisory committee's note to 2014 amendment.  Thus, as amended in 2014, Rule 801(d)(1)(B)(ii) "expands the purposes for which prior consistent statements may be offered." *Purcell*, 967 F.3d at 196; *see also* Fed R. Evid. 801 advisory committee's note to 2014 amendment ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory.").

Where a prior consistent statement is offered to rebut an allegation of recent fabrication under Rule 801(d)(1)(B)(i), a proponent must establish by a preponderance of the evidence three elements: "(1) that the prior consistent statement is consistent with the witness's in-court testimony; (2) that the prior consistent statement is being offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive; and (3) that the

67

prior consistent statement was made prior to the time that the supposed motive to falsify arose." *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 103 (2d Cir. 1995); *see also Tome*, 513 U.S. at 167.

While there is no established test to determine the admissibility of prior consistent statements under Rule 801(d)(1)(B)(ii), the Second Circuit has upheld district court findings that prior consistent statements are admissible non-hearsay under subsection (ii) when introduced to rebut "defendants' attacks on [the declarant's] credibility and memory," *Flores*, 945 F.3d at 706, or "to rebut [defense counsel's] charge of inconsistency and to rehabilitate [the declarant's] credibility by placing the alleged discrepancies in context." *Purcell*, 967 F.3d at 197; *see also United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017) (affirming district court's admission of prior consistent statements that "rebutted [the d]efendant's attack on [the declarant's] purportedly faulty memory"). There is no requirement for subsection (ii), unlike subsection (i), that the prior consistent statement occur prior to any motive to fabricate, to the extent one existed. *See United States v. Begay*, 116 F.4th 795, 801-02 (8th Cir. 2024) (holding that *Tome*'s requirement that a consistent statement be made prior to when a motive to lie arose does not apply to subsection (ii), even in instances in which the defense attacks a witness's credibility both based on an alleged motive to lie and on some other ground), *cert. denied*, 145 S. Ct. 1933 (2025); *see also United States v. Bruce*, 127 F.4th 246, 253-56 (10th Cir. 2025) (analyzing *Tome* only with regard to statements admitted under subsection (i) and not for statements admitted under subsection (ii)), *cert. denied*, 145 S. Ct. 2865 (2025).

Rule 801(d)(1) applies to a witness who is subject to cross-examination and "does not restrict admissibility to statements of one who has already been cross-examined." *Flores*, 945 F.3d at 706. Accordingly, where the defense has already attacked a witness, the prior consistent statements may be offered during the witness's direct examination, rather than waiting until after

cross-examination.  *See id.* (upholding trial court's admission of prior consistent statements where "the government sought permission to introduce the notes and reports of [the declarant] during his direct testimony" and "it was clear that he would be subject to cross-examination"); *United States v. Burrell*, 43 F. App'x 403, 406 (2d Cir. 2002) (allowing prior consistent statements of cooperating witness because the defendant "argued in her opening statement that the cooperating witnesses had a motive to lie"); *see also Bruce*, 127 F.4th at 256-57 (finding no error where Government discussed prior consistent statements in its opening statement and the prior consistent statements were later properly admitted at trial).  The prior consistent statements do not, however, have to be proffered through the testimony of the declarant but may be proffered through any witness who has firsthand knowledge of the statement."  *United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir. 2010) (affirming admission of prior consistent statements under Rule 801(d)(1)(B) to rebut defense insinuation that witness had testified from improper motive); *see also Purcell*, 967 F.3d at 197 (upholding admission of a witness's testimony recounting the declarant's statements to rebut charge of declarant's inconsistency).

### B.  Discussion

The Government expects that much of the evidence at trial will consist of victim testimony about their experiences with the defendants, including rapes and sexual assaults that they were subjected to by the defendants.  *See supra* Background Section II.B-C.  Certain of these victims told others about these assaults, whether through conversations they had in person or via phone calls, text messages, or other social media messages, long before they talked to the Government (and often long before the criminal charges or any lawsuits against the defendants were filed).  These prior statements are consistent with the victims' anticipated trial testimony and were often made to family and/or friends.

These victims' prior statements are admissible under Rule 801(d)(1)(B)(i) and (ii) if the defense attacks their credibility in opening statements or through cross-examination. *See Flores*, 945 F.3d at 705-06 (admitting prior consistent statement of witness after defense's opening statement called into question the witness's credibility). Under subpart (i) of Rule 801(d)(1)(B), if the defendant claims that any victim recently fabricated her testimony, the admissibility of her prior consistent statement will depend in part on the alleged "recent improper influence or motive in so testifying." Fed. R. Evid. 801(d)(1)(B)(i). Depending on the nature of the defendants' attacks, the Court should permit the Government to offer consistent statements made by a victim prior to any alleged recent improper influence or motive to fabricate. *See Tome*, 513 U.S. at 167. As to subpart (ii), victims' prior consistent statements are admissible "to rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B)(ii) at 705 ("As 'not hearsay,' such statements are—subject to the usual prerequisites such as relevance— admissible as proof of the substance of the statement."). If the defense attacks the credibility of a victim on any ground, such as inconsistency or faulty memory, the Government is entitled to rehabilitate that victim's statements through their prior consistent statements. *See, e.g.*, *Purcell*, 967 F.3d at 197; *Flores*, 945 F.3d at 705-06; *Cox*, 871 F.3d at 487

As noted above, many victims have made prior consistent statements, and some of these victims have already seen their credibility attacked by the defense. One of these victims is Victim-2. The Government expects that Victim-2 will testify while she was in the Hamptons for Labor Day Weekend 2016, Oren gave her a drink, which made her feel as though she had lost control of her body, and raped her. Soon after, Victim-2 told her former boyfriend that she had been drugged and raped, and the former boyfriend sent Victim-2 multiple text messages about resources for rape survivors. During a bail hearing in the Southern District of Florida, counsel

specifically attacked Victim-2's credibility through cross-examination of a Government witness. *See* Dec. 30, 2024 Alon Alexander Bail Hearing Tr. 35-36 ("Q: And isn't it true that after this supposed sexual assault, Victim Two stayed in the Hamptons at the same house where you now say she claims to have been raped, for yet another day?"; "Q: And isn't it true that after supposedly being sexually assaulted, [Victim-2] went on boat rides with the Alexander brothers, right?"; "Q: Meanwhile, Individual Number One, her friend who supposedly had heard that Oren Alexander had raped Victim Two, was waterskiing on the shoulders of Alon Alexander, right?"). If the defendants similarly attack Victim-2's credibility at trial, Victim-2's prior consistent statements from shortly after the assault in 2016—far before any potential motive to lie arose—are plainly admissible to rehabilitate her credibility. The Government expects similar attacks on other victims in the defense's opening statements and on cross-examination.

Accordingly, the Court should permit the Government to introduce victims' prior consistent statements once the requirements of 801(d)(1)(B)(i) or (ii) are met and the proper foundation is made.

## V. Evidence or Argument Concerning Irrelevant and Unfairly Prejudicial Topics Should Be Precluded[16]

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

---

[16] For avoidance of doubt, in all of the Government's motions *in limine* seeking to preclude evidence or argument about certain topics, the Government seeks to preclude the defendants' introduction of evidence through both cross-examination of the Government's witnesses and the defendants' own case.

cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### A. Evidence or Argument Concerning Minor Victim-3's Alleged Consent to Sexual Abuse Should Be Precluded

At trial, the Government intends to proceed only on sex trafficking of a minor under 18 U.S.C. § 1591(b)(2) for Count Five, rather than sex trafficking by force, fraud, or coercion under 18 U.S.C. § 1591(b)(1). Consent is not a valid defense to sex trafficking of a minor. *See United States v. Corley*, 679 F. App'x 1, 4 (2d Cir. 2017) ("Further, the victims could not consent because they were minors."); *United States v. Thomas*, No. 23 Cr. 481 (NSR), 2025 WL 2860312, at *6 (S.D.N.Y. Oct. 9, 2025) ("Under 18 U.S.C. § 1591, consent is not an element when the victim is under 18; minors cannot legally consent to sex trafficking."); *United States v. Kidd*, 385 F. Supp. 3d 250, 253 (S.D.N.Y. 2019) (granting Government motion to preclude any defense or argument that minor victims consented to being trafficked or sexually exploited); *United States v. Maxwell*, 20 Cr. 330 (AJN), Dkt. 565 at 35 (instructing jury that "[i]t is not relevant whether or not [the minor victim] was a willing participant in performing commercial sex acts when she was under the age of 18 years old. Consent by the person is not a defense to the charge [of Sex Trafficking of a Minor]"); *United States v. Almonte*, 16 Cr. 670 (KMW), Trial Tr. at 960 (same); *see also United States v. Brooks*, 610 F.3d 1186, 1199 (9th Cir. 2010) ("[T]he victim's willingness to

engage in sexual activity is irrelevant, in much the same way that a minor's consent to sexual activity does not mitigate the offense of statutory rape or child molestation."); *United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009) ("Because the victims were minors and could not legally consent, the government did not need to prove the elements of fraud, force, or coercion, which are required for adult victims.").

Count Five concerns only a minor victim, Minor Victim-3, who could not consent to engage in sexual activity under the law. Accordingly, evidence or arguments that Minor Victim-3 consented in any way to being trafficked or sexually exploited would not give rise to a valid defense, and should be precluded. *See Elbert*, 561 F.3d at 777-78 (affirming exclusion of evidence of a victim's consent under Federal Rule of Evidence 412). In the absence of a valid consent defense, evidence concerning Minor Victim-3's consent to sexual activity should also be excluded as irrelevant. *See* Fed. R. Evid. 401. Such evidence is not probative or relevant to any issue at the trial. It cannot support a defense, and it does not impeach the witnesses or undermine her credibility.

And in any event, argument and evidence about Minor Victim-3's consent should be excluded under Rule 403. Any marginal value of such evidence would serve primarily to cast aspersions on the victim for engaging in sexual acts, embarrassing and stereotyping her. These are precisely the forms of harm the law elsewhere tries to mitigate. *Cf.* Fed. R. Evid. 412 & advisory committee's note to 1994 amendment (restricting introduction of evidence of a victim's other sexual behavior to encourage victims to come forward and avoid "invasion of privacy, potential embarrassment and sexual stereotyping"); 18 U.S.C. § 3771(a)(8) (giving victims the right to be treated with "respect for the victim's dignity and privacy"). In addition, any evidence predicated on Minor Victim-3's consent would be improperly aimed at jury nullification and

should be precluded on that basis alone. *See United States v. Moran-Toala*, 726 F.3d 334, 343 (2d Cir. 2013). In short, the probative value of such evidence is significantly outweighed by the danger of prejudice. Accordingly, the Court should preclude evidence or arguments that Minor Victim-3 consented in any way to being trafficked or sexually exploited.

### B. Evidence or Argument Concerning Defendants' Failure to Commit Other Bad Acts, Including Other Alleged Consensual Sex Acts, Should Be Precluded

The Court should deny any attempt by the defendants to offer evidence that the defendants engaged in certain consensual sexual encounters, including group sex or orgies, with women other than the testifying victims. In other words, the defendants cannot admit evidence of consensual sex acts with other partners or argue that because *other* women purportedly consented to sex acts or group sex with them, the victims in this case must have also consented. Such evidence constitutes impermissible "good acts" evidence and should be precluded, as should evidence of any other unrelated good acts the defendant may seek to offer.

"Good acts" evidence, or evidence of the absence of bad acts, is irrelevant and inadmissible. "No less than evidence of a defendant's prior 'bad acts' used to show that he committed the crime charged, . . . 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts." *United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021) (upholding exclusion of "testimony regarding [defendant's] relationships with coaches whom he did not bribe"). Accordingly, "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990); *see also Dawkins*, 999 F.3d at 792. "A single occurrence of lawful conduct is simply irrelevant to other occurrences of unlawful conduct." *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020); *see Williams*, 205 F.3d at 34 ("We reject [the defendant's] assertion that the evidence of innocent travel was necessary to rebut the

74

government's allegation that [the defendant] had been involved in other cocaine importations from Jamaica. Although the government did argue that [the defendant] had been involved in other importations, it did not allege that [the defendant] had engaged in drug activity during these particular trips.").

This same principle applies in cases involving sex trafficking: the mere fact that a defendant had consensual sex on occasions with women *other* than the testifying victims has no bearing on whether the defendants' sexual encounters with these victims were consensual or nonconsensual. *See, e.g.*, *Boyce v. Weber*, No. 19 Civ. 3825 (JMF), 2021 WL 2821154, at *8 (S.D.N.Y. July 7, 2021) (in a civil sex trafficking case, excluding evidence of witnesses who would testify that the defendant did not abuse them, because "[i]t is well established that a defendant may not seek to establish his innocence . . . through proof of absence of criminal acts on specific occasions"); *United States v. Raniere*, 384 F. Supp. 3d 282, 325 (E.D.N.Y. 2019) (rejecting a motion for discovery because "statements by individuals who were not allegedly directed to have sex with [the defendant] or were not threatened with the release of collateral in exchange for acts of care are not *Brady* material because they have no bearing on whether the alleged victims were so directed or threatened"); *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (excluding "good acts" evidence in case involving "racketeering and racketeering conspiracy, and specific acts and a pattern of criminal conduct, including [] sex trafficking").

Even assuming *arguendo* that there was some minimal relevance to good acts evidence related to the defendants' consensual sexual activity with individuals other than the victims of the charged offenses, it should be excluded under Federal Rule of Evidence 403. Pursuant to Rule 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any

minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *Rivera*, 2015 WL 1725991, at *2 (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

The defendants should thus be precluded from questioning witnesses about or offering evidence or argument, including in their opening statements, regarding times that they claim that they had consensual sexual encounters with women *other than* the victims in this case. This prohibition should include any allegedly consensual encounters that involved group sex or involved the use of narcotics with individuals who are not part of the Government's case-in-chief. Such evidence is wholly irrelevant to any issue in dispute at trial and should be precluded under Rules 401 and 403. *See, e.g.*, *Dawkins*, 999 F.3d at 792; *Williams*, 205 F.3d at 34. The Government is not required to prove and will not contend at trial that every sexual encounter the defendants ever had was nonconsensual. Rather, the evidence will show that the sexual encounters with the testifying victims at issue in this case were the result of force, fraud, and/or coercion or were otherwise non-consensual. Accordingly, because it is not a defense to claim that the defendants are not guilty of crimes with which they are not charged, this good act evidence is irrelevant under Rule 401. Further, such evidence should be precluded under Rule 403 since it would likely confuse and mislead the jury as to the nature of the charges, introduce non-germane issues that the Government may need to rebut, and needlessly complicate and lengthen the trial.

Likewise, to the extent the defendants seek to present evidence or argument concerning their commission of other unrelated good acts—including good acts involving their employment, charitable or volunteer work, philanthropic giving, or other similar deeds—to seek to disprove his

76

guilt, they should be precluded from doing so.  While a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait," or the witness's opinion of the defendant with regard to that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense.  *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *Rivera*, 2015 WL 1725991, at *2 (precluding evidence of charitable giving); *United States v. Fazio*, No. S2 11 Cr. 873, 2012 WL 1203943 (KBF), at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to specific instances of good conduct; character is to be proven by reputation or opinion evidence."), *aff'd*, 770 F.3d 160 (2d Cir. 2014).  The defendants should accordingly be precluded from offering evidence or argument concerning any specific instance or instances of prior good acts.

### C. Evidence or Argument Concerning the Government's Motives for the Investigation or Prosecution Should Be Precluded

The defendants have claimed that this prosecution is discriminatory and targets the defendants for their "wealth and high-profile status."  (Dkt. 95 at 11-14).  These claims are utterly baseless, as the Government established in its opposition to the defendants' motion to dismiss for selective prosecution.  (Dkt. 121 at 32-40).  Nevertheless, the time to litigate such accusations is in pretrial motion practice, not in front of the jury.  The Court should preclude any evidence or argument concerning the Government's supposed motivations for this prosecution.[17]

---

[17] The defense has represented to the Government that it does not presently intend to make arguments concerning the Government's motivations or bias in this prosecution.  Nonetheless, the Government believes a ruling from the Court precluding this evidence is necessary in this case. *See United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.), June 27, 2025 Tr. ("Combs Trial

The Second Circuit has explained that claims of purported government misconduct must be "directed to the court rather than jury." *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997). Allegations concerning the Government's conduct are "ultimately separate from the issue of [a defendant's] factual guilt" and concern an alleged "defect in the institution of the prosecution." *Id.* Accordingly, district courts routinely and correctly preclude defendants from raising these arguments at trial. *See, e.g.*, *id.* ("[W]e agree with the district court's decision to resolve for itself whether the government's conduct was lawful and to prevent Regan from presenting evidence on that subject.").

This extends to claims challenging the motives of a prosecution. In general, "the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate." *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000); *see United States v. Armstrong*, 517 U.S. 456, 463 (1996) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in [the prosecutor's] discretion.").

Defendants are permitted to challenge the motives for a prosecution by seeking dismissal of an indictment due to vindictive or selective prosecution. *See, e.g.*, *United States v. Avenatti*, 433 F. Supp. 3d 552, 558, 562-64, 576 (S.D.N.Y. Jan. 15, 2020) (denying vindictive and selective prosecution claims). Such challenges, however, are issues "for the court rather than for the jury."

---

Tr.") at 7903, 7909-11 (counsel for Oren arguing in his summation for his client Sean Combs that the jury could "conclude . . . that the government targeted Sean Combs," after agreeing that he would not make any selective prosecution argument before the jury and after the Court granted the Government's motion to preclude any argument that the charges were brought for improper reasons, *see United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.), Dkt. 304 at 25-26, requiring a curative instruction).

*United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (quoting *Regan*, 103 F.3d at 1082); *see* Fed. R. Crim. P. 12(b)(3)(A)(iv) (listing, among pretrial motions, "a defect in instituting the prosecution, including . . . selective or vindictive prosecution"). When presented to the jury, these kinds of improper arguments invite nullification. *See United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to jurors in the federal courts, to 'render a true verdict *according to the law and the evidence*.' We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.") (emphasis in original).  Accordingly, courts have precluded defendants from arguing to the jury about the Government's motives. *See Farhane*, 634 F.3d at 166-67 (affirming a sustained objection to a defense closing argument that "the government had targeted him for prosecution based on his religion"); *United States v. Duncan*, No. 18 Cr. 289 (SHS), 2019 WL 2210663, at *3 (S.D.N.Y. May 22, 2019) ("[T]o the extent Locust seeks to highlight the fact that he was not a target of the investigation to suggest that the government's true targets were the doctors and lawyers allegedly involved in the conspiracy and to draw attention to their absence from this case, the Court has already ruled that such argument is improper."); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude the defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting" the defendant), *aff'd and remanded*, 433 F.3d 273 (2d Cir. 2006).

The defendants here raised a selective prosecution claim, which was soundly rejected by this Court.  (*See* Oct. 17, 2025 Op. at 21-23.)  Defense counsel should not now be permitted to re-raise their claims before the jury that their clients were unfairly targeted in any way, whether it be

because of their wealth, politics, religion, or some other basis. *See* Combs Trial Tr. at 7909-11 (issuing corrective instruction that that "[t]he decision of the government to investigate an individual or the decision of a grand jury to indict an individual is none of your concern"). Nor should the defense be allowed to invite the jury in any way to speculate as to the Government's motivations for its charging decisions. *See id.* at 7808-12 (issuing corrective instruction that "it would be improper for you to consider [the charging decisions made by prosecutors in this case] in your deliberations" and instructing the jury to disregard defense counsel's invitation in summation for the jury to ask why the Government charged the case, *id.* at 7778).

The jury must determine whether the Government has sustained its burden of proving beyond a reasonable doubt that the defendants have engaged in sex trafficking, enticement, and sexual abuse. The origin of or motivation behind the prosecution is not for the jury's consideration. *See Reese*, 933 F. Supp. 2d at 583-84 ("[A] defendant may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case." (internal quotation marks omitted)). Evidence of such would serve no purpose other than to seek to distract the jury from evidence of the defendant's guilt or to encourage jury nullification. It therefore should be precluded.

### D. Evidence or Argument Concerning that the Charges Brought Against the Defendant Are Novel Should Be Precluded

On many different occasions, the defendants have argued that this prosecution is novel. They have, for example, claimed that the prosecution is "unprecedented" because it federally punishes "date rape" and "party rape," which the defense claims are purely local crimes. (Dkt. 95 at 12-13). They have also claimed or suggested that the Government's sex trafficking theory specifically is novel or improper because it, among other things, lacks a bargained for exchange or explicit *quid pro quo*, (*see* Dkt. 97 at 10-13); does not involve cash for sex, (Dkt. 97 at 13); and

conflates the "commercial sex act" element with the "force, fraud, or coercion" and "recruitment/enticement" elements of sex trafficking, (Dkt. 97 at 15-16). The Court rejected these arguments as a matter of law, (Oct. 17, 2025 Op. at 7-11, 18-23), yet the defendants have informed the Government that they may pursue these arguments before the jury.[18] The Court should preclude them from doing so.

Any argument that the prosecution or sex trafficking theory is novel or unusual should be precluded as wholly irrelevant. *See e.g.*, *Stewart*, 2004 WL 113506, at *2 ("Any characterization of the securities fraud charge in Count Nine as 'novel' is irrelevant to the jury's consideration of the indictment in this case. The defense may not argue or present evidence to the jury that tends to show that this count is an unusual or unprecedented application of the securities laws."); *United States v. Motovich*, No. 21 Cr. 497 (WFK), 2024 WL 3303723, at *6 (E.D.N.Y. July 2, 2024) ("The novelty or unusualness of the bank fraud charges is irrelevant to the question presented to the jury—whether or not Defendant committed bank fraud.").

In addition, any evidence or argument along these lines would also improperly lead to juror confusion and invite nullification. *See Thomas*, 116 F.3d at 615 (Jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."); *see also Sparf & Hanson v. United States*, 156 U.S. 51, 101 (1895) ("Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves."); *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983) ("A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the

---

[18] The defense has also noted that they are considering pursuing other similar arguments, such as the charged conduct is not sex trafficking because it lacks a traditional pimp and prostitute relationship. The Government is also seeking to preclude these arguments.

fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power." (emphasis in original)).  The Court should prohibit it.

### E. Evidence or Argument Concerning the "#MeToo" Movement Should Be Precluded

The defense has informed the Government that it may make reference to the so-called "#MeToo" movement at trial.[19]  The Court should preclude any defense reference, argument, or evidence of "#MeToo" as wholly irrelevant and highly prejudicial under Rule 403.  "#MeToo" appears to mean different things to different people, communities, and organizations,[20] and the phrase is often politicized.[21]  *See United States v. Hadden*, No. 20 Cr. 468 (RMB) (S.D.N.Y.), Dkt. 226 (Dec. 29, 2022 Tr.) at 25-26 (precluding evidence or argument related to #MeToo movement); Combs Trial Tr. at 3757 (sustaining objection to question on cross-examination "that you joined

---

[19] Indeed, the defendants' proposed expert, Dr. Strange, seeks to opine that "research shows that the media exposure surrounding the #MeToo movement, specifically, led people to reinterpret their past sexual experiences."  (Ex. B at 7).  As laid out in more detail in Section VIII.B below, the research on which Dr. Strange relies does not support the proposition that the #MeToo movement led people to "reinterpret" their memories into false memories and any attempt to introduce evidence or argument concerning the #MeToo movement under the guise of "expert" testimony would be utterly irrelevant, highly prejudicial, and misleading to the jury.

[20] *See, e.g.*, "MeToo movement," Wikipedia, https://en.wikipedia.org/wiki/MeToo_movement (last accessed Oct. 31, 2025) (defining #MeToo as a "social movement and awareness campaign against sexual abuse, sexual harassment, and rape culture, in which survivors (led by the voices of women, especially public figures) share their experiences of sexual abuse and harassment"); Lesley Wexler and Jennifer K. Robbennolt, *#MeToo and Restorative Justice*, 37 GPSOLO 68-69, (July-Aug. 2020); Karlyn Borysenko, "The Dark Side of #MeToo: What Happens When Men Are Falsely Accused," Forbes (Feb. 12, 2020), https://www.forbes.com/sites/karlynborysenko /2020/02/12/the-dark-side-of-metoo-whathappenswhen-men-are-falsely-accused/.

[21] *See, e.g.*, Brakkton Booker, "The politics of #MeToo are evolving," Politico (Aug. 17, 2021), https://www.politico.com/newsletters/the-recast/2021/08/17/cuomo-scandal-me-too-movement-politics-evolving-494010.

the #MeToo money grab against Sean Combs; is that true?").  It has been used by various different speakers to alternately support, disparage, and vilify victims of sexual assault.  References to "#MeToo," which is not universally defined, only serves to stir the emotions of the jury and inject a politicized and controversial term into this trial that is wholly irrelevant and removed from the questions of fact before the jury.  This case revolves around the specific actions the defendants took toward specific victims.  The jury will be asked to render a verdict upon those actions, not upon social movements or politically or culturally contested concepts.  Accordingly, the defendant should not be permitted to use such matters to distract the jury away from its proper focus on the defendants' conduct.

### F. Evidence or Argument Concerning the Defendants' Personal Circumstances Should Be Precluded

The defendants should also be precluded from offering evidence of or arguments about aspects of their lives that have no bearing on their guilt or innocence and may tend to elicit the jury's sympathy, such as those relating to their family background, spouses, children, religion, health, age, or any other similar, irrelevant, personal factors.  *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "purely or mainly to cast [the defendant] in the sympathetic light of a dedicated family man").  Such evidence and argument that make the defendants appear sympathetic for reasons unrelated to the charges at issue improperly invites the jury to acquit a defendant even where the evidence proves his guilt beyond a reasonable doubt.  It

is well-established that juries are not "to act based on their . . . sympathy." *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021); *see, e.g.*, *United States v. Mustafa*, 753 F. App'x 22, 37 (2d Cir. 2018) ("The district court correctly recognized that evidence of solitary confinement could be used for the improper purpose of provoking juror sympathy."). Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper. *See In re United States*, 945 F.3d 616, 626 (2d Cir. 2019) ("[T]rial courts have the duty to forestall or prevent jury nullification."). Accordingly, such evidence is irrelevant to the jury's determination of guilt, and should be precluded.

### G. Evidence or Argument Concerning the Defendants' Possible Punishment or Their Desire for to be Released from Prison Should Be Precluded

The defendants should similarly be precluded from offering evidence or argument concerning the punishment or consequences they face if convicted or their desire to be released from prison. Where the jury has no role at sentencing—such as in this case—it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.* There is no proper basis for the defendant to put these issues before the jury in any form, and he should not be permitted to offer evidence or argument inviting the jury to consider them. *See, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374, Dkt. No. 288 (JMF) (S.D.N.Y. Jan. 13, 2022) (Tr. 9-10) ("anything that adverts to possible punishments, including possibility of incarceration, however obliquely, is improper and will not be permitted," including, for example, a statement in opening or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly veiled reference to the prospect of incarceration, which is altogether improper"); *United States v.*

*Riley*, No. 13 Cr. 339 (VEC), 2014 WL 3435721, at *2 (S.D.N.Y. July 14, 2014) (granting Government motion to preclude defendant from referring to consequences if convicted).[22]

Similarly, the defendant should be prevented from raising any argument or evidence that the defendant has already suffered any consequences, whether personal or professional, through being charged with crimes. Such argument has no relevance other than to seek sympathy and implicitly suggest that the jury should acquit because the defendant has already suffered enough. In short, the Court should not countenance any attempts at jury nullification. *Thomas*, 116 F.3d at 616.

### H.  Evidence or Argument Concerning the Government's Motivations for Arresting Alon and Oren Alexander on Count Ten Should Be Precluded

Alon and Oren drugged and assaulted Victim-7 on a cruise ship in 2012 that departed from and returned to the United States and made stops in the Bahamas in between. The defendants were charged in May 2025 with aggravated sexual abuse by force or threat or intoxicant, committed in the special maritime jurisdiction of the United States, in violation of 18 U.S.C. §§ 2241(a)(1), (b)(2), 3238, 7, and 2. That charge, which is Count Ten of the S3 Indictment, remained sealed until June 10, 2025 when the defendants were arrested for that offense in the courthouse in Manhattan. (*See* Sealed Opinion and Order October 17, 2024 ("Sealed Order") at 24). Venue for Count Ten, which charges Alon and Oren, exists in the district where "any one of two or more joint offenders, is arrested." 18 U.S.C. § 3238.

In their pretrial motions, the defendants challenged the propriety of venue in this District for Count Ten. They argued among other things that the Government had abused the grand jury process and that the defendants had in fact been arrested for the offense in Miami, or alternatively,

---

[22] Although it is black-letter law that concerns about punishment should not be put before the jury, the Government nevertheless makes this motion because the defense has told the Government that it is still considering whether it will make these arguments.

Brooklyn. (*See* Dkt. 99 at 10-15). The Court has rejected the defendants' arguments and found that the courthouse arrest for Count 10 on June 10, 2025 was procedurally proper and that because the defendants had not previously been arrested in connection with that offense "the Southern District of New York was the place of apprehension for Count Ten, rendering venue proper in this District." (Sealed Order at 25).

At trial, absent a stipulation, the Government expects to establish venue for Count Ten by introducing copies of the arrest warrants for the defendants and with testimony from one or more of the law enforcement agents who executed the warrants in Manhattan on June 10, 2025. If the defendants intend to contest venue for Count Ten—which they have asserted in conversations with the Government that they have a right to do—they should not be permitted to make irrelevant factual or legal arguments that are designed to confuse the jury on the issue.

The arguments the defendants raised in their unsuccessful motion to dismiss Count Ten are legal arguments that Court has rejected and that they should not be permitted to reprise in front of the jury. As to their rejected arguments about abuse of the grand jury process and improper sealing of the indictment, like the defendants' other rejected arguments that the prosecution was improperly brought, the time to make these arguments was with the Court, not with the jury. *See Farhane*, 634 F.3d at 167. And as to their arguments that they were in fact arrested in connection with Count Ten in Miami or Brooklyn, the Court has found that until they were arrested for Count Ten in Manhattan, the defendants "were detained pursuant to the Bail Reform Act on the underlying indictment," not based on the charges in Count Ten. (Sealed Order at 25). This legal holding about the connection of an earlier arrest to charges that had not yet been brought makes any further argument about the defendants' earlier arrests in Florida and their detention in Brooklyn irrelevant to the issue of venue for Count Ten. Indeed, in their reply brief to their original

motion to dismiss Count Ten, the defendants argued that the issues they raised about venue for Count Ten were legal arguments that were not properly submitted to a jury. (*See* Dkt. 151 at 6-7). As to that point, the Government agrees.

Proving venue remains the Government's burden, and the defendants can, of course, contest venue for all counts, but the right to challenge the Government's evidence of venue is not the same as the right to raise before the jury irrelevant and confusing legal arguments in support of the defense's position. To the extent it is the defendants' intent to contest venue by arguing that before June 10, 2025 they had already been arrested "in connection with" Count Ten, that is a legal, not factual, question that requires analysis of, among other things, the Bail Reform Act's provisions authorizing pretrial detention. (*See* Sealed Order at 25 ("Alon and Oren were in custody on a wholly separate basis; they were detained pursuant to the Bail Reform Act on the underlying indictment.")); *see also United States v. Catino*, 735 F.2d 718, 723-24 (2d Cir. 1984) (deciding whether an earlier arrest was "in connection with" a later charge as a legal issue following a conditional guilty plea). The defendants cannot raise with the jury a legal claim the Court has already rejected.

## VI.  Evidence or Argument Concerning Victims' Counsel or Privileged Topics Should Be Precluded

Based on statements of the defendants and their attorneys and conversations with defense counsel, the Government expects that if permitted, at trial the defendants will attempt to portray the prosecution of the defendants' decade plus pattern of sexual assault as orchestrated by plaintiffs' lawyers pulling the strings behind the scenes. The defendants have made this claim multiple times. At the bail argument before the Court in January 2025, Tal's attorney argued: "[T]he criminal investigation began about six months ago, and that was after a personal injury lawyer began recruiting several plaintiffs to bring a lawsuit against at least one of the Alexander

brothers.  That was the beginning of orchestrated efforts encouraging women to profit from past sexual experiences that they had had with the brothers." (Dkt. 37 at 17-18).  Tal repeated this claim in his pretrial motions and argued plaintiffs' lawyers—in particular Evan Torgan and Carissa Peeples—played a leading role in law enforcement investigations and had "helped coordinate the victim accounts" in the Government's warrant affidavits. (Dkt. 82 at 4, 15).[23]

Because arguments about the identity of a victim's lawyer are irrelevant, and because the defendants' conspiracy theories are unsupported by evidence, would require victims to divulge attorney-client communications to refute them, and would cause a criminal trial about the defendants' conduct to devolve into a proceeding about the actions of civil lawyers, the Court should preclude evidence and argument on the subject at trial under Federal Rule of Evidence 403.

The name of a victim's counsel has no bearing on the issues that are being litigated at this trial.  The defendants have suggested that the identity of a victim's lawyer can be evidence of bias or motivation to lie, but this argument falls apart under the barest of scrutiny.  Just as a criminal defendant accused of serious crimes would hire the most experienced and successful criminal defense attorneys he could to represent him, regardless of if he was innocent or guilty, so too would a civil plaintiff hire an experienced attorney to represent her, regardless of the veracity of her claims.  In either instance, the identity of a litigant's attorney is wholly irrelevant and a distraction. *See United States v. Gaines*, 170 F.3d 72, 82 (1st Cir. 1999) (admonishing the Government for "needlessly inject[ing] [the defendant's] lawyer into the factual fabric of the case and creating the troubling possibility that [the defendant's] choice of a trial attorney could be used by the jury to

---

[23] It is not only Tal's lawyers making this claim. In a state prosecution, Alon and Oren have raised the same argument.  *See* Charles Rabin & Jay Weaver, "Lawyers for Alexander brothers accuse Morgan & Morgan firm of orchestrating rape charge," Miami Herald (Feb 15, 2025), https://www.miamiherald.com/news/local/article300213249.html.

draw a negative inference about [his] involvement with drugs").  It is thus no more appropriate for the defendants to suggest that the victims are lying based on the identities the victims' lawyers, than it is for the Government to argue the defendants are guilty, based on the identities of theirs.

Moreover, the defendants' claim of an orchestrated attempt by a few attorneys to strong arm victims and the Department of Justice into bringing a criminal prosecution lacks any good faith basis.  The defendants' argument is essentially that because one lawyer, Evan Torgan, represents a sizeable number of victims, he has necessarily engaged in unethical behavior, shared information between clients, and/or coached them on what to say, among other things. Of the 25 victims described in this motion, Torgan has at one time or another represented fifteen of them in some capacity.[24]  But beyond the mere fact of representation, the Government is not aware—and the defense has not identified—anything improper by Torgan or any other attorney, or anything that bears on the credibility of the victims or the issues that will be before the jury at trial.  Nor is the fact that one attorney represents multiple victims improper or untoward; insinuating otherwise would allow the defense to baselessly malign victims without any permissible purpose.  Put simply, there is no evidence that Torgan has done anything other than faithfully represent his clients, and there is no evidence that he is orchestrating or improperly influencing this prosecution or the testimony of his clients.[25]  This line of questioning is simply irrelevant.

On the other side of the ledger, permitting the victims to be questioned regarding the identity of their lawyers would cause undue prejudice, mislead the jury, and waste time.  As an

---

[24] As noted above, the defendants have also attacked Carissa Peeples.  Peeples represents none of the victims who are expected to testify at trial.

[25] Notably, of the fifteen victims whom Torgan has at one time or another represented, only five have sued the defendants, and one of those victims retained a lawyer other than Torgan when she did so. This is not to say that if more of his clients had sued the defendants would have any better argument that Torgan had engaged in unethical behavior. But the general lack of lawsuits among his clients here highlights the baseless nature of the defendants' argument.

initial matter, if the Court were to permit even limited questioning about the identities of victims'

attorneys and allow the resulting argument that there is something nefarious about multiple victims

being represented by the same attorney, the Government would be unfairly hamstrung from

presenting a rebuttal.   This is because the Government would be unable to fairly refute the

defendants' point without eliciting attorney-client privileged information from the victims (or the

attorneys) such as information about a victim's relationship with her lawyer, what her lawyer told

her during the representation, and the victim's discussions with her lawyer about whether to sue

or not sue the defendants, among other privileged topics.   Permitting such questioning by the

defense would necessarily force the victims (or their attorneys) to assert the attorney-client

privilege.   *See United States v. Coven*, 662 F.2d 162, 170 (2d Cir. 1981) ("It is clear that

government witnesses have a right to assert the attorney-client privilege on cross-examination.").

The Court has discretion to limit cross-examination to protect this privilege and should exercise it

here given the irrelevant and prejudicial nature of such questioning.   *See United States v. Lin*, 225

F.3d 647, 2000 WL 1340361, at *2 (2d Cir. 2000) ("It is within the court's discretion to limit cross-

examination to the extent that it would violate the witness's attorney-client privilege."); *United

States v. Rainone*, 32 F.3d 1203, 1207 (7th Cir. 1994) ("A trial judge does not violate the

Constitution when he limits the scope of cross-examination for a good reason, and here as in the

usual case desire to protect the attorney-client privilege was a good reason.").

In addition, testimony or argument about the identity of victims' lawyers will distract from

the core issues at trial and needlessly waste time and confuse the jury.   As jurors are frequently

instructed, there is nothing improper or uncommon about witnesses in criminal cases having

attorneys represent their own interests.   Allowing questioning of a victim regarding her counsel

90

raises the specter of impropriety and wastes time with a topic of no relevance. It also improperly suggests that there is some import to the fact of the representation.

This is not to say that the Government believes that cross-examination of victims about civil lawsuits is entirely unfair. Within the standard bounds of cross-examination, as monitored by the Court, the Government expects that the defendants will elicit from some victims that they have sued the defendants, and from this, the defendants can argue to the jury that the victims (or at least the small subset who have sued) have financial motives to lie and should not be relied upon. This is fair cross-examination and gives the defendants the chance to elicit the testimony they need to argue the issue to the jury. *See United States v. Concepcio*n, 983 F.2d 369, 391 (2d Cir. 1992) ("So long as the jury has before it sufficient information to make a discriminating appraisal of the witness's possible motives for testifying falsely in favor of the government, we will uphold the trial court's exercise of its discretion."). But the Court has "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Crowley*, 318 F.3d 401, 417 (2d Cir. 2003). Evidence and argument about the specific identities of the victims' lawyers is one place where the Court should exercise this discretion.

## VII. Cross-Examination of Witnesses with Respect to Issues Irrelevant to Credibility Should Be Precluded

The defendants should be limited in or precluded from cross-examining the Government's witnesses on the following topics:

1. <u>Minor Victim-3</u>: One citation for trespassing and one separate arrest for criminal impersonation ███████████████████████ in or about 2009.

2. <u>Victim-1</u>: One conviction between in or about 2008 and 2011 for driving under the influence.

91

3. Friend-1:[26] One misdemeanor conviction from in or about 2008 to "wet and reckless" driving under the influence.

4. Friend-2:[27] Convictions for driving under the influence in or about 2007, 2012, and 2016.

As discussed below, these topics should be precluded because they have no bearing on the witness's credibility, are irrelevant to the issues on trial, and would be distracting to the jury.

**A. Applicable Law**

Rule 608(b) establishes the test for impeachment by evidence of specific instances of past conduct. The Rule provides that such instances may be inquired into on cross-examination "if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 608(b). Notably, the Rule precludes the admission of extrinsic evidence to prove specific instances of a witness's prior conduct for purposes of attacking the witness's character for truthfulness. *Id.* Rule 608(b) also provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." The Court "may, on cross-examination, allow [those prior acts] to be inquired into," but only if such acts "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1).

Rule 609 governs the admissibility of witnesses' prior convictions. Any conviction more than 10 years old (meaning that "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later") is presumptively inadmissible unless "its probative value, supported by specific facts and circumstances, substantially outweighs its

---

[26] As identified above, Friend-1 ███████████████████████████ .

[27] As identified above, Friend-2 ███████████████████████████
███████████████

92

prejudicial effect." Fed. R. Evid. 609(b).  In order to admit a conviction that is more than 10 years old, a court must make an "on-the-record determination supported by specific facts and circumstances that the probative value of the evidence substantially outweighs its prejudicial effect." *United States v. Mahler*, 579 F.2d 730, 736 (2d Cir. 1978).  The Second Circuit "ha[s] repeatedly 'recognized that Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances.'" *Farganis v. Town of Montgomery*, 397 F. App'x 666, 669 (2d Cir. 2010) (quoting *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993)).

Within the 10-year timeframe, there are two categories of convictions that must be admitted: (1) evidence of a witness's prior felony conviction, subject to Rule 403; and (2) convictions for crimes of dishonesty or false statements, regardless of whether they are felonies. Fed. R. Evid. 609(a)(1)(A), 609(a)(2).  *See United States v. Estrada*, 430 F.3d 606, 615 (2d Cir. 2005) (outlining the permissible scope of cross-examination pursuant to F.R.E 609(a)).  With respect to the second category—*crimen falsi*—a conviction involves a crime of dishonesty or false statements "if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2). However, the Second Circuit has recognized that "Congress meant to narrowly define *crimen falsi*." *United States v. Khalil*, 2005 WL 3117195, at *2 (2d Cir. Nov. 22, 2005) (citing *United States v. Payton*, 159 F.3d 49, 57 (2d Cir. 1998)). "The use of the second prong of Rule 609(a) is thus restricted to convictions that bear directly on the likelihood that the [witness] will testify truthfully (and not merely on whether he has a propensity to commit crimes)." *Id.* (quoting *United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977)). Convictions that do not "tend[] to demonstrate premeditation 'generally have little or no direct bearing on honesty or veracity.'" *United States v.*

*Brown*, 606 F. Supp 306, 316 (E.D.N.Y. 2009) (holding that a criminal contempt conviction was inadmissible pursuant to Rule 609(a)); citing *Estrada*, 403 F.3d at 618 ("convictions which rest on … violent or assaultive crimes generally do not" relate to credibility.").

Finally, as discussed above, district courts have "broad discretion in controlling the scope and extent of cross-examination," *Caracappa*, 614 F.3d at 42 (internal quotation marks omitted), and courts have "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Figueroa*, 548 F.3d 222, 227 (2d Cir. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

### B.  Discussion

The Court should preclude, under Rules 608 and 609, cross-examination and extrinsic evidence of the citations and convictions described above.   The Government will first address Minor Victim-3's arrest for providing a false name and date of birth and then turn to the remaining citations and convictions.

### 1.  Cross-Examination of Minor Victim-3 Regarding Her Citation for Trespassing and Arrest for Criminal Impersonation Should Be Precluded

In or about 2009, when she was seventeen years old, Minor Victim-3 (i) received a citation for trespassing, and (ii) was separately arrested for criminal impersonation. ███████████████

███████████████████████████████████████████████████████

██████   The defense should not be permitted to question Minor Victim-3 regarding either of these incidents or her ███████████████.

*First*, the Court should preclude cross-examination on Minor Victim-3's trespassing citation. ████████████████████████████████████████████

███████████████████████████████████████████████████████.  This

incident is not admissible under Federal Rule of Evidence Rule 608(b) because it does not bear on

Minor Victim-3's truthfulness, nor is admissible under Rule 609, because it did not result in a

criminal conviction.  A mere citation ████████████████████ is completely irrelevant

and would only serve to embarrass the victim; the fact that this occurred several months after the

assault does not change that calculation.  *See* Fed. R. Evid. 401, 404(a)(1), 609(b)(1).  The Court

should not allow any cross-examination regarding this citation.

    *Second*, the Court should also preclude cross-examination regarding Minor Victim-3's

arrest for criminal impersonation.  ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████.[28]

    The defense should not be permitted to question Minor Victim-3 about this arrest or

possible conviction.  To the extent she was convicted of criminal impersonation, such a conviction

is more than ten years old and is presumptively inadmissible.  *See* Fed. R. Evid. 609(b).  Although

this kind of conviction could theoretically bear on her character for truthfulness, any probative

value it presents does not "substantially outweigh" its potential prejudice.  Fed. R. Evid. 609(b)(1).

The probative value of this potential conviction is minimal.  Not only does it post-date the assault

about which Minor Victim-3 will be testifying, it also has little bearing on Minor Victim-3's

truthfulness given that Minor Victim-3 was a minor at the time and is testifying now, fifteen years

---

[28] Minor Victim-3 believed that this incident was expunged from her record.  In drafting this motion, the Government searched for but was unable to find any criminal records for Minor Victim-3.

later, as an adult. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 4417693, at *4 (S.D.N.Y. Oct. 3, 2017) (precluding cross-examination on twenty-year-old conduct as "too remote in time to have any significance"). The prejudicial value of this incident, on the other hand, is extremely high. Cross-examination along these lines would be highly prejudicial and potentially distracting for the jury, as it "may be viewed as reflecting poorly on the [Minor Victim-3's] character and influence the jury to a point of distraction from the matter about which [they are] called on to testify." *United States v. Agostini*, 280 F. Supp. 2d 260, 261-62 (S.D.N.Y. 2003) (precluding cross-examination regarding a victim witness's arrests as irrelevant as to the victim's veracity, as potentially inflammatory, and improper because they were "merely allegations . . . not yet been proven"). In addition, cross-examination on this topic could be a waste of time and result in a trial within a trial about an incident not at the heart of Minor Victim-3's testimony. To the extent questioning is allowed on this topic, the Government will have to elicit testimony from Minor Victim-3 about how her life dramatically spiraled as a result of the defendants' assault on her, including these two incidents.[29]

### 2. Cross-Examination of Victim-1, Friend-1, and Friend-2 Regarding Their Criminal Convictions Should Be Precluded

The Court also should preclude any cross-examination of the witnesses' prior convictions. *First*, with the exception of Friend-2's 2016 DUI conviction, each violation is more than ten years old and thus is presumptively inadmissible pursuant to Rule 609(b).

---

[29] To the extent the arrest for criminal impersonation did not result in a conviction, the defense should also be precluded from questioning about the arrest itself, which would be confusing and prejudicial. *See Michelson v. United States*, 335 U.S. 469, 482 (1948) ("unproven allegations such as an arrest, without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness."); *United States v. Forney*, 24 Cr. 146 (KAM), 2025 WL 2208298 at *20 (E.D.N.Y. Aug. 4, 2025) (citing *Michelson*).

*Second*, the violations have no probative value to the relevant issues here and certainly not enough that its value "substantially outweighs its prejudicial effect" as Rule 609(b) requires. *Mahler*, 579 F.2d at 736; *United States v. Kozlovski*, No. 10 Cr. 458 (RRM), 2011 WL 4916915, at *2 (E.D.N.Y. Oct. 14, 2011) (precluding cross-examination regarding a witness's DUI conviction). Nor are they relevant to the witnesses' character for truthfulness. With respect to Victim-1, Tal assaulted Victim-1 at a residence in the Hamptons in or about July 2011 after consuming approximately half a glass of wine. Victim-1's drinking on a different night, in a different location, and under different circumstances has no bearing on the events charged in the Indictment. Fed. R. Evid. 401, 404(a)(1), 609(b)(1).

This is doubly true of Friend-1 and Friend-2's convictions for driving under the influence. Neither witness will testify that she was assaulted by the defendants. Their testimony will be limited to their observations of events surrounding the charged incidents and, to the extent that it is relevant and admissible, certain prior consistent statements made by victims in this case. Friend-1's 17-year-old misdemeanor "wet and reckless" conviction occurred when she was in her early twenties, years before the events about which she will testify, and far outside the 10 year period permitted for cross regarding felonies (which this is not) under Rule 609. And it is utterly irrelevant to her character for truthfulness. Friend-2's convictions for driving under the influence[30] equally inappropriate topics for cross examination—they have no bearing on her character for truthfulness or any relevance to the facts of this case. Any such Fed. R. Evid. 401, 404(a)(1), 609(b)(1).

---

[30] The Government is working to obtain a copy of Friend-2's rap sheet. In the event Friend-2's 2016 DUI conviction is a misdemeanor, it is not a proper topic of cross examination under Rule 609.

*Finally*, citations and misdemeanor violations like the ones at issue here "have little or no direct bearing on honesty or veracity," *Brown*, 606 F. Supp 2d at 316, and so are not the types of *crimen falsi* that are permitted for cross-examination under Rule 609(a)(2), and are also inadmissible as extrinsic evidence under Rule 608 since they neither bear on the witness's truthfulness or have any probative value to the defendants' criminal trial.[31]

## VIII.  The Defendants' Proffered Expert Testimony Should Be Precluded

### A.  Legal Standard

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[31] The Government is aware that Victim-5 had one citation for underage drinking in 2008 and one citation in 2011 for failing to pay for a taxi. Neither of these is a misdemeanor or felony conviction, and the Court should not allow cross-examination on these events, which are not relevant to her character for truthfulness and would serve only to embarrass her. To the extent Rule 609 applies to these citations, they are presumptively inadmissible given their age. Fed. R. Evid. 609(b). In addition, their probative value does not substantially outweigh their prejudicial effect to warrant admission. The 2008 citation was merely for underage drinking, conveys no information about her level of intoxication, has nothing to do with honesty or truthfulness, and is temporally distinct from the subject of her testimony, which will be focused on an assault in or about June 2009. Her 2011 citation for fare evasion, which she paid promptly when after she was notified of it, is equally irrelevant and occurred a full two years after Victim-5's interactions with the defendants. *See United States v. Mohamed*, No. 18 Cr. 603 (ARR), 2020 WL 1686259, at *2 (E.D.N.Y. Apr. 7, 2020) (precluding cross-examination on 12-year-old fare evasion conviction). Accordingly, these decades-old citations have no bearing on Victim-5's veracity in 2025 and are not relevant impeachment material for her testimony.

(d) the expert has reliably applied the principles and methods
to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). A district court exercises discretion in admitting expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is, of course, whether the witness "is qualified to be an 'expert'" in the subject matter at issue. *See Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable. *Daubert*, 509 U.S. at 589-90; *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying her testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire*, 526 U.S. 137. The reliability inquiry is flexible and "must be tied to the facts of a particular case." *Id.* at 150 (citations and internal quotation marks omitted). The Second Circuit has emphasized that "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the

99

facts and methods to the case at hand." *Id.* Minor flaws with an otherwise reliable expert opinion will not bar admission of that evidence; however, the Court should exclude the expert evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (quotation marks omitted).

To be admissible, the expert's reasoning also must fall outside of the understanding of the average juror. Put another way, "[t]estimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). *See also United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir.1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.") In detailing the proper role of the expert, Advisory Committee Notes accompanying Rule 702 explain that "[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702, Advisory Committee Notes (1972).

Rules 401 and 403 of the Federal Rules of Evidence state that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible

prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

Among other things, the Court "must consider whether an expert's proposed testimony would usurp the province of the judge to instruct on the law, or of the jury to make factual determinations." *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (citations omitted). While Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the Second Circuit has admonished courts to take care "lest [the expert] be allowed to usurp the function of the judge." *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505, 511 (2d Cir. 1977). Accordingly, courts must not admit "opinions which would merely tell the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)). Nor may an expert opine as to a party's state of mind, credibility, intent, or motive. *See LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) (collecting cases); *see, e.g.*, *Highland Capital Mgmt. v. Schneider*, 551 F. Supp. 2d 173, 182-183, 187 (S.D.N.Y. 2008).

Finally, expert opinion should not be offered where it does not fit the facts of the case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591; *cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an apples and oranges comparison"); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp.

3d 612, 642 (S.D.N.Y. 2016) (expert opinion inadmissible where it is "a mismatch for the facts" of the case).

### B.  The Proffered Expert Testimony of Dr. Strange Should Be Precluded

The Government respectfully moves, under Federal Rules of Evidence 401, 403, and 702, to preclude the defense from eliciting certain opinion testimony from Dr. Deryn Strange, including her assessment of the victims' credibility.  According to the expert disclosure, the defendant intends to elicit opinion testimony from Dr. Strange on a variety of topics related to memory formation, including false memory formation.  The Government does not object to the introduction of reliable opinions that are relevant to issues in this case, such as the formation and retrieval of memories.  The Government does, however, object to other opinions the defense seeks to offer through Dr. Strange, namely opinions that do not fit the facts of this case, opinions that are unreliable and unsupported by the cited literature, opinions on matters that fall squarely within the ken of the average juror, and opinions that would invade the province of the Court and the jury.

#### 1.  Expert Disclosure

The defense seeks to offer expert opinions of Dr. Strange to "assess any memory factors that were present in the case and to offer opinions regarding the relevance of scientific research in the area of human memory to the facts of the case itself."  (Ex. B at 1).[32]  Specifically, the defense seeks to offer testimony from Dr. Strange regarding the following five topics (*See generally* Ex. B at 2-9):

1. "General Overview of How Memory Works," (*See* Ex. B at 2-4) specifically:

   a.  Memory works in a "three-stage process: encoding, storage and retrieval."

      i.  "First is *encoding*, for something to be remembered later, we must enter it into our memory system."

---

[32] The Government is attaching a copy of the notice provided for Dr. Strange's testimony as Exhibit B.

        ii. "Second is *storage*: the act of retaining information in memory for any period of time."

           1. "Every time the memory is activated in some way—such as, reading an article about the event, watching video footage, discussing it with therapists, investigators, or family members, or merely thinking about it—it will be slightly altered."

        iii. "Third is *retrieval*: reporting on the event or simply thinking about it. Retrieval will be affected by the kinds of questions we are asked, the goals of the conversation or retrieval attempt, and our emotions."

    b. "Memory retrieval is subject to . . . Forgetting.  Memory weakens over time."

        i. "Indeed, the more time that passes, the more susceptible our memories are to suggestion."

    c. "Goals and attitudes are central to the dynamic and reconstructive nature of autobiographical memory."

        i. "Information acquired over time can change how people interpret earlier events; a benign interaction can be reinterpreted as something criminal."

        ii. "[R]esearch shows that people can recall only the autobiographical memories that support their current goals."

        iii. "Motivations can lead to remembering the past in a distorted manner beyond simply biasing memory selection and search."

    d. "[I]f details are not encoded—because someone is in an altered state for example—they cannot be accurately recalled later."

        i. "[E]ven when details are encoded, they are subject to distortion."

2. Traumatic memory "is just as susceptible to the general principles outlined above and below." (*See* Ex. B at 4-5).

    a. "[P]eople tend to believe that extreme stress uniformly improves and protects memory, which is a false belief that creates a problematic set of expectations (e.g., for accurate event memory no matter how long the delay"

    b. "[I]f an event was not processed as traumatic at the time it was occurring, to remember it as traumatic later is a memory distortion."

c.  "Stress can negatively affect a person's memory for both the minor and major details of an event."

d.  "[A]t very high levels of stress and arousal, human attention is typically narrowed to the most immediately important features of the event—survival, for example-at the expense of all others."

e.  "[E]ven people who are highly trained are not immune to the deleterious effects of stress on memory.

    i.  "From these studies we can conclude that memory processing is hampered at the time of the trauma and that produces deficits in later memory of the event."

    ii.  "The lack of encoded detail can also make it very easy to distort people's memories of what they experienced."

    iii.  When participants of a study were exposed to misinformation, such as leading questions containing misinformation or doctored video footage, "even trained military personal [sic] are susceptible to significant memory distortion."

3.  "[I]nformation we absorb from others—via conversations media reports, film and television, therapy, etc.—can influence what we later recall about an event." (*See* Ex. B at 5-7).

a.  "[R]esearchers have used a particular methodology termed 'the misinformation effect' for over forty years to demonstrate the kinds of details that can be absorbed into our memories and how that can happen.  It is important to note that people can falsely remember minor details . . ., and they can also come to remember entirely false events."

b.  "[A]fter a false event has been suggested (explicitly or implicitly) four processes must occur.  First, people must come to believe the event was plausible, and second, they must also develop an autobiographical belief that it actually occurred. . . . Third, people must construct a detailed memory of the event . . . . Fourth, and finally, people must commit a source monitoring error."

c.  "[C]ognitive dissonance could also underlie the development of false memories."

d.  "Information acquired over time can change how people interpret earlier events."

e.  "[T]he amount of detail a person reports is not a proxy for memory accuracy."

4.  "There are a variety of specific suggestive influences that play a role in the creation of a false or distorted memory." (*See* Ex. B at 7-9).

    a.  "Media can distort the memory of witnesses or alleged victims."

    b.  "Hearing other people's stories in tv reports, reading comments on social media, seeing adverts, hearing radio interviews, can all lead people to claim those details as a personally-experienced memory to the extent it has 'realistic' characteristics."

    c.  "[T]he literature consistently finds that pretrial publicity . . . can significantly bias juror and jury verdicts."

    d.  [S]ocial media and television can amplify these effects, spreading inadmissible information rapidly and influencing juror attitudes, especially in high-profile or emotionally charged cases."

    e.  "[E]xperimental studies have shown that exposure to misinformation can increase the formation of false memories for events, especially when the information is presented as familiar or comes from trusted sources."

    f.  "Research shows that social media can function similarly to group therapy by providing peer support, shared experiences, and a sense of community and also be a source of misinformation."

    g.  "[G]roup therapy sessions typically also provide a great deal of psychoeducation around trauma and the body's response . . . Moreover they encourage the participants to offer feedback to each other about the experiences they share. Research shows that feedback can lead people to remember their own autobiographical experiences as being worse than they originally reported."

    h.  "Groups can also act as a pressure-cooker environment to produce false memories."

    i.  "[P]eople often reflect upon their previous experiences, recalling what they saw or heard, under many different circumstances. For example, during therapy or meetings with lawyers. . . . [T]hese retellings of an event can result in a rich and fluent narrative emerging over time that implies, but does not necessarily reflect, the memory's veracity."

    j.  "[W]hen we chose to retell or recall a memory, this process is selective: memory tends to become better for details that are selectively and repeatedly recalled but worse for details that are not, a phenomenon called *retrieval-induced forgetting*."

5.  "[T]here is reason to believe alleged victim's memories could have been distorted by a variety of sources, including the copious mainstream media and social media allegations against the Alexander Brothers received prior to, during and subsequent to any criminal investigation and ultimate indictment." (*See* Ex. B at 9).

For the reasons below, the opinions contained in paragraphs 3 and 4 should be precluded because they lack fit with this case and are used merely as vehicles to insert a speculative factual narrative about the case, and thus are both irrelevant and confusing to the jury; the opinions contained in paragraphs 1(b) and 3(d) should be precluded because they are commonsense principles within the ken of the jury; the opinions described in paragraph 5 should be precluded because they invade the province of the jury in assessing witness credibility and demeanor; and the opinions contained in paragraphs 1(c)(i), 4(a), 4(b), 4(e), and 4(i) should be precluded because they are unreliable and unsupported by literature.

### 2. Discussion

The Government agrees that opinion testimony about memory may be proper in some respects.[33]  That said, significant swaths of Dr. Strange's proposed testimony do not satisfy the *Daubert* standard.  Specifically, the Government objects to any attempt by the defense to offer her testimony as to (a) opinions as to false memory formation, including potential sources of suggestive influence, that do not fit the facts of the case and/or are unreliable, (b) opinions that are commonsense principles within the ken of the jury, such as forgetting and reinterpretation, and (c) opinions on witness credibility, such as Dr. Strange's opinion that "there is reason to believe the alleged victims' memories could have been distorted." (Ex. B at 9).

### a. Opinions as to False Memory Formation Should Be Precluded

Dr. Strange seeks to offer opinions on the formation of false memories.  (Ex. B at 5-9).  These opinions either lack fit to the case and/or are unreliable.

To start, Dr. Strange's opinion that false memory may be implanted is based primarily on research studies wherein the researchers *purposefully lied* to participants—by either showing the

---

[33] The Government does not object to Dr. Strange's opinions regarding how memory works generally, including trauma memory (paragraphs 1 and 2, except for paragraphs 1(b), and 1(c)(i)).

participants doctored photographs or else telling the participants false narratives that the researchers claimed had happened to the participants.  (*See* Amanda J. Barnier, et al., *A Conceptual and Empirical Framework for the Social Distribution of Cognition: The Case of Memory*, Cognitive Systems Research March 2008 at 14-15[34] (in one study participants were asked about an event in their lives, after which a researcher would share their own stories about a similar event in their own lives and then summarize to the participants the details that the participants had supposedly shared but with *purposeful lies added*; these other studies discussed did not appear to measure accuracy of memory when discussed in a social setting); Alan Scoboria et al., *A Mega-Analysis of Memory Reports from Eight Peer-Reviewed False Memory Implantation Studies*, Memory 2017 at 25-27 (conducting a "mega-analysis" of eight studies in which the participants were told false narratives that allegedly happened to them, and some were also provided self-relevant details, doctored photos, and/or told to imagine a false narrative); Deryn Strange, et al., *False Memories*, Do Justice and Let the Sky Fall: Elizabeth Loftus and Her Contributions to Science, Law, and Academic Freedom, 2007 (certain excerpts available at https://www.google.com/books/edition/Do_Justice_and_Let_the_Sky_Fall/I4HytppAceMC?hl=en&gbpv=1&dq=Do+justice+and+let+the+sky+fall&printsec=frontcover) (summarizing studies in which researchers successfully planted false memories in participants by feeding them false pictures and false narratives)); C.A. Morgan III et al., *Misinformation Can Influence Memory For Recently Experienced, Highly Stressful Events*, International Journal of Law and Psychiatry, 36(1), 11-17 (using a four step process to implant false memories in participants, including showing them doctored photographs and videos).

---

[34] The Government can provide copies of each of the articles cited in this section at the Court's request.

Other research relied upon by Dr. Strange is even farther afield to the extent it involved testing individuals' memories of a movie—containing events that *did not happen to them*—and whether their own recollection of a movie they watched once held up when exposed to the recollections of others who watched different versions of the movie containing different details. (*See* Garry L. French et al., *You Say Tomato? Collaborative Remembering Leads to More False Memories for Intimate Couples Than for Strangers*, Memory 2008 (Exhibit D) at 4-7 (intimate couples and pairs of strangers were shown, without their knowledge, two different versions of a movie and then asked to discuss the movies as if they had watched the same movie to study the likelihood of memory contamination); Fiona Gabbert, et al. *Memory Conformity: Can Eyewitnesses Influence Each Other's Memories for an Event?* Applied Cognitive Psychology April 2003 at 3-4 (pairs of strangers were shown different versions of a single event and then told to discuss, believing that they had seen the same version)).

In short, all of the studies relied on by Dr. Strange for these opinions involved scenarios in which the researchers went through extraordinary lengths to lie to participants about what had happened to them—at times, using fabricated evidence—*in order to confuse participants* and implant memories into their mind.

The trial evidence in this case will not contain any analogues to the cited research studies whatsoever. There is no evidence that any of the victim witnesses were told what the defendants did to them by anyone else and then adopted that information as their own memory[35] (much less that someone who purposefully lied to the victim witnesses about the victims' own experiences

---

[35] Victim-17

with the defendants) or that any of the victim witnesses were shown doctored photos or videos purporting to depict what happened to them.[36] In other words, Dr. Strange has based her opinion regarding the implantation of false memories on studies involving conditions that are entirely absent in this case.[37] Thus, the proffered expert testimony "does not relate to any issue in the case," and, ergo, "is not relevant" and "non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted).

In addition, introduction of such an opinion would not only be unfairly prejudicial but would also create a huge risk of misleading the jury in thinking that the conditions mentioned in the studies exist here. Absent evidence that third parties lied to the victim witnesses in order to deliberately plant false memories in them, Dr. Strange should not be permitted to opine on the formation of false memories. *See* Fed. R. Evid. 702 Advisory Committee Note ("generalized" expert testimony must "'fit' the facts of the case"); *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 642 (finding testimony fails *Daubert*'s "fit" requirement where there is a lack of "record foundation"); *Libby*, 461 F. Supp. 2d at 10-11 (excluding expert testimony regarding memory errors for several reasons, including that expert opinions are based on research examining juror understanding impacting the reliability of eyewitness identifications, but eyewitness identifications were not the subject of witness testimony in that case). Any opinions Dr. Strange seeks to offer on false memory formation should be limited to those as to which there is a clear evidentiary predicate establishing their "fit" to the case.

---

[36] *See also supra* Discussion Section VI. The defendants' repeated attempts to portray the case against them as the orchestrated effort of plaintiffs' lawyers is fanciful and has no basis in fact.

[37] Even if someone had lied to the Victims regarding their experience with the defendants, the research indicates that such lies would result in false memories for only a minority of Victims. (*See* Barnier 2008 at 15 (approximately 30% of participants included a false memory that was suggested by the researcher); Scoboria et al. 2017 at 25-27 (the false memory rate was between approximately 19% to approximately 46.1 % when all three misinformation techniques were used).

Further, Dr. Strange seeks to opine that "information acquired over time can change how people interpret earlier events; a benign interaction can be reinterpreted as something criminal." (Ex. B at 3). Dr. Strange seems to be opining that individuals can subsequently reinterpret an event that is in fact not criminal as criminal based on newly obtained information and that such reinterpretation would be a false memory of what actually happened. The studies that Dr. Strange claims "supports this 'reinterpretation' mechanism" (Ex. B at 3) are inapposite and do not in fact support Dr. Strange's opinion. *See* Susan Clancy and Richard McNally, *Who Needs Repression? Normal Memory Processes Can Explain "Forgetting" of Childhood Sexual Abuse*, Scientific Review of Mental Health Practice, 2005/2006, 4(2), 66-73; Susan Joslyn et al., *Remembering and Forgetting Childhood Sexual Abuse*, Memory, 5(6), 703-24. As a threshold matter, both of those studies focused on forgotten or "repressed" memories of childhood sexual abuse, and are therefore simply not relevant to the facts at issue in this case. This opinion is also irrelevant because none of the victims in this case are expected to testify that they interpreted their sexual assault or rape by the defendants as "benign" at the time. But beyond that, these studies simply do not support the proposition that Dr. Strange wishes to advance. Both studies conclude that normal memory processes, rather than repression or dissociation, could explain why some people may forget experiencing childhood sexual abuse as a young child, particularly when the child did not experience the abuse as traumatic in the moment because, among other reasons, they did not understand it to be sexual, trusted the abuser, or the abuse was not physically painful. *See* Clancy and McNally at 70; Joslyn et al. at 707. In each case, the victim understood the abuse as traumatic at a later time, after they matured enough to understand the nature of the abuse. Neither of these studies concluded that because the victim did not perceive the abuse as "traumatic" at the time, their memory of the events was inaccurate or false when they subsequently came to better

understand what happened to them.  Dr. Strange's opinion on this point seeks to twist the science she purports to rely on far further than the data allows, and any such testimony should be precluded.

Finally, even if a factual foundation can be laid, the general principle that a person may sometimes adopt a *suggested* false memory as his own, especially when that person was given falsified evidence of that event occurring to him, is common knowledge within the jurors' ken, even if they are unfamiliar with the scientific bases, research, and labels used to describe the phenomenon.  "[It] is no secret that memory decreases over time, that individuals can selectively remember or even [unintentionally] fabricate events, or that stress can have an impact on memory or perception." *Libby*, 461 F. Supp. 2d at 13 (quoting *Robertson v. McLoskey*, 676 F. Supp. 351, 354 (D.D.C. 1988)).

### b. Opinions as to Potential Sources of Suggestive Influence Should Be Precluded

As a corollary to Dr. Strange's opinion that false memories may be implanted, she also opines on potential sources of suggestive influence, including (1) media; (2) social media; and (3) retelling/discussion.  These opinions should also be precluded on the ground that they are unreliable and do not fit the facts of this case.

Dr. Strange opines that "media can distort the memory of witnesses and/or alleged victims" (*see* Ex. B at 7).  The statement is unsupported by the literature Dr. Strange purports to rely on.  Two of the three articles that Dr. Strange cites for that proposition do not support that point at all; instead, they find that an increase in media reporting on sexual misconduct allegations can lead to an increase in disclosure of similar experiences or cause people to reinterpret past experiences as sexual harassment.  Notably, neither article opines on whether the reported memories are distorted or false.  *See* Ramona Alaggia and Susan Wang, *I Never Told Anyone Until the #MeToo Movement: What Can We Learn From Sexual Abuse And Sexual Assault Disclosures Made Through Social*

*Media?"*, Child Abuse & Neglect, 103, Article 104312; Brittney Amber et al., *High-Profile Sexual Misconduct Media Triggers Sex Harassment Recall and Reinterpretation*, Equity, Diversity, and Inclusion, September 2019.  The third article, of which Dr. Strange herself is an author, is a study involving deliberately giving study participants external feedback on their memories to determine whether that caused them to recall those events differently and does not address the impact of the media on memory.  *See* Melanie Takarangi and Deryn Strange, *Emotional Impact Feedback Changes How We Remember Negative Autobiographical Experiences*, Experimental Psychology, 2010, Vol. 57(5):354-359.

Dr. Strange also opines that "hearing other people's stories in tv reports, reading comments on social media, seeing adverts, hearing radio interviews, can all lead people to claim those details as a personally experienced memory to the extent that it has 'realistic' characteristics." (Ex. B at 7).  Dr. Strange does not cite a single article that specifically supports that opinion, and on its face, that broad statement is strains credulity.  The Court has undoubtedly seen movies or TV shows about trials and court cases; it is doubtful that the Court has ever once mistaken fictional cases in popular media with its own docket.  Dr. Strange's own work demonstrating that when presented with false media headlines, particularly when paired with doctored photographs—another example of researchers affirmatively lying to participants—some people develop false memories *about things that did not happen to them* does not come close to supporting the proposition that someone reading a news article about another person would adopt those experiences as their own.  (*See* Ex. B at 7; Jacqueline Austin and Deryn Strange, *Television Produces More False Recognition for News than Newspapers*, Psychology of Popular Media Culture, 2012, Vol. 1, No. 3, 167-175; Deryn Strange et al., *Photographs Cause False Memories For The News*, Acta Psychologica, 2011, 136, 90-94).

In support of her opinion that social contagion can be caused by social media (*see* Ex. B at 8), Dr. Strange relies upon an article by Harris et al., *Social Contagion of Autobiographical Memories*, in which participants in a study were asked to describe four autobiographical events, such as their final high school exam, to a confederate who then summarized it back to the participant, including suggested contagion details—that is, false details. The confederate also recited a script purporting to be their own memories of the same autobiographical events. Following these interactions, the study found that 30 percent of participants reported at least one suggested detail for at least one event and 90 percent reported an unsuggested detail for at least one event. The unsuggested details ranged from thoughts and feelings about the memories to specific details. However, the article's authors note its limitations in their findings, writing "we do not make claims about accuracy, since we tested autobiographical material with no verifiability. . . . in some cases, adopting contagion involved adding entirely new details, and it is possible that the confederate simply reminded participants of accurate details they had not mentioned previously." Harris at 325. This study simply does not support the conclusion that social media use can cause a person to adopt false autobiographical memories as their own. Nor does its methodology have application to the facts presented here, where there is no indication that the victims were fed unsuggested details about their assaults as in the study.

Dr. Strange also seeks to opine that "social media can function similarly to group therapy, by providing peer support, shared experiences, and a source of community." (Ex. B at 8). A review of the articles she cites for that proposition make clear that these studies are focused on participation in online support groups or active sustained engagement between peers, something that is simply not supported by the evidence in this case. (*See id.*). This appears to be an attempt to introduce the concept of group therapy—despite the fact that there is no evidence that any

particular Victim witness participated in group therapy, making any such testimony utterly irrelevant in this case.

Dr. Strange seeks to opine that repeated retellings of "an event can result in a rich and fluent narrative emerging over time that implies, but does not necessarily reflect, the memory's veracity," and specifically fingers "therapy or meetings with lawyers" as times of retelling that may cause memory distortion. (Ex. B. at 6). Dr. Strange does not support this proposition with *any* literature. Dr. Strange does cite literature that supports the principle that "memory tends to become better for details that are selectively and repeatedly recalled, but worse for details that are not." (*Id.*). But the principle that some memories become stronger over time with retelling and other memories diminish over time—another commonsense principle within the ken of the jurors—is not the same as her proffered opinion that retelling memories *can create false ones*. Indeed, elsewhere in the same paragraph, Dr. Strange offers the general opinion that "[a]lthough retelling an event does not necessarily lead to new and inaccurate supplementary details being added, it can." (*Id.*) Leaving aside that this opinion is devoid of any details under which "retelling" can lead to inaccurate details, Dr. Strange did not cite any articles to supporting so general a proposition. As such, this opinion is supported by nothing and should be precluded.

Finally, Dr. Strange's expert notice includes a paragraph about how pretrial publicity "can significantly bias juror and jury verdicts," including that "jurors often misattribute information from [pre-trial publicity] as having been presented during the trial." (Ex. B at 7). Without question, any testimony relating to juror influence must be precluded. Permitting jurors to hear expert testimony about their own memories of evidence presented at trial would be highly inappropriate and prejudicial.

### c. Opinions Within the Ken of the Jury Should Be Precluded

The following opinions by Dr. Strange are commonsense opinions within the ken of the jury:

- How memory fades and weakens over time, as described in Paragraph 1(b) above.

- How information acquired over time can change how people interpret earlier events, as described in Paragraph 3(d) above.

Any testimony from Dr. Strange with respect to these commonsense principles of memory and perception should be excluded under Rules 703 and 403 because such testimony would not aid the jury. "It is common knowledge that memory fades with time." *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) (affirming district court denial of defendant's motion to retain an eyewitness expert). An expert is simply not needed to "point out that memory decreases over time." *United States v. Welch*, 368 F.3d 970, 973-75 (7th Cir. 2004) (excluding eyewitness memory and perception expert). As one court has explained:

> [O]n a daily basis the average juror is personally faced with innumerable questions of memory and cognition, as everyone in their daily lives is called upon to store, encode, and retrieve information he or she has been subjected to. Although the average juror may not understand the scientific basis and labels attached to causes for memory errors, jurors inevitably encounter the frailties of memory as a commonplace matter of course.

*United States v. Libby*, 461 F. Supp. 2d 3, 12-13 (D.D.C. 2006). "Accordingly, an expert's opinion that memory fades and weakens over time is inadmissible, given that it falls within the ken of the average juror. . . The Court will thus preclude Dr. Strange's opinion that memory is subject to forgetting." *United States v. Paduch*, 23 Cr. 181 (RA) (S.D.N.Y.) (May 6, 2024, Tr. 1249).

When expert testimony on memory and perception is permitted, courts must exercise "judicial oversight" in this area. *See R.D. v. Shohola, Inc.*, 2019 WL 6053223, at *10-13 (M.D. Pa. Nov. 5, 2019). "Left unregulated, memory expert testimony can invade the fundamental province of the jury—determining witness credibility," and must be excluded as unduly prejudicial

under Rule 403. *Id.* at \*6 (citing cases); *see also United States v. Heine*, No. 15 Cr. 238 (SI), 2017 WL 5260784, at \*2 (D. Or. Nov. 13, 2017) (excluding expert testimony under Rules 702 and 403 because it would not be helpful to the jury and would "invad[e] the jury's role in assessing the credibility of witnesses," and because the trial did "not involve issues of repressed or recovered memories," among other things); *Libby*, 461 F. Supp. 2d at 14 (excluding memory expert's testimony because it would not be helpful to the jury, invaded the province of the jury, and was likely to confuse, mislead, or unduly influence the jury, among other things).

Similarly, the concept that "[i]nformation acquired over time can change how people interpret earlier events" is well within the ken of the average juror. It is a common experience for a person's interpretation of an event to change based on post-event information or based on additional maturity and insight that comes with time. Indeed, the Government submits that every juror has likely experienced something earlier in their life that takes on new meaning or significance at a later point in time. This is not a revolutionary concept requiring the aid of an expert. As such, Dr. Strange's testimony on this score is unnecessary and inappropriate. *See Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014) ("[C]ommon-sense concepts are especially appropriate for consideration by a jury."); *see also, e.g.*, *DeWit v. UPS Ground Freight, Inc.*, No. 16 Civ. 36, 2017 WL 5905575, at \*2 (N.D. Fl. Jul. 25, 2017 (excluding expert testimony on hindsight bias on that ground that it is not beyond the understanding of the average lay person) (citations and internal quotation marks omitted); *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." (citations and internal quotation marks omitted)).

**d. Opinions Bearing on Witness Credibility Should Be Precluded**

Consistent with clear caselaw from this Circuit, Dr. Strange should be barred from opining that the "alleged victim's memories could have been distorted by a variety of sources, including the copious mainstream media and social media the allegations against the Alexander Brothers received prior to, during and subsequent to any criminal investigation and ultimate indictment." (Ex. B at 9). This opinion is a thinly veiled credibility assessment of the victim witnesses who are at the heart of this case. It is well-settled that "expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 398.

To the extent that Dr. Strange is permitted to testify at all regarding false memory implantation and potential sources of suggestive influence, she should not be permitted to reach any conclusions about whether there was such implantation or suggestive influence in this case. To be sure, where there is a good faith basis to do so, the defense can elicit factual predicates for those sources of suggestive influence during cross-examination of the fact witnesses. But, Dr. Strange's opinion as to what events actually transpired—e.g., whether a victim witness saw an article or social media post and how it could have affected the victim's memory—is not an expert opinion. Instead, it goes directly to the heart of fact finding that is within the sole province of the jury. Allowing Dr. Strange to testify to the fact of suggestive influence on individual victim witnesses would essentially grant the defendant an opportunity to present hearsay "evidence," under the cloak of expert testimony, regarding what each victim witness experienced. As courts have repeatedly found, it is "inappropriate for experts to act as . . . vehicles for factual narrative . . . ." *Island Intell. Prop.*, 2012 WL 526722, at *2; *see also Maxwell*, 20 Cr. 330 (AJN) (S.D.N.Y.) Dkt. 541 at 15 (rejecting memory expert testimony that suggestive activities occurred

in the current case); *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

Moreover, it is wholly unclear how Dr. Strange has arrived at her opinion that the victims' memories could have been distorted. Dr. Strange signed the expert notice before the Government produced 3500 material, meaning that her purported opinion that the victims' memories may have been distorted is simply speculation based on the Government's public filings and a handful of media articles—an utterly inadequate basis to form an opinion about any particular victim's memory. And while defense counsel has advised that Dr. Strange is now reviewing the 3500 material, those materials do not support a conclusion that the victims altered their memories or developed new memories after reading news articles or seeing social media posts regarding the Alexander Brothers, nor is there anything regarding the substance of the conversations they had with civil lawyers. Thus, Dr. Strange has no basis whatsoever to comment on whether or not certain "sources of suggestive influence" may have influenced any of the victims before the jury, much less a basis to show that she has "reliably applied [her] principles and methods of the facts of the case." Fed. R. Evid. 702. Notably, in *United States v. Paduch*, Judge Abrams precluded Dr. Strange from offering just such testimony, holding that "the Second Circuit has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702. Moreover, experts may not simply transmit hearsay to the jury or otherwise serve as a vehicle for the factual history of the case. Dr. Strange's testimony about the particular facts of this case would violate these principles and the Court thus precludes such testimony." *United States v. Paduch*, 23 Cr. 181 (RA) (May 6, 2024, Tr. 1256-1257).

Similarly, Dr. Strange should be precluded from providing the opinion "that people tend to believe that extreme stress uniformly improves and protects memory, which creates a problematic set of expectations (e.g., for accurate event memory no matter how long the delay)." (Ex B at 4). This unsourced opinion in essence states that people are overconfident about the accuracy of their memories *if* they are of the belief that extreme stress improves and protects memory. In providing this opinion to the jury, Dr. Strange would be telling the jury to assume that each victim is overconfident in the accuracy of their memory because people tend to believe that extreme stress improves memory. In other words, by telling the jury what people "tend to believe" and the consequences of that belief, Dr. Strange will be improperly providing an opinion about the beliefs of the Government's witnesses without the requisite predicate.

Finally, Dr. Strange's testimony on this subject should be precluded under Rule 403. There is substantial risk that jurors will substitute Dr. Strange's findings as their own in fact finding and evaluating the credibility of witnesses before them. "This risk of confusing or misleading the jury substantially outweighs the little permissible relevance that the opinion has." *Maxwell*, Nov. 21, 2021 Opinion and Order at 10 (precluding expert testimony on the indices of credibility); *Paduch*, May 6, 2024, Tr. 1257 ("There is also a significant risk of prejudice under Rule 403, given the Court finds a substantial risk that jurors will instead use Dr. Strange's testimony to evaluate the credibility of witnesses before them.").

### C.  The Proffered Expert Testimony of Dr. Aoun Should Be Precluded

The defendants have provided notice for Dr. Elie Aoun. Dr. Aoun's expert disclosure indicates that the defense will elicit expert testimony to rebut the Government's expert testimony from a toxicologist regarding "gamma-hydroxybutyric acid ('GHB'), benzodiazepines, and MDMA" as well as the effects of alcohol ingestion on the body. As relevant to this motion, Dr. Aoun is expected to provide testimony about the following:

Dr. Aoun will testify that the ingestion of GHB, like alcohol and barbiturates, results in euphoria, dysphoria, sexual disinhibition, behavioral disinhibition, altered mental states and impairments in the formation of memories. It is a relatively short-acting substance, and does not have long-lasting effects. **In order to perpetuate its effects, users of GHB need to re-dose frequently, every hour or hour and a half.** GHB has been a commonly used substance recreationally since the 1990s.

---

Dr. Aoun will also testify as to the effects of an alcohol blackout on individuals. Blackouts are a separate phenomenon from alcohol intoxication. Severe intoxication with a substance (typically alcohol and/or benzodiazepines) can cause an individual to experience a blackout episode during which, they will behave with impaired conscious control, fail to form memories of their behaviors during the episode, **yet, may present as if they are sober**. Those around them may not recognize that they are intoxicated or are in the midst of a blackout episode. Individuals in the midst of a blackout episode **may be acting rationally or cognitively, appear sober, can have conversations with others, drive cars, and appear conscious**. Yet, they would have no recollection of their actions.

(Ex. C, Aoun Disclosure at 1-2 (emphasis added).)

For the reasons outlined below, the Court should preclude two categories of opinions proffered by Dr. Aoun. *First*, the Court should preclude testimony regarding the way that individuals can present when under the influence of alcohol, as it falls within the ken of the average juror, does not fit the facts of this case, and is likely to confuse the jury. *Second*, the Court should preclude testimony that all "users of GHB need to re-dose frequently, every hour or hour and a half," as this opinion is not reliable and is likely to confuse the jury. In addition to seeking to preclude those opinions, the Government also moves to require further disclosures regarding Dr. Aoun, including details regarding his proffered opinions and the bases for those opinions, as the notice provided by the defense to date is not sufficient under Rule 16.

### 1. Opinions Regarding the Presentation of Intoxicated Individuals

Dr. Aoun seeks to offer opinions about the ways in which individuals under the effect of an alcohol "blackout" present to third parties. Specifically, he opines that people experiencing an

alcohol-induced blackout "may present as if they are sober" or "may be acting rationally or cognitively, appear sober, can have conservations with other, drive cars, and appear conscious." (Ex. C at 1).

The Court should preclude this opinion for two reasons. *First*, the Court should preclude this opinion since it does not fit the facts of the case. Fed. R. Evid. 403. For this opinion to be relevant, the defense must proffer a basis in the record for when a victim "present[ed] as if they [were] sober" or were "acting rationally or cognitively [or] appear[ed] sober" when they were in fact intoxicated. *Contra* Ex. C at 2. Without this, Dr. Aoun's testimony is nothing more than an attempt to introduce the idea that the defendants believed that their victims were sober through an expert where no such evidence will be introduced at trial. Absent evidence presented by as-yet unidentified witnesses called by the defendants stating that they observed a victim presenting as sober when the victim testifies that she felt incapacitated, introducing Dr. Aoun's opinion that hypothetical individuals *could possibly* present as sober when they were in fact experiencing an alcohol-induced blackout creates an incredible risk that the jury would mistakenly believe— without evidence—that any of the victims presented as sober to the defendants or were intoxicated from alcohol and not intentional drugging. *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 642 (finding testimony fails Daubert's "fit" requirement where there is a lack of "record foundation"). For the same reasons, introduction of this opinion is unduly prejudicial under Rule 403.

*Second*, unlike illegal or illicit drug use, the average juror is well aware of the different the effects that alcohol can have on the body. Most jurors have themselves consumed alcohol, felt its effects, and observed the ways that alcohol affects. Indeed, according to the National Institute on Alcohol Abuse and Alcoholism—a specialized institute within the National Institute of Health, 85% of Americans adults reported that they drank alcohol in their lifetime and 66.5% stated that

they drank alcohol within the last year.[38] Between 2010 and 2015, alcohol-induced blackouts were reported by approximately 50% of drinkers.[39]  Simply put, the jury does not require an expert to explain to them that people suffering extreme alcohol impairment respond in many different ways—it is a matter that "the average juror is [] capable of understanding on his or her own." *Mejia*, 545 F.3d at 194.  *See also Grayson v. Thompson*, 257 F.3d 1194, 1221 (11th Cir. 2006) ("the effects of excess alcohol consumption are not necessarily outside the ken of the average juror").  Accordingly, this portion of Dr. Aoun's testimony should be precluded.

## 2.  Opinions Regarding the Metabolic Effects of GHB

The Court also should preclude Dr. Aoun's categorical opinion that, "[i]n order to perpetuate its effects, users of GHB need to re-dose frequently, every hour or hour and a half" because it is not based in a reliable methodology.  While general acceptance of an expert's opinion in his or her field "is not a necessary precondition to admissibility," *Daubert*, 509 U.S. at 598, flaws that are "large enough that the expert lacks 'good grounds' for his or conclusion" are not admissible.  *Amorgianos*, 303 F.3d at 267.   Courts may consult scientific literature to determine whether such good grounds exist.  *Id.* at 269 (district court properly exercised its discretion to review the scientific literature relied upon by the expert).

It is both common knowledge and a generally accepted scientific principle that a person's height, weight, age, gender, genetics, and substance tolerance factor heavily into the speed at which

---

[38] "Alcohol Use in the United States" Age Groups and Demographic Characteristics," *National Institute of Alcohol Abuse and Alcoholism* (Aug. 2025) *available at* https://tinyurl.com/3m5amy9b

[39] Wetherill, Reagan & Kim Fromme, "Alcohol-induced blackouts:  A review of recent clinic research with practical implications and recommendations for future studies," *Alcohol Clin Exp Res* (May 2016) *available at* https://tinyurl.com/yc75ve79.

the body metabolizes.[40] Despite this scientific consensus, Dr. Aoun's opines, without qualification, about the frequency with which *any* "user[] of GHB" would need to re-dose (or be re-dosed) "in order to perpetuate [GHB's] effects" without a single citation to supporting authority. Ex. C at 1. Without any qualification about how a person's individual characteristics can alter the time needed before an additional dose is needed, Dr. Aoun's opinion lacks a basis in science. Accordingly, the Court should preclude this opinion as unreliable to the extent that Dr. Aoun's intends to testify unequivocally that any person who ingests GHB would need to administer, or be administered, an additional dose of GHB "every hour or hour and a half" to continue to feel its effects.

### 3. The Court Should Require the Defendants to Supplement Their Expert Notice

In addition to the substantive infirmities in the proffered expert testimony highlighted above, the defendants' notice lacks adequate specificity regarding Dr. Aoun's opinions and the bases for those opinions. *See* Fed. R. Crim. P. 16(b)(1)(C). Accordingly, the defendants should be required to supplement their expert notice to inform the Government of the substance of—and bases for—Dr. Aoun's opinions.

The defendants' notice lacks sufficient disclosure of the actual opinions he will offer. For example, the notice states that "Dr. Aoun's testimony will address the solubility of those drugs, their taste when dissolved and whether it is possible to mask their taste in a drink." Ex. C at 1.

---

[40] *See*, *e.g.*, Rachna Gupta et al., *Factors influencing drug toxicity, in* Pharmacokinetics and Toxicokinetic Considerations (Rakesh Kumar Tekade eds. 2022) ("Multiple and interrelated physiological factors such as age, dose-time correlation, exposure time, nutritional position, gender, sex, and hormonal conditions (such as pregnancy) are responsible for inducing drug toxicity … These factors decide the fate of drugs and influence their pharmacological and toxicological parameters that control different pharmacokinetics parameters like absorption, distribution, metabolism, and excretion of drugs."); Francesco P. Busardo et al., "GHB Pharmacology and Toxicology: Acute Intoxication, Concentrations in Blood and Urine in Forensic Cases and Treatment of the Withdrawal Syndrome," 13 Current Neuropharmacology 47 (2015) (discussing the complex pharmacology of GHB).

Notably, this statement does not express any opinion about the three matters discussed. After receiving this notice, the Government has no idea whether Dr. Aoun will testify that drugs are soluble (or not), whether they retain their taste when dissolved (or not), or whether it is possible to mask their taste in a drink (or not). These general statements give no indication whatsoever of Dr. Aoun's opinions, let alone the bases upon which those opinions are based. Without any explanation beyond these generalities, the defendant has failed to provide the Government with sufficient notice of what the "witness's opinion" will be. *See* Fed. R. Crim. P. 16(b)(1)(C). Such vague notice defeats the purpose of disclosure under Rule 16, which is to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *United States v. Wilson*, 493 F. Supp. 2d 484, 487 (E.D.N.Y. 2006). For similar reasons, *i.e.*, the deficiency of his expert notice, at least one other court has already precluded Dr. Aoun from testifying at trial. *United States v. Biden*, No. 23 Cr. 61 (MN), 2024 WL 3892606, at *2 (D. Del. June 2, 2024) (precluding Dr. Aoun's testimony because "the Court agrees with the government that there are no actual opinions offered for the topics and no bases for any opinions").

Because the defendants' disclosure provides the Government with inadequate knowledge of the content or basis of the testimony, the Government cannot meaningfully prepare to test the merits of such testimony through cross-examination. Accordingly, the Court should require the defense to supplement its expert notice and further disclose Dr. Aoun's particular opinions and their bases so that the Government can meaningfully prepare cross-examination and consider whether to offer additional expert testimony to rebut his opinions.

**IX.    Victims Who Have Not Filed Suit Under Their True Names Should Be Permitted to Testify Under a Pseudonym to Protect Them from Undue Harassment, Embarrassment, or Other Adverse Consequences**

Pursuant to the Crime Victims' Rights Act, the Government requests that the Court take certain measures at trial to protect the dignity and privacy of victims.  *See* 18 U.S.C. § 3771(a)(8). As discussed above, the Government expects a number of victims to testify at trial.  The details of each victims' encounters with the defendants are outlined further in Background Section II.B-C, *supra*.  ███████████████████████  filed lawsuits in their own names against at least one of the defendants in or about 2024 and 2025.  Victim-2, Minor Victim-3, Victim-4, Victim-6, Victim-7, Victims-9 through -21, Victim-23, Victim-24, and Minor Victim-25 (the "Anonymous Victims") have not publicly revealed details of their anticipated testimony to the public and have asked that their identities not be revealed to the public.

To protect their privacy, the Government respectfully requests that the Court take certain narrowly tailored measures at trial, consistent with protections afforded to victims of sex crimes in recent federal trials within this Circuit.  Specifically, the Government requests that (1) the Anonymous Victims be referred to at trial using only pseudonyms; (2) the Court preclude the defense from eliciting personally identifying details of those witnesses; and (3) the Court seal exhibits that contain the first and/or last names of these witnesses and/or their likeness in photographs or videos, with redacted versions to be made available to the public.

**A.    Applicable Law**

The Confrontation Clause guarantees defendants the right to cross-examine witnesses who testify against them.  *See, e.g.*, *Figueroa*, 548 F.3d at 227.  This right, however, is not absolute.  A defendant's rights under the Confrontation Clause must yield to accommodate other legitimate interests in the criminal trial process.  *See, e.g.*, *id*.  For instance, trial courts have "wide latitude . . . to impose reasonable limits . . . on . . . cross-examination based on concerns about, among other

things, harassment, prejudice, . . . or the witness's safety." *United States v. Al Farekh*, 810 F. App'x 21, 25 (2d Cir. 2020) (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see* Fed. R. Evid. 611(b) (imposing limits on the scope of cross-examination).

In the context of the disclosure of witness identifying information, the Second Circuit has identified two primary interests of defendants: "(1) obtaining information needed for in-court and out-of-court investigation of the witness; and (2) enabling defense counsel to elicit information that might be relevant to the jury's deliberations as to the credibility or knowledgeability of the witness." *United States v. Marcus*, No. 05 Cr. 457 (ARR), 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970)) (finding the defendant's argument that "the district court's decision permitting two of the Government's witnesses to testify using only their first names and not to disclose their addresses or employment violated" the defendant's due process rights to be "without merit" in a sex trafficking and forced labor case), *aff'd*, 628 F.3d 36, 45 n.12 (2d Cir. 2010).

If the Government provides a reason to "limit disclosure of identifying information in open court," the defendant must "demonstrate a 'particularized need' for disclosure . . . which the court weighs against the risks to the witness." *Id.* (quoting *United States v. Bennett*, 409 F.2d 888, 901 (2d Cir. 1969)). Such reason "may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." *Marti*, 421 F.2d at 1266.

Strong public interests support limiting public disclosure of victim identities and other sensitive information. The Crime Victims' Rights Act, 18 U.S.C. § 3771, requires district courts to implement procedures to ensure that crime victims are accorded, among other rights, "[t]he right to be reasonably protected from the accused," and "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy." *Id.* §§ (a)(1), (a)(8). Moreover, the public "has a

strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes." *Doe on behalf of Doe No. 1 v. Nygard*, No. 20 Civ. 6501 (ER), 2020 WL 4890427, at *3 (S.D.N.Y. Aug. 20, 2020) (quoting *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 195 (E.D.N.Y. 2006)).    This public interest becomes "only stronger" when there are "sprawling allegations of widespread sexual abuse" against a defendant.    *Id.*

Given these strong public interests and the explicit nature of testimony involved in sex abuse cases, victims in such cases often testify or are referred to only using pseudonyms or without using their last names. *See e.g.*, *United States v. Raniere*, No. 20-3520-CR, 2022 WL 17544087, at *6-7 (2d Cir. Dec. 9, 2022) (affirming district court's decision to permit adult victims in racketeering and sex trafficking prosecution to testify using first names, nicknames, or pseudonyms); *United States v. Thomas*, No. 23 Cr. 481 (NSR) (S.D.N.Y.), Dkt. 87 (Oct. 9, 2025 Order) at 18 (permitting minor victim to testify using pseudonym); *United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.), Dkt. 262 (Apr. 18, 2024 Order), Dkt. 263 (Apr. 18, 2024 Tr.) at 13-16, Dkt. 304 (Apr. 25, 2024 Tr.) at 34 (permitting adult victims to testify under pseudonym); *United States v. Rosado*, No. 21 Cr. 516 (RMB) (S.D.N.Y.), Dkt. 100 (Sept. 19, 2023 Tr.) at 33 (permitting minor and adult victims to testify under their first names only); *United States v. Ortiz*, No. 13 Cr. 460 (LAK) (S.D.N.Y.), Dkt. 65 (June 28, 2022 Tr.) at 4-5 (permitting minor victim to testify under her first name only); Nov. 1, 2021 Tr. at 5:24-13:23, *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.), Dkt. No. 456 (permitting minor victims and their family members to testify using a pseudonym or first name); Order at 19-21, *United States v. Kelly*, No. 19 Cr. 286 (E.D.N.Y. Nov. 4, 2021), Dkt. No. 255 (permitting victims to testify using a pseudonym, nickname, or first name).

Specifically, "the practice of allowing alleged victims of sexual abuse to testify under a pseudonym has been widely permitted because requiring alleged victims to publicly provide their names could chill their willingness to testify for fear of having their personal histories publicized and may cause further harassment or embarrassment." *United States v. Daskal*, No. 21 Cr. 110 (NGG) (LB), 2023 WL 9424080, at *3 (E.D.N.Y. July 12, 2023); *see also Raniere*, 2022 WL 17544087, at *7 (affirming use of pseudonyms where "the District Court reasoned that requiring victims to provide their names in public could chill their willingness to testify, for fear of having their personal histories publicized" ). Victims in sex abuse cases suffer from "likely adverse personal, professional and psychological consequences of publicly linking their identities to their past" experiences. *United States v. Paris*, No. 06 Cr. 64 (CFD), 2007 WL 1484974, at *2 (D. Conn. May 18, 2007). "In light of the explicit nature of the conduct that the witnesses will be testifying about," victims have "legitimate" fears "of harassment by the media" and "loss of employment potentially resulting from trial publicity." *Marcus*, 2007 WL 330388, at *1. Equally, because of the explicit nature of the offense conduct, which may require victims to testify about "degrading and humiliating treatment," revealing victim identities "would likely cause . . . anxiety and risk social stigma," and "could chill the willingness of other alleged victims of sex crimes to come forward." *Martinez*, No. 17 Cr. 281 (ERK) (E.D.N.Y.), Dkt. 34 (Dec. 18, 2017 Order) at 2. These interests significantly outweigh any defense interest, especially where the defense knows the true identities of victims and is able to mount a defense. *See id.* at 2-3 ("[D]efendant has not identified any 'particularized need' for the disclosure of Jane Doe's identity information in open court. Defendant already knows who Jane Doe is, and will not be prevented from mounting a defense in the event that she is referred to only as Jane Doe.").

Courts within the Southern and Eastern Districts of New York have routinely allowed victims to testify pursuant to a pseudonym and to redact their personal information from exhibits in publicized cases where the victims' testimony concerned illegal sexual abuse. Most recently, in the highly publicized case of *United States v. Combs*, Judge Subramanian granted the Government's motion to allow multiple victims to testify using a pseudonym. *United States v. Combs*, No. 24 Cr. 542 (AS) (S.D.N.Y.) (April 18, 2025 Tr. at 13-15). The court in *Combs* explained that its decision was based, in part, on the "noted the risks that . . . requiring victims to provide their names in public could chill their willingness to testify for fear of having their personal histories publicized" and the "potential personal and economic toll of public revelation of the victims' identities." *Id*. at 14:13-20. Judge Nathan also granted such a motion in *United States v. Maxwell*, another highly publicized case in this district. No. 20 Cr. 330 (AJN), 2021 WL 5967913, at *1 (S.D.N.Y.). In *Maxwell*, the court cited two main reasons for its decision. First, the court found that because of the "sensitive and inflammatory nature of the conduct alleged," pseudonyms were necessary to protect the victims "right to be treated with fairness and with respect for the victim's dignity and privacy" under the Crime Victims' Rights Act. *Id*. (quoting 18 U.S.C. § 3771(a)(8)). Second, the Court noted the strong public policy reasons for the use of pseudonyms: "if alleged victims of abuse were subject to publicity, harassment, and embarrassment, other alleged victims of sex crimes may be deterred from coming forward to report abuse." *Id*. (citation and internal quotation marks omitted).[41]

---

[41] Two other judges in this District recently allowed victims of sexual abuse to testify under pseudonyms at trials that received media attention. During trial in *United States v. Paduch*, 23 Cr. 181 (RA), which took place in April/May 2024, Judge Abrams permitted thirteen different witnesses—who were either victims of sexual abuse or the relatives of victims— to testify under pseudonyms. Similarly, during trial in *United States v. Hadden*, 20 Cr. 468 (RMB), which took place in January 2023, Judge Berman permitted eight victims to testify under pseudonyms. In

Similar rationales have been used by courts in the Eastern District of New York. In *United States v. Raniere*, No. 18 Cr. 204 (E.D.N.Y.), the Court granted the Government motion for testifying victims to testify "under a nickname, first name, or pseudonym only, and to not be required to disclose uniquely identifying information." *Raniere*, No. 18 Cr. 204 (E.D.N.Y.), Dkt. 622 (May 6, 2019 Order) at 32. The court explained that "requiring victims of sex trafficking . . . and other crimes to provide their names in public could chill their willingness to testify," and "would only cause further embarrassment and humiliation, given the inflammatory nature of the conduct alleged." *Id.* at 32, 35 (citations and internal quotation marks omitted). It also may "cause other victims to fear seeking help from law enforcement." *Id.* (internal quotation marks omitted). Although the defendant claimed that several victims' names were already public and that some victims had come forward by choice, Judge Garaufis found those facts "irrelevant," explaining "just because some victims' names are publicly available does not mean that the details of their experiences are already available," and "the choice of a victim to publicly discuss a crime is not analogous to being put on the stand about it, as, in court, the victim will not be able to choose how and to what level of detail she discusses the crime." *Id.* at 34 n.17.

## B. Discussion

As discussed above, the Government expects the victims in this case will testify in explicit detail about highly sensitive, personal experiences involving sex acts caused by force, fraud, and/or coercion or while the victim was a minor. The limited protections the Government requests on their behalf are reasonable, necessary, and narrowly tailored to protect the victims' well-being, prevent undue embarrassment and other adverse consequences, and prevent the victims from being

---

those cases, the defense consented to the use of pseudonyms, so the practice's permissibility was not litigated, but both cases demonstrate that it is entirely feasible to efficiently conduct a complex trial with documentary evidence while also allowing multiple victims to testify under pseudonyms.

harassed by the press and others. This request is by no means extraordinary. As set out above, it is entirely consistent with the decisions of many other district judges within this Circuit who have recently permitted victims of sex crimes to testify under pseudonym to protect their privacy, especially in cases that have attracted media attention. There is no reason for this Court to deviate from that well-established practice here.

### 1. The Court Should Permit the Anonymous Victims to Testify Under Pseudonym to Avoid Unnecessary Harassment, Humiliation, Social Stigma, and Professional Consequences

The Government requests that the Anonymous Victims be permitted to testify under pseudonyms and to direct that others refer to those individuals by their pseudonyms throughout trial to avoid the real personal and professional costs that testifying in this type of trial will pose to each woman.[42]

*First,* since the defendants' arrest, this case has garnered considerable media attention, and the Government expects that members of the media will attend and report on the trial.[43] Media coverage has also reported on the lawsuits filed by ███████████████████████[44]

---

[42] Should the Court grant this motion, the Government also asks that, pursuant to the order, the defense be required to refer to witnesses by their pseudonyms and precluded from making argument to the jury that the use of a pseudonym is improper or otherwise reflects on the character or truthfulness of the victim, including but not limited to referring to victims as "the woman who testified as" a pseudonym or as a person using a "false name." *See* Combs Trial Tr. at 7753, 7800 (defense closing in which counsel used these terms to refer to witness who testified using a court-ordered pseudonym).

[43] *See, e.g.,* Adam Reiss, *More accusations added to federal sex trafficking case against Alexander brothers*, NBC (June 10, 2025), https://www.nbcnews.com/news/us-news/accusations-added-federal-sex-trafficking-case-alexander-brothers-rcna212217; Debra Kamin & Benjamin Weiser, *Alexander Brothers Face More Sex Crimes, Including Against Underage Girl*, N.Y. Times (May 8, 2025), https://www.nytimes.com/2025/05/08/realestate/alexander-brothers-charges-sex-crimes.html.

[44] *See, e.g.,* ████████████████████████████████████████

The heightened publicity of this case increases the risk that the victims will be harassed by the press and public if identified by their real names. Publicizing their names will subject them to unwanted attention at the time they are testifying about some of the most difficult moments of their lives in a criminal sex abuse trial.

*Second*, publicizing the names of the Anonymous Victims will cause them significant embarrassment, anxiety, and social stigma in light of their anticipated testimony. The Government expects these victims will each testify in explicit detail about being raped or sexually assaulted by the defendants. These details will undoubtedly be "inflammatory" and unduly embarrassing in light of the "nature of the conduct alleged." *Raniere*, No. 18 Cr. 204, Dkt. 622 at 32; *see also Thomas*, 23 Cr. 481, Dkt. 87 at 18 (granting the Government's pseudonym motion to avoid "undue embarrassment").

The overwhelming majority of the Anonymous Victims have never publicly discussed the defendants; however, the analysis is no different with respect to the four victims who have publicly discussed their experiences with the defendants (two who did so anonymously):

- <u>Minor Victim-3.</u> In or about 2024, Minor Victim-3 commented on media coverage regarding the lawsuits filed against the defendants. Specifically, she (1) ████████████████ ██████████████████████████████████ and (2) ██████████████[45] Minor Victim-3 did not identify herself as a victim of the defendants' abuse and there is no basis to treat her differently than any other victim who testifies about highly sensitive and embarrassing topics such as this.

- Moreover, Minor Victim-3 is expected to testify about sexual assault that occurred while she was a minor. In addition to the Crime Victims' Rights Act, crimes against minors are also governed by the Child Victims' and Child Witnesses' Rights Act, which provides "for

---

[45] A "bot" a program designed to perform automatic and repetitive tasks. In the social media context, a bot is a program designed to create predetermined commentary to posted material.

any . . . measures that may be necessary to protect the privacy of the child" "[o]n motion by any person . . . if the court determines that there is a significant possibility that [the public disclosure of the name or other information concerning the child in the course of the proceedings] would be detrimental to the child." 18 U.S.C. § 3509(d)(3). While Minor Victim-3 is no longer a child, courts in this Circuit and this District have permitted victims of sexual abuse to testify under pseudonyms "whether or not the alleged victims are minors or adults or adults testifying about abuse that allegedly occurred when they were minors." *United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y. Nov. 15, 2021) (Dkt. 465 at 7); *see also, e.g.*, *United States v. Raniere*, No. 20-3520, 2022 WL 17544087, at *6–7 (2d Cir. Dec. 9, 2022); *United States v. Rosado*, No. 21 Cr. 516 (RMB) (S.D.N.Y. Sept. 19, 2023), Dkt. 100 at 33 (permitting victim who had been sexually abused as a minor to testify under her first name only); *United States v. Ortiz*, No. 13 Cr. 460 (LAK) (S.D.N.Y. June 28, 2022), Dkt. 65 at 4-5 (permitting victim who had been raped as a minor to testify under her first name only).

- <u>Victim-12.</u>  Sometime between in or about 2017 and in or about 2021 or 2022, Victim-12 responded to a post made on a public forum.  The post stated, in substance and in part, that the poster was assaulted by the defendants and was looking for others who had been similarly affected.  Victim-12's public reply to the post stated in substance and in part that she had a similar experience with the defendants.  Victim-12 did not provide any personal identifying information in the post.  Given the facts of her limited disclosure, the Court should treat Victim-12 no differently than any other Anonymous Victim because Victim-12 never publicly associated herself with allegations of assault.  Moreover, that Victim-12 posted on the internet that she had been assaulted does not make the use of a pseudonym less appropriate. *See United States v. Terranova*, 750 F. Supp. 3d 15, 27-28 (E.D.N.Y. 2024) (concluding victim did not "waive[] his right to anonymity by publicly discussing the case on a social media platform where he had thousands of followers" because his "trial testimony has the potential to expose him to a far greater degree of embarrassment and stigma than his social media post might have"); *Raniere*, No. 18 Cr. 204, Dkt. No. 622 at 34 n.17 ("[T]he choice of a victim to publicly discuss a crime is not analogous to being put on the stand about it, as, in court, the victim will not be able to choose how and to what level of detail she discusses the crime.").  Here, Victim-12's anticipated testimony at trial will be far more fulsome than her prior public disclosure, and will include highly sensitive information, including details of her rape.  *See Maxwell,* No. 20 Cr. 330, Dkt. No. 456 (Nov. 1, 2021 Tr.) at 9 (granting motion to allow victims to testify under pseudonym, even where at least one victim had previously spoken publicly about the case).

- Victim-14. Victim-14 has filed a civil lawsuit  .  At the time of filing, Victim-14 petitioned the court to proceed anonymously.  judge presiding over Victim-14's lawsuit held her motion for pseudonymity in abeyance  The Government understands that there are circumstances under which a victim may be permitted to proceed anonymously under the laws governing this lawsuit.  Until the court presiding over the matter determines whether Victim-14 may proceed anonymously, like the other Anonymous Victims, Victim-14 has not associated

her name with the details of her assault. Doing so now, before she has learned whether she will be allowed to proceed anonymously in her civil suit, subjects her to the same harms as the other Anonymous Victims without Victim-14 having made the choice to proceed publicly.

- Victim-17. Victim-17 also filed a civil lawsuit ███████████████████████████████ █████████████ and simultaneously moved to proceed pursuant to a pseudonym. ███████████             Victim-17's motion █████████████████████████████████████. Accordingly, Victim-17 should be treated as any other Anonymous Victim.

*Third*, the publicity surrounding this case increases the personal and professional consequences to the victims for testifying. Victims have expressed serious concerns to the Government about the risks that association with this case will pose to their personal relationships and future employment. Making that association widely public requires the victims to be associated with the graphic details of their experiences, not just in the general public consciousness, but with their friends, families, colleagues, and prospective employers.

Taken together, requiring the Anonymous Victims to testify under their true names imposes serious costs on them. It is inconsistent with the Crime Victims' Rights Act's exhortation that victims are to be treated with respect for their "dignity and privacy." 18 U.S.C. § 3771(a)(8). And requiring victims of sex crimes to provide their names in public could chill their willingness to testify for fear of having their personal histories publicized as they move forward with their lives. It could also cause other victims to avoid seeking help from law enforcement because of fear that coming forward could subject them to further harassment and embarrassment.

### 2. The Use of Pseudonym of Narrowly Tailored to the Particular Privacy Interests of the Anonymous Victims

The Government's request is narrowly tailored to the privacy interests of the Anonymous Victims. As part of this request, the Government asks that the Court: (1) limit references at trial to these victims to their pseudonyms, including in jury addresses and examination of witnesses; (2) preclude the defense from eliciting personal identifying information for these victims,

including their addresses and the names of their family members; and (3) seal exhibits containing the names or likeness of the Anonymous Victims.[46]

The use of these limited precautions—all routinely applied in similar cases in this Circuit—will not curtail the defendants' due process rights. As an initial matter, the Government expects the jury to learn the true names of each Anonymous Victim. The Government intends to offer documentary evidence under seal that would corroborate the identity of each victim and which contains the victims' true names. Thus, while those names will remain hidden from the public, they will be revealed to the jury.[47] Similarly, during *voir dire*, prospective jurors can be given a sheet of paper with the true names of the protected witnesses and asked whether they know any individuals on the paper. In this way, the Court and parties may screen for juror bias without requiring the Court or any juror to state a protected name in open court.

The requested protections also will not compromise the defendants' confrontation rights in any way. The defendants already know the true identities of the Anonymous Victims, and are fully able to complete an investigation in advance of trial. There is no need—much less a particularized need—for the victims' true names or other personal identifying information to be stated in open court to accomplish that purpose. The use of these victims' real names will not add

---

[46] For the same reasons, any courtroom sketch artists should be precluded from drawing the faces of victims. *See*, *e.g.*, Nov. 18, 2021 Order, Maxwell, 20 Cr. 330 (AJN) (S.D.N.Y.), Dkt. No. 471 ("[C]ourtroom sketch artists whether in the courtroom or overflow rooms may not draw exact likenesses of the Protected Witnesses."); May 6, 2019 Text Order, *Raniere*, 18 Cr. 204 ("Sketch artists will be allowed in the courtroom and overflow room with their supplies. They may, however, not draw exact likenesses of jurors or witnesses other than co-defendants should they testify[.]").

[47] This can be accomplished simply and has been done frequently in this jurisdiction. *See United States v. Maxwell*, 20 Cr. 330 (AJN); *United States v Hadden*, 20 Cr. 468, (RMB); *United States v. Paduch*, 23 Cr. 181 (RA); *United States v. Combs*, 24 Cr. 542 (AS); *United States v. Thomas*, 23 Cr. 481 (NSR). The jury can learn a victim's name by displaying a document containing that victim's name, such as her driver's license or passport, for the witness and the jury—but not the public—and asking the victim whether the name on the document is her true name.

anything to their testimony or enable the defense to more effectively cross-examine them. *See Daskal*, 2023 WL 9424080, at *5 (finding anonymity appropriate where defendant already knew alleged victim's name, noting defendant "is free to undertake whatever research he sees fit in advance of trial"); *see also Kidd*, 385 F. Supp. 3d at 255 ("[T]he right to know the victims' identity is separate from whether the victims may testify at trial anonymously.").

Similarly, the sealing of exhibits containing the names and/or likeness of the Anonymous Victims is also appropriate. Although "the public has an especially strong right of access to evidence introduced in trials," *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) (internal quotation marks omitted), it "is not absolute," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). *See United States v. Graham*, 257 F.3d 143, 149 (2d Cir. 2001). Indeed, "subject matter [that] is traditionally considered private rather than public" will weigh "heavily against access." *Amodeo*, 71 F.3d at 1051. This includes certain "[f]inancial records . . . , family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters . . . ." *Id.* "[T]he 'venerable' privacy-interest exception to the presumption of access exists to avert 'cater[ing] 'to a morbid craving for that which is sensational and impure.''" *United States v. Cohen*, 366 F. Supp. 3d 612, 625-26 (S.D.N.Y. 2019) (brackets in original) (quoting *Amodeo*, 71 F.3d at 1051). The Government's sealing request is narrowly tailored to prevent public disclosure only of the identifying information in those exhibits which would identify the Anonymous Victims, either directly or indirectly. Any other result would defeat the purpose of permitting these victims to testify using pseudonyms. *See Paris*, 2007 WL 1484974, at *2 (concluding the interest in protecting victim identities outweighed the public interest in access to information because "the public and press will be able to hear the Jane Does' and Minors' testimony in full").

In sum, the identifying information the Government seeks to limit in open court, specifically, the names and identifying information about the Anonymous Victims is irrelevant to their testimony.  There is a substantial risk, however, that disclosure of such information will identify the victims with particularity, and thus subject them to harassment, retaliation, and embarrassment, or additional adverse consequences.  Accordingly, the Court should permit these witnesses to testify under pseudonyms and preclude the defense from eliciting testimony regarding their personally identifying information.

## **CONCLUSION**

For the reasons set forth above, the Government's motions *in limine* should be granted.

Dated:      New York, New York
            November 5, 2025


Respectfully submitted,

JAY CLAYTON
United States Attorney


By:    _____/s/_____
       Kaiya Arroyo
       Elizabeth A. Espinosa
       Andrew Jones
       Madison Reddick Smyser
       Assistant United States Attorneys