Pb6FALEc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          24 Cr. 676 (VEC)

5  ALON ALEXANDER, *et al.*

6                                      Conference
                Defendants.
7  ------------------------------x

8
                                       New York, N.Y.
9                                      November 6, 2025
                                       2:00 p.m.
10

11 Before:

12              HON. VALERIE E. CAPRONI,

13                                      District Judge

14                      APPEARANCES

15 JAY CLAYTON
        United States Attorney for the
16      Southern District of New York
   BY:  MADISON SMYSER
17      ANDREW JONES
        ELIZABETH ESPINOSA
18      KAIYA ARROYO
        Assistant United States Attorneys
19

   HOWARD SREBNICK
20 JASON GOLDMAN
        Attorneys for Defendant Alon Alexander
21

   MARC AGNIFILO
22 ZACH INTRATER
        Attorneys for Defendant Oren Alexander
23

   MILTON WILLIAMS
24 DEANNA PAUL
   ALEXANDER KAHN
25      Attorneys for Defendant Tal Alexander

Pb6FALEc

1    Also Present:

2    Justine Atwood, Federal Bureau of Investigations
     Antonio Pagan, NYPD

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pb6FALEc

1      THE DEPUTY CLERK:  The Honorable Valerie Caproni

2  presiding in the matter of The United States v Alexander, et

3  al., 24 Cr. 676.

4           Counsel, please state your appearance for the record.

5           MS. SMYSER:  Good afternoon, your Honor.

6           Madison Smyser, Andrew Jones, Elizabeth Espinosa, and

7  Kaiya Arroyo for the government.  And we're joined at counseled

8  at counsel table by Special Agent Justine Atwood and Detective

9  Tony Pagan of the FBI.

10          THE COURT:  Good afternoon, everybody.

11          MR. SREBNICK:  Good afternoon, Judge.  Howard Srebnick

12  on behalf of Alon Alexander, who stands next to me.

13          THE COURT:  Good afternoon, Mr. Srebnick.  Good

14  afternoon, Mr. Alexander.

15          MR AGNIFILO:  Good afternoon, your Honor.

16          Marc Agnifilo, and I'm accompanied by my partner, Zach

17  Intrater.  And we're here for Oren Alexander, who is with me on

18  my left.

19          THE COURT:  Good afternoon, Mr. Agnifilo.  And I'm

20  sorry.  Who is your partner?

21          MR AGNIFILO:  Is Zach Intrater, your Honor.

22          THE COURT:  Mr. Intrater.

23          And good afternoon, Mr. Alexander.

24          MR. WILLIAMS:  For Tal Alexander, Walden Macht Haran &

25  Williams by Milton Williams, Deanna Paul, and Alex Kahn.

Pb6FALEc

1    THE COURT:  Good afternoon, Mr. Williams, Ms. Paul,

2  Mr. Kahn, and good afternoon, Mr. Alexander.

3    You've each sent me a number of items that you want to

4  talk about.  I'm going to talk about a whole list of things.

5  Keep track.  If I've missed anything that you want to talk

6  about, I'll give you time at the end of the day to talk about

7  that.

8    So, let's start with the question of whether there's

9  going to be a jury questionnaire in this case.  I have to say

10  that I am, at the moment, very much on the fence about whether

11  it's a good idea or a bad idea.

12    To the defense, the argument there's been a lot of

13  publicity, I don't really buy that argument.  There has been

14  some publicity, but there has not been the sort of publicity

15  that would typically give rise to the need for a questionnaire.

16    So, who wants to talk first?

17    All right.  Mr. Agnifilo.

18    MR AGNIFILO:  I'm happy to go first.  First, I want to

19  thank the Court for agreeing to see us on short notice.  We

20  really appreciate it.  I think there's two issues.  I think

21  that there's the issue of publicity, and I honestly saw it

22  exactly the way I think your Honor saw it.  I mean, there's a

23  lot of press around this case.  Is there enough press to

24  justify a jury questionnaire?  I think it's a close call, and

25  there could be more press as we get tot he trial date.

Pb6FALEc

1      THE COURT:  These guys apparently think that there

2  should be.

3      MR AGNIFILO:  It would have helped my argument to just

4  see a robust jury of press people, but they let me down.

5      THE COURT:  You dissing those guys.  Come on.

6      MR AGNIFILO:  Mr. Weiser counts as three, so.

7      THE COURT:  Oh.

8      MR AGNIFILO:  So, I think that's one thing.  And part

9  of what I wanted to come here and see is what your Honor

10  thought of these things so I could sort of conform our

11  arguments accordingly.

12      I think the other reason why I think the jury

13  questionnaire in a case like this could be helpful is because

14  the case involves issues that I think are more personal and

15  private in nature, and we would want to probe the jurors on

16  some of those views.

17      And so unlike --

18      THE COURT:  What do you mean?

19      MR AGNIFILO:  So, there's going to be evidence of

20  group sex.  There's going to be evidence of threesomes.

21  There's going to be evidence of promiscuity.  There's going to

22  be, you know, sexual evidence.  The case is about sex and

23  sexuality.

24      And so it strikes me as the kind of thing that a jury

25  selection process in its normal course, when we sit here and we

Pb6FALEc

1    ask folks, well, what do you think about this, what do you

2    think about this, I think sometimes people are more comfortable

3    being honest about personal confidential matters about that in

4    a questionnaire, and so that they don't have to actually speak

5    in courtrooms.  Some people don't like speaking in public.

6            And so I'm trying to kind of capture that element as

7    well, I mean, because that's going to be a very important thing

8    for us to ferret out.  I think it's important for the

9    government, too, and probably for the Court, to make sure that

10   we have the jurors who can kind of keep an open mind, that

11   don't have strong preconceived notions one way or the other.

12           And it strikes me that best way to get honest,

13   truthful answers to personal questions is sometimes in the form

14   of a questionnaire.  That, to me, combined with the -- and I

15   think that might even be a more compelling reason in this case.

16           Just by way of background -- and no two cases are

17   alike -- I know we had, questionnaires, we had in Combs but

18   that was probably mostly because of the press.

19           THE COURT:  Very different because of publicity.

20           MR AGNIFILO:  Yes.  That was because of the process.

21           We had it with Ranieri.  That was in Brooklyn.  There

22   was a lot of press there.  I don't know if there was more press

23   than here.  I don't really know.  But I think Judge Garaufis

24   there, I think, saw the value in a questionnaire with sensitive

25   topics.

Pb6FALEc

1       So, what I'd like to do, unless -- I don't need an

2   answer to anything I'm going to raise today.  A lot of what I

3   want to do is get the Court's feeling on things, just not -- we

4   have a pretty good working -- even better than pretty good.  We

5   have a good working relationship with the government.  We're

6   getting a lot of stuff done.

7           THE COURT:  Good.

8           MR AGNIFILO:  But one thing I'm mindful of that

9   sometimes happens when your working relationship it too good

10  is, you all reach these accommodations and the Judge says:

11  Hey, there's still a judge involved, and so I don't want to get

12  too far down the field without checking in.

13          THE COURT:  Okay.

14          MR AGNIFILO:  So I hear your Honor, we can discuss it.

15  I think the government's going to be against the questionnaire.

16          THE COURT:  They wrote me a three-page letter

17  explaining in gruesome detail why they're opposed, but I'll let

18  them talk, too.

19          MR AGNIFILO:  I don't think I've convinced them in the

20  interim, so I think they're still against it.  I see what your

21  Honor's thoughts are and we can take it up.  We don't have to

22  do it today; our trial is in two months.

23          THE COURT:  We hope.

24          MR AGNIFILO:  Yes.

25          THE COURT:  Let me push a little bit.

Pb6FALEc

1      The way you phrased some of what I think you would

2 want as a question, I think I would probably say no, and that

3 might influence your position whether you want a questionnaire

4 at all.

5      So, for example, the notion that I would have a

6 questionnaire that has an open-ended, how do you feel about

7 people having three-way sexual relations is not going to be

8 there.

9      MR AGNIFILO:  I understand that.

10      THE COURT:  There might be a question that says you

11 are going to hear evidence that the defendants engaged in -- I

12 think maybe there's no dispute that they engaged in three-way

13 sexual relations.  Do you have any strong feelings about such

14 sexual relations that would make it difficult for you to be a

15 fair and impartial juror in this case?  That kind of a

16 question, I'm open to, and I think probably that's appropriate.

17 It's definitely appropriate.

18      The real question is, if that's the sort of questions

19 that are being asked as opposed to what it sounded like what

20 you wanted me to ask which is, how do you feel about group sex,

21 I'm not asking those questions.  I'm not asking them in a

22 questionnaire, and I'm not asking them orally.

23      So does that at all influence the notion of whether

24 you think it's better to go with a questionnaire than with

25 questioning?

1    And let me also sort of put, as a secondary

2    possibility in this case -- again, I'm not suggesting this is

3    where my head is, because I'm really not sure where my head is

4    -- one advantage or disadvantage of a questionnaire is that it

5    then allows you to do very targeted individual questioning of

6    jurors on an individual basis.

7    In some ways, that can also be done without a

8    questionnaire.  That is, you can go through the normal voir

9    dire and figure out who will answer "yes" to a question and

10   then pull people in individually to do individual voir dire,

11   which is faster and maybe gets to the same -- maybe scratches

12   the same itch.

13   MR AGNIFILO:  Let me just say, I don't really care how

14   we get to the final destination, and I think your Honor is

15   right.  I think your Honor's formulation of the question is a

16   more appropriate question for the jury.

17   I think there's -- the thing that I like about the

18   questionnaire is, I think it promotes candor and it promotes a

19   fulsome answer by someone who might not be comfortable speaking

20   in a place like a courtroom or any place in public.

21   A lot can be accomplished by individualized voir dire.

22   I think that's right.

23   And in terms of what's better, let us -- what I think

24   makes the most sense is, let us give all of that thought here

25   on the defense side and then talk to the government about it.

Pb6FALEc

1          If your Honor's open to individualized voir dire in

2   lieu of a questionnaire, that's good for us to know as a

3   possibility, because maybe that gets us to the same endpoint

4   without a questionnaire.

5          Some judges prefer -- every judge is a little bit

6   different when it comes to questionnaires, and I know your

7   Honor has done, in some cases --

8          THE COURT:  I've done them.

9          MR AGNIFILO:  So let us -- I hear you that this has

10  been very helpful.  We'll talk about on the defense side.

11  We'll talk with our colleagues and the government and maybe

12  we'll come up with a proposal that --

13         THE COURT:  Agreed upon?

14         MR AGNIFILO:  Hmm?

15         THE COURT:  That's agreed upon.

16         MR AGNIFILO:  Yes, that's agreed upon.  That's right.

17         THE COURT:  Okay.  Who is talking for the government?

18         MS. SMYSER:  I am, your Honor.

19         And we're happy to continue engaging in discussions

20  with the defense with that.  I think some level of

21  individualized questioning probably is appropriate in this

22  case, given the topics in the case.

23         I think our position, as laid out in the letter, is

24  that the questionnaire is not the right place to do that.  And

25  I think, especially if we're focusing on the sensitive topics,

Pb6FALEc

1  with the kinds of questions your Honor going to ask, you're

2  likely going to want to ask follow-up questions of jurors.  And

3  the most efficient way to do that is to do that here in the

4  courtroom and to not delay it with a questionnaire.

5         And there are ways to address, I think, some of the

6  issues that defense counsel raises about people, you know, not

7  wanting to speak in public, because I'm sure your Honor can

8  take people to sidebar, that whatever the issue may be, if

9  topics are particularly sensitive, we can address them in those

10  individualized-question settings.  So we're happy to talk with

11  the defense about that.

12         THE COURT:  Let me suggest that what I was

13  thinking, if we go that route, would be dealing with what are

14  kind of the non-sensitive questions that we ask everybody, you

15  know:  Do you know people in law enforcement; have you had a

16  bad relationship with a police officer, that type of kind of

17  the routine voir dire questions that we ask of everybody.  Do

18  that pretty much in a group, see if we're knocking out people

19  for cause for that.  But then send everybody back and then do a

20  set of individual questions, in open court, so that the forth

21  estate knows what's going on and so your clients know what's

22  going on.

23         But it would be an individual prospective juror at a

24  time that we would sort of ask a list of, quote, sensitive

25  questions and as well as the normal questions that I have to

1    ask everybody individually anyway, like:  Where do you live;

2    how long have you lived there; what do you do for a

3    living, that kind of thing.

4         So, think about that, and if you can reach agreement

5    on that, and even better, if you can reach agreement on what

6    the sensitive questions would look like, that would be ideal.

7         For the non-case-specific questions, as I think I've

8    told you before, I have pretty standard questions that do not

9    change very much.  In fact they probably don't change at all,

10   and they're not likely to for this case.  But for the

11   case-specific questions, I obviously need your input because I

12   don't know what the facts are.

13        So, see what you can work out I'll set a date for when

14   I'd like you to get back to me on that.

15        The next issue was the schedule.  The defendant wants

16   me to sit from 9:30 to 3 o'clock.  The government says it's

17   amenable to some alteration of the schedules.

18        Let me say that first off, where are we now on how

19   long this trial is going to be?

20        MS. SMYSER:  So that is the main question I expected

21   your Honor to bring up, and I think that will be largely

22   determined by the motions *in limine*, your Honor.

23        And so in speaking with the defense before this, it

24   may make sense to put off the decision about how long the trial

25   day is going to be until your Honor has had a chance to decide

1   the motions *in limine*.

2           THE COURT:  Imagine that you get everything you want,

3   and they get nothing that they want.  Okay?  I'm not suggesting

4   that's it, but just, that will give me a sense of worse-case

5   scenario, how long is the government's case.

6           (Counsel conferred)

7           MS. SMYSER:  Your Honor, I think with the proposed

8   schedule to sit until 3, and I understand your Honor often

9   takes Fridays off, that would probably be about six weeks.

10          THE COURT:  Oh, then we're not doing that.

11          Let me just say that even before I heard that, my

12  inclination is -- you can have a seat -- a jury trial imposes,

13  on citizens, a huge burden.  I insist on being efficient with

14  jurors' time.  And it is not efficient with their time, and I

15  know that I have colleagues who disagree with this, but it is

16  not an efficient use of a juror's time to end the court day at

17  3 o'clock.

18          So, we will sit my normal court day, which is 9:30 to

19  5, *más o menos*, depending on what's going on.  We take an hour

20  for lunch.  We have a morning break and an afternoon break, so

21  that resolves that issue.

22          And six weeks is a very long trial, just saying.  I

23  recognize that that was assuming a 3 o'clock end to the

24  day, but even so, five weeks is a long trial.

25          Okay.  And I should say, like, how long's the defense

1  case going to be if you get everything you want?

2          MR AGNIFILO:  Well, if we get everything we want on

3  the government's case it will be a three-week trial.

4          THE COURT:  Well, I assume I'll be dismissing the

5  charges after opening if you get what you want.

6          MR AGNIFILO:  I think I always build in a week of a

7  defense case.

8          THE COURT:  We're going to sit a standard day, then.

9          My next question is to the government.  There have

10  been a bunch of redactions that I authorized in all of the

11  briefing.  We're now down to, though, what are the appropriate

12  redactions in the decision on the omnibus pretrial motions.

13          So, you've represented to me that if the information

14  that you're proposing to be redacted was disclosed, that that

15  would identify these people.

16          So, I kind of have two questions.  One, my

17  understanding that the defense now knows who all those people

18  are, and what I don't understand is how a member of the public

19  would be able to tell, from the material that's redacted, who

20  the people are.

21          I mean, I understand and I'm sensitive to the need, at

22  least until trial to -- and maybe even after they testify -- to

23  protect their identity, but it's not obvious to me why that

24  information discloses who these people are.

25          MS. SMYSER:  You know, I think that is --

Pb6FALEc

1          THE COURT:  Do you need to answer that in a sort of *in*

2    *camera* way, not *ex parte* but in camera?  I mean, it is easy for

3    you to explain to me why it discloses them?

4          MS. SMYSER:  That may be easier, your Honor.

5          THE COURT:  Okay.  All right.  I'm going to ask you to

6    do that.  I'm also going to ask you to read it again and see if

7    there isn't -- even accepting your theory as right, why there

8    isn't more of the material that can be unredacted.

9          Remember that the whole idea of this is, the public

10   needs to understand why I ruled the way I ruled, and certain of

11   the redactions really eliminate that, because there's no

12   indication of why I came out the way I did because of what's

13   redacted.  So, see if you can't minimize the redactions further

14   and explain to me why the more minimized redactions are

15   necessary to protect the identities.

16         Defense, are you guys sill pressing -- after you've

17   seen the information -- are you still pressing for a *Wade*

18   hearing, or are you throwing in the towel on that.

19         MR AGNIFILO:  Your Honor, I believe we have a response

20   on that issue that's due tomorrow.

21         THE COURT:  You do.

22         MR AGNIFILO:  We are still pressing for it.

23         THE COURT:  Okay.

24         MR AGNIFILO:  And I think we're going to be filing

25   something with your Honor tomorrow.

1          THE COURT:  Okay.  Well, if you're still pressing on
2     it, there's definitely a possibility.
3          MR AGNIFILO:  Yes, your Honor.
4          THE COURT:  The next is in a letter from the defense,
5     relative to Rule 412.  You asked whether notice is okay or
6     whether a motion is required.  So, a plain reading of the rule
7     is that a motion is required.
8          MR AGNIFILO:  No question.
9          So here's -- I have a proposal on that.  I think the
10    government is okay with the proposal.  In the first instance --
11    and I think it's by the tenth, so it's four days from now --
12         THE COURT:  Soon, yeah.
13         MR AGNIFILO:  -- we are going to give the government
14    notice of everything that we think could conceivably be 412.
15    And what I mean by that is, this case is going to feature
16    many, many photographs of men and women in bathing suits on the
17    beach, on boats.  I think we're going to give them notice of
18    all of that.  We're going to try and be as inclusive as we
19    possibly can.
20         What I hope to do, then, is to speak to the government
21    and sort of, see, this really isn't 412.  Someone in a baiting
22    suit, in and of itself, is not sexual conduct or is admitted to
23    show their sexual predisposition.  Let's all agree that's not
24    412.  Let's see if we can do that and so we now minimize our
25    universe.

1      At some point -- and we'll need a schedule along these

2 lines, but I think it's premature to set the schedule now;

3 that's my view -- is at some point, we're going to have,

4 obviously, disagreement on the 412 issue.

5      So if it's not 412(a), you know, we didn't get to the

6 exception of 412(b), then, it's going to be relevant or

7 admissible for other reasons.  It won't be a 412 issue at all.

8      THE COURT:  That is, it's not going to be introduced

9 for that purpose.

10      MR AGNIFILO:  It won't be introduced for that purpose.

11 And the parties will have agreed to that, so that makes it

12 easier for the Court.

13      There will undoubtedly be, probably, sharp

14 disagreement on certain things, and so when we kind of see what

15 that is -- and this is why it's good that we have two months

16 until the trial, because as your Honor knows, the Rule says we

17 make to make a motion two weeks before trial.  We're not

18 looking to wait nearly that long.

19      THE COURT:  I'm going to set a date that's earlier.

20      MR AGNIFILO:  I have no doubt.

21      But I think what we want to do is whittle it down, see

22 what the points of disagreement are, and then at that point,

23 we'll make a motion that it's admissible as an exception to 412

24 or whatever it is, and then we'll have a ruling some time in

25 December.

Pb6FALEc

1          THE COURT:  Does that resolve the government's

2     concern?

3          MS. SMYSER:  Yes, your Honor.  I think we can work

4     with the defense on that.

5          THE COURT:  Perfect.

6          The government -- I think it's the government -- is

7     asking me to expedite a decision on the 413 issue and the use

8     of pseudonyms.  I'll do what I can.  I certainly understand why

9     that needs to be resolved before the final pretrial conference

10    and as further as possible.

11         The defense wants a schedule for oral argument on the

12    motions *in limine*.  Here's the thing.  I've got one side, I've

13    got opening briefs, which I haven't read.  I've started them,

14    but I haven't read them, and I haven't gotten responsive

15    briefs.

16         I take your request under advisement.  I do not find

17    that oral argument is always helpful.  It just takes up a lot

18    of time.  There may be limited issues where oral argument will

19    be helpful, and I will set it at an appropriate time.

20         The letter I got from the defense, dated November the

21    6th requests "a schedule for 3500 production and a deadline for

22    outstanding iCloud production."  In terms of the schedule, I so

23    ordered what y'all asked for a whole long time ago, like, back

24    in September.

25         So, what's the problem with 3500 material.

Pb6FALEc

1          What's gone off the rails?

2          MR AGNIFILO:  No, I don't think there's a problem.

3          THE COURT:  You've got an order.  You don't need

4   another one.

5          MR AGNIFILO:  No, that's right.

6          I think the iCloud.

7          THE COURT:  The iCloud, that's a different question.

8          MR AGNIFILO:  I think that's right.  I think that's

9   what it is.

10          And again we're just putting this -- we just want to

11   try and resolve it, to get it as soon as we can so we don't

12   come back after the fact and say, hey, Judge, something

13   terrible's happened; we don't have it.

14          THE COURT:  I appreciate that.

15          What's the story with the iCloud?

16          MS. SMYSER:  Yes, your Honor.

17          We have obtained warrants for the iClouds of certain

18   third parties, not the defendants.

19          And we recently, on September 8, got a warrant for the

20   iClouds of four different people.  We've kept the defense in

21   the loop on that.  And those iClouds take time to process and

22   be released to us.

23          So, those iClouds were released to our filter team on

24   October 23.  The filter team is -- this is their highest

25   priority right now in our case, and they're currently

1    undergoing privilege review.

2           Obviously, we know we have a trial coming up, and so

3    we have talked to the filter team and asked them to produce

4    things to us in batches that they have reviewed, so then we can

5    turn things over to the defense more quickly that are

6    responsive to our warrant.  I expect to get our first

7    production from the filter team next week, which we will then

8    review and produce to the defense.

9           THE COURT:  So, the filter team is only looking for

10   privileged materials.  They're not looking for a responsiveness

11   review?

12          MS. SMYSER:  Right.  They need to take out the

13   privileged material.

14          THE COURT:  Okay.

15          MS. SMYSER:  We've asked them, for example, to focus

16   on communications with the defendants.  We would expect that

17   those would be relevant at trial.

18          THE COURT:  And, presumably, not privileged.

19          MS. SMYSER:  Presumably, not privileged, so hopefully,

20   we will get those quickly and produce them immediately to the

21   defense, because those would be responsive to our warrant.

22          THE COURT:  Got it.

23          MS. SMYSER:  So, we'll get those out as quickly as we

24   can and, as the privilege team clears more of those iClouds, we

25   will produce them to the defense.

Pb6FALEc

1          THE COURT:  Essentially, you're going to get them as

2    quickly as you can get them.

3          MS. SMYSER:  Yes.

4          THE COURT:  Okay.  The next request came from the

5    defense.  The defendants want a commitment that the trial will

6    be based on the current S3 indictment.  I'm assuming that if I

7    asked the government about this, they would say, Judge, our

8    investigation is continuing; right?

9          MR. MENKEN:  That's correct, your Honor.

10          THE COURT:  Okay.

11          MR AGNIFILO:  So, this is where we have an interesting

12    discussion about the separation of powers.  I cannot ask your

13    Honor and I don't ask your Honor to do anything.  Let -- the

14    executive branch is going to do what the executive branch does;

15    it's going to investigate.

16          But I think the Court is within it is

17    right, certainly, under, I think, Federal Rule of Evidence 611

18    and other principles, to say, there's a case before me.

19    There's a trial date that I have set.  I have a schedule.  I

20    assume all these lawyers have schedules.  And that trial is

21    going to go forward on January 5.

22          Now the concern, always -- and I have no to think the

23    government is going to do this; this isn't what that's about --

24    is, they're doing an investigation.  They come upon something

25    that's dynamite new evidence on December 15.  And we see a

1    superseding indictment on December 18 and we say, Judge this is

2    terrible.  We can't start our trial.  What do we do then?  And

3    so this request would make that not happen.

4            And what I think the Court can do, I think, is, the

5    Court can say, we're trying the S3 indictment on January 5.

6    You guys investigate and have at it, but if you get something

7    different, something new, you have to put it in a different

8    charging instrument.

9            And I'm not asking for this request because I see any

10   problem.  I don't see any problem.  But if I don't say it and

11   then that happens, then we're all stuck with a superseding

12   indictment.

13           THE COURT:  So, I can say that.  I can say, based on

14   the S3, or I can say your deadline is December 1, whatever

15   indictment is outstanding on December 1, that's the indictment

16   we're going to go with.

17           Or I could say nothing and see what happens, and if

18   something comes up, I can say, you know what?  This is

19   sufficiently all interrelated that it makes sense to do a

20   single trial.

21           I don't want to try this case twice, assuming that

22   some blockbuster is going to come along.  Once, I suspect, is

23   going to be more than sufficient, so the government needs

24   to, if they're going to do something else, you need to fish or

25   cut bait quickly.

1      If they supersede on the day before Thanksgiving and

2 it adds a count and you guys think that this is not a big

3 deal, we can manage it, it's more of the same, different victim

4 but more of the same, you may or may not want to be saying you

5 want to postpone the trial or you want to sever the count.

6      We just don't know.  I don't know.  So, let me think

7 about whether I want to set a deadline to say, either indict by

8 this point or we're going to go forward on the S3 indictment or

9 leave it to the discretion of the Executive Branch, recognizing

10 that the Judicial Branch may go in a way of severing out that

11 count if it comes too late.

12      That all raises the whole issue of the trial date.

13 Let me just say that y'all have given me substantial pretrial

14 motions in the form of motions *in limine*.  I would like to keep

15 the date, January 5, but I also want to be thoughtful about the

16 motions, because these are obviously important, both to the

17 government and to the defense, in terms of how this trial is

18 going to proceed.

19      I looked at my calendar.  I consulted at length with

20 my deputy, who has very, very strong feelings about when trial

21 should go, based on her schedule, so trying to accommodate all

22 of that.  If we do not go in January, the next logical time

23 that would work on my schedule would be May, May to June, that

24 time frame.

25      What does that do to the parties?

Pb6FALEc

1          (Counsel conferred)

2          MR AGNIFILO:  I see the government conferring, and I

3    don't want to go first if they want to go first, but I'm

4    already standing so, all right.

5          It's awfully hard.  Let me -- I do not want to put the

6    Court in a position where they feel rushed.  I don't want to

7    put the Court's staff in a position where it's an undesirable

8    date.  The problem we obviously have is, we have three in

9    custody --

10          THE COURT:  Understood.

11          MR AGNIFILO:  -- the defendants, and that's a weighty,

12    weighty concern.  And we are moving heaven and earth.  It's a

13    lot of work for us as well.  It's obviously much harder.

14          THE COURT:  You're not answering my question.  You're

15    telling me why you don't want the trial date to move.  I

16    understand that, and that's not my first choice either.

17          MR AGNIFILO:  Right.

18          THE COURT:  My question is, what's the availability if

19    things slipped to May?

20          MR AGNIFILO:  I would be -- this is a priority.  I

21    would make myself available.  I have to talk to my colleagues.

22          MR. SREBNICK:  I do have a trial set June.  It's --

23          THE COURT:  June what?

24          MR. SREBNICK:  June -- it could be June 1.  I could

25    give you the exact date, Judge.  I don't recall now, but it's

Pb6FALEc

1    essentially set.  It's a high-profile accident case in South

2    Florida where a young girl died.  The defendant is accused of

3    reckless driving.  He's facing a long time in prison, and the

4    witnesses are all college students who are available --

5              THE COURT:  To be out of school.  Okay.

6              MR. SREBNICK:  Correct.

7              MR. WILLIAMS:  We're available.  It's not the big

8    preference and obviously, potentially, we'd like to revisit the

9    bail issue if that were to get adjourned, but we're available,

10   your Honor.

11             THE COURT:  Okay.  That's helpful.

12             We are to the end of my list of issues.

13             How about from the government?  I didn't ask the

14   government, because I assumed the government will be available

15   when I tell you to be available.

16             MS. SMYSER:  Yes, your Honor.

17             THE COURT:  And hopefully, you'll have paychecks by

18   then.

19             Anything further that the government would like to

20   discuss, Ms. Smyser?

21             MS. SMYSER:  Your Honor, we just wanted to raise --

22   and we just discussed this with the defense right before this

23   conference -- that the government's become aware that the

24   defense has been serving some Rule 17 subpoenas seeking victim

25   information.  We asked the defense whether those have been

Pb6FALEc

1    court-ordered.  I understand that they have been.

2            And we also asked the defense if they were giving

3    notice to the victims when those concerned victim information,

4    as required by Rule 17(c)(3).  I understand that as of

5    now, notice has not been given, but they do intend to give

6    notice.  And we would request that when the defense receives

7    any returns, that those be produced to the government.

8            So, just wanted to put that on the record, your Honor.

9            THE COURT:  Okay.

10           MR AGNIFILO:  One second, Judge.

11           THE COURT:  Sure.

12           (Counsel conferred)

13           MR AGNIFILO:  We agree with all of that, and we'll

14   provide it to the government.  And we are going to give notice,

15   and the subpoenas have all been ordered by the Court.

16           THE COURT:  Okay.

17           Anything else from the government?

18           MS. ESPINOSA:  Your Honor, I believe there's just one

19   issue that Ms. Paul and I wanted to discuss, if your Honor

20   would allow us to approach on that, briefly.

21           THE COURT:  Okay.

22           MS. ESPINONSA:  Counsel for the other defendants as

23   well would like to come.

24           (Pages 27 - 30 SEALED)

25           (Continued on next page)

Pb6FALEc

1          (In open court)

2          MS. PAUL:  Your Honor, we would also ask that that

3     portion of the transcript be sealed.

4          THE COURT:  Okay.  That portion of the transcript

5     should be sealed.  The parties can have access to it.

6          Anything further from the government?

7          MS. SMYSER:  No, your Honor.  Thank you.

8          THE COURT:  Anything further from the defense?

9          MR AGNIFILO:  Yes.  One small issue that I'm not

10    asking the Court to do anything on at the moment.  We're

11    talking about the government about the possibility of asking

12    that the jury be anonymous from the press.  Not because --

13    we've done that in some prior trials, and it's all really about

14    the candor when jurors are speaking about, again, themselves

15    and the views of things and can they be the right kind of juror

16    for a particular case.

17         I don't think the government -- I've asked the

18    government to consider it.  I don't think they've run it to

19    ground on their end yet, so I think what's fair, what I'd ask

20    is just let them to that.  They'll come back to me.  We'll come

21    to the Court and we'll see where we are on that.

22         THE COURT:  So the jury issues are whether they should

23    be anonymous to the press, not to the parties.

24         MR AGNIFILO:  Correct.

25         THE COURT:  And also to whether oral voir dire with

Pb6FALEc

1    individualized questions on the sensitive questions scratches

2    the defense's itch and there can be agreement on that.

3              MR AGNIFILO:  Yes, that's right.

4              And I'm trying to -- if the Court has a

5    preference, and I'm not -- but I want to know what the Court's

6    preference is.  If the Court's preference is, I'd rather do

7    this orally than in a written questionnaire, we would

8    conform -- I mean, I'm going to talk to my colleagues, but we

9    would conform our approach to that if the Court has a strong

10   feeling.

11             THE COURT:  Again, I'm sort of on the fence, but if I

12   was leaning one way or the other, I'm leaning that way because

13   I think it will be much mast faster.  A questionnaire kills a

14   full week.  Between the time you give the jurors the

15   questionnaires -- because it can't be given a Monday; it has to

16   be on a Tuesday or a Wednesday -- by the time the government

17   gets them, copies them -- I think I was going to pull 125

18   jurors -- and you guys go through them, I'm not bringing jurors

19   back until Friday.  And so it kills a full week.

20             So even if we were starting on January 5, we're not

21   going to start on January 5; it's more like January 12,

22   earliest.

23             So, that's one reason to go with oral.  Is it's a much

24   faster way and I think we -- one risk of a written

25   questionnaire that it does away with, also, is the problem that

1  they had in the Maxwell case of people reading the

2  questionnaire very quickly and sort of just checking off "no"

3  rather than actually paying attention.  So an oral voir dire

4  prohibits that because they have to pay attention, because

5  they're asked the question.

6         If I'm leaning one way or the other, I'm leaning

7  towards not a questionnaire and leaning towards somewhat

8  unusual oral voir dire as to the sensitive questions.

9         MR AGNIFILO:  Thank you.

10        THE COURT:  With that, if the parties can get together

11 and talk about that and the question of anonymity, that --

12        MR. WILLIAMS:  Your Honor, I have one question.

13        THE COURT:  I'm sorry.  I didn't go through.

14        Anything else from the defense?

15        MR. WILLIAMS:  It's a logistical question.  The last

16 two matters I had in front of you, you didn't sit Friday.

17 Ms. Smyser mentions that.  Is that your practice still, not to

18 sit on Friday because it was a calendar day?

19        THE COURT:  Certainly if the trial is going to go five

20 weeks, we definitely will not sit on Friday.

21        MR. WILLIAMS:  Thank you.

22        THE COURT:  With the caveat that if the trial is

23 dragging, I reserve the right to sit longer than 5 o'clock and

24 to have you come in on Fridays.  And I know that's not in

25 anybody's interest, because you need Fridays to get your ducks

Pb6FALEc

1    in a row, so then don't have a draggy case.  Don't duplicate

2    cross-examination.  Don't go a long cross-examination for two

3    hours when a half an hour and more than adequate *, et cetera, et*

4    *cetera, et cetera*.

5            You're all perfectly qualified, experienced trial

6    attorneys.  You know what I'm talking about, so just let's do

7    an efficient trial.

8            MR. WILLIAMS:  Thank you, Judge.

9            THE COURT:  Anything else from the defense?

10           MR. SREBNICK:  Can we get just one moment, your Honor?

11           (Counsel conferred)

12           MR. SREBNICK:  Nothing further, your Honor.

13           Thank you.

14           MR AGNIFILO:  Thank you, your Honor.

15           THE COURT:  I need to hear back from you on the jury

16   issue.  Today is the 6th, right?  How about by the 14th?

17           MR AGNIFILO:  That's fine, Judge.

18           THE COURT:  The government, if you can -- can you get

19   me something by Monday on the issue of the redactions?

20           MS. SMYSER:  Yes, your Honor.

21           THE COURT:  Okay.  So that's due on November 10.  On

22   the 412 issue, I don't have to do anything yet, right?  You're

23   going to get together.  I will -- it seems to me, if we keep

24   the January 5 date, two weeks before that seems a little bit

25   late if we're actually going have to litigate 412, so I would

Pb6FALEc

1  say, any motion directed to 412 evidence needs to be made by

2  December 8.

3       I'm going to shorten your response times, so the

4  government's response will be due the 12th, and any reply will

5  be due the 16th.  That's just on the 412 evidence.

6       MS. SMYSER:  Your Honor, on that point, I'm sure the

7  Court is aware, but the victims do have a right to be heard on

8  412, and so we may need to build in a hearing or a conference.

9       THE COURT:  Yeah, I suspect, so the motion has to be

10  served on them, so -- not the victim, the person, the person

11  who it affects.

12       MS. SMYSER:  Yes.

13       THE COURT:  Yeah.

14       Okay.  Was there anything else that I needed to set a

15  date for?

16       MS. SMYSER:  No, your Honor.

17       MR AGNIFILO:  I think you have everything, Judge.

18       THE COURT:  Okay.  All right.

19       Thanks, everybody.

20       I will see you whenever we next all get together.

21       MR AGNIFILO:  Thank you, your Honor.

22       (Adjourned)

23

24

25